## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Ángel Alejandro Heredia Mons, Etowah County Detention Center, 827 Forrest Avenue, Gadsden, AL 35901; | ) ) ) ) |
| Roland Nchango Tumenta, Dayana Mena López, Y.A.L., J.M.R., P.S.P., and R.O.P., Pine Prairie ICE Processing Center, 1133 Hampton Dupre Road, Pine Prairie, LA 70576; | ) ) ) ) ) Civil Action No. _____ |
| Adrián Toledo Flores and Douglas Enrique Puche Moreno, Bossier Medium Security Facility, 2984 Old Plain Dealing Road, Plain Dealing, LA 71064; | ) ) ) ) **Class Complaint for Injunctive** |
| M.R.M.H., LaSalle ICE Processing Center, 830 Pine Hill Road, Jena, LA 71342; | ) **and Declaratory Relief** ) ) |
| F.J.B.H., River Correctional Facility, 26362 LA-15, Ferriday, LA 71334; | ) ) ) |
| Miguel Ángel Giron Martinez, Jackson Parish Correctional Center, 327 Industrial Drive, Jonesboro, LA 71251; | ) ) ) ) |
| on behalf of themselves and others similarly situated, | ) ) |
| *Plaintiffs,* | ) ) ) |
| *v.* | ) ) |
| Kevin K. McALEENAN, Acting Secretary of the Dep't of Homeland Security, in his official capacity, Washington, DC 20528; Matthew T. ALBENCE, Acting Director for U.S. Immigration and Customs Enforcement, in his official capacity, 500 12th Street, SW, Washington, DC 20536; Nathalie R. ASHER, Acting Executive Associate Director for ICE Enforcement and Removal Operations, in her official capacity 500 12th Street, SW, Washington, DC 20536; and George H. LUND III, Director of the ICE New Orleans Field Office, in his official capacity, c/o Office of the General Counsel Dep't of Homeland Security, Mail Stop 4650, Washington, DC 20528, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) ) |

**CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

1.     This lawsuit is about hundreds of people who lawfully presented at official ports of entry along the Southern U.S. border to claim their right to seek asylum, only to be confined indefinitely in remote immigration jails across the Deep South. They have all demonstrated a credible fear of persecution and are now in removal proceedings before the Executive Office for Immigration Review ("EOIR").

2.     Current law denies them the right to petition immigration judges for their release from custody. Instead, they must ask their jailer, the Department of Homeland Security ("DHS"), to grant them release on parole for the duration of their asylum proceedings. Fewer than 10 years ago, DHS released roughly 90 percent of such asylum seekers. Now, release rates have plummeted to the single digits. In no jurisdiction is the release rate lower than in the New Orleans Field Office of U.S. Immigration and Customs Enforcement ("ICE"), where, across the five states under its jurisdiction—Alabama, Arkansas, Louisiana, Mississippi, and Tennessee—only *two* (2) of 130 release requests were granted last year.

3.     A binding 2009 policy directs ICE to release such asylum seekers, provided they establish their identity and show they are not a danger or flight risk. Despite that, in November 2018, high-ranking ICE officials disavowed the agency's obligations under the policy in response to a question from the American Immigration Lawyers Association about whether the policy remained in effect in the jurisdiction of the New Orleans ICE Field office: "Technically no, by

Executive Order. However, there is an injunction in certain field offices outside the New Orleans AOR [Area of Responsibility]."[1]

4.      The statement by the New Orleans ICE Field Office confirmed that this jurisdiction, like other ICE jurisdictions across the country, had effectively rescinded the 2009 policy.

5.      The statement by the New Orleans ICE Field Office contradicts other public agency documents and even the agency's representations to courts. In a February 2017 memorandum implementing an Executive Order, then-DHS Secretary John Kelly wrote that the 2009 policy "shall remain in full force and effect."[2]  DHS has made the same representation before the U.S. Supreme Court.[3]  In the *Damus v. Nielsen* litigation pending before the U.S. District Court for the District of Columbia, DHS has stated in oral argument that the 2009 policy is binding upon the agency.[4]

6.      Across the five Southern states under the command of the New Orleans ICE Field Office, hundreds of asylum seekers are incarcerated for months on end, enduring abuses in confinement in exchange for the right to press their claims in court. ICE's refusal to consider the release of these asylum seekers on a case-by-case basis violates federal law, costs taxpayers

---

[1] Email from Brian Acuna, New Orleans ICE Assistant Field Office Director, New Orleans ICE Field Office, to ICE Liaison, Brian Acuna to American Immigration Lawyers Association – Midsouth Chapter (Nov. 29, 2018) (attached as Ex. A).

[2] *See* Memorandum from John Kelly, *Implementing the President's Border Security and Immigration Enforcement Improvements Policies*, at 10 (Feb. 20, 2017) [hereinafter Kelly Mem.], *available at:*https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

[3] Supplemental Reply Brief for the Petitioners at 6 n.2, *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) (No. 15-1204), 2017 WL 727754.

[4] *See* Mem. Op., *Damus v. Nielsen,* 313 F.Supp.3d 317, 338 (D.D.C. July 2, 2018) (Boasberg, J.), ECF No. 34 at 29 (citing government's statement at oral argument that "the Directive is, in fact, binding").

millions of dollars each month, and causes untold suffering to the men and women who seek legal protection inside the United States.

7.      Plaintiffs bring this class action to enjoin a DHS unwritten policy and practice of categorically denying parole to asylum seekers with no individualized review of whether detention is necessary, in violation of DHS's own directive and guidelines.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 702.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because multiple defendants reside in this District; a substantial part of the events or omissions giving rise to this action occurred in this District; and this District is presiding over a related case involving similar questions of law and fact. *Damus v. Nielsen,* 313 F.Supp.3d 317 (D.D.C. 2018).

## PARTIES

10.     All Plaintiffs presented at official U.S. ports of entry, sought asylum, and demonstrated a credible fear of persecution or torture. All Plaintiffs are pursuing their asylum claims before EOIR. All Plaintiffs are confined under the jurisdiction of the New Orleans ICE Field Office at one of the following immigration jails:  the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie"), the LaSalle ICE Processing Center in Jena, Louisiana ("LaSalle"), the River Correctional Center in Ferriday, Louisiana ("River"), the Bossier Medium Security Facility in Plain Dealing, Louisiana ("Bossier"), the Jackson Parish Correctional Center

in Jonesboro, Louisiana ("Jackson"), and the Etowah County Jail in Gadsden, Alabama ("Etowah").

11.     Plaintiffs appear in their individual capacity and as representatives of a proposed class, as is further discussed *infra*.

12.     Plaintiff Angel Alejandro Heredia Mons fled Cuba with his wife to escape persecution for refusing to participate in political activities of the Communist Party. Both presented at an official U.S. port of entry in Laredo, Texas, in July 2018, and expressed their fear of returning to Cuba and their desire to seek asylum in the United States.  DHS separated Mr. Heredia Mons from his wife, confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office.  Mr. Heredia Mons was placed in removal proceedings after his wife's positive credible fear finding was linked to his case.  He is pursuing his asylum claim before EOIR. He was denied parole despite submitting evidence of his identity, that he does not pose a danger to the public, and that he does not pose a flight risk, because he has a U.S. citizen uncle willing and able to sponsor him. He is currently detained at Etowah.

13.     Plaintiff Roland Nchango Tumenta, a member of a Cameroonian opposition party seeking the independence of Southern Cameroon, presented at an official U.S. port of entry in San Ysidro, California, in September 2018. There, he expressed his fear of return and his desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He was denied parole, despite submitting evidence of his identity, that he does not pose a danger to the public, and that he does not pose a flight risk, because he has a permanent resident uncle willing and able to sponsor him. He is currently detained at Pine Prairie.

