**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Ángel Alejandro Heredia Mons, *et al.*, on behalf of himself and others similarly situated, | ) ) ) ) ) ) |
| *Plaintiffs,* | ) Civil Action No. 1:19-cv-01593(-JEB) |
| *v.* | ) |
| KEVIN McALEENAN, Acting Secretary of the Dep't of Homeland Security, in his official capacity, *et al.*, | ) ) ) ) |
| *Defendants.* | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 4

   A.    Legal Framework Governing Parole Decisions ................................................ 4

      1.   *INA and Implementing Regulations* .......................................................... 4

      2.   *The Parole Directive* ................................................................................ 5

LEGAL STANDARD ...................................................................................................... 17

   A.   Preliminary Issues ............................................................................................ 17

      1.   *Jurisdiction* .............................................................................................. 17

      2.   *Legal Requisites for Establishing a Preliminary Injunction* ................... 18

ARGUMENT .................................................................................................................... 18

   I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ....................... 18

     A.    Plaintiffs are Likely to Show That the NOLA ICE Field Office's Departure From the Parole Directive Violates the APA, Being Arbitrary, Capricious, and Contrary to Law. ................................................................................................ 18

     B.   NOLA ICE's Refusal to Provide Individualized Parole Determinations Violates the INA and Its Implementing Regulations, and It Implicates Constitutional Concerns. 24

     C.    NOLA ICE's Refusal to Abide by the Parole Directive Violates the Due Process Clause. ......................................................................................................... 29

      1.   *Arriving Asylum Seekers Are Protected by the Due Process Clause.* ........................... 29

      2.   *NOLA ICE's Refusal to Provide Individualized Parole Determinations Violates the Due Process Clause.* ................................................................................ 31

   II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. .......................................................................................................... 31

   III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF. .................................................................................. 33

   CONCLUSION ............................................................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*Abdi v. Duke*, 280 F. Supp. 3d 373 (W.D.N.Y. 2017) ............................................................ passim

*Ahad v. Lowe*, 235 F. Supp. 3d 676, 687-88 (M.D. Pa. 2017)................................................. 29, 30

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 372-75 (1998) .......................... 23

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017)...................... 23

*Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410, 415 (E.D.N.Y. 1988)................ 21

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)........ 31, 32

*Clark v. Martinez*, 543 U.S. 371, 381 (2005) ............................................................................. 27

*Damus v. Nielsen*, 313 F. Supp. 3d 317, (D.D.C., 2018) ........................................................ passim

*Diaz v. Schiltgen*, 946 F. Supp. 762, 764-65 (N.D. Cal. 1996)................................................ 25, 28

*Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977).................................................................. 19

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ............................................ 22

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ........... 22, 23

*Hernandez v. Sessions*, 872 F.3d 976, 995-96 (9th Cir. 2017) ..................................................... 33

*Hubbard v. EPA*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) .............................................................. 29

*Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) ......................................................... 24, 27, 28

*Jennings*, 2017 WL 727754, at *6 (Feb. 21, 2017)................................................................ 21, 23

*Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003) .......................................... 20

*Maldonado v. Macias*, 150 F. Supp. 3d 788, 800 (W.D. Tex. 2015)........................................... 29

*Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992)............................................................. 25

*Mass. Fair Share v. Law Enf. Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985).............. 19

*McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988).................... 21, 26

*Morton v. Ruiz*, 415 U.S. 199, 235 (1974)............................................................................. 19, 20

*Nat'l Venture Capital Ass'n v. Duke*, 2017 WL 5990122, at *1 (D.D.C. Dec. 1, 2017)............. 24

*Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) ............................................................................ 29

*O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 429 (D.C. Cir. 1992)............................................ 33

*R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015) ................................................ passim

*Rosales-Garcia v. Holland*, 322 F.3d 386, 408 (6th Cir. 2003) ............................................ 29, 30

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) ...................................... 33, 34

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ........................................ 30, 31

*Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010).......................................................... 18

*Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) ................................................................ 29

*U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d 1232, 1235 (D.C. Cir. 1994)............................................ 21, 26

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)....................... 19, 20

*United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988)................................................... 32

*Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929, 934-95 (D.C. Cir. 2008) ............ 23

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)....... 31, 32

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ............................................................................... passim

**Statutes**

§ 1252(a)(2)(B)(ii) ................................................................................................ 18
5 U.S.C. § 706(2)(A) ........................................................................................... 18
8 U.S.C. § 1101 ..................................................................................................... 3
8 U.S.C. § 1182(d)(5) .......................................................................................... 26
8 U.S.C. § 1182(d)(5)(A) ......................................................................... 5, 24, 25
8 U.S.C. § 1225(b)(1)(B)(ii) ......................................................................... 4, 24
8 U.S.C. § 1225(b)(1)(B)(v) ................................................................................. 4

**Other Authorities**

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 .................... 34
U.S. ICE, Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of
    Persecution or Torture (Dec. 8, 2009) ................................................ 5, 6, 13

**Rules**

8 C.F.R. § 208.30(f) ............................................................................................. 4
8 C.F.R. § 212.5(b) .................................................................................. 5, 20, 26
8 C.F.R. § 212.5(b)(5) ........................................................................................ 26
8 C.F.R. § 235.3(c) ............................................................................................... 5

## INTRODUCTION

For the reasons delineated in this Court's decision in *Damus v. Nielsen,* 313 F. Supp. 3d 317 (D.D.C. 2018),), and in this brief, Plaintiffs move this Court to grant their request for a preliminary injunction requiring the U.S. Department of Homeland Security's ("DHS") component, the New Orleans Field Office of U.S. Immigration and Customs Enforcement ("NOLA ICE"), to immediately comply with the principles and procedures governing the release from detention of asylum-seekers, otherwise known as the "Parole Directive." As this Court recently noted, the Parole Directive "establishes the process by which ICE must determine whether an individual who has passed a credible-fear interview—the first step toward gaining asylum status—will be released from detention on parole pending a full hearing." *Id.* at 323. The facts of this case are virtually the same as *Damus's,* as Plaintiffs assert that NOLA ICE officials have denied their parole requests—and in some cases, access to the parole process altogether—in violation of the Administrative Procedure Act, the Immigration and Nationality Act, and the Due Process Clause of the Fifth Amendment.

Fewer than ten years ago, ICE paroled roughly 90 percent of asylum seekers. *Id*. Now, nationwide parole release rates have plummeted. In no jurisdiction is the parole release rate lower than in DHS's NOLA ICE Field Office, where, across the five states under its jurisdiction— Alabama, Arkansas, Louisiana, Mississippi, and Tennessee—only *two* (2) of 130 (1.5 percent) parole requests were granted in 2018. Dkt. 2, ¶ 2.

NOLA ICE officials have continued to openly disavow their obligations under the Parole Directive, despite scienter of this Court's July 2, 2018 preliminary injunction order, and affirmations and representations by NOLA ICE officials that the Parole Directive remains in effect. NOLA ICE officials are fully aware that this Court granted *Damus* Plaintiffs' request for a preliminary injunction directing DHS "to comply with the Parole Directive, and to provide

1

individualized parole determinations" to asylum seekers. *Id*.  In November 2018, just a few months after this Court's issuance of the *Damus* preliminary injunction, a high-ranking NOLA ICE official represented to a nationally-recognized organization of immigration lawyers that the Parole Directive was no longer in effect by "executive order" in the NOLA ICE Field Office, but remained in effect in other field offices due to an injunction (presumably the one issued by this Court in July 2018).  Dkt. 15-3, Exh. 12; Dkt. 2, ¶¶ 3-4. As recently as February 2017, then-DHS Secretary John Kelly wrote that the Parole Directive "shall remain in full force and effect."  Dkt. 2, ¶ 5. Over the past year, DHS has represented to the U.S. Supreme Court and this Court in briefs and oral argument that the Parole Directive remains binding policy upon ICE.  *Id*.

