**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **HEREDIA MONS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | Civil Action No. 19-1593 (JEB) |
| **KEVIN K. MCALEENAN, Acting Secretary of the Department of Homeland Security**, *et al.*, | |
| **Defendants.** | |

## MEMORANDUM OPINION

Last summer in <u>Damus v. Nielsen</u>, 313 F. Supp. 3d 317 (D.D.C. 2018), this Court granted a preliminary injunction to a provisional class of plaintiffs who were challenging the practices of five Immigrations and Customs Enforcement field offices.  Specifically, those plaintiffs successfully maintained that ICE was violating the Department of Homeland Security's "Parole Directive," a policy memorandum that sets forth procedural requirements for determining whether an asylum-seeker is eligible for pre-hearing release on parole.

This suit offers the identical arguments – this time in relation to ICE's <u>New Orleans</u> Field Office, which Plaintiffs claim has effectively rescinded the Parole Directive, even while publicly reaffirming its vitality.  Rather than following the Directive, the Office is allegedly denying all asylum-seekers parole as a matter of policy.  In opposing a preliminary injunction and in simultaneously moving to dismiss, the Government principally asserts that the claims of each of the named Plaintiffs here are "moot" – *i.e.*, extinguished, given that they have either had their parole requests re-adjudicated on an individualized basis or are no longer in the custody of the New Orleans Field Office.  Therefore, the Government argues, because the named Plaintiffs have

already achieved the individualized review that they sought by bringing this lawsuit (or such

review is now unavailable to them), the Court is powerless to allow this class action to proceed.

This Court is not so constrained.  Even assuming that the named Plaintiffs' claims here

are moot, the Court retains jurisdiction over the proposed class.  While it is true that class actions

are normally moot if no named representative with an unexpired claim remains at the time of

certification, <u>see</u> <u>United States v. Sanchez-Gomez</u>, 138 S. Ct. 1532, 1538 (2018), an exception

applies where the alleged harms would otherwise evade review because they are "inherently

transitory."  <u>Id.</u>  Such is the case here.  Defeated on their jurisdictional position, Defendants offer

little beyond their <u>Damus</u> arguments on the merits.  The Court, accordingly, will reach the same

result and grant Plaintiffs' Motion.  In issuing an injunction of this nature for a second time, this

Court again simply holds the Government to the policy that it purports to already be following.

I.      **Background**

A.  <u>Statutory and Regulatory Framework</u>

The Court begins with the relevant statutory and regulatory framework at issue, as it did

in its prior decision on the subject of the Parole Directive.  <u>See</u> <u>Damus</u>, 313 F. Supp. 3d at 323–

24.  The Immigration and Nationality Act outlines the foundations of our nation's immigration

system, including the process by which noncitizens can apply for asylum.  <u>See</u> 8 U.S.C. §

1225(b)(1)(A)(ii).   If an interviewing officer determines that an asylum-seeker has a "credible

fear" of persecution in her home country, that person "shall be detained for further consideration

of [her] application."  <u>Id.</u> § 1225(b)(1)(B)(ii); <u>see also</u> 8 C.F.R. § 208.30(f) (describing the

procedures surrounding a positive credive-fear finding).  The INA, however, also offers another

option besides detention, permitting the Attorney General to temporarily parole these individuals

for "urgent humanitarian reasons or significant public benefit."  <u>See</u> 8 U.S.C. § 1182(d)(5)(A).

Agency regulations provide that the Secretary of Homeland Security may parole asylum-seekers who are "neither a security risk nor a risk of absconding," in the service of such "urgent humanitarian reasons or significant public benefit."  8 C.F.R. § 212.5(b).

In 2009, DHS issued the "Parole Directive," which further fleshes out when, precisely, it is in the "public benefit" for an asylum-seeker to be paroled.  See ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).  According to the Directive, if an asylum-seeker establishes her identity and that she presents neither a flight risk nor a danger to the public, her detention "is not in the public interest," and thus ICE "should, absent additional factors . . . parole the alien."  Id., ¶ 6.2  (emphases added).  But how might ICE determine if an asylum-seeker poses a flight risk or a danger?  The Directive offers a binding roadmap.  First, it states that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case."  Id.  Next, to aid in this individualized consideration, the Directive prescribes that asylum-seekers "shall" be provided with certain procedural safeguards.  See, e.g., id., ¶ 6.1.  These include written notice of the parole process explained in a language they understand, a parole interview within seven days of a credible-fear finding, written notification of a parole determination, and a brief explanation of the reasoning behind any decision to deny parole.  Id., ¶¶ 6.1–8.1.  In sum, the Directive "establishes certain minimum procedures and processes that are to be utilized in making [parole] determinations."  Damus, 313 F. Supp. 3d at 324.