14.     Plaintiff Dayana (legal name Dairo Mena López), a Cuban political dissident and transgender woman, fled Cuba after police tortured her for her political beliefs and gender identity.

In January 2019, she presented at an official U.S. port of entry in El Paso, Texas, expressed her fear of returning to Cuba, and indicated her wish to seek asylum in the United States. DHS confined her at the border, then transferred her to the custody of the New Orleans ICE Field Office. She passed a credible fear interview and is pursuing her asylum claim before EOIR. She has been denied access to the parole process, despite having evidence that she does not pose a danger to the public and that she does not pose a flight risk, because a U.S. citizen is ready and willing to sponsor her. She is currently detained at Pine Prairie.

15.      Plaintiff M.R.M.H. fled Honduras because a Transnational Criminal Organization tortured him, breaking his foot and jaw, and threatened him with death. In December 2018, he presented at an official U.S. port of entry in San Ysidro, California. There, he expressed a fear of returning to Honduras and his desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He was denied parole five times, despite submitting evidence of his identity, that he does not pose a danger to the public, and that he does not pose a flight risk, because a U.S. citizen is willing and able to sponsor him. He is currently detained at LaSalle.

16.      Plaintiff P.S.P., a physician, fled Cuba because government agents were demanding that he harm patients for political reasons. In October 2018, he presented at an official U.S. port of entry in Laredo, Texas, expressed his fear of returning to Cuba, and indicated his desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He has been denied access to basic information about the parole process, despite many requests from him and his U.S. citizen sister. He has evidence to establish his identity, that he does not pose a danger to the public, and that he does not pose a flight risk,

6

because his U.S. citizen sister is ready and willing to sponsor him. P.S.P. is currently detained at Pine Prairie.

17.     Plaintiff Y.A.L., a Cuban political dissident, presented at an official U.S. port of entry in Brownsville, Texas, in October 2018. There, he expressed his fear of return to Cuba and his desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He was denied parole despite submitting evidence of his identity, that he is not a danger to the public, and that he is not a flight risk, because his permanent resident wife is ready and willing to sponsor him. He is currently detained at Pine Prairie.

18.     Plaintiff Miguel Ángel Girón Martínez is a student activist and a member of an opposition political party in Honduras. He fled after suffering persecution for his political work. In January 2019, he presented at an official U.S. port of entry in San Ysidro, California, and expressed a fear of return to Honduras and a desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He has been denied access to the parole process, despite trying to submit evidence that he is neither a danger to the public nor a flight risk, because a U.S. citizen is ready and willing to sponsor him. He is currently detained at Jackson.

19.     Plaintiff Douglas Enrique Puche Moreno, a Venezuelan political dissident, presented at an official U.S. port of entry in Laredo, Texas, in September 2018. There, he expressed a fear of returning to Venezuela and a desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office. He passed a credible fear interview and is pursuing his asylum claim before EOIR. He

was denied parole despite establishing his identity, that he is not a danger to the public, and that he is not a flight risk, because a U.S. citizen is ready and willing to sponsor him.  He is currently detained at Bossier.

20.     Plaintiff Adrián Toledo Flores, a Cuban political dissident, presented at an official U.S. port of entry in Brownsville, Texas, in October 2018.  There, he expressed a fear of returning to Cuba and a desire to seek asylum in the United States.  DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office.  He passed a credible fear interview and is pursuing his asylum claim before EOIR.  He was denied parole before having the opportunity to submit evidence in support of his parole application.  Since then, he has submitted evidence of his identity, that he does not pose a danger to the public or a flight risk, because his permanent resident family are ready and willing to sponsor him.  However, ICE has failed to issue a parole decision to him.  He is currently detained at Bossier.

21.     Plaintiff J.M.R., a conscientious objector who refused military service in Cuba, presented at an official U.S. port of entry in Hidalgo, Texas, in July 2018. There, he expressed a fear of return to Cuba and a desire to seek asylum in the United States. DHS confined him at the border, then transferred him to the custody of the New Orleans ICE Field Office.  He passed a credible fear interview and is pursuing his asylum claim before EOIR.  He was denied parole despite submitting evidence of his identity, that he is not a danger to the public, and that he is not a flight risk, because his U.S. citizen uncle is ready and willing to sponsor him.  He is currently detained at Pine Prairie.

22.     Plaintiff R.O.P. a physician, fled Cuba after authorities demanded that he harm patients for political reasons. He presented at an official U.S. port of entry in Laredo, Texas, in July 2018.  There, he expressed a fear of return to Cuba and a desire to seek asylum in the United States.  DHS confined him at the border, then transferred him to the custody of the New Orleans

ICE Field Office.  He passed a credible fear interview and is pursuing his asylum claim before

EOIR.  He was denied parole despite submitting evidence that he is neither a danger to the public,

nor a flight risk, because his U.S. citizen fiancée is ready and willing to sponsor him.  He is

currently detained at Pine Prairie.

23.     Plaintiff F.J.B.H. fled Honduras with his girlfriend and her son due to persecution

by gang members affiliated with the ruling political party.  They traveled with the migrant caravan

and presented at an official U.S. port of entry in San Ysidro, California, in December 2018.  There,

F.J.B.H. and his girlfriend expressed a fear of return to Honduras and their desire to seek asylum

in the United States.  DHS separated him from his family, confined him at the border, then

transferred him to the custody of the New Orleans ICE Field Office.  He passed a credible fear

interview and is pursuing his asylum claim before EOIR.  He was denied parole despite submitting

evidence of his identity, that he is not a danger to the public, and that he is not a flight risk, because

his U.S. citizen aunt and uncle are ready and willing to sponsor him.  He is currently detained at

River.

24.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting

Secretary of the Department of Homeland Security ("DHS").  In this capacity, he directs each of

the component agencies within DHS, including U.S. Immigration and Customs Enforcement

("ICE").  Defendant McAleenan is responsible for the administration of immigration laws and

policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention and

release on parole of arriving asylum seekers.

25.     Defendant Matthew T. Albence is sued in his official capacity as Acting Director

of ICE, the sub-agency that operates the government's immigration detention system.  In this

capacity, Defendant Albence directs the administration of ICE's detention policies and operations,

including those policies and operations regarding the detention and release on parole of arriving asylum seekers.

26.     Defendant Nathalie R. Asher is sued in her official capacity as Acting Executive Associate Director of ICE Enforcement and Removal Operations.  In this capacity, Defendant Asher is responsible for implementing the administration's detention policies and operations, including those policies and operations regarding the detention and release on parole of arriving asylum seekers.

27.     Defendant George H. Lund III is sued in his official capacity as Acting Director of the New Orleans ICE Field Office.  In this capacity, Defendant Lund is responsible for ICE detention policies and operations—including those regarding the detention and release on parole of arriving asylum seekers—in the area of responsibility of the New Orleans District, which stretches across Alabama, Arkansas, Louisiana, Mississippi, and Tennessee.

## FACTUAL BACKGROUND

### A.     Legal Framework Governing Arriving Asylum Seekers' Release from Custody.

28.     Since the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRAIRA"), a person who arrives at an official U.S. port of entry without proper entry documents, or who attempts to enter through fraud is normally subject to expedited removal, a summary proceeding with no hearing and no opportunity for judicial review. 8 U.S.C. § 1225(b)(1)(A)(i).