Detaining asylum seekers without affording them individualized review of their parole requests, including an assessment of whether they are flight risks or dangers to the community, violates the Parole Directive.  As in *Damus*, these Plaintiffs present evidence that they are likely to succeed on the merits of their claims. NOLA ICE's total disregard of the Parole Directive has resulted in the prolonged detention of asylum seekers, absent a minimally sufficient determination by ICE that an individual asylum seeker poses a flight risk or a danger to the community, as required by the Parole Directive.

While the Government continues to represent to federal courts, including the U.S. Supreme Court, that the Parole Directive remains in full force and effect, and the law unequivocally requires that government agencies follow their own rules, NOLA ICE officials violate the Parole Directive every day. In granting *Damus* Plaintiffs' request for a preliminary injunction, this Court joined another federal court in holding that ICE field offices unlawfully violate the Parole Directive by failing to provide individualized parole reviews to determine whether detention of asylum seekers was justified based on flight risk or danger to the community. *See Abdi v. Duke*, 280 F. Supp. 3d

373 (W.D.N.Y. 2017). Plaintiffs present evidence that is virtually the same as the *Damus* plaintiffs, and therefore urge this Court to reach the same conclusion and preliminarily enjoin NOLA ICE's violations of the Parole Directive.

Moreover, detention of asylum seekers without considering whether they pose flight or security risks also violates the Immigration and Naturalization Act, 8 U.S.C. § 1101, *et seq.* ("INA") and regulations promulgated thereunder. In *Jean v. Nelson*, the Supreme Court held that a predecessor version of the INA's parole provision requires immigration authorities to "make individualized determinations of parole." 472 U.S. 846, 857 (1985). The current version of the parole statute contains the same operative language that formed the basis for the Supreme Court's ruling in *Jean* and thus likewise mandates "individualized determinations of parole." *Id.* Pursuant to INA regulations, such individualized review must be based on flight risk, danger to the community, and the public interest. Rather than conducting such individualized assessments, however, Defendants instead are unlawfully denying parole to virtually all asylum seekers in their jurisdiction.

Finally, detaining asylum seekers without considering whether detention is necessary based on the specific circumstances of each individual's case violates the Due Process Clause. Each additional day of detention exacerbates ongoing irreparable harm to these individuals, who may be detained for many months—or even years. Absent *Damus*-like intervention by this Court, hundreds more asylum seekers detained by NOLA ICE will suffer the same fate. No public interest justifies such unlawful detention. Accordingly, the Court should preliminarily enjoin Defendants' violations of the Parole Directive in the NOLA ICE Field Office, and require that Plaintiffs and other proposed class members receive individualized determinations of flight risk and danger to the community before they continue to be detained.

Plaintiffs are asking this Court for "no more than [to] hold the Government accountable to its own policy, which recently has been honored more in the breach than the observance." *Damus*, 313 F. Supp. 3d at 323.

## FACTUAL BACKGROUND

### A.     Legal Framework Governing Parole Decisions

#### 1.     INA and Implementing Regulations

The INA requires that a person who requests asylum at a port of entry to the United States undergo an interview with an immigration officer and demonstrate a credible fear of persecution in his or her home country, meaning there is a "significant possibility" that the individual is eligible for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). If an individual establishes a credible fear of persecution, he or she is entitled to a hearing before an immigration judge to adjudicate the asylum claim. *See id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

The time from an asylum seeker's credible fear interview with an immigration officer to a decision on his or her asylum claim by an immigration judge is typically several months. *See, e.g.*, Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶¶ 18, 23; Dkt. 16-2, Exh. 2, Mena López Decl. ¶¶ 15, 24; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 12, 18; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶¶ 18, 24; Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶¶ 18, 23; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶¶ 15-16, 26; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶¶ 12, 19; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶¶ 13, 20; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 13, 33; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 15, 29; Dkt. 16-11, Exh. 11, Girón Martínez Dec. ¶¶ 15, 21. If either the asylum seeker or DHS appeals the immigration judge's asylum decision to the Board of Immigration Appeals or a federal court of appeals, the process can take longer than a year. *See, e.g.*, Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 18; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 12.  (Plaintiffs have remained in immigration detention for over a year).

4

DHS, via its component ICE, has the authority to release asylum seekers from detention pending resolution of their asylum claims. Pursuant to the INA, the Secretary of DHS "may . . . in his discretion parole into the United States" "any alien applying for admission to the United States," including any asylum seeker, "*on a case-by-case* basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis). (Emphasis added). The INA's implementing regulations provide that DHS must exercise its parole discretion on a "case-by-case basis" and that it may parole arriving aliens who "present neither a security risk nor a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

### 2.    *The Parole Directive*

In 2009, DHS issued the Parole Directive.[1] The Parole Directive defines circumstances under which there is a "public interest" in granting parole pursuant to the INA and implementing regulations. It provides that absent exceptional overriding factors, an asylum seeker who has established a credible fear of persecution should be granted parole in the "public interest," and released from detention while pursuing his or her asylum claim, so long as the individual establishes his or her identity and presents neither a flight risk nor danger to the community. Parole Directive ¶ 6.2. In considering parole applications, the Parole Directive requires that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id.*

---

[1] ICE Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture*, ¶ 4.4 (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

The Parole Directive also delineates a number of procedural requirements for DHS's adjudication of parole applications. These prescribe that the agency must:

- Provide arriving noncitizens with notice of their right to seek parole, which "shall be explained . . . in a language they understand," *id.* ¶ 6.1;

- Conduct a parole interview within "seven days following a finding that an arriving [noncitizen] has a credible fear," *id.* ¶ 8.2;

- Provide written notification of the parole decision that contains "a brief explanation of the reasons for any decision to deny parole" within seven days of the interview, *id.* ¶ 6.5-6.6;

- Notify applicants whose applications are denied that they may request a redetermination, *id.* § 8.2;

- "Review all relevant documentation offered" by the asylum seeker, as well as "any other information available," in determining identity, *id.* ¶ 8.3.1.b;

- "[C]onsider whether setting a reasonable bond and/or" an alternative to detention program would mitigate any flight risk concerns, *id.* ¶ 8.3.2.c; and

- Engage in supervisory review of individual officers' decisions, *id.* ¶ 8.5-8.6.

ICE Field Offices have historically relied on the Parole Directive to grant parole to thousands of asylum seekers with credible fears of persecution, based on individualized findings that their detention was unnecessary. This is not surprising, as the overwhelming majority of asylum seekers who establish a credible fear lack any criminal history, pose no threat to public safety, and do not need to be detained to ensure their appearance for court proceedings.[2] DHS has

---

[2] *See, e.g.*, Mark Noferi, "A Humane Approach Can Work: The Effectiveness of Alternatives to Detention for Asylum Seekers" at 1, 3 (July 2015) (summarizing research showing that asylum seekers are predisposed to comply with legal processes), *available at:*), https://www.americanimmigrationcouncil.org/sites/default/files/research/a_humane_approach_can_work_the_effectiveness_of_alternatives_to_detention_for_asylum_seekers.pdf.

not revoked or amended the Parole Directive. As recently as February 2017, then-DHS Secretary John Kelly stated that the Parole Directive "remain[s] in full force."  DHS has not withdrawn or amended the Parole Directive since that time.  In 2018, DHS argued before this Court that the Parole Directive remained in full effect, before this Court preliminarily enjoined DHS from violating the Parole Directive. *Damus*, 313 F. Supp. 3d at 317.