During the years immediately following implementation of the Directive, DHS released asylum-seekers on parole at a 90% rate nationwide subsequent to their credible-fear determinations.  See ECF No. 2 (Complaint), ¶ 2.  In 2017, then–DHS Secretary John Kelly confirmed that the Parole Directive "remain[s] in full force and effect."  Memorandum of John

Kelly, "Implementing the President's Border Security and Immigration Enforcement Improvement Policies" at 10 (Feb. 20, 2017) (Kelly Memorandum).  The Acting Director of the New Orleans Field Office, moreover, recently proclaimed that the Parole Directive "is still in effect in New Orleans."  ECF No. 27 (Def. MTD), Exh. A (Declaration of Scott Sutterfield), ¶ 6. Yet the percentage of asylum-seekers that that Office has released on parole has dramatically declined in recent years.  The Office currently retains the lowest release rate of any jurisdiction in the country, having denied 98.5% of release requests in 2018 and 100% of requests made thus far in 2019.  See ECF No. 30 (Pl. Response) at 5; Def. MTD at 4 n.4.

    B.  Plaintiffs' Detentions

    Eleven named individuals bring the present action.  Plaintiffs and those they seek to represent "all demonstrated a credible fear of persecution and are now [or previously were] in removal proceedings before the Executive Office for Immigration Review."  Compl., ¶ 1.  Rather than being placed on parole during the pendency of their asylum determinations, Plaintiffs were "confined under the jurisdiction of the New Orleans ICE Field Office" at one of six immigration jails for months on end.  Id., ¶ 10.

    In July 2018, lead Plaintiff Ángel Alejandro Heredia Mons fled Cuba with his wife to escape persecution for their refusals to participate in Communist political activities.  Id., ¶ 12. DHS separated Heredia Mons from his wife at the border, transferring her to an ICE facility in Taylor, Texas, and him to the New Orleans Field Office.  Id., ¶ 59.  She passed a credible-fear interview in early August 2018, and DHS granted her parole later that month.  Id.  Heredia Mons had no such luck.  After passing his credible-fear interview, he received a parole advisal in a language he does not speak, four days after the deadline to submit documents.  Id., ¶ 60.  He never received a parole interview.  Id.  The Office denied his parole request in a "form letter"

dated September 10, 2018, and it has detained him since that date.  Id., ¶ 61.  The other named

Plaintiffs – Miguel Ángel Giron Martinez, Douglas Enrique Puche Moreno, Adrián Toledo

Flores, Dayana Mena López, M.R.M.H., P.S.P, Y.A.K., J.M.R., R.O.P., and F.J.B.H – recount

similar narratives.

On June 30, 2019, the above-named Plaintiffs brought the present class action seeking to

enjoin DHS's alleged practice of categorically denying parole to asylum-seekers in contravention

of the Directive.  They assert that Defendants' effective recession of the Directive is arbitrary and

capricious and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C.

§ 706(2).  See Compl., ¶¶ 129–33.  Additionally, they allege that separate and apart from their

obligations under the Parole Directive, Defendants have violated both the APA and the Due

Process Clause of the Fifth Amendment to the Constitution in failing to provide individualized

determinations of flight risk and danger.  Id., ¶¶ 134–42.

Plaintiffs now move for a preliminary injunction, while Defendants have countered with a

Motion to Dismiss.  The Court heard oral argument on August 29, 2019, and issues this

expedited Opinion.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. NRDC, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011)

(quoting Winter, 555 U.S. at 20).  "The moving party bears the burden of persuasion and must

demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hospitality Staffing

Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (citing Chaplaincy of Full

Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

      Historically, these factors have "been evaluated on a 'sliding scale.'" Davis v. Pension

Ben. Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009).  In other words, if the movant makes an

"unusually strong showing on one of the factors, then it does not necessarily have to make as

strong a showing on another factor." Id. at 1291–92.  This Circuit has hinted, though not held,

that Winter – which overturned the Ninth Circuit's "possibility of irreparable harm" standard –

establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent,

free-standing requirement[s].'" Sherley, 644 F.3d at 392–93 (quoting Davis v. PBGC, 571 F.3d

1288, 1296 (Kavanaugh, J., concurring)); see League of Women Voters v. Newby, 838 F.3d 1, 7

(D.C. Cir. 2016) (declining to address whether "sliding scale" approach is valid after Winter).

Unresolved, too, is the related question of "whether, in cases where the other three factors

strongly favor issuing an injunction, a plaintiff need only raise a serious legal question on the

merits." Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation and citation

omitted).

## III.   Analysis

      Plaintiffs' core contention is that the New Orleans Field Office has effectively rescinded

the 2009 Directive by failing to offer asylum-seekers individualized review of their parole

applications and instead denying them in summary fashion.  Like the plaintiffs in Damus, they

offer comparative statistics as well as affidavits from detained asylum-seekers and their counsel.

For the most part, Defendants stand on the same arguments that the Court previously found

wanting in Damus; indeed, they simply incorporate them by reference.  See Def. MTD at 6.  As a

result, the Court's analysis of the merits essentially tracks its prior articulation.

Defendants do, however, raise one novel argument.  They ask this Court to dismiss Plaintiffs' proposed class action for lack of jurisdiction on the ground that the claims are moot.  As the Court disagrees, it will grant Plaintiffs' Motions for a Preliminary Injunction and Class Certification, while largely denying Defendants' Motion to Dismiss.  It first addresses jurisdiction, then moves to class certification and the merits of the injunction, and concludes with the Motion to Dismiss.