29.     However, in cases where the person expresses a fear of persecution in her or his country of origin, or the intention to apply for asylum, an asylum officer must interview her or him to determine whether there is a "significant possibility" that she or he is eligible for asylum—in

other words, whether her or his fear is credible.  Such interviews are called credible fear interviews ("CFIs"). 8 U.S.C. §§ 1225(b)(1)(A)(ii), 1225(b)(1)(B)(v).

30.     Once an asylum officer determines a person has a credible fear of persecution, the expedited removal proceeding is terminated, and the person is placed in "full" removal proceedings so an immigration judge can adjudicate her or his asylum claim. 8 U.S.C. § 1229a(a)(1).

31.     For purposes of this complaint, persons who presented at ports of entry and were found to have a credible fear are "Arriving Asylum Seekers."

32.     By statute, Arriving Asylum Seekers "shall be detained for further consideration of the[ir] application for asylum."  8 U.S.C. § 1225(b)(1)(B)(ii).  The statute "mandates" the detention of Arriving Asylum Seekers "throughout the completion of applicable proceedings," including asylum hearings before immigration judges. *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018).

33.     By law, Arriving Asylum Seekers are deprived of the right to petition an immigration judge for their release from custody.  8 C.F.R. § 1003.19(h)(2)(i)(B).

34.     Instead, the only administrative avenue for release for Arriving Asylum Seekers throughout their immigration proceedings is to petition DHS, the very agency that made the determination to confine them, for release on parole.

35.     Congress established the parole process as a means for noncitizens seeking admission to the United States, including Arriving Asylum Seekers, to obtain temporary release from custody.  As now codified, Congress has instructed the Attorney General to make parole determinations "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" (hereinafter, "the Parole Statute").  8 U.S.C. § 1182(d)(5)(A).

36.    The Attorney General delegated this authority to the Secretary of Homeland Security, who in turn has delegated it to DHS's three component agencies: Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and Immigration and Customs Enforcement ("ICE").  8 C.F.R. § 212.5.  ICE has parole jurisdiction over persons in removal proceedings.[5]

37.    The regulations promulgated to implement the Parole Statute prescribe five categories of noncitizens who qualify for parole for "urgent humanitarian reasons" or "significant public benefit," two of which are most relevant to this case: (1) those with "serious medical conditions for whom continued detention would not be appropriate," and (2) those "whose continued detention is not in the public interest."  8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

38.    Shortly after IIRAIRA's enactment, in December 1997, the Immigration and Naturalization Service ("ICE") set forth guidelines for field offices to make parole determinations for Arriving Asylum Seekers, stressing that "[p]arole consideration for detainees who meet the credible fear standard, and accurate statistics on parole, are critical to the success of the expedited removal program."[6]

39.    In 2005, an independent government commission found that Arriving Asylum Seekers' chances of winning release on parole varied drastically depending on the jurisdiction in which they were confined.[7]  While the Harlingen field office released 97.6 percent of asylum

---

[5] Memorandum of Agreement Between USCIS, ICE, and CBP for the purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States (September 2018), *available at:* https://www.ice.gov/doclib/foia/reports/parole-authority-moa-9-08.pdf.

[6] U.S. Commission on International Religious Freedom, "Report on Asylum Seekers in Expedited Removal," Vol. II at 97-100 (Feb. 8, 2005) [hereinafter Report on Asylum Seekers in Expedited Removal], *available at*: https://www.uscirf.gov/sites/default/files/resources/stories/ pdf/asylum_seekers/ERS_RptVolII.pdf.

[7] "Report on Asylum Seekers in Expedited Removal," Vol. I at 22.

seekers before their asylum hearing, the New Orleans field office released just 0.5 percent.[8]  The commission recommended that DHS take steps to promote "more consistent implementation of parole criteria."[9]

40.    DHS then issued guidance on parole in 2009 to address these concerns ("2009 Parole Directive").   In conformity with the Parole Statute, the 2009 Parole Directive provides that parole is in the "public interest," and should be granted to Arriving Asylum Seekers who establish their identities, pose neither a flight risk nor a danger to the community, and for whom no additional factors weigh against their release.[10]

41.    The 2009 Parole Directive's stated purpose "is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States."[11]   To that end, it instructs ICE Detention and Removal Operations field offices to follow detailed procedures in making parole determinations and establishes reporting requirements "to ensure accountability and compliance with [its] procedures."

42.    In particular, the Parole Directive requires:

a.   *Automatic consideration for parole upon passing of CFI.*[12]

b.   *Timely notification*.  ICE must provide Arriving Asylum Seekers with a Parole Advisal and Scheduling Notification ("Parole Advisal"). Parole Directive §§ 6.1, 8.1. The Parole Advisal must be provided to Arriving Asylum Seekers "as soon as practicable," after a positive credible fear finding. Parole Directive §§ 6.1, 8.1.

---

[8] *Id.* at 62.

[9] *Id.* at 67.

[10] Parole Directive ¶ 6.2; *see* Fact Sheet, "Revised Parole Policy for Arriving Aliens with Credible Fear Claims," U.S. Immigration and Customs Enforcement (Dec. 16, 2009) [hereinafter 2009 Parole Directive Fact Sheet], *available at*: https://www.ice.gov/factsheets/credible-fear.

[11] ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hdparole_of_arriving_aliens_found_credible_fear.pdf.

[12] 2009 Parole Directive Fact Sheet.

c. *Notification in a language Arriving Asylum Seekers understand.* "The contents of the notification shall be explained" in a language the Arriving Asylum Seeker understands, and if necessary, through an interpreter. Parole Directive §§ 6.1, 8.1.

d. *Time to submit documents in support of parole, and instructions on where to submit them.* The notification must include a deadline to submit documents and instructions for how to submit them. Parole Directive § 8.1.

e. *Timely parole interviews by officers familiar with legal requirements for parole.* DRO officers familiar with the 2009 Parole Directive and related legal authorities, must interview Arriving Asylum Seekers to assess their eligibility for parole, no later than <u>seven days</u> after a positive credible fear finding. Parole Directive § 8.2.

f. *Brief explanation of reasons for denial.* If the DRO officer denies parole, he or she must write a letter to the Arriving Asylum Seeker briefly explaining the reasons for denying parole. This letter is in addition to the Parole Determination Worksheet, and must be forwarded to a supervisory officer for review. Parole Directive § 8.2.

43.    The 2009 Parole Directive also requires DRO officers to apply certain criteria to

their determinations about identity, flight risk, and safety risk, including:

a. *Identity.* DRO officers must review all relevant documentation offered by Arriving Asylum Seekers, as well as "any other information available" about them, to determine whether they have established their identities. 2009 Parole Directive § 8.3(1)(b).

b. *Alternative ways to establish identity.* If an Arriving Asylum Seeker is lacking government-issued identification, the DRO officer should ask whether he or she can obtain it. If the Arriving Asylum Seeker cannot, he or she "can provide for consideration sworn affidavits from third parties." If those are not available, the DRO officer "should explore whether" the Arriving Asylum Seeker may establish his or her identity through credible statements. 2009 Parole Directive § 8.3(1)(b).

c. *Flight risk.* Arriving Asylum Seekers must provide an address where they will reside upon release. DRO officers are to consider such factors as community and family ties, prior criminal history, ability to post bond, alternatives to detention, property ownership, and possible relief from removal.

d. *Safety Risk.* Arriving Asylum Seekers must show they do not pose a risk to public safety. DRO officers must consider evidence of rehabilitation for persons with prior offenses or disciplinary infractions.

e. *Additional Factors.* ICE agents may, but need not, consider "exceptional, overriding factors" such as "serious adverse foreign policy consequences" or "overriding law enforcement interests." 2009 Parole Directive § 8.3(4)(a).