As in *Damus,* the statistics show that NOLA ICE officials have ceased to implement the Parole Directive.   According to ICE data obtained from DHS and analyzed by Plaintiffs' statistician, from January 2016 through December 2016, NOLA ICE made 229 parole decisions, denying parole in 56 cases (or 24.5 percent of cases). Exh. Declaration of Sophie Beiers ("Beiers Decl.," attached hereto as 1) ¶ 6.  That year, NOLA ICE granted parole in 173 cases (or 75.5 percent of cases). *Id.* at ¶ 7.  That year, NOLA ICE did not provide any reasons for denial.[3] *Id.* From January 2017 through November 2017,[4] NOLA ICE made 78 parole decisions. *Id*. at ¶ 7. From 2016 to 2017, the grant and denial rates completely flipped. In 2017, NOLA ICE denied parole in 64 cases (or 82 percent of cases) and granted parole in 14 cases (or 18 percent of cases). *Id*.  In 2017, NOLA ICE did not list the reasons for denial 97 percent of the time, but they listed the remaining two (2) (2.9 percent) denials as due to "flight risk."  *Id*.

---

[3] Ms. Beiers believes that some reasons for denial were listed in the "comments" column, but they did not follow the same structure as those listed in the allotted denial category columns. Many "comments" alluded to the absence of a US Sponsor or US Address.  *See,* Exh.1, Beiers Dec. fn. 1.
[4] DHS provided Plaintiffs with spreadsheets through November 2019; there was no data included for NOL in June 2017 and Plaintiffs did not receive data for December 2017.

From January 2018 through January 2019,[5] NOLA ICE made 130 parole decisions.[6] *Id.* at

¶ 8. That year, NOLA ICE denied parole in 128 cases (or 98.5 percent of cases) and granted parole

in just two (2) cases (or 1.5 percent of cases). *Id*. In 2018, the reasons for denial were given.

NOLA ICE based the lion's share of denials on flight risk grounds. *Id*. at ¶ 14. NOLA ICE officials

denied parole based on flight risk in 85 cases, or 66.4 percent of cases involving a denial of parole.

*Id*. In ten (10) of the cases denied based on flight risk, NOLA ICE officials noted an additional

finding: a prior parole denial had been issued, and there was no basis to reconsider it. *Id.* Only one

case denied due to flight risk was also denied due to NOLA ICE's determination that the person

was a danger to the community. *Id.* Of the 43 cases (33.6 percent) denied for other reasons outside

of flight risk, thirteen (13) were denied solely due to no basis for redetermination and thirty (30)

had no reason listed. *Id.* That means only one denial had anything to do with flight risk.

The statistics above show a remarkable increase in the rate of parole denials in the NOLA

ICE Field Office over the last two-and-a-half years. The change from a denial rate of 24.5 percent

in 2016 to a denial rate of 98.5 percent for the period between January 2018 to January 2019

demonstrates that NOLA ICE officials have abdicated their responsibility to follow their own

Parole Directive. In fact, the NOLA ICE Field Office has the highest rate of parole denials of any

field office in the United States.

Given the fact that statistics show that NOLA ICE has the highest parole denial rate in the

country, it is unsurprising that a high-ranking NOLA ICE official admitted that the NOLA ICE

Field Office had abandoned the Parole Directive by "executive order," when responding to a

---

[5] DHS provided Plaintiffs' statistician with spreadsheets through February 2019, but there was no data for NOLA ICE included in the February 2019 spreadsheet.
[6] One parole decision date was marked as September 2019. Ms. Beiers believes this was entered erroneously and should have been marked September 2018. This one case is included in the overall 130 figure.

question from an immigration lawyer regarding whether the Parole Directive was still in effect in the NOLA ICE region.  Dkt. 15-3, Exh. 12 at 8.  Nor is it surprising that a NOLA ICE official informed the attorney of an asylum seeker that "it was not his call [to deny parole to the attorney's client]; that it [sic] was a directive to blanket deny paroles [sic] in Louisiana from the New Orleans Field Office Director Trey Lund."  Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16.

Other legal services providers serving facilities located in the NOLA ICE Field Office region confirm that the Field Offices have effectively stopped granting parole. *See* Dkt. 15-4, Exh. 13, Page Decl. ¶¶ 9-10; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 9; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 9; Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 17; Exh. 2, Hartle Decl. ¶ 9. Some of these practitioners observed a marked departure from earlier treatment of parole requests, finding that individuals like the named Plaintiffs—who established their identity and pose no flight risk or danger—are now routinely denied parole, while similarly situated clients were routinely granted parole in earlier years. *See* Dkt. 15-4, Exh. 13, Page Decl. ¶¶ 9-10.

NOLA ICE officers have told practitioners and detained asylum seekers that "there is a blanket directive to deny paroles [sic]" by the NOLA ICE Field Office Director Trey Lund."  Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16. Other NOLA ICE officials have told detainees and legal services providers that they should not rush to turn in documents for their parole requests because ICE does not "give parole" in Louisiana, and that NOLA ICE is "not giving parole to anyone." Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 24; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 10; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶ 21.

Testimony from Plaintiffs and legal services providers also demonstrates that the NOLA ICE Field Office is not making individualized parole determinations.  For example, the former Warden of the Pine Prairie Detention Facility, Indalecio Ramos, told one of the Plaintiffs that

NOLA ICE officials could not "possibly tend to everyone," in response to the Plaintiff's question about never seeing ICE agents at Pine Prairie conducting parole interviews or helping to provide information about parole to the people detained there.  Dkt. 16-6, Exh. 6, R.O.P. Decl.  ¶ 25. When asked for the reason that NOLA ICE denies parole to almost everyone who requests it, a NOLA ICE official informed a Plaintiff that "you are all flight risks;" another NOLA ICE official told the same individual that "not even if Trump came to River [the detention facility] would we give out parole." Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 25, 28.

Instead, the NOLA ICE Field Office issues denials that give no indication that they are considering the evidence submitted in support of the parole requests. The denials typically come as short form letters containing boilerplate language and checkboxes indicating that the asylum seeker poses a "flight risk" or has not sufficiently demonstrated her identity—even when these reasons are facially inconsistent with the evidence submitted. *See, e.g.*, Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 14 (NOLA ICE officer told attorney he denies parole because it would be 99 percent impossible for individual to demonstrate he is not a flight risk); Dkt. 15-6, Exh. 15, Badilla Decl. ¶¶ 10, 15; Dkt. 15-7, Exh. 16, Boyer Decl. ¶¶ 9-11, 17; Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶ 21; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶ 16; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 20; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 21; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶ 21; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 19; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 16, 20; Dkt 16-10, Exh. 10, F.J.B.H. Decl. ¶ 20; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶ 17.

In the denial letters, ICE provides no individualized explanation of why parole was denied. *See* Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶ 22; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 23; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 21.  One of the Plaintiffs attested that he noticed that NOLA ICE issued him a denial letter identical to his bunkmate's.  Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 21.  In some

cases, ICE has not provided a reason for the denial, or even issued a written decision at all. Dkt. 16-5, Exh. 5, P.S.P. Decl., Exh. C; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 18; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 24, 28.

The evidence also shows that the NOLA ICE Field Office is failing to follow other requirements of the Parole Directive. For instance, asylum seekers are not notified of the availability of parole, with most NOLA ICE officials failing to ensure that detainees receiving parole documents—often in a language they do not understand—are able to understand the content. *See* Dkt. 16-2, Exh. 2, Mena López Decl. ¶ 16; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 12-14; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 14; Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶ 19; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶¶ 13-16; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 16; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶ 13; Dkt 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 16-18; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶ 16.

When notification is provided, the ICE officer may not "explain the contents of the notification to the [asylum seeker] in a language he or she understands." Parole Directive § 8.1; *see* Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶ 18; Dkt. 16-2, Exh. 2, Mena López Decl. ¶ 16; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 12, 14; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 19; Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶ 19; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 15; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶ 13; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 14; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶ 15; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 16, 19; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶¶ 15-16; Dkt. 15-4, Exh. 13, Page Decl. ¶ 11; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 10; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 4.

Some asylum seekers are denied parole even before they are notified of their ability to seek it. *See, e.g.*, Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 20; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶

15; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 15-16, 32; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶ 20; Dkt. 15-6 Exh. 15, Badilla Decl. ¶ 3.