A.  Jurisdiction

The Court begins, as it must, with jurisdictional issues.  It separately addresses justiciability and mootness.

1.  *Statutory Restrictions on Reviewability*

As a preliminary issue, the Court again rejects Defendants' contention (incorporated by reference) that it lacks jurisdiction to review Plaintiffs' claims because they are barred by 8 U.S.C. §§ 1252(a)(2)(B)(ii) and (f)(1).  Briefly, the former provides:

> [N]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security.

As this Court previously held in Damus, "[T]o the extent Plaintiffs are challenging the determinations themselves – *i.e.*, the actual balancing of the merits of each application for parole – this Court agrees that it lacks jurisdiction."  313 F. Supp. 3d at 327.  The plaintiffs there and here, however, "are not challenging the outcome of ICE's decisionmaking, but the method by which parole is currently being granted (or denied).  The question, therefore, is whether such a claim falls within the scope of § 1252(a)."  Id.  It does not.  Where plaintiffs challenge an overarching agency action as unlawful – in this case, a systemic failure to follow the Parole

Directive – Supreme Court and Circuit precedent dictate that such a challenge does not fall within § 1252's jurisdictional bar.  See Zadvydas v. Davis, 533 U.S. 678 (2001) (holding that challenges to "extent of the Attorney General's authority" to indefinitely detain individuals are outside scope of § 1252(a)(2)(B)(ii)); R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 176–77 (D.D.C. 2015) (holding that district courts have jurisdiction to review challenges to policies underlying detention but not discretionary determinations granting or denying bond or parole in individual cases).

Second, this Court is again unconvinced that another provision of the INA – 8 U.S.C. § 1252(f)(1) – precludes it from granting the classwide injunctive relief sought by Plaintiffs. That section provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-1232], other than with respect to . . . an individual alien against whom proceedings under such part have been initiated."  As this Court noted in R.I.L-R (and Damus), § 1252(f)(1) "prohibits only injunction of 'the operation of' the detention statutes."  R.I.L-R, 80 F. Supp. 3d at 184 (quoting Rodriguez v. Hayes, 591 F.3d 1105, 1120 (9th Cir. 2010)).  But "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized[,]  . . . the court is not enjoining the operation of [the statute], and § 1252(f)(1) therefore is not implicated."  Id. (quoting Rodriguez, 591 F.3d at 1120) (internal quotations and citations omitted).  Here, Plaintiffs seek to enjoin "conduct" that the INA allegedly does not authorize – viz., the Office's flagrant disregard of the Parole Directive.  Therefore, a classwide injunction in this case would not obstruct the "operation of" the detention statutes.

2.   *Mootness*

The focus of the Government's briefs here is on an issue not tackled by the <u>Damus</u> decision.  Defendants contend that even if this Court at one time had jurisdiction to decide Plaintiffs' claims, it no longer does so because such claims are now moot.  The Constitution limits the federal courts' jurisdiction to those claims that embody actual "[c]ases" or "[c]ontroversies."  U.S. Const. art. III, § 2, cl. 1.  A "case or controversy exists when both the plaintiff and the defendant have a 'personal stake' in the lawsuit," and a "plaintiff demonstrates a personal stake by establishing standing to sue, which requires . . . 'an ongoing interest in the dispute.'"  <u>Campbell-Ewald Co. v. Gomez</u>, 136 S. Ct. 663, 678–79 (2016) (Roberts, C.J., dissenting) (quoting <u>Camreta v. Greene</u>, 563 U.S. 682, 701 (2011)).  A complaining party lacks standing, and a case is considered "moot," "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  <u>Schmidt v. United States</u>, 749 F.3d 1064, 1068 (D.C. Cir. 2014) (internal quotation marks omitted).  Therefore, "[i]f a case becomes moot, federal courts are divested of jurisdiction over the action."  <u>Id.</u>

According to Defendants, developments subsequent to the filing of the instant Complaint have mooted the named Plaintiffs' claims and thereby stripped this Court of jurisdiction.  First, some of the Plaintiffs are no longer in the custody of the New Orleans Field Office.  Plaintiffs concede that these individuals' claims are, in fact, moot.  <u>See, e.g.</u>, ECF No. 28 (Pl. Reply) at 9. Second, the Office has allegedly re-adjudicated the statuses of the remainder of the named Plaintiffs on an individualized basis, and it has again denied them parole.  Indeed, the agency's declarant explains, almost all of the named Plaintiffs who remain in the custody of the New Orleans Field Office have been ordered removed by an Immigration Judge.  <u>See</u> Sutterfield Decl., ¶ 8.  Some have also lost their appeals to the Bureau of Immigration Appeals and are

therefore subject to a final order of removal.  Id.  Largely because of these adverse
determinations, the agency concluded during the re-adjudications that the named Plaintiffs
currently under the custody of the New Orleans Field Office present flight risks, and it
accordingly denied them parole.  Id.