14

44.     In February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "shall remain in full force and effect."[13]

45.     DHS has not revoked, withdrawn, or amended the Parole Directive since former Secretary Kelly's statements.

46.     One day after former Secretary Kelly's statements, government litigators represented to the Supreme Court of the United States that the 2009 Parole Directive remains "in full force and effect," emphasizing that it generally requires DHS "to release the alien if he establishes his identity [and] demonstrates that he is not a flight risk or danger," and requires an individualized analysis that "calls for far more than checking a box on a form."[14]

47.     In July 2018, the government represented to a federal judge in the District of Columbia that the 2009 Parole Directive is binding.[15]

**B.     DHS Has Effectively Rescinded the 2009 Parole Directive in the New Orleans ICE Field Office, Denying Parole to More Than 98 Percent of Arriving Asylum Seekers.**

48.     Since the Trump Administration took office in 2017, DHS has effectively rescinded the 2009 Parole Directive in the New Orleans ICE Field Office, denying parole in virtually all cases in 2018.

49.     Despite the representations of federal officials, including then-DHS Secretary Kelly and government lawyers litigating a similar case before this Court, the New Orleans ICE Field Office has effectively declared that the 2009 Parole Directive is no longer in effect.

---

[13] *See* Kelly Mem. at 10.

[14] Supplemental Reply Brief for the Petitioners at 6 n.2, *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).

[15] *See Damus,* 313 F.Supp.3d at 338 (citing government's statement at oral argument that "the Directive is, in fact, binding").

50.     In November 2018, a top-ranking ICE official answered a question from the American Immigration Lawyers Association Midsouth Chapter thusly: [16]

> Is the 2009 Parole Memo still in effect? If so, what percentages of parole requests are granted by the NOLA Field Office? We have problems contacting the Deportation Officer for these – what can we do? **Technically no, by Executive Order.  However, there is an injunction in certain field offices outside the New Orleans AOR.  We do not have statistics to give out.  If you cannot contact the Deportation Officer, please speak with the supervisor or NewOrleans.Outreach@ice.dhs.gov to pass on your parole request.**

51.     Since 2016, parole rates in the New Orleans ICE Field Office have sharply dropped, reflecting DHS' effective rescission of the 2009 Parole Directive in that jurisdiction.

52.     From 2016 through 2018, the rate of parole grants in the New Orleans ICE Field Office has dropped by more than 73 points.

53.     According to ICE data, in 2016, the New Orleans ICE Field Office granted parole in 75.9 percent of cases.

54.     In 2017, the New Orleans ICE Field Office granted parole in only 21.9 percent of cases, a decline of 54 percentage points.

55.     In 2018, the New Orleans ICE Field Office granted parole in only 2 out of the 130 cases in which it made determinations, or in fewer than 2 percent of all cases.

56.     Since 2016, the rate of cases granted parole in the New Orleans ICE Field Office has decreased from 75.9 to 1.5 percent.

57.     The parole grant rate of the New Orleans ICE Field Office in calendar year 2018 was the lowest of any field office in the country.

---

[16] *Ex. A.*

C.   **The New Orleans ICE Field Office Engages in Sham Parole Reviews and Blanket Denials of Parole, Causing Plaintiffs and Proposed Class Members Irreparable Harm.**

58.     Defendants' policy and practice of denying parole in nearly all cases is causing the Plaintiffs and proposed class members numerous irreparable harms, including subjecting them to arbitrary and prolonged detention.

59.     Mr. Heredia Mons has been confined by DHS for more than ten months. He fled Cuba because he was persecuted for refusing to participate in political activities. He and his wife sought asylum in Laredo, Texas, in July 2018 and were detained separately. She was confined at the T. Don Hutto Residential Center in Taylor, Texas; he was sent to Bossier. She passed her credible fear interview in early August 2018, and was granted parole on August 24, 2018.  She has requested that her asylum case be consolidated with Mr. Heredia Mons's case.  ICE continues to detain him.

60.     After Mr. Heredia Mons passed his credible fear interview, he received a parole advisal in English, a language he does not speak. The proof of service was dated September 8, 2018. The deadline for him to submit documents was September 4, 2018—four days *before* the date on the proof of service. The advisal promised a parole interview. He never received one.

61.     Thereafter, Mr. Heredia Mons submitted documents in support of his parole request that were substantially similar to those his wife had submitted. The documents included: a letter from his sponsor—who is his uncle, as well as the sponsor's proof of U.S. citizenship, address, and income; Mr. Heredia Mons' marriage certificate; and a letter from his wife's attorney offering to represent Mr. Heredia Mons if he were released from ICE custody.  ICE denied Mr. Heredia Mons parole in a form letter dated September 10, 2018.  The ICE official marked two checkboxes:

flight risk and "exceptional factors," which the official explained as: "You are an enforcement priority."

62.    Mr. Heredia Mons' prolonged detention has significantly restricted his ability to adequately prepare for and pursue his claim.[17]   Representation is crucial to prevailing on an asylum claim;[18] yet because he was confined, Mr. Heredia Mons was unable to avail himself of the legal representation offered by his wife's attorney. Because he was confined, ICE's blanket parole denial policy deprived Mr. Heredia Mons of access to information about and assistance from the few attorneys offering legal representation to people detained at Bossier.

63.    Ms. Mena Lopez, a trans woman, has been confined by DHS for four months.  In Cuba, she lived openly as a trans woman and refused to complete compulsory military service. Cuban authorities misidentified her as a gay man and attempted to force her to serve in the military. Due to her political beliefs and identity, Cuban authorities have beaten her, taunted her with homophobic slurs, locked her in a frigid chamber for hours, and held her under arrest.

64.    Once inside the United States, Ms. Mena Lopez passed her credible fear interview. On February 28, 2019, she was served with a parole advisal.  The proof of service was back-dated to the previous day.  The deadline on the parole advisal for submitting documents was February 28, 2019, the same day she received it.  While the advisal promised a parole interview on March 1, 2019, she has yet to receive a parole interview.

---

[17] Plaintiffs' First Amended Complaint at 29, *SPLC v. DHS*, No. 18-cv-00760-CKK (D.D.C. Oct. 31, 2018), ECF No. 49-2 ("just two percent of detained *pro se* immigrants obtain successful outcomes in their removal proceedings," versus "seven percent of *pro se* immigrants who were released from custody and 17 percent of *pro se* immigrants who were never detained").

[18] *See, e.g.*, *id.* at 4 (detained immigrants with representation are ten-and-a-half times more likely to succeed in removal case than *pro se* detainees); Eagly & Shafer, *supra* note 21, 49; TRAC Immigration, *Asylum Representation Rates Have Fallen Amid Rising Denial Rates* (Nov. 28, 2017) (reporting government data showing represented asylum seekers are five times more likely to win asylum than *pro se* litigants), *available at:* http://trac.syr.edu/immigration/reports/491/.

65.     In ICE custody, Ms. Mena Lopez has been subjected to prolonged periods of solitary confinement against her will on account of her gender identity.  Upon entering the United States at El Paso, Texas, she was placed in isolation because she is trans.  After experiencing isolation, she decided to try to pass as a gay man to avoid any future segregation.  Upon transfer to Cibola County Correctional Center in Milan, New Mexico, she passed as a gay man and was assigned to the general population. She did not know that it was possible to live alongside other trans women at Cibola.  Then, when she was transferred to the Tallahatchie County Correctional Facility in Tutwiler, Mississippi ("Tallahatchie"), to await a credible fear interview, she was again identified as trans and isolated for a month.   At that point, she cut her hair in a bid to again pass as a gay man. At Pine Prairie, she was initially placed in the general population.   When she disclosed to a psychologist that she is trans, she was placed in isolation for several days.  While in isolation, Ms. Mena Lopez was shackled whenever she left her cell, and her access to recreation, the law library, and religious services was restricted.