Many asylum seekers are not given parole interviews within seven days of passing a credible fear screening, or even before their parole requests are denied. *See* Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶ 19; Dkt. 16-2, Exh. 2, Mena López Decl. ¶ 18; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶ 14; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶¶ 19-20; Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶ 19; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 18; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶ 15; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 16; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶ 16; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 20, 23; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶ 16; Dkt. 15-4, Exh. 13, Page Decl. ¶ 12; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 11.

Sometimes the ICE Field Offices simply do not respond to parole requests. Dkt. 16-2, Exh. 2, Mena López Decl. ¶ 20; Dkt. 16-3, Exh. 3, Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶ 21; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 23; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶¶ 18, 20; Dkt. 16-8, Exh. 8, Puche Moreno Delc. ¶ 17; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶ 16; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16; Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 16. When parole interviews and formal denials are provided, the denials frequently are not within seven days of the interview. *See* Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶¶ 19-20; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶ 18; Dkt. 15-4, Exh. 13, Page Decl. ¶ 13.

The form denials also typically come in English, regardless of whether the asylum seeker understands English. *See* Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶ 22; Dkt. 16-3, Exh. 3, Y.A.L. Decl., Exh. C; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶ 20; Dkt. 16-5, Exh. 5, P.S.P. Decl., Exh. C; Dkt. 16-6, Exh. 6, R.O.P. Decl., Exh. C; Dkt. 16-9, Exh. 9, M.R.M.H. Decl., Exh.B; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶ 19; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶ 17; Dkt. 15-4, Exh. 13, Page

Decl. ¶ 14; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 13. In all of these instances, NOLA ICE's conduct violates the Parole Directive and is evidence that officials in this region are disregarding the Parole Directive in favor of a blanket parole denial policy that does not encompass an individual assessment of each asylum seekers' potential for flight risk and danger to the community.

Officials at ICE and DHS Headquarters are fully aware of NOLA ICE's failure to follow the Parole Directive. The Parole Directive specifically requires ICE Headquarters to analyze periodic reporting on parole decisions and take corrective action as needed. *See* Parole Directive ¶¶ 8.11, 8.12. Although ICE Headquarters has been aware of detention practices across the ICE Field Offices for more than two years and that those practices violate the Parole Directive as this Court held in *Damus,* neither ICE Headquarters, nor the DHS Secretary, who supervises ICE Headquarters, has taken any action to require the NOLA ICE Field Office to follow the Parole Directive.   Neither has ICE Headquarters taken action against the NOLA ICE Field Office Director, who NOLA ICE officials assert is implementing an "Executive Order" that abandons the Parole Directive in favor of a blanket denial of parole to asylum seekers.  Dkt. 15-3, Exh. 12 at 12; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16.

As a result of NOLA ICE's unlawful non-compliance with the Parole Directive, Plaintiffs are suffering irreparable harm from their unnecessarily prolonged detention.  For example, Plaintiff R.O.P., a physician, fled Cuba because he refused to comply with the Cuban Government's orders to withhold medically necessary treatment from patients who were political dissidents.  Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶¶ 5-11. Cuban government officials punched and threatened R.O.P. with suspension of his medical license, if he did not follow their unethical orders. *Id*.  Faced with physical violence and the prospect of never practicing medicine again for refusing to violate his Hippocratic oath, R.O.P. fled Cuba in July 2018. *Id*. at ¶ 12.  Upon surrendering at a

port of entry in the U.S. on July 17, 2018, R.O.P. was shuttled from Texas to detention facilities in the NOLA ICE region. *Id*. at ¶ 14. R.O.P. does not speak English, yet NOLA ICE officials provided parole documents written in English-only to him, never bothering to explain the content. *Id*. at ¶¶ 15-17. R.O.P. later learned that the documents were a Parole Advisal and Notice, and that he had missed his parole interview, as he had received the documents on the date that the interview was scheduled. *Id*. After much effort, R.O.P. managed to gather evidence to apply for parole with the help of his U.S. citizen girlfriend; yet NOLA ICE again denied his parole request. *Id*. at ¶¶ 19-21. R.O.P.'s parole denial letter was identical to his bunkmate's. The letter stated that he was denied parole because he was a flight risk, even though he had a sponsor and met all other parole criteria. *Id*. at ¶ 14. With the help of legal counsel, R.O.P. submitted another parole request in September 2018, but he has yet to receive any response from NOLA ICE to that request. *Id*. at ¶ 23. R.O.P. submitted sponsorship letters, including one from his U.S. citizen girlfriend, to show he is not a flight risk. In addition, as a doctor, he has often cared for other detainees who are not provided adequate medical care, and he has provided evidence of this, demonstrating that is compassionate, productive, and not a danger to the community; yet, a year after arriving in the U.S., NOLA ICE continues to detain him under unsanitary, unhealthy (he has lost 40 pounds since he arrived in the U.S.), and oppressive conditions, and subject to frequent racial abuse. *Id*. at ¶¶ 21-23, 28-39. The Parole Directive should afford R.O.P. the opportunity to be free, but as R.O.P. learned, NOLA ICE has a "blanket ban on parole", and "justice does not exist [there]." *Id*. at ¶ 24.

Plaintiff P.S.P., like R.O.P., is a Cuban doctor who fled government persecution because he refused to cause medical harm to pregnant women, and because of his sexual orientation. Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶¶ 5, 11. The Cuban Government beat and tortured P.S.P. because of his political and ethical beliefs, and because of his sexual orientation. *Id*. at ¶¶ 10-14. Like all of

the named Plaintiffs, P.S.P. passed his credible fear interview and should have received information about applying for parole. Instead, NOLA ICE officials failed to explain the availability of parole to P.S.P. in a language that he could understand, and he only learned about the process after speaking to other detainees. *Id.* at ¶ 19. Despite presenting evidence, in accordance with the Parole Directive, establishing that he is not a flight risk nor a danger to the community if he were paroled, P.S.P. remains detained to this day, as NOLA ICE has denied his multiple parole requests. *Id.* at ¶¶ 21-24.

Plaintiffs Mena López and J.M.R. are conscientious objectors fleeing beatings and torture at the hands of the Cuban Government. Dkt. 16-2, Exh. 2, Mena López Decl. ¶¶ 5-11; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶¶ 7-17. As a trans woman, Plaintiff Mena López has suffered significant medical, physical, and psychological harm while in prolonged detention, despite the fact that she meets all of the requisites for parole under the Parole Directive, and NOLA ICE should have granted her parole, but did not because of their blanket parole denial policy. *Id.* at ¶¶ 21-25. Like Ms. Mena López, J.M.R. meets all the requisites of the Parole Directive, but NOLA ICE has denied him parole twice, even though he has only ever submitted one request for parole. Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶¶ 20-23. J.M.R.'s prolonged detention has harmed his health and, like all of the other Plaintiffs, his ability to work on his asylum case. *Id.* at ¶¶ 25-31.

Plaintiffs Y.A.L. and M.R.M.H. are suffering irreparable medical harm from their unjust, prolonged detention. Despite meeting the requisites for parole under the Parole Directive, NOLA ICE continues to detain these asylum seekers in facilities that do not provide the medical care they so desperately need, unnecessarily putting their lives at risk. Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 20-24; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 21-36.

All the Plaintiffs representing the putative class share similar experiences, finding themselves detained in the Kafkaesque bureaucracy that is the NOLA ICE parole process.  All the named Plaintiffs are limited-English proficient, and required—but did not receive—interpretation and translation from NOLA ICE officials, in order to understand documents and quickly comply with parole deadlines.  *See*, pp. 11-2, 13, *supra*.  Even in cases where they have been able to retain legal counsel, NOLA ICE officials ignore compelling evidence in support of their parole requests and instead cleaved to their blanket parole denial policy.  *See, e.g.,* Dkt. 16-2, Exh. 2, Mena López Decl. ¶¶ 21-25; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 15-24; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. Exhs. C-I.  Plaintiffs Heredia Mons and Toledo Flores presented themselves at ports of entry with their respective partners.  Their partners, women who were detained in other ICE Field Offices, are currently free on parole; yet Heredia Mons and Toledo Flores—who have presented virtually the same evidence in support of their parole requests—remain in detention under NOLA ICE.  Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶¶ 15-20; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶¶ 10-20.

As in *Damus*, DHS has access to statistics clearly showing that the NOLA ICE Field Office has ceased to comply with the Parole Directive, and is currently implementing a policy resulting in the granting of parole requests to only 1.5 percent of detainees.  Exh. 1, Beiers Decl. ¶ 13. And like in *Damus*, without the intervention of this court, DHS will continue to ignore the NOLA ICE Field Office's non-compliance with internal policy and guidelines, and Plaintiffs and others in their class will continue to suffer in prolonged detention.

All but two of the Plaintiffs are currently detained as they await final adjudications of their asylum claims.[7] Plaintiffs already experienced trauma before fleeing their home countries and are

---

[7] The Board of Immigration Appeals recently denied Plaintiff Heredia Mons's asylum appeal, and he is now subject to a final order of deportation; Plaintiff Roland Nchango Tumenta was granted asylum after the filingfilin of the Complaint in this case.

thus particularly sensitive to the harm inflicted by continued detention. *See Damus*, 313 F. Supp. 3d at 342 (discussing testimony of Plaintiff's expert Dr. Allen Keller, which noted the "harmful effects of immigration detention on the health and well-being of asylum seekers"). With each additional day of incarceration, these harms grow worse. *See id.*; Dkt. 16-1, Exh. 1, Heredia Mons Decl. ¶¶ 24-27; Dkt. 16-2, Exh. 2, Mena López Decl. ¶¶ 21-25; Dkt. 16-3, Exh. 3, Y.A.L. Decl. ¶¶ 18-24; Dkt. 16-4, Exh. 4, J.M.R. Decl. ¶¶ 26-31; Dkt. 16-5, Exh. 5, P.S.P. Decl. ¶¶ 24-28; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶¶ 27-39; Dkt. 16-7, Exh. 7, Toledo Flores Decl. ¶¶ 22-26; Dkt. 16-8, Exh. 8, Puche Moreno Decl. ¶¶ 22-25; Dkt. 16-9, Exh. 9, M.R.M.H. Decl. ¶¶ 35-39; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶¶ 26-30; Dkt. 16-11, Exh. 11, Girón Martínez Decl. ¶¶ 21-26; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 12; Dkt. 15-7, Exh. 16, Boyer Decl. ¶¶ 12-17.

## LEGAL STANDARD

### A.   Preliminary Issues[8]

#### 1.   *Jurisdiction*

In its decision granting the preliminary injunction sought by the *Damus* Plaintiffs, this Court acknowledged it had jurisdiction over the matter because, as with the Plaintiffs in this case, the *Damus* Plaintiffs alleged "that ICE [was], as a matter of general course, not complying with the policies and procedures of the Parole Directive;" and the *Damus* Plaintiffs were "not challenging the <u>outcome</u> of ICE's decision-making, but the <u>method</u> by which parole is currently being granted (or denied)." *See Damus* 313 F. Supp. 3d at 327 (emphasis added). Like the *Damus* Plaintiffs, the Plaintiffs in this action are "challeng[ing] an overarching agency" action as unlawful—in this case, Defendants' systematic failure to follow the Parole Directive and to instead

---

[8] Plaintiffs have filed a separate Memorandum in Support of Motion for Class Certification, Dkt. 15-1, wherein they set forth their arguments for class certification.

impose detention without its safeguards and individualized determinations." *Id*. (citing *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015));).  *See also*, *Abdi*, 280 F. Supp. 3d at 385373, 385 (W.D.N.Y. 2017) (federal district court had jurisdiction beyond the jurisdictional bar of § 1252(a)(2)(B)(ii) where plaintiffs were not asking the court to review the propriety of any given parole decision, but, instead, simply sought compliance with certain minimum procedural safeguards when parole decisions are made). *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (holding that §1252(a)(2)(B)(ii) does not strip federal courts of jurisdiction over "challenge[s to] the extent of the Attorney General's [discretionary] authority" over detention).

### 2.  *Legal Requisites for Establishing a Preliminary Injunction*

In deciding whether to issue a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted). Plaintiffs meet these requirements.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   Plaintiffs are Likely to Show That the NOLA ICE Field Office's Departure From the Parole Directive Violates the APA, Being Arbitrary, Capricious, and Contrary to Law.

The APA requires that courts "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As set forth below, NOLA ICE's failure to implement the Parole Directive should be preliminarily enjoined because it is arbitrary, capricious, and contrary to law. As this Court established in *Damus*, the NOLA ICE

Field Office is bound by the *Accardi* doctrine to comply with the Parole Directive, and its failure to do so is arbitrary, capricious, and contrary to law.

This Court held that the Parole Directive "is binding agency policy and . . . can be challenged via an *Accardi* claim." *Damus*, 313 F. Supp. 3d at 338. Pursuant to the *Accardi* doctrine, "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." *Jefferson v. Harris*, 2018 WL 324209, at *6 (D.D.C. Jan. 5, 2018) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954)); *accord Abdi*, 280 F. Supp. 3d at 386. In particular, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Jefferson*, 2018 WL 324209 at *6 ("interference with regulations that seek to safeguard a plaintiff's individual rights implicates the *Accardi* doctrine and its requirement that agencies abide by their own procedures"); *Abdi*, 280 F. Supp. 3d at 389 (violation of "internal policy" implicates *Accardi* doctrine if it "pertains to individual rights").

The requirement that an agency follow its own directives is not "limited to rules attaining the status of formal regulations." *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985); *cf.*1985); *accord Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977) (whether provisions of nonregulatory agency guidance were binding depended on analysis of language, intent, and context).). Rather, even an unpublished manual or policy binds the agency if "an examination of the provision's language, its context, and any available extrinsic evidence" supports the conclusion that it is "mandatory rather than merely precatory." *Doe*, 566 F.2d at 281; *see also Mass. Fair Share*, 758 F.2d at 711-12 (invalidating agency action that violated the "highly-refined procedures for treatment of applications for grants" found in internal program documents); *Jefferson*, 2018 WL 324209, at *6 (plaintiff pleaded valid *Accardi* claim based on agency

violations of its "policies," "regulations[,] and guidelines"). Again, this is particularly so "[w]here the rights of individuals are affected," *Morton*, 415 U.S. at 235, and where the guidance provides one of "the only safeguard[s] . . . against unlimited agency discretion." *Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003).

This Court held that in circumstances strikingly similar to those at issue in this case that the Parole Directive was binding on DHS under the *Accardi* Doctrine. *Damus*, 313 F. Supp. 3d at 338. Consistent with its status as a "directive," the Parole Directive imposes numerous substantive and procedural obligations on DHS and ICE, many of which affect the "rights of individuals." *Morton*, 415 U.S. at 235. Most importantly, the Parole Directive "explain[s] how the term ['public interest' in 8 C.F.R. § 212.5(b)] is to be interpreted by [DHS] when it decides whether to parole arriving aliens." Parole Directive ¶ 4.4. In doing so, the Directive instructs that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id.* § 6.2. Moreover, if a noncitizen "establishes to the satisfaction of [DHS] his or her identity and that he or she presents neither a flight risk nor danger to the community, [DHS] should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.*

As noted, the Parole Directive also mandates that DHS "shall" follow a number of procedures in making parole decisions, such as the requirement that its officers inform asylum seekers of the availability of parole in a language they understand. *Id.* ¶ 6.1; *see also supra* at 6-7. All of the referenced substantive and procedural provisions impose obligations on the agency that it is bound to follow, and that affect whether or not individuals will continue to be deprived of their liberty.