Plaintiffs, for their part, contest that the detained individuals' claims have been mooted.
They first argue that the Office's denial of all these individuals' parole requests demonstrates
that Defendants are continuing to categorically refuse parole to all asylum-seekers and are
thereby flouting the demands of the Parole Directive.  See ECF No. 30 (Pl. Response) at 8.  They
further characterize the "re-adjudications" as "shams" and offer affidavits in support of their
position that the detained Plaintiffs "continue to suffer from the [New Orleans] Field Office's
unlawful policy" of ignoring the Parole Directive.  See Pl. Reply at 10.  They also believe that
until final removal, Plaintiffs could be released – e.g., via BIA appeal or remand – and thus their
claims remain live.

The Court, however, need not decide this battle of competing affidavits or even decide
whether true re-adjudication occurred.  Class actions are "[n]ormally . . . moot if no named class
representative with an unexpired claim remain[s] at the time of class certification."  United
States v. Sanchez-Gomez, 138 S. Ct. 1532, 1538 (2018) (emphasis added).  The Supreme Court
has, however, recognized certain limited exceptions to this rule, situations where a lower court
may "relate [a] certification motion back' to a date when the individual claims were live."  J.D.
v. Azar, 925 F.3d 1291, 1307 (D.C. Cir. 2019) (emphasis added) (quoting Genesis Healthcare
Corp. v. Symczyk, 569 U.S. 66, 71 n.2 (2013)).  Relevant here, where "claims are so inherently
transitory that the trial court will not have even enough time to rule on a motion for class
certification before the proposed representative's individual interest expires," the Court has found

such relation back appropriate.  See County of Riverside v. McLaughlin, 500 U.S. 44, 52 (1991)

(emphasis added).  Otherwise, such claims would be "effectively unreviewable, because no

plaintiff [would] possess[ ] a personal stake in the suit long enough for litigation to run its

course."  Genesis Healthcare, 569 U.S. at 76.  Even assuming *arguendo* that the named

Plaintiffs' claims are moot, consequently, their proposed class action necessarily qualifies for

this "inherently transitory" exception.

It bears mentioning at the outset that the Supreme Court specifically "crafted the

exception in injunctive class actions," such as this one, "challenging criminal and immigration

detention procedures."  J.D., 925 F.3d at 1308.   To provide one example, that Court has held

that claims regarding certain bail-hearing practices are "inherently transitory" because "it is by

no means certain that any given individual, named as plaintiff, would be in pretrial custody

[awaiting a bail hearing] long enough for a district judge to certify the class."  Gerstein v. Pugh,

420 U.S. 103, 110 n.11 (1975); see also McLaughlin, 500 U.S. at 52 (same).

More recently, both the Supreme Court and the D.C. Circuit have had occasion to outline

the contours of the "inherently transitory" exception in the context of challenges to current

immigration-detention procedures.  First, in Nielsen v. Preap, 139 S. Ct. 954 (2019), the

Supreme Court reviewed a challenge to DHS's practice of detaining without bail immigrants

who had been convicted of certain crimes and were awaiting the conclusion of removal

proceedings.  Arguing that DHS's policy violated the Illegal Immigration Reform and Immigrant

Responsibility Act, the Preap plaintiffs brought two separate injunctive class actions seeking bail

hearings for those detained individuals.  Id. at 960–61.  By the time of class certification, the

named plaintiffs had obtained either cancellation of removal or bond hearings, and therefore the

Government argued that their claims were moot.  Id. at 963.  A plurality of the Court, however,

held that the class action was not moot (and therefore that the Court retained jurisdiction over the claims asserted) because at least one of the named plaintiffs in both cases faced the "threat of rearrest and mandatory detention."  Id.  Of significance here, even if the plaintiffs had not faced such a threat, the cases still would not have been moot, the plurality reasoned, because the harms alleged were "transitory enough to elude review."  Id. (emphasis added).  The plurality found these detention-based claims to be transitory because they end "as soon as the decision on removal is made," id., even though such immigrants "are held on average, for one year, and sometimes longer."  Id. at 976 (Thomas J., concurring in part and concurring in the judgment) (internal quotation marks omitted).

Taking up the mantle from the Preap plurality, the D.C. Circuit recently applied the "inherently transitory" exception in certifying a class consisting of unaccompanied alien children who challenged a policy that functioned as "an across-the-board ban on access to abortion" for those minors being detained by DHS.  See J.D., 925 F.3d. at 1299, 1299.  There, the representative plaintiffs' claims became moot when they left Government custody.  Id. at 1307.  In certifying the class, the D.C. Circuit canvassed the Supreme Court's jurisprudence concerning the "inherently transitory" exception – including the Preap decision – and discerned the following rule:

> In sum, the "inherently transitory" exception to mootness requires
> [courts] to determine (i) whether the individual claim might end
> before the district court has a reasonable amount of time to decide
> class certification, and (ii) whether some class members will retain
> a live claim at every stage of litigation.  An affirmative answer to
> both questions ordinarily will suffice to trigger relation back.