66.     Because of the grueling conditions in isolation, she requested transfer back to the general population, where she now suffers from constant threats, insults, and humiliation.  In May 2019, attorneys asked ICE to transfer her to Cibola for placement in its dedicated unit for trans women.   That request has gone unanswered.  Every day Ms. Mena Lopez is confined compounds the physical, mental, and emotional harm she suffers from confinement as a trans woman and trauma survivor.[19]

---

[19] *See, e.g.*, Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the U.S.*, at 7-11, 26-27 (2011), *available at:* https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf (noting confinement correlates with feelings of "helplessness and hopelessness that lead to debilitating depressive symptoms, chronic anxiety, despair, dread," Post-Traumatic Stress Disorder, and suicidal ideation, and asylum seekers are particularly vulnerable because confinement may exacerbate past trauma); Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture, *From Persecution to Prison: The Health*

67.     Mr. Toledo Flores has been confined by ICE for over seven months.  A pharmacy technician, Mr. Toledo Flores fled Cuba following reprisals for defying orders from Cuban officials to harm clients for political reasons.  Specifically, Mr. Toledo Flores refused to withhold prescription medication from a client; in retaliation, Cuban officials interrogated and beat him, fired him from his job, and prevented him from obtaining other pharmacy work.  Cuban officials came to his house, threatened him, and pushed his girlfriend, who was pregnant at the time.

68.     Mr. Toledo Flores and his girlfriend fled Cuba in October 2018, and sought asylum in the United States. They were detained separately.  While Mr. Toledo Flores' girlfriend was released from detention, he was sent to jails in Port Isabel, Texas, and Tallahatchie, Mississippi, where he passed his credible fear interview.  Thereafter, Mr. Toledo Flores was served with a parole advisal in English, a language he does not understand.  The advisal set a deadline of November 14, 2018 to submit a parole request and supporting documents.

69.     While he languished in detention, Mr. Toledo Flores' daughter was born in Florida, in early November 2018.

70.     Thereafter, Mr. Toledo Flores was moved to Bossier.  A few days after arriving, he received another document in English: a parole denial form letter dated November 14, 2018, the same date that ICE had indicated he would need to submit documents in support of his parole request.  He never received a parole interview, and was unable to submit documents before the deadline.

71.     Mr. Toledo Flores did not come to understand the contents of the parole advisal and the form letter until after the November 14, 2018 deadline.  Nevertheless, on two occasions

---

*Consequences of Detention for Asylum Seekers* at 2 (2003) (finding most detained asylum seekers experienced symptoms of depression or anxiety, and half had symptoms of PTSD).

thereafter, his family and attorney have submitted documents in support of parole, including: a Cuban certification that he had no criminal record; tax documents and proof of address, identity, and permanent residency of his sponsor; an offer of employment; letters of support from permanent resident family members; and his daughter's birth certificate.

72.     Since Mr. Toledo Flores' family submitted these documents, ICE has failed to reconsider his parole request.  ICE has also failed to return calls from Mr. Toledo Flores' girlfriend inquiring into the possibility of his release.

73.     Because of Mr. Toledo Flores' prolonged detention in rural Louisiana, he has not been able to meet his daughter, a U.S. citizen who is now six months old. He has not been able to work to support his daughter and girlfriend. He and his family have been denied visitation privileges at Bossier. His isolation from family and friends, coupled with his conditions of confinement, have significantly harmed his mental health. He now suffers from depression and has developed insomnia.

74.     Y.A.L. fled Cuba in October 2018, after Cuban police detained and assaulted him, fabricated charges against him for so-called anti-government acts, and threatened to make him disappear.

75.     Upon indicating his intent to seek asylum in the United States, Y.A.L. was detained and transferred to Tallahatchie, Mississippi, where he passed his credible fear interview. Thereafter, he received a parole advisal and scheduling notification in English with no proof of service date. The parole advisal set a deadline of October 18, 2018, to submit documents, and indicated that his interview had been scheduled for November 17, 2018.  Due to lack of access to legal representation, Y.A.L. did not understand the instructions and could not submit documents by the deadline.  He never received a parole interview.

76.     On January 3, 2019, Y.A.L. sought release on parole with the assistance of a lawyer. The request was based on two grounds: the 2009 Parole Directive and urgent humanitarian concerns.  The request complied with the requirements of the 2009 Parole Directive and included: a letter of support from his sponsor, his wife, who is a permanent resident; and proof of the address in Miami where, if released, he would live with his wife and the two children they had raised as a family for ten years.  In support of the humanitarian ground, he filed medical records showing he suffers from gout, and that his condition had deteriorated significantly in ICE custody.  ICE denied the request in a form letter dated January 10, 2019.  Several flight risk boxes were checked: failure to establish substantial ties to the community, and that no amount of bond could ensure his appearance.

77.     ICE has failed to provide Y.A.L. with adequate medical care at Pine Prairie, causing significant harm to his health.  Prior to being detained, Y.A.L. managed his gout successfully with medication and diet.  In ICE custody, he has lost the ability to walk.  He suffers from swelling, redness, and extreme pain in his extremities.  He cannot independently bathe or use the toilet, and relies on other detained men for assistance.  He is confined to a wheelchair.  Despite many requests to detention officials, he has been continuously deprived of a medically appropriate diet and adequate medical treatment.  The longer he remains detained, the more his pain and suffering intensifies.

78.     M.R.M.H., 18, has been confined by DHS for nearly five months.  Before fleeing Honduras, he survived two assaults by MS-13 members that left him with a broken foot and jaw. On his journey north, in Mexico, he suffered another attack.  Upon arrival in the United States, he was detained at the border and transported to Tallahatchie, Mississippi, where he waited about six weeks to take and pass his credible fear interview.

79.     Only two days after receiving his credible fear determination, M.R.M.H. received a parole denial letter, dated February 16, 2019.  He had never received a parole advisal or been informed of any deadline to submit supporting documents.

80.     With legal assistance, he sought parole reconsideration three times.  The requests complied with the 2009 Parole Directive.  The first, filed on March 4, 2019, included his birth certificate; letters of support from three U.S. citizens, two of whom were willing to serve as sponsors; and the sponsors' proof of address and income. ICE denied parole in a form letter dated March 20, 2019.  Two checkboxes were marked: flight risk, with no amount of bond ensuring appearance, and failure to show changed circumstances since his first parole denial.

81.     On April 7, 2019, while M.R.M.H. was in ICE custody at the River facility, he experienced an allergic reaction to food and went into anaphylactic shock.  His throat closed, he could not breathe, and he lost consciousness.  He was taken to a hospital near River for emergency treatment.

82.     M.R.M.H. submitted a second request for parole the following day, on April 8, 2019.  The second request marshaled additional evidence: a letter from an attorney guaranteeing that she would represent him in his asylum proceedings if he were released from custody; letters from several supporters in Milwaukee, including a family member; one of his sponsors' step-daughter, who is a therapist; a community organization, and a local priest.  ICE denied the second request in an email dated April 12, 2019.  The email stated: "Your previous parole request was denied. You have spoken to the case officer.  ERO New Orleans sees you are trying to request a 2nd time. Your clients[*sic*] next hearing with DOJ EOIR will be on May 28, 2019.  At this point, ERO will not consider release on parole.  Your client will remain in custody pending the determination from the IJ [immigration judge]."