The Government itself has conceded that the Parole Directive imposes meaningful constraints on how DHS adjudicates parole requests. The Government recently represented to the United States Supreme Court that the Parole Directive requires DHS to "automatically consider parole for arriving aliens found to have a credible fear, and to release the alien if he establishes his identity, demonstrates that he is not a flight risk or danger, and there are no countervailing considerations." Pet. Suppl. Reply Br., *Jennings*, 2017 WL 727754, at *6 (Feb. 21, 2017). The Government also represented that the Directive requires a parole review that "calls for far more than 'checking a box on a form,'" and specifically "provides for notice to the alien, an interview, the opportunity to respond and present evidence," and other procedural requirements. *Id.* The Government further represented to the Supreme Court that the Parole Directive provides critical safeguards against the arbitrary detention of arriving asylum seekers and that it remains "in full force and effect." *See id.* at *6 n.2; *see also Abdi*, 280 F. Supp. 3d at 379 (recognizing that the Government "recently embraced" the Parole Directive before the Supreme Court, "telling the Justices that it remained in full force and effect").

Despite the Government's representations, the NOLA ICE Field Office—like the five Field Offices involved in the *Damus* litigation—has simply stopped following the Parole Directive. Statistics show that from January 2018 to January 2019, NOLA ICE granted parole requests to only 1.5 percent[9] of applicants—by far the lowest parole approval rate of any ICE Field Office in

---

[9] There is no doubt that the NOLA ICE Field Office's overwhelming denial rate demonstrates a departure from the Parole Directive's requirement of individualized determinations. *See, e.g.*, *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988)1988) (four departures out of approximately 100 decisions was insufficient to show willingness to depart from model on individualized basis); *U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d 1232, 1235 (D.C. Cir. 1994)1994) (where agency "exercised discretion in only one out of over 300 cases," it would show "little support for the [agency's] assertion that it intended not to be bound"); *Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410, 415 (E.D.N.Y. 1988)) ("two . . . instances of deviation" out of 386 decisions "can hardly form the basis for a finding of agency discretion").

the United States. NOLA ICE officials have admitted to legal service providers and asylum seekers in its custody that there is a "blanket" parole denial policy/directive, and have openly discouraged legal service providers and detainees from wasting their time applying for parole. Dkt. 15-3, Exh. 12 at 8; Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16; Dkt. 16-6, Exh. 6, R.O.P. Decl. ¶ 24; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 10; Dkt. 16-10, Exh. 10, F.J.B.H. Decl. ¶ 21.

The testimony of attorneys with clients in custody of NOLA ICE confirms that NOLA ICE has abandoned the Parole Directive. Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 10; Dkt. 15-4, Exh. 13, Page Decl. ¶ 10; Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 17. As one legal services provider notes: "the New Orleans Field Office has created insurmountable barriers for arriving asylum seekers to gain release from detention under the Parole Directive. . . . it appears that New Orleans ICE officials are not giving due consideration to parole applications." Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 17.

Defendants' failure to follow the Parole Directive is arbitrary and capricious for an additional reason: DHS cannot lawfully change its position on an established policy like the Parole Directive without "display[ing] awareness that it is changing position" and "show[ing] that there are good reasons for the new policy." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) [hereinafter, ") [*Fox TV*"]; *accord Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Where, as here, an agency effectively abandons a prior policy, it must provide a more detailed explanation than if it were writing on a blank slate—particularly in light of the "serious reliance interests that must be taken into account." *Fox TV*, 556 U.S. at 515-16.

Neither DHS nor, by extension, the NOLA ICE Field Office, has officially acknowledged that it has changed its policy.[10] In fact, it has done precisely the opposite by representing to the Supreme Court in 2017 and to this Court in 2018 that the Parole Directive remains "in full force and effect." Pet. Suppl. Reply Br., *Jennings*, 2017 WL 727754, at *6 n.2; *Damus*, 313 F. Supp. 3d at 326 ( (Defendant DHS asserted that ICE continues to implement Parole Directive). Nor has DHS provided *any* explanation, much less a reasoned explanation, for departing from the Parole Directive. Accordingly, its actions are arbitrary and capricious under *Fox TV*.

Further, while NOLA ICE's abandonment of the Parole Directive may not have been in response to a written policy change, the requirement that an agency provide a reasoned explanation for a policy change applies equally to explicit and *sub silentio* departures from prior policy and practice. *See, e.g.*, *Fox TV*, 556 U.S. at 515 (agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017) (agency cannot depart from "established pattern of agency conduct" without reasoned explanation).

Plaintiffs urge this Court to follow its own precedent set in *Damus* and to enjoin NOLA ICE's unexplained departure from the Parole Directive, as Plaintiffs are likely to show that NOLA ICE is implementing a new, unwritten blanket parole denial policy in violation of the APA. *See, e.g.*, *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929, 934-95 (D.C. Cir. 2008); *see also Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 372-75 (1998) (agency must follow its announced standard in adjudications, and cannot adopt different standard in practice).

---

[10] NOLA ICE officials have admitted to legal services providers and some of the named Plaintiffs that the NOLA ICE Field Office is implementing a policy of "blanket" parole denials.  *See* Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 10; Dkt. 15-4, Exh. 13, Page Decl. ¶ 10; Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 17.

The overwhelming statistical and testimonial evidence clearly demonstrates that NOLA ICE has departed from the policy set forth in the Parole Directive in violation of the APA.

**B. NOLA ICE's Refusal to Provide Individualized Parole Determinations Violates the INA and Its Implementing Regulations, and It Implicates Constitutional Concerns.**

The language of the INA and its regulations mandate individualized parole reviews. The failure of the NOLA ICE Field Office to provide individualized parole reviews not only violates the Parole Directive; it also violates the INA. Accordingly, even if DHS were to revoke the Parole Directive and to provide reasoned grounds for doing so, the failure of the NOLA ICE Field Office to consider release on parole based on the facts of each case still would be unlawful.

The INA establishes that an arriving asylum seeker initially "shall be detained," 8 U.S.C. § 1225(b)(1)(B)(ii)), but that the Attorney General (now the DHS Secretary) then "may . . . in his discretion parole" such individuals into the United States on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *accord Nat'l Venture Capital Ass'n v. Duke*, 2017 WL 5990122, at *1 (D.D.C. Dec. 1, 2017) ("The [INA] . . . grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States on a case-by-case basis."). According to the Supreme Court, release on parole is an "express exception" to detention and is a "specific provision authorizing release." *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018).

Under established Supreme Court precedent, the INA provision that the Attorney General "may, in his discretion" release individuals on parole mandates that Defendants in fact make individualized parole decisions. In *Jean v. Nelson*, the Supreme Court considered a predecessor version of the parole statute. *Jean*, 472 U.S. at 848. Like the current version, it provided that the Attorney General "may in his discretion" release individuals applying for admission into the United States on parole. *Id.* at 859 (internal quotation marks omitted). Specifically, the version of

24

the parole statute at issue in *Jean* provided that the Attorney General (or his designee) "may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." *Id.* (quoting predecessor version of 8 U.S.C. § 1182(d)(5)(A)) (internal quotation marks omitted). Based on this language, the Supreme Court remanded the case before it with instructions that the lower court determine "whether INS officials exercised their discretion under § 1182(d)(5)(A) *to make individualized determinations of parole*." *Id.* at 857 (emphasis added).

The Supreme Court thus determined in *Jean* that the words "may in his discretion parole" require immigration authorities to consider a putative parolee's individual circumstances in determining whether release on parole is appropriate. *See, e.g.*, *Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992) (*Jean* requires that immigration authorities "'make individualized determinations of parole'" (quoting *Jean*, 472 U.S. at 857)); *accord Diaz v. Schiltgen*, 946 F. Supp. 762, 764-65 (N.D. Cal. 1996) (under predecessor version of parole statute, "[t]he District Director is required to 'make individualized determinations of parole'" (quoting *Jean*, 472 U.S. at 857)). "[I]n *each case* a district director must determine whether a *particular person* is likely to flee, and whether that person's continued detention would be in the public interest." *Marczak*, 971 F.2d at 515 (emphasis added).