Id. at 1311.  The court further adopted a flexible approach for ascertaining whether a claim "might" end before certification, requiring "reasoned supposition" based on the "practicalities" of the litigation at issue.  Id. at 1310.  Applying that standard, the court held that the plaintiffs –

who were held in custody, and therefore subject to the policy, for "uncertain and unpredictable" lengths of time that averaged 3 months by the time of the court's decision – brought "inherently transitory" claims.  Id. at 1311.

This case presents a somewhat thorny variant on the "inherently transitory" exception because, as discussed above, the parties cannot agree as to when the named Plaintiffs' claims were mooted, if at all.  It is most likely that their claims remained live only from the period (lasting a maximum of six months) between their credible-fear determinations and their hearings before an Immigration Judge, at which time the parole calculus necessarily changed in character. As the Government argues, an alien facing an order of removal from an IJ presents a fundamentally different flight risk from one who is merely awaiting a hearing before an IJ, and the Parole Directive is silent as to the effect of such a decision.  See Def. MTD at 15.  This silence may be attributed to the fact that the procedural mandates of the Directive are generally applicable to the period immediately following the credible-fear determination.  See Parole Directive, ¶ 8.2 (noting that parole interview must occur "no later than seven days" following credible-fear finding).  It is also possible, as Defendants argue, that the "re-adjudications" provided to the named Plaintiffs at various points in time (usually within a few weeks of their IJ hearings) mooted their claims.  Finally, Plaintiffs argue that claims of this nature remain live until an asylum-seeker's receipt of a final order of removal, the termination of an adjudication process that can last well over a year.  The Court does not accept this theory, but if it did, the claims would not be moot in the first place.

This Court thankfully need not decide precisely when the named Plaintiffs' claims became moot – if at all – because it easily concludes that the nature of their claims is such that they "might" be mooted before certification.  First, either of the events that Defendants assert

mooted the named Plaintiffs' claims falls within the length of time that courts from the <u>Preap</u>

plurality to this Court have found to qualify as an "inherently transitory" period.   <u>See</u> <u>R.I.L.-R</u>,

80 F. Supp. 3d at 183 (period of unlawful detention lasting weeks or months qualified for

"inherently transitory" exception).   Months of detention may feel unbearably lengthy to those

being detained but represent a mere moment in the arena of civil litigation where, as Charles

Dickens famously noted in <u>Bleak House,</u> a case often "drags its dreary length."

Take, for example, Plaintiff M.R.M.H.  He arrived in the United States in January 2019

and received a credible-fear determination in mid-February of 2019.  <u>See</u> Compl., ¶ 79.  He was

ordered removed by an IJ on July 16, 2019, and had his parole re-adjudicated and denied on July

31.  <u>See</u> Sutterfield Decl., ¶ 8(c).  Accepting the Government's argument that the re-adjudication

mooted his claim, it remained live for about five months total and only a month and a half after

the filing of the Complaint.  Put differently, Defendants cannot maintain that the re-adjudications

and releases at issue here mooted Plaintiffs' claims, while simultaneously asserting that such

claims will generally continue to remain "live" for over a year in order to avoid the "inherently

transitory" exception.

Additionally, the "practicalities and prudential considerations" of this particular class

under review demand application of the "inherently transitory" exception.  As in <u>J.D.</u>, Plaintiffs

were detained without individualized parole review for "uncertain and unpredictable" periods of

time, the precise length of which was entirely under Defendants' control.  <u>J.D.</u>, 925 F.3d at 1342

(Silberman, J., dissenting) (disagreeing with the majority that the proposed class of detained

unaccompanied pregnant minors brought "inherently transitory" claims, but conceding that his

analysis would be different if the "average time of detention was [in] the Government's complete

control").  Even if some individuals detained by the Office might retain live claims for upwards

of a year, the reality of the immigration-detention process makes identifying those persons in advance largely impossible.  See Thorpe v. Dist. of Columbia, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (holding that claims regarding nursing-facility placement were "inherently transitory" because "[t]he length of any individual's stay in a nursing facility is impossible to predict, so even though there are certainly individuals whose claims will not expire within the time it would take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will be those individuals").

Defendants also assert that the Preap plurality's conclusion that the plaintiffs – who brought claims that generally remain live for about a year – qualified for the "inherently transitory" exception should be ignored because the plurality did not focus on the "amount of time at issue."  ECF No. 31 (Def. Reply) at 11.  The Court has several responses to this argument.  As an initial matter, the idea that the Preap plurality simply failed to notice the longevity of the claims involved strains credulity, especially given that two Justices dissented specifically from this aspect of the opinion.  See 139 S. Ct. at 975 (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in the judgment).  This precise argument, moreover, was raised by the J.D. dissenting judge, see J.D., 925 F.3d at 1341–42 (Silberman, J., dissenting), but was rejected by the majority, the decision of which this Court is bound to follow. J.D., 925 F.3d at 1309.   The J.D. majority instead embraced a "pragmatic" approach to the "inherently transitory" exception and outlined the factors just applied by this Court.  Id. at 1310. Judge Silberman's dissent in J.D. also advocated disregarding the time period involved in Preap and instead looking to whether the Government controls how long a claim will remain "live" (as was the case in Preap).  Id. at 1341 (Silberman, J., dissenting).  In this case, as noted, that factor also favors Plaintiffs.