83.     On April 17, 2019, M.R.M.H. again requested parole on the grounds of urgent humanitarian concerns due to ICE's failure to adapt M.R.M.H.'s diet and medical treatment to prevent future life-threatening emergencies. His attorney for parole proceedings received an email response from Deportation Officer Jacques T. Metoyer on May 2, 2019, stating that M.R.M.H. "is not eligible for release on an Order of Supervision as he is not [*sic*] a final order of removal."  In another email received by M.R.M.H.'s attorney on May 20, ICE states, "our agency is going to continue your client's detention without release on OSUP [Order of Supervision]."

84.     ICE has failed to provide M.R.M.H. with adequate medical care or a medically appropriate diet, causing significant harm to his health. M.R.M.H. has notified ICE and jail officials several times that he is allergic to certain foods.  Yet ICE has failed to ensure that he has access to food that does not provoke potentially life-threatening allergic reactions. As a result, M.R.M.H. has had hives for several months.  He has experienced severe breathing problems, including anaphylaxis. He has lost consciousness and been hospitalized on several occasions. A physician who conducted an independent medical evaluation of M.R.M.H. in April 2019, found he needed allergy testing, a special diet, immediate access to an epinephrine pen, and x-rays of his foot and chest.  Another physician who reviewed M.R.M.H.'s medical records found he "is at extremely high risk of dying in ICE custody from a preventable condition."

85.     As a trauma survivor, M.R.M.H.'s ongoing confinement in a prison-like setting has exacerbated his psychological symptoms.  He is exhibiting signs of post-traumatic stress disorder, including flashbacks, nightmares, and psychological distress.[20]  Every day that he remains in confinement compounds the harm he suffers.

---

[20] *See* note 16, *supra.*

86.     Mr. Puche Moreno, has been confined by DHS for more than eight months.   In Venezuela, he was an active member of an opposition party seeking to oust embattled President Nicolás Maduro.   Because of his political work, he was kidnapped and assaulted by agents of the ruling party.   He fled after learning of credible threats against his life.

87.     Upon indicating his intent to seek asylum in the United States, Mr. Puche Moreno was detained, then sent to Tallahatchie, Mississippi, where he had to wait about five weeks for his credible fear interview, which he passed.   He sought parole four times, initially *pro se* and subsequently with the assistance of an attorney.   All three requests by the attorney complied with the 2009 Parole Directive.   The first, submitted on December 17, 2018, included: a letter from Mr. Puche Moreno's sponsor, a U.S. citizen uncle; his sponsor's proof of address; and letters of support from three family friends, two of whom are U.S. citizens and one of whom is a permanent resident. Neither Mr. Puche Moreno nor his attorney received any response to this request, which the attorney re-submitted by email on December 28, 2018.

88.     On January 7, 2019, Mr. Puche Moreno submitted a revised parole request with more evidence that he did not pose a flight risk: proof of legal representation in his asylum proceedings, which correlates with high appearance rates at court hearings[21]; and an offer of employment from a U.S. citizen employer.   An ICE agent responded by email on January 7, 2019, saying he would review the request.   A couple days later, ICE issued a form denial dated December 28, 2018.   Two boxes were checked: flight risk, with no amount of bond ensuring appearance; and failure to show changed circumstances.

89.     In light of deteriorating conditions in Venezuela, including food shortages, power outages, the cessation of international flights, and the threat of further U.S. sanctions, Mr. Puche

---

[21] Ingrid V. Eagly & Steven Shafer, *A Nat'l Study of Access to Counsel in Immigration Court*, 164 Univ. of Pa. Law Review 1, 10 (2015) [hereinafter Eagly & Shafer].

Moreno submitted a fourth parole request. The request, based on changed circumstances, contained news articles about the humanitarian crisis in Venezuela, the cessation of flight operations, and the move by U.S. lawmakers to secure Temporary Protected Status for Venezuelans. Despite the proof of cessation of air traffic between the U.S. and Venezuela, ICE again denied parole.

90.    Mr. Puche Moreno's prolonged detention has meant many painful days without any communication with his family. When he was forced to flee Venezuela, he had to leave his wife of less than one month. From detention, communication is costly, and Mr. Puche Moreno can only speak with her a couple of times a month. Without access to parole, he has been unable to work to support his family, who have struggled to pay the thousands of dollars in attorneys' fees required to pursue his asylum claim. In addition, Mr. Puche Moreno suffers from hyperinsulinism, which he has been unable to manage due to lack of control over his diet in detention. His condition leaves him feeling weak and light-headed with frequent headaches, further contributing to the stress of long-term confinement and fear of deportation back to violence.

91.    P.S.P. has been confined by DHS for nearly eight months. He fled Cuba because government agents were demanding that he harm patients for political reasons. In response to the spread of the Zika virus, Cuban officials demanded that he pressure pregnant patients to terminate their pregnancies if they tested positive for the virus. This practice sought to shore up the international reputation of Cuba's medical system by covering up a spike in birth deformities and infant mortality attributable to the Zika virus.

92.    As part of this practice, Cuban officials demanded that P.S.P. to perform a late-term abortion on a patient despite evidence that the laboratory was producing unreliable test results. After he refused to follow their order, Cuban authorities retaliated against him, beating and detaining him. They began asking patients if he touched them inappropriately and made a baseless

accusation of prostitution against P.S.P., who is gay.  All his life, he has faced discrimination for his Afro-Latino roots and sexual orientation.

93.     P.S.P. fled Cuba to seek asylum in the United States.  He was detained for more than a month before he was given a credible fear interview, which he passed.  Thereafter, he received a parole advisal in English, a language he does not speak or read fluently.  The advisal had a proof of service date of November 21, 2018.  It promised a parole interview on November 20, 2018, a date that had already passed.  It set a deadline for submission of documents on November 21, 2018—the very same date on the proof of service.

94.     P.S.P. and his sponsor, his U.S. citizen sister, tried unsuccessfully for months to obtain information from the New Orleans ICE Field Office about the parole process. His sister called ICE several times trying to reach P.S.P.'s deportation officer, who has never returned her calls.  She mailed to Pine Prairie, via overnight delivery, a package with documents in support of parole for P.S.P.  The package was returned without any notice of receipt or decision.

95.     After three months in ICE custody in Louisiana without any prospect of release, P.S.P. submitted a written request for access to the parole process.  Specifically, he requested a parole interview and instructions for submitting documents in support of his parole request.  ICE responded about two months later, stating only "[h]earing scheduled in Feb." P.S.P. interpreted this to mean that because his asylum hearing was scheduled for February, ICE had denied his request for a parole interview and the opportunity to submit supporting evidence.

96.     Forced to wait over seven months for a decision from the immigration judge in his asylum case, P.S.P. has suffered great harm from his lengthy detention, including separation from his permanent resident sister and U.S. citizen brother-in-law. He has followed all the legal steps asked of an asylum seeker by passing his credible fear interview and presenting himself at every court hearing.

27

97.     J.M.R. has been confined by DHS for more than ten months. A political dissident in Cuba, J.M.R. refused to enlist in the military as required.   For that, Cuban authorities appeared at a soccer field where he was playing, beat him with a baton, pulled him off the field, and jailed and interrogated him.   Because he refused to complete compulsory military service, Cuban authorities twice beat him in this fashion, issuing him a citation and fine and threatening to disappear him.