As noted, like the predecessor version of the parole statute at issue in *Jean*, the current statute provides that the Attorney General "may, in his discretion" release asylum seekers on parole. *Jean* thus mandates individualized parole reviews in this case and precludes parole determinations "on the basis of broad, non-individualized policies." Indeed, unlike the predecessor version of the parole statute, the current version of the statute expressly states that parole should

be considered on a "case-by-case basis," 8 U.S.C. § 1182(d)(5)), making it all the more clear that individualized review is required.

The NOLA ICE Field Office is not making "individualized determinations of parole." Rather, in denying parole in nearly 100 percent of cases, Exh. 1, Beiers Dec. ¶ 13, NOLA ICE officials are implementing a "broad, non-individualized policy" of general detention—without regard to whether an individual asylum seeker is a flight risk or a danger to the community, or whether detention of the asylum seeker is otherwise in the public interest.[11]

Beyond the statute, NOLA ICE also violates regulations promulgated pursuant to the parole statute. The regulations define when DHS may permissibly exercise its parole discretion "on a case-by-case basis." 8 C.F.R. § 212.5(b). They provide that arriving asylum seekers are eligible for parole if they "present neither a security risk nor a risk of absconding" and if their "continued detention" is determined not to be in "the public interest." 8 C.F.R. § 212.5(b)(5). 8 C.F.R. § 212.5(b)(5). Read in conjunction with the statute, the regulations require an individualized parole review in which an immigration official considers whether an individual asylum seeker presents a flight risk or a danger to the community and if his or her release is in the public interest. *See id.* The NOLA ICE Field Office is not engaging in the required individualized consideration. *See supra* at 9. Their failure to do so violates INA regulations and is contrary to law under the APA.

Finally, NOLA ICE's blanket parole denial policy implicates constitutional concerns by depriving individuals of a fundamental interest in freedom from custody. *Zadvydas v. Davis*, 533 U.S. at 690 ("A statute permitting indefinite detention of an alien would raise a serious

---

[11] Just as the statistical evidence demonstrates that NOLA ICE officials have impermissibly departed from the Parole Directive, *see supra* atpp. 8-9, the evidence also confirms that NOLA ICE has stopped exercising the discretion required by statute. *See, e.g.*, *McLouth Steel Prod. Corp.*, 838 F.2d at 1321; *U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d at 1235.

constitutional problem."). The doctrine of constitutional avoidance precludes NOLA ICE's blanket parole denial policy and mandates that the INA and its regulations be construed to require individualized parole determinations based on flight risk and danger to the community. Courts must read a statute to avoid serious constitutional problems when it is "fairly possible" to do so. *Id.* at 689. *See* (2001); *see also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (constitutional) (the avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"); *Jennings*, 138 S. Ct. at 843 (canon "permits a court to choose between competing plausible interpretations of a statutory text" (internal quotation marks and emphasis omitted)). Courts have consistently "read significant limitations" into the "immigration statutes in order to avoid their constitutional invalidation." *Zadvydas*, 533 U.S. at 689.

Therefore, the parole statute and regulations must be construed to require individualized parole determinations founded on whether an individual is a flight risk or a danger to the community, clearly the opposite of NOLA ICE's blanket parole denial policy. As discussed above, the Supreme Court's decision in *Jean* mandates that construction and, in all events, such construction is "fairly possible." In *R.I.L-R.*, this Court addressed a section of the INA providing that the Attorney General "may continue to detain" or may instead release a non-citizen on bond or conditional parole pending a decision on whether he or she should be removed from the United States. The Government argued that "the statute contains no limitation on the Executive's discretion to detain, nor does it enumerate the factors that may be considered." *R.I.L-R.* 80 F. Supp. 3d at 186. Applying the doctrine of constitutional avoidance, the Court held that the provision did not afford DHS unfettered discretion to detain individuals absent individualized assessments of flight risk or danger to the community. The Court determined that the phrase "may continue to

detain" must instead be construed to mean that immigration authorities only "may continue to detain" individuals when continued detention is consistent with due process principles—*i.e.*, when detention is justified by circumstances specific to the individual's case, like flight risk or danger to the community. *Id*. at 190.

Similarly, in *Zadvydas*, the Supreme Court addressed whether the words "may detain" in the INA authorized the Government to effect indefinite detention of migrants. Applying the constitutional avoidance doctrine, the Court determined that "may detain" must be construed in the context of the Due Process Clause and held that "while 'may' suggests discretion, it does not necessarily suggest unlimited discretion." 533 U.S. at 697; *accord Jennings*, 138 S. Ct. at 844 (discussing avoidance analysis in *Zadvydas*).

The words "may, in his discretion, parole . . . on a case-by-case basis" cannot appropriately be construed to give the Government unfettered discretion simply to deny parole in virtually all cases, without considering whether continued detention of asylum seekers is necessary based on flight risk or danger to the community. Nor can the words appropriately be construed to authorize the NOLA ICE Field Office to deprive asylum seekers of their liberty for months or years on end in order to send a message to others. To so construe the statute would improperly render this sole "exception to detention" for arriving asylum seekers (*Jennings*, 138 S. Ct. at 844) a meaningless nullity. *See, e.g.*, *Diaz*, 946 F. Supp. at 766.

Consistent with due process, the words "may, in his discretion, parole . . . on a case-by-case basis" rather require that the Government in fact *exercise* discretion in evaluating parole requests on a "case-by-case" basis." Moreover, pursuant to the regulations, the Government must exercise such case-by-case discretion based on flight risk, danger to the community, and the public interest. As evidenced by the testimony from legal services providers, NOLA ICE has forsaken

28

individualized parole assessments in favor of a blanket parole denial policy in violation of the INA. Dkt. 15-5, Exh. 14, Giardina Decl. ¶ 16; Dkt. 15-6, Exh. 15, Badilla Decl. ¶ 10; Dkt. 15-4, Exh. 13, Page Decl. ¶ 10; Dkt. 15-7, Exh. 16, Boyer Decl. ¶ 17.

### C.   NOLA ICE's Refusal to Abide by the Parole Directive Violates the Due Process Clause.

Separate from the APA, NOLA ICE's failure to abide by the Parole Directive also violates the Due Process Clause. *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (independent cause of action exists to remedy constitutional violations); *Hubbard v. EPA*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) ("[T]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself . . . .").

### 1.   *Arriving Asylum Seekers Are Protected by the Due Process Clause.*

While the Supreme Court in *Jennings* did not reach the issue, numerous courts have found that the Due Process Clause protects against the arbitrary detention of "arriving" (or "excludable") noncitizens like Plaintiffs. *See, e.g.*, *Rosales-Garcia v. Holland*, 322 F.3d 386, 408 (6th Cir. 2003) (en banc) (finding serious constitutional problems with indefinite detention of excludable noncitizens); *Ngo v. INS*, 192 F.3d 390, 396 (3d Cir. 1999) (same); *Ahad v. Lowe*, 235 F. Supp. 3d 676, 687-88 (M.D. Pa. 2017) ("rising sea of case law" "has consistently determined that detained aliens," including arriving noncitizens, "are entitled to some essential measure of due process"); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 800 (W.D. Tex. 2015)TExh. 2015) ("[I]t is clear that aliens—even inadmissible aliens—are entitled to some constitutional protections, including some amount of due process."); *see also Rosales-Garcia*, 322 F.3d at 410 n.29 ("[N]o circuit has concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments do not apply to excludable aliens.").