In any event, the named Plaintiffs here bring claims that, according to Defendants, were generally extinguished well within a year.  This Court therefore need not assume that Preap sets an outer temporal bound because Plaintiffs' proposed class does not reach it.  In sum, given the realities of the claims involved here and the "practicalities" of the immigration-detention process generally, this Court has no trouble concluding that the named Plaintiffs' claims "might end before the district court has a reasonable amount of time to decide class certification." J.D., 925 F.3d at 1311.

Finally, the Government does not contest that Plaintiffs also satisfy the second factor necessary for invoking the "inherently transitory" exception – namely, that "some class members will retain a live claim at every stage of litigation." Id.  Plaintiffs present substantial evidence that the New Orleans Field Office continues to detain a great number of the members of the proposed class without granting them individualized parole determinations.  As of this month, more than 8,000 people were in ICE custody in Louisiana and Mississippi. See Pl. Response at 13.  This tide shows no sign of waning.  In other words, there will continue to be people seeking parole from the New Orleans Field Office immediately following credible-fear determinations. Plaintiffs have therefore established both requirements of the "inherently transitory" exception. The Court thus relates back class certification to the date of the pleadings, at which time, as Defendants concede, the class's claims certainly remained live.

B. Class Certification

Having disposed of Defendants' jurisdictional contentions, the Court can make quick work of the class-certification arguments it previously addressed in Damus.  To obtain certification, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements.  See Wal-Mart Stores, Inc. v. Dukes, 564

U.S. 338, 345 (2011).  According to Rule 23(a), a class may be certified only if: (1) it is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative are typical of those of the class ("typicality"), and (4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation").  Plaintiffs must show, in addition, that: (1) the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent adjudications, (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, or (3) questions of law or fact common to the members of the class predominate over any questions affecting only individual members.  See Fed. R. Civ. P. 23(b)(1)–(3).

Plaintiffs' proposed class here consists of "[(1)] [a]ll arriving asylum-seekers (2) who receive positive credible fear determinations; and (3) who are or will be detained by U.S. Immigration and Customs Enforcement; (4) after having been denied parole by the New Orleans ICE Field Office."  Compl., ¶ 120.  The Court finds that this proposed class meets the conditions supplied by Rule 23 for substantially the same reasons that the Damus plaintiffs satisfied those same requirements.  See Damus, 313 F. Supp. 3d at 329–35.  Given that the Government does not raise any new arguments regarding class certification here, this Court will not further elaborate on the discussion of these issues it previously provided.

C.   Merits of Injunction

The Court turns next to the merits of Plaintiffs' Motion for a Preliminary Injunction. They first assert that in failing to follow the Parole Directive, the New Orleans Field Office is acting contrary to law in violation of the APA.  See Compl., ¶¶ 129–33.  They also allege that

Defendants have violated both the APA and the Due Process Clause by neglecting to provide individualized parole adjudications to asylum-seekers. Id., ¶¶ 134–42. As in Damus, the Court narrows its focus to Plaintiffs' first theory, finding that it warrants injunctive relief. The discussion will first consider likelihood of success and next address irreparable harm and the public interest.

      1. *Likelihood of Success*

As was the case in Damus, Plaintiffs' first APA claim is based on the "Accardi doctrine." The doctrine takes its name from a Supreme Court decision holding that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions." Wilkinson v. Legal Servs. Corp., 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267–69 (1954)). The Supreme Court has also extended the doctrine to a challenge to a benefits determination that did not comply with the procedures set forth in an agency's internal manual. See Morton v. Ruiz, 415 U.S. 199, 232, 235 (1974). In applying the Accardi doctrine, the high court has reaffirmed that "it is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required," particularly where "the rights of individuals are effected." Id. at 235. In this Circuit, "Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." Battle v. FAA, 393 F.3d 1330, 1336 (D.C. Cir. 2005); see also Steenholdt v. FAA, 314 F.3d 633, 639 (D.C. Cir. 2003) ("The Accardi doctrine requires federal agencies to follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions.").

Accardi does not, however, provide an unlimited means of reviewing agency action; not every agency policy is enforceable in a court of law. According to the Supreme Court, the

enforceability of agency policies depends upon whether they impose binding norms on the agency.  Vitarelli v. Seaton, 359 U.S. 535, 539–40 (1959); Service v. Dulles, 354 U.S. 363, 372 (1957).  This Circuit has further clarified that "an agency pronouncement is transformed into a binding norm if so intended by the agency," a determination that takes into account the substance and intent of the agency action, as well as whether it confers individual protections or privileges. See Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987) (citations omitted).  In the immigration context, the Second Circuit has explained that the Accardi doctrine's "ambit is not limited to rules attaining the status of formal regulation," and that it can be applied to internal agency guidance.  See Montilla v. INS, 926 F.2d 162, 167 (2d Cir. 1991).