98.     J.M.R. fled Cuba to seek asylum in the United States.   He was detained at the border, then moved to Tallahatchie.   He was forced to wait in detention for nearly a month before he was given a credible fear interview, which he passed. Thereafter, he received a parole advisal in English, a language he does not understand, and he was transferred to Pine Prairie.   He had been unable to retain an attorney and did not understand the significance of the parole advisal when, on September 12, 2018, he received a form letter denying him parole.   The form letter had marks by several check boxes related to flight risk: failure to provide a valid U.S. address where he would reside if released, and that no amount of bond could ensure his appearance.

99.     With legal assistance, he sought parole reconsideration on November 21, 2018.   The request complied with the 2009 Parole Directive, and included a copy of his birth certificate, a notarized affidavit of support from his sponsor, his U.S. citizen uncle, proof of his sponsor's address in Florida, and a Cuban certification that he had no criminal record.   ICE denied parole in a form letter dated November 27, 2018.   The only checkbox marked on the form indicated "fail[ure] to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination."

100.     J.M.R.'s confinement in a remote immigration prison in Louisiana, far from his sponsor and other family support in south Florida, deprived him of access to legal representation to pursue his asylum claim before the immigration judge.   Accordingly, he was forced to represent

himself *pro se* at his asylum hearing.  His confinement also restricted his ability to represent himself at his asylum hearing by limiting his access to relevant evidence and information.  At Pine Prairie, he failed to receive a package of documents mailed by his uncle to support his asylum claim, and he had limited access to legal materials.

101.    R.O.P has been confined by ICE for more than ten months.  He fled Cuba because government agents were demanding that he harm patients for political reasons. A physician at a state hospital, he was pressured to withhold life-saving treatment from a patient who was a nationally recognized political dissident. When R.O.P. confronted state authorities about the unethical conduct at the hospital, state authorities began to retaliate against him.

102.    R.O.P. fled Cuba to seek asylum in the United States.  He was detained for about a month before he was given a credible fear interview, which he passed. Thereafter, he was served with a parole advisal in English.  Though the advisal lacked a proof of service date, he was served with it one day before the deadline for him to submit documents in support of parole.  The advisal promised a parole interview on August 28, 2018.  But he never received a parole interview. The advisal also specified the mailing address and fax number where documents were to be sent.

103.    Shortly after receiving the advisal, R.O.P.'s relative gathered documents in support of his parole request, and sent them to R.O.P.'s ICE officer at the mailing address and fax on the advisal.  When his relative called the ICE officer to confirm receipt, the ICE officer told the relative that documents were not accepted via fax. Several days later, the relative called the ICE officer again to confirm receipt of the documents by mail; the ICE officer acknowledged receipt. ICE denied R.O.P. parole in a form letter dated August 30, 2018.  The form letter had marks by several check boxes related to flight risk: failure to establish substantial ties to the community, and no amount of bond could ensure his appearance.

104.     After that, R.O.P. sought parole reconsideration with legal assistance. The application bolstered his community ties by adding a new letter of support from his sponsor, his U.S. citizen fiancée, a letter from her U.S. citizen daughter, and another letter from a permanent resident who studied and worked alongside him in Cuba, and was also forced to flee due to persecution.  Despite the additional evidence, R.O.P. was not granted parole.

105.     R.O.P.'s confinement in a remote immigration prison in Louisiana has prolonged his separation from his sponsor, who is his U.S. citizen fiancée, and exposed him to illness due to the conditions of confinement.  He suffered from an ear infection that went untreated for weeks after a medical professional dismissed his complaints, saying his ear was dirty. Although he eventually received treatment for the infection, he remains exposed to mold on the walls near his bed and has been forced to place plastic bags over it to prevent the moisture from dripping onto his bed.

106.     F.J.B.H. has been confined by DHS for five months. He fled Honduras after criminal gangs affiliated with the ruling political party extorted him for months, and eventually robbed him at gunpoint, beat him, and attempted to kidnap his girlfriend and son. After taking his girlfriend and son into hiding, they joined the migrant caravan in October 2018 and journeyed toward the United States to seek asylum.

107.     Upon presenting at the U.S. border, he was separated from his family, detained, and transported to Tallahatchie. There, he received a credible fear interview, which he passed. On January 17, 2019, F.J.B.H. received a parole advisal in English and a two-page document in Spanish with general information about parole.  Because he does not understand English, F.J.B.H. did not understand the contents of the advisal and did not realize the deadlines it set for the submission of documents in support of parole.

108.    The following day, on January 18, 2019, F.J.B.H. was served with a parole denial

letter.  Because he does not understand English, he did not realize he had been denied parole on

the basis of flight risk. Although he requested library access to use a Spanish-English dictionary,

he was denied it.  A few weeks later, after his transfer to River, he was served with a second parole

advisal. F.J.B.H. refused to sign the proof of service of the advisal until an ICE officer explained

to him the contents of the document in Spanish.  The advisal set a deadline of March 27, 2019 to

submit documents in support of his parole application, and promised an interview on the same

date.  The interview did not occur.

109.    On or around March 25, 2019, F.J.B.H. submitted documents in support of his

parole application in person to an ICE officer at River.  The documents included a copy of his birth

certificate, a letter from his sponsor, his permanent resident sister, and a Honduran certification of

no criminal record. The ICE officer replied that ICE was not giving parole to anyone.   ICE denied

F.J.B.H. parole in a form letter dated March 28, 2019, again for flight risk. ICE agents at River

told F.J.B.H. that they would not grant parole to anyone even if President Trump visited them, and

that the reasons they deny parole to all is because all are flight risks.

110.    While confined in a remote immigration prison in Louisiana, F.J.B.H. has been kept

far from his permanent resident sister, his girlfriend, and the child they have jointly raised for six

years.  Due to the high cost of phone calls, he is rarely able to speak to his family over the phone

and has had to rely mainly on letters to communicate with family and search for legal

representation.  Not having been able to secure an attorney, he expects to represent himself *pro se*

in his asylum hearing before the immigration judge.

111.    Mr. Giron Martinez has been confined by DHS for almost five months. He fled

Honduras in October 2018, after Honduran government officials and death squads threatened him

with disappearance and death for his participation in political activities.   On January 14, 2019,

Mr. Giron Martinez sought asylum in San Ysidro, California.   On or around February 12, the same day that he passed his credible fear interview, he received packet of documents in English, a language he does not understand.  No one verbally explained the contents of the packet to him.  A few days later, with the help of an English language interpreter, Mr. Giron Martinez learned that the documents he received were a parole advisal.

112.   The advisal set a deadline of February 13, 2019 for Mr. Giron Martinez to submit documents in support of his parole request, and his parole interview was scheduled for February 14, 2019.  Shortly thereafter, Mr. Giron Martinez received an English-language letter which, he later learned through an interpreter, denied him parole.  He did not have an opportunity to submit documents in support of parole, nor did he receive an interview.

113.   Mr. Giron Martinez again sought parole in April 2019.  He submitted documents in support of his parole request including: his Honduran passport, a letter of support from his U.S. citizen sponsor, as well as his sponsor's proof of address and income.  Shortly thereafter, ICE denied Mr. Giron Martinez parole in a form letter.  The ICE official marked a checkbox stating that Mr. Giron Martinez was a flight risk.

114.   Mr. Giron Martinez's prolonged detention has significantly restricted his ability to adequately prepare for and pursue his asylum claim.  Due to restricted communication at Jackson, it has been nearly impossible for him to secure an attorney and communicate with his sponsor to prepare his asylum case.