*Zadvydas* reinforces this conclusion. Seven of nine Justices in *Zadvydas* agreed that even noncitizens who had lost all legal right to reside in the United States had the right to "freedom from [unjustified] physical restraint," 533 U.S. at 690; *see also id.* at 721 (Kennedy, J., dissenting) (acknowledging "serious" and "obvious" constitutional problems arising from arbitrary detention of noncitizens with removal orders, and stating that "both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious"). If noncitizens who have *no* legal right to be in the United States have such due process protections, it follows that those who—like Plaintiffs—*do* have a right to pursue legitimate asylum claims must have at least the same rights. *See, e.g.*, *Ahad*, 235 F. Supp. 3d at 688 ("Given the scope of the due process protections provided to detained aliens, and acknowledged by the courts in the past, it would be anomalous to completely deny this modest measure of due process to detainees held pursuant to § 1225(b).").

Defendants may rely on the Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), to argue that Plaintiffs lack due process rights because they presented themselves at ports of entry. Such reliance on *Mezei* would be unfounded. *Mezei* may be read to suggest that certain arriving noncitizens do not have due process rights with respect to their *admission* to the United States where national security is at issue. *See id.* at 215 ("we do not think that respondent's *continued exclusion* deprives him of any statutory or constitutional right" (emphasis added)); *id.* at 216 ("respondent's *right to enter* the United States depends on the Congressional will"). But *Mezei* does not mean that such individuals lack due process rights with respect to arbitrary *detention*.

The *en banc* Sixth Circuit emphasized in *Rosales-Garcia* that any such broad reading of *Mezei* was "eclipsed" by later Supreme Court cases that "rigorously delineated" "the contours of constitutionally permissible civil detention." *Rosales-Garcia*, 322 F.3d at 413-14. *Rosales-Garcia*

further explained that the *Mezei* court "explicitly grounded its decision in the special circumstances of a national emergency and the determination . . . that Mezei presented a threat to national security"—circumstances that are absent in this case. *Id.*

       2.    *NOLA ICE's Refusal to Provide Individualized Parole Determinations Violates the Due Process Clause.*

Pursuant to the Due Process Clause, the Government may not detain asylum seekers on grounds not reasonably related to the legitimate purposes of preventing flight or protecting the community. *Zadvydas*, 533 U.S. at 690. As this Court has acknowledged, *Zadvydas* "grounds its analysis of immigration detention in principles derived from the wider civil-commitment context." *R.I.L-R.*, 80 F. Supp. 3d at 189. Plaintiffs' detention based on NOLA ICE's blanket denial of parole—rather than an individualized determination that detention is warranted due to flight risk or danger to the community—deprives Plaintiffs of their due process rights.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Like the *Damus* Plaintiffs, the Plaintiffs have presented evidence showing that they are suffering or will suffer irreparable harm absent this Court's intervention: "asylum-seekers are being denied parole without the protections of the ICE Directive. . . .  instead, they are subject to a *de facto* 'no-parole' reality, under which detention has become the default option. . . .  being deprived of the safeguards of the Parole Directive harms putative class members in a myriad ways." *Damus* 313 F.3d at 342.

In order to establish irreparable harm, the moving party must show that the injury is "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The injury must also be "both certain and great; it must be actual and not

theoretical." *Id.* (quoting *Wisconsin Gas*, 758 F.2d at 674). Finally, the injury must be "beyond remediation." *Id.*

In this case, Plaintiffs and those similarly situated will suffer irreparable harm without injunctive relief. First, their injury is imminent and certain. They are currently being detained at NOLA ICE facilities. As this and other courts have recognized, detention irreparably harms Plaintiffs and other putative class members "in myriad ways." *Id.; R.I.L-R.*, 80 F. Supp. 3d at 191; *Abdi*, 280 F. Supp. 3d at 404 (detained asylum seekers suffered irreparable harm in "negative physical and mental health effects of prolonged detention and the fact that their continued detention has prevented putative class members from adequately preparing for their asylum hearings before an immigration judge").

Moreover, Plaintiffs already experienced trauma before fleeing their home countries, and are thus particularly vulnerable to the harm inflicted by continued detention, which "worsen[s] symptoms of trauma and severely impede[s] the ability of asylum seekers to recover from their physical and mental conditions." *Damus*, 313 F. Supp. 3d at 342 (citing to the Declaration of Allen S. Keller, "discussing the harmful effects of immigration detention on the health and well-being of asylum-seekers"). These harms only grow worse with each additional day of incarceration. *Id.* As such, the injuries caused by NOLA ICE's policy of blanket denials of parole are "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (internal quotation marks and citation omitted).

Plaintiffs' injuries also are "beyond remediation." Plaintiffs do not seek monetary compensation for their injuries. Rather, they seek injunctive and declaratory relief setting aside NOLA ICE's blanket parole denial policy. The "unnecessary deprivation of liberty clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988)

(citation omitted). And "[u]nlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact." *R.I.L-R.*, 80 F. Supp. 3d at 191.

## III.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST BOTH FAVOR INJUNCTIVE RELIEF.

Plaintiffs ask this Court to follow its own precedent set out in *Damus* and enjoin an unlawful and unconstitutional policy to prevent irreparable harm to numerous vulnerable asylum seekers. Each Plaintiff seeks nothing more than an individualized review to determine whether there is a need for him or her to be detained. Neither the Government nor the public has any legitimate interest in denying Plaintiffs this modest relief. Indeed, the Government itself has expressly determined that the "continued detention" of asylum seekers who have passed credible fear, established their identity, and are not flight risks "is not in the public interest." Parole Directive § 6.2.

Numerous courts, including this Court, have recognized that the likelihood that individuals "will . . . be deprived of their physical liberty . . . in the absence of the injunction" weighs heavily in favor of granting preliminary relief. *E.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 995-96 (9th Cir. 2017) (describing numerous harms suffered by noncitizens in immigration detention); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) ("[T]he harm to petitioner if he is not released is immeasurably significant."). These grave harms far outweigh any countervailing governmental interest.

Moreover, the "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" where the Government must comply with its constitutional and legal obligations. *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 429 (D.C. Cir. 1992); *see also R.I.L-R.*, 80 F. Supp. 3d at 191 (explaining that public interest is served by injunction that "ends an unlawful practice" and ensures compliance with the APA) (citation and quotation marks

33

omitted); *Seretse-Khama*, 215 F. Supp. 2d at 54 ("the public interest is served by petitioner's release" because continued unlawful detention "poses serious constitutional risks"); *Abdi*, 280 F. Supp. 3d at 410 ("Granting preliminary injunctive relief will simply require Respondents to comply with their legal obligations and afford Petitioners procedural protections in connection with Respondents' exercise of discretion.").

It is important to note that treating asylum seekers with basic fairness and dignity is among our nation's best traditions and a source of public interest and pride. *See* Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States."). It is not in the public interest to arbitrarily detain asylum seekers, or to hamper their ability to effectively argue for asylum, so that they can be more easily sent back to where they come from.

In short, the balance of harms and the public interest decisively favor requiring NOLA ICE to follow the law, and afford asylum seekers the process required by DHS's own binding Parole Directive, as well as by the INA and the Due Process Clause.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a class-wide preliminary injunction should be GRANTED.

Dated: July 18, 2019

Respectfully submitted,

  //s// Melissa Crow_____

Katie Schwartzmann*
Bruce Hamilton*
**AMERICAN CIVIL LIBERTIES UNION OF LOUISIANA FOUNDATION**
P.O. Box 56157
New Orleans, LA 70156
Tel: (504) 522-0628
kschwartzmann@laaclu.org
bhamilton@laaclu.org

Melissa Crow (D.C. Bar No. 453487)
Luz Virginia López*
**SOUTHERN POVERTY LAW CENTER**
1101 17th St., NW, Suite 750
Washington, DC 20036
Tel: (202) 355-4471
melissa.crow@splcenter.org
luz.lopez@splcenter.org

Mary Bauer*
**SOUTHERN POVERTY LAW CENTER**
1000 Preston Avenue
Charlottesville, VA 22903
Tel: (470) 606-9307
mary.bauer@splcenter.org

Laura Rivera*
**SOUTHERN POVERTY LAW CENTER**
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
Tel: (404) 521-6700
laura.rivera@splcenter.org

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*

35