As this Court held in Damus, the Accardi doctrine applies to Plaintiffs' claim that Defendants have violated the APA in failing to abide by the Parole Directive.  See 313 F. Supp. 3d at 336–38.  The APA empowers litigants to challenge agency action that is arbitrary, capricious, and contrary to law, see 5 U.S.C. §§ 702, 706(2), and the Accardi doctrine provides them with a means by which they can hold agencies accountable to their own policies.  See, e.g., Burdue v. FAA, 774 F.3d 1076, 1082 n.2 (6th Cir. 2014) ("Under the doctrine outlined in Accardi, a party may always challenge an agency's failure to abide by its own regulations.") (internal citation omitted).  It is clear, moreover, that Accardi claims may arise under the APA. See, e.g., Schaefer v. Geren, 607 F. Supp. 2d 61, 68–70 (D.D.C. 2009), aff'd sub nom. Schaefer v. McHugh, 608 F.3d 851 (D.C. Cir. 2010) (addressing Accardi claim pursuant to allegation that Army Board for Correction of Military Records "acted arbitrarily, capriciously, and contrary to law" in violation of APA § 706(2)(A)).

As the Court previously explained in more detail, the Parole Directive qualifies as precisely the sort of "binding" agency policy affecting individual rights to which the Accardi

doctrine may govern.  See Damus, 313 F. Supp. 3d at 337; see also Abdi v. Duke, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) (holding that agency cannot "avoid application of Accardi by simply disclaiming any binding effect in the [D]irective itself" and that "[t]o find otherwise would render the teachings of Accardi and its progeny meaningless").  Plaintiffs' allegation that Defendants are neglecting "to follow their own procedures" in denying detainees parole therefore falls "well within the scope of the Accardi doctrine" and is "properly framed as a claim that the agency's actions were 'arbitrary, capricious, and an abuse of discretion.'"  Damus, 313 F. Supp. 3d at 337.

The question to be decided here, consequently, is whether the New Orleans Field Office, like the Offices discussed in Damus, is no longer following the Parole Directive.  It bears mentioning that Defendants have offered no evidence to the contrary beyond vague unsubstantiated assertions that the "[D]irective is still in effect in New Orleans."  Sutterfield Decl., ¶ 6.  In fact, in claiming that in response to this litigation the named Plaintiffs have had their parole statuses re-adjudicated "in accordance with the 2009 ICE Parole Directive," id., ¶ 8, Defendants seem to implicitly concede that such individualized review was not granted to those Plaintiffs previously.

Plaintiffs, on the other hand, offer a substantial body of evidence in support of their claim that the Office has ceased following the Directive.  First, the sheer percentage of asylum-seekers denied parole by the New Orleans Field Office offers them powerful ammunition.  In 2016, the Office denied parole in only 24.5% of the 229 decisions made.  In 2017, that denial rate skyrocketed to 82% of 78 decisions.  In 2018, it rose even higher to 98.5% of 130 decisions.  See ECF No. 22 (Pl. Motion for PI) at 8; id., Exh. 1 (Declaration of Sophie Beiers) at 1–4.  Finally, it has attained the unsurpassable height of a 100% denial rate this year.  See Pl. Response at 5.

These most recent denial rates are even higher than those of some of the Offices found to be out of compliance with the Directive in <u>Damus</u>.  <u>See</u> 313 F. Supp. 3d at 339 (noting that during the period in question two of the challenged Offices (Los Angeles and Detroit) denied 92% and 98% of parole applications, respectively).  Indeed, as of 2018, the New Orleans Field Office maintained the highest rate of parole denials of any field office in the United States.  <u>See</u> Pl. Response at 5.

DHS generally and the New Orleans Field Office specifically have continued to proclaim, however, that the Directive "remain[s] in full force and effect," and the Government has represented the same to the Supreme Court.  <u>See</u> Kelly Memorandum at 8; Sutterfield Decl., ¶ 6; Pet. Suppl. Reply Br., <u>Jennings v. Rodriguez</u>, No. 15-1204, at 6 n.2 (filed Feb. 21, 2017).  Yet Defendants offer absolutely no explanation for the precipitous nosedive in the parole-grant rates issued by an Office that has allegedly preserved the same underlying policy for making those decisions all along.

There's more.  Plaintiffs also offer a number of declarations from asylum-seekers and their advocates that describe the New Orleans Field Office's myriad violations of the Parole Directive.  These declarations attest to the automatic, rather than individualized, nature of the parole proceedings, various aspects of which run directly contrary to the guarantees provided by the Directive.  For example, various declarants assert that detainees often are not notified of the availability of parole.  Even when they are, they receive parole documents in a language they do not understand, and they are often not granted an interview.  <u>See, e.g.</u>, ECF No. 16 (Pl. Motion for Class Certification), Exh. 2 (Declaration of Dayana Mena López), ¶ 16; <u>id.</u>, Exh. 1 (Declaration of Ángel Heredia Mons), ¶ 18.  Sometimes the Office does not even respond to parole requests.  When it does, it issues boilerplate parole denials devoid of any individualized

explanations.  See, e.g., Heredia Mons Decl., ¶ 22; Pl. Motion for Class Certification, Exh. 4 (Declaration of J.M.R.), ¶ 23; id., Exh. 6 (Declaration of R.O.P.), ¶ 21.