115.   Mr. Tumenta has been confined by ICE for almost ten months.  He fled his native country of Cameroon in April 2018, after the Cameroonian government banned the Southern Cameroons National Council – the political party of which he is a card-carrying member – and massacred hundreds of its members.  The Southern Cameroon National Council is recognized by the United Nations as a political party whose members are targeted for political persecution,

torture, and murder.   Before fleeing Cameroon to seek asylum in the U.S., the Cameroonian government beat, tortured, and detained Mr. Tumenta on multiple occasions.   This fear for his life caused Mr. Tumenta to leave behind his pregnant wife, who could not travel with him to the U.S. to seek asylum due to her pregnancy.   On September 6, 2018, Mr. Tumenta arrived in San Ysidro, California, seeking asylum. He was detained and transferred to Tallahatchie, where he was given a credible fear interview, which he passed in October 2018.

116.    On October 16, 2018, he was served with a parole advisal.   The advisal set the date for his parole interview on that very same day, and set a deadline for him to submit documents in support of his parole request the following day, October 17, 2018. Mr. Tumenta was unable to submit documents within the 24-hour deadline because his confinement made it difficult for him to communicate with his family and solicit his documents.   He never received a parole interview.

117.    A few days later, Mr. Tumenta contacted his sponsor, his U.S. permanent resident uncle, who prepared a parole application including: an affidavit of support from his uncle, the sponsor's proof of address and immigration status, and proof of Mr. Tumenta's identity. Thereafter, Mr. Tumenta was transferred to Pine Prairie.   Upon his arrival, he received a form letter from ICE denying him parole. The letter, dated October 17, 2018, had a checkbox marked for flight risk.

118.    On October 28, 2018, Mr. Tumenta submitted a written request to an ICE official inquiring about his parole denial.   He received a response from the ICE official on November 1, 2018, informing him that the "parole decision will not change for now."   He later spoke to another ICE official who told him: "[y]ou're going nowhere; "the first decision won't change;" and ICE "won't give you parole."

119.    Mr. Tumenta's confinement in a remote Louisiana immigration prison has caused him many harms. The experience of confinement has compounded the trauma he suffered in

Cameroon; he now suffers from depression, flashbacks, and difficulty sleeping. Because he is confined, he cannot support his wife, who has given birth to their son, nor can he speak to her regularly.  He has suffered physical illness in confinement, contracting mumps, which led to him being isolated from the general population.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated.  The proposed class is defined as follows:

> All arriving asylum seekers (2) who receive positive credible fear determinations; and (3) who are or will be detained by U.S. Immigration and Customs Enforcement; (4) after having been denied parole by the New Orleans ICE Field Office.

121.    The class is so numerous that joinder of all members is impracticable. According to ICE data, the New Orleans ICE Field Office denied parole to 128 people in 2018.

122.    Many more individuals are now or will become class members in the future, given that ICE is expanding its capacity to confine noncitizens in the custody of the New Orleans ICE Field Office.

123.    Currently, ICE holds up to 1,160 men and women in custody at LaSalle, in Louisiana.

124.    Currently, ICE holds nearly 800 men and trans women in custody at Pine Prairie, in Louisiana.

125.    Currently, ICE has the capacity to confine hundreds more people in Louisiana at Bossier, Jackson, and the Allen Parish Public Safety Complex in Oberlin.

126.    Currently, ICE has capacity to confine nearly 1,000 people in Mississippi at Tallahatchie.

127.     Recently, ICE added capacity to confine about 600 people at River in Louisiana.

128.     Recently, ICE added capacity to confine up to 1,000 people at the Richwood

Correctional Center[22] in Monroe, Louisiana.

## CAUSES OF ACTION

**First Claim
(Administrative Procedure Act)
Unlawful Failure to Follow and/or Effective Rescission of the ICE Parole Directive**

129.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs.

130.     The 2009 Parole Directive is a final agency action.

131.     The 2009 Parole Directive remains in effect. Accordingly, DHS is bound by its

terms, and its provisions must be applied to Arriving Asylum Seekers who receive positive

credible fear determinations.

132.     Despite that, the New Orleans ICE Field Office has taken the position that the

2009 Parole Directive is no longer in effect.

133.     Defendants' policy and practice of ignoring the Parole Directive is arbitrary,

capricious, and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §

706(2).

**Second Claim
(Administrative Procedure Act – Violation of the Immigration and Nationality Act
and Implementing Regulations)
Failure to Provide Individualized Determinations of Flight Risk and Danger**

---

[22] KNOE News, "More than a thousand migrant detainees from the border to be housed at the Richwood Correctional Facility," (April 4, 2019), *available at*: https://www.knoe.com/content/news/More-than-a-thousand-migrant-detainees-from-the-border-to-be-housed-at-the-Richwood-Correctional-Facility--508150181.html; Noah Lanard, "Louisiana Decided to Curb Mass Incarceration. Then ICE Showed Up." Mother Jones (May 1, 2019), *available at*: https://www.motherjones.com/politics/2019/05/louisiana-decided-to-curb-mass-incarceration-then-ice-showed-up/.

134.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs.

135.     The INA and its implementing regulations prohibit DHS from subjecting asylum seekers to long-term civil immigration detention absent an individualized determination that the individual poses a flight risk or is a danger to the community.

136.     Defendants are failing to provide individualized determinations, instead issuing denials on a categorical basis to nearly all Arriving Asylum Seekers.

137.     Defendants' categorical detention of Plaintiffs and those similarly situated, without any individualized review of flight risk or danger to the community, violates the INA and its implementing regulations.

**Third Claim**
**(Due Process Clause of the Fifth Amendment to the United States Constitution)**
**Failure to Provide Individualized Determinations of Flight Risk and Danger**

138.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs.

139.     Arriving Asylum Seekers are "persons" within the meaning of the Due Process Clause.

140.     Accordingly, Arriving Asylum Seekers may not be deprived of liberty without due process of law.

141.     Defendants are failing to provide Asylum Seekers with individualized determinations regarding release from confinement.

142.     Defendants' failure to provide such individual review infringes on Arriving Asylum Seekers' liberty interests without due process of law, as required by the Fifth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the New Orleans ICE policy and practice is arbitrary, capricious and contrary to law;

2. Enter an order enjoining Defendants from detaining Plaintiffs and proposed class members absent parole reviews that result in individualized determinations that detention is necessary to prevent flight or danger to the community and that conform to the other requirements of the 2009 Parole Directive;

3. Appoint a special master to oversee the New Orleans ICE Field Office's compliance with the 2009 Parole Directive;

4. Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act and any other applicable statute or regulation; and

5. Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: May 30, 2019                        Respectfully submitted,


                                                  //s// Melissa Crow

Katie Schwartzmann*                        Melissa Crow (D.C. Bar No. 453487)
Bruce Hamilton*                            Luz Virginia López*
**AMERICAN CIVIL LIBERTIES UNION**         **SOUTHERN POVERTY LAW CENTER**
**OF LOUISIANA FOUNDATION**                1101 17th St., NW, Suite 750
P.O. Box 56157                             Washington, DC 20036
New Orleans, LA 70156                      Tel: (202) 355-4471
Tel: (504) 522-0628                        melissa.crow@splcenter.org
kschwartzmann@laaclu.org                   luz.lopez@splcenter.org
bhamilton@laaclu.org
                                           Mary Bauer*
                                           **SOUTHERN POVERTY LAW CENTER**
                                           1000 Preston Avenue
                                           Charlottesville, VA 22903
                                           Tel: (470) 606-9307
                                           mary.bauer@splcenter.org

                                           Laura Rivera*
                                           **SOUTHERN POVERTY LAW CENTER**
                                           150 E. Ponce de Leon Ave., Ste. 340
                                           Decatur, GA 30030
                                           Tel: (404) 521-6700
                                           laura.rivera@splcenter.org

                                           Attorneys for Plaintiffs
                                           *Pro Hac Vice applications forthcoming