It should come as no surprise then that, according to the declarants, officials associated with the New Orleans Field Office have made numerous comments that suggest they no longer feel constrained by the Parole Directive.  In response to Plaintiff R.O.P.'s request for an individualized parole inquiry, for example, a former Warden of one of the detention facilities under the Office's jurisdiction responded that he could not "possibly tend to everyone."  R.O.P. Decl., ¶ 25; see also ECF No. 15, Exh. 14 (Declaration of Joseph Giardina), ¶ 17 (New Orleans ICE officer told attorney he denies parole because it would be 99% impossible for an individual to demonstrate he is not a flight risk).  In response to the American Immigration Lawyers Association's inquiry as to whether the Directive remains in effect at the New Orleans Field Office, Assistant Field Office Director Brian Acuna stated, "[T]echnically no, by Executive Order."  Compl., Exh. A. (Email from Brian Acuna to Ana Sardi) at 4.  (He now retracts that statement, which he claims to have made in error.  See Def. MTD, Exh. C (Declaration of Brian Acuna), ¶¶ 10–13.)

The numbers and the affidavits provide a powerful case – one the Government barely attempts to rebut – that the New Orleans Field Office no longer follows the dictates of the Parole Directive.  The Court therefore finds that Plaintiffs have demonstrated a likelihood of success on the merits of their Accardi claim.

2. *Irreparable Harm*

To establish the existence of this second factor necessary for the issuance of a preliminary injunction, a party must demonstrate that its injury is "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  Chaplaincy of Full

Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The injury must also be "both certain and great; it

must be actual and not theoretical."  Id. (quoting Wisconsin Gas, 758 F.2d at 674).  Finally, the

injury must be "beyond remediation."  Id.  Like the plaintiffs in Damus, Plaintiffs here have

established that they will suffer irreparable harm without injunctive relief.  As the Court there

noted, detention irreparably harms individuals "in myriad ways," and the injuries at stake there

and here are "beyond remediation."  313 F. Supp. 3d at 342.

3.  *Balance of Harms and Public Interest*

Finally, these last two prongs pose no serious obstacle to Plaintiffs' request for a

preliminary injunction.  "The public interest is served when administrative agencies comply with

their obligations under the APA."  N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 21

(D.D.C. 2009).  In fact, the Parole Directive itself states that the detention of asylum-seekers who

are neither a flight risk nor dangerous is "not in the public interest" and thus requires an

individualized parole determination as to whether they should be released.  See Parole Directive,

¶ 6.2 (emphasis added).  The Court therefore finds that these two factors also favor Plaintiffs.

D.  Motion to Dismiss

In addition to opposing Plaintiffs' Motion for a Preliminary Injunction, Defendants have

moved to dismiss all of Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules

of Civil Procedure.  "The former Rule concerns subject-matter jurisdiction, the latter, 'failure to

state a claim upon which relief can be granted.'"  Arbaugh v. Y & H Corp., 546 U.S. 500, 512

(2006) (quoting Fed. R. Civ. P. 12(b)(6)).  "Motions to dismiss on grounds of mootness are

properly brought under Rule 12(b)(1)."  Flores ex rel. J.F. v. Dist. of Columbia, 437 F. Supp. 2d

22, 27 (D.D.C. 2006).  Defendants do not raise separate arguments in support of their Motion to

Dismiss but instead refer the Court to the <u>Damus</u> arguments.  The Court consequently reaches the same decision.

Specifically, the analysis provided above precludes Defendants' Motion to Dismiss Plaintiffs' APA claim.  As already explained, their class action is not moot, and the Court's conclusion that Plaintiffs have demonstrated a likelihood of success on the merits of their APA claim forecloses any argument for dismissing it.  Defendants' Motion to Dismiss Plaintiffs' due-process count, however, is destined for a brighter future.  In <u>Damus</u>, after finding that the plaintiffs had demonstrated a likelihood of success on the merits of their APA claims, this Court dismissed their due-process count, invoking basic principles of judicial restraint.  <u>Damus v. Nielsen</u>, No. 18-578, 2019 WL 1003440, at *2 (D.D.C. Feb. 28, 2019).  The Court sees no reason to chart a different course in this case.  Indeed, Plaintiffs have already expressed their acceptance of this approach.  <u>See</u> Pl. Response at 5–6.  Here, as in <u>Damus</u>, "the merits of the constitutional cause of action rise and fall in relevant part with the merits of Plaintiffs' APA claim[ ]," and the "same relief" would obtain for a violation of the APA.  <u>See</u> <u>Damus</u>, 2019 WL 1003440, at *2.  The Court therefore grants Defendants' Motion to Dismiss Plaintiffs' due-process claim, though it does so without prejudice.

## IV.    Conclusion

For these reasons, the Court will grant Plaintiffs' Motion for a Preliminary Injunction and Class Certification and grant in part and deny in part Defendants' Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ <u><em>James E. Boasberg</em></u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>September 5, 2019</u>