# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ángel Alejandro Heredia Mons et al.** ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | **Civ. No.: 1:19-cv-01593** |
| ) | |
| **Kevin K. McALEENAN et al.** ) | |
| ) | |
| *Defendants/Respondents.* ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## <u>EMERGENCY MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 2

II.  FACTUAL BACKGROUND ..................................................................................... 2

  A.  The Parties ........................................................................................................... 2

  B.  The COVID-19 Virus .......................................................................................... 4

  C.  COVID-19 Poses a Grave Risk of Harm to Persons in Congregate Unhygienic
  Environments Such as the Facilities Currently Housing All Class Members. ................... 6

  D.  Older Adults and Those with Certain Medical Conditions Are Particularly
  Vulnerable to the Grave Risk of Harm, Including Serious Illness or Death. ...................... 9

  E.  People Detained in the Region Face an Elevated Risk of COVID-19 Transmission. 10

  F.  Many Class Members Present High-Risk Vulnerability to COVID-19. ..................... 12

  G.  This Court Should Require NOLA ICE to Immediately Reassess Parole for All of
  Class Members and Should Prioritize the Cases Most Vulnerable to COVID-19. ........... 15

III. LEGAL STANDARD ............................................................................................... 16

  A.  Preliminary Issues .............................................................................................. 16

    1)  Jurisdiction. .................................................................................................. 16

    2)  Class Certification ......................................................................................... 17

  B.  Legal Framework Governing Parole Decisions ............................................... 17

    1)  The INA and Implementing Regulations ....................................................... 17

  C.  Legal Requisites for Establishing a Preliminary Injunction ......................... 22

IV.  ARGUMENT ............................................................................................................. 23

  A.  Likelihood of success on merits ......................................................................... 23

    1)  Plaintiffs' Claims Arise under the APA. ....................................................... 25

    2)  The Directive is binding o nICE and DHS under the Accardi doctrine. ........ 27

    a.  The Directive is binding because it impacts rights of arriving aliens. ............ 27

    b.  The Directive is binding because the boilerplate language it contains is ineffective
    and does not enable Defendants to evade legal challenges. ............................................ 29

    3)  Defendants persistently refuse to adhere to the binding directive during the COVID-19
    pandemic, despite the issuance of a prior order by this Court granting injunctive relief. ..... 30

    a.  Parole grant rates continue to be abysmal and a departure from previous
    application of the Directive, with no rational justification. ............................................. 31

    b.  Defendants often deny parole without arriving aliens ever having applied,
    indicating that they are not conducting individualized determinations as required by
    the Directive. ................................................................................................................. 32

**c.   Defendants explicitly state that applying for parole is futile, and parole grants will not be issued.** ................................................................................................................ 33

**d.   Defendants fail to provide a reasonable amount of time for arriving aliens to submit parole applications.** ............................................................................................ 34

**e.   Defendants continue to determine flight risk and danger arbitrarily, despite mounting evidence in favor of granting parole.** ............................................................ 34

**f.   Defendants disregard the vulnerability of individuals with medical issues and ignore provisions that parole of such persons is justified.** ................................................ 37

*4)   Plaintiffs' claims validly challenge final agency action, entitling them to judicial review of those claims under the APA.* .............................................................................. 38

*5)   Defendants' refusal to adhere to the Directive renders their actions arbitrary and capricious under the INA, requiring their actions to be overturned under the APA.* .......... 39

**a.   Defendants' actions are arbitrary and capricious under the APA.** ........................ 39

**b.   Defendants' actions are contrary to law, as they violate the INA.** ......................... 41

**B.   Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.** .............. 42

*1)   Plaintiffs Will Become Infected with COVID-19 if They Remain in Detention.* ............ 43

*2)   Plaintiffs Will Likely Become Ill and/or Die from Infection if They Remain in Detention.* 45

*3)   Current Protocols of ICE to Address COVID-19 Do Not Address, and Instead Worsen and Increase Likelihood of, Infection and/or Death from COVID-19.* ................................ 46

**C.   The Balance of Harms and the Public Interest Both Favor Injunctive Relief.** .......... 47

**CONCLUSION** ................................................................................................................ 49

# TABLE OF AUTHORITIES

## Cases

*Abdi v. Duke*, 280 F. Supp. 3d 373, 385 (W.D.N.Y. 2017) .......................................................... 16

*Aptheker v. Sec'y of State*, 378 U.S. 500, 505-509 (1964) ........................................................ 28

*Aracely v. Nielsen*, 319 F.Supp.3d 110, 149, 157 (D.D.C. 2018).......................................... passim

*Bennet v. Spear*, ..................................................................................................................... 27, 38, 42

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ............... 42, 46

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C., 2018)........................................................ passim

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ......................................... 22

*DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) ............... 28

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019)
................................................................................................................................................... 22

*Hi-Tech Pharmacal Co. v. United States FDA*, 587 F. Supp. 2d 1, 8 (D.D.C. 2008) ................. 23

*INS v. Yang*, 519 U.S. 26 (1996)............................................................................................... 31, 40

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977)................................... 48

*Klayman v. Obama*, 957 F.Supp.2d 1 (D.D.C. 2013) .................................................................. 48

*Las Americas v. Trump*,
      available at https://www.splcenter.org/sites/default/files/documents/0029._03-27-
      2020_emergency_motion_for_tro.pdf...................................................................................... 4

*Lopez v. FAA*, 318 F.3d 242, 246–48 (D.D.C. 2003)................................................................... 30

*Mons v. McAleenan*, No. CV 19-1593 (JEB), 2019 WL 4225322, (D.D.C. Sept. 5, 2019) .. passim

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)................................. 23

*Morton v. Ruiz*, 415 U.S. 199, 231 (1974)............................................................................... passim

*R.I.L-R. v. Johnson, 80 F. Supp. 3d 164 (D.D.C. 2015)* .................................................. 17, 38, 47

*Ramirez v. U.S. Customs & Enf't, 310 F.Supp.3d 7 (D.D.C. 2018)* ...................................... 38, 39

*Service v. Dulles*, 354 U.S. 363, 38 (1957)................................................................................... 27

*Sottera, Inc. v. FDA, 627 F.3d 891 (D.C. Cir. 2010)* ................................................................. 22

*U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)......................................................... 27

*Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925 (D.D.C. 2008)......................................... 38

*Vitarelli v. Seaton, 359 U.S. 535 (1959)* .................................................................................... 27

*Youngberg v. Romeo, 457 U.S. 324 (1982)*................................................................................. 28

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................................................................................... 16

## Statutes

§ 212(d)(5)(A).................................................................................................................................. 41

5 U.S.C. § 551 ............................................................................................................................ 26, 29

5 U.S.C. § 701 .................................................................................................................................. 25

5 U.S.C. § 704 ............................................................................................................................ 28, 38

5 U.S.C. § 706 .................................................................................................................................. 25

5 U.S.C. § 706(2)(A)................................................................................................................... 39, 40

5 U.S.C.A. § 553 .............................................................................................................................. 42

5 U.S.C.A. § 553 A ................................................................................................ 25

6 U.S.C. § 251-98 .................................................................................................. 24

8 U.S.C. § 1103(a)(3) (2008) ................................................................................ 24

8 U.S.C. § 1182(d)(5)(A) ...................................................................................... 18

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................................ 17

*8 U.S.C. § 1252(f)(1)* .......................................................................................... 16

Administrative Procedures Act ........................................................................ passim

Immigration and Nationality Act ...................................................................... 1, 17

INA § 212(d)(s)(A) ................................................................................................ 24

**Rules**

8 C.F.R. § 208.30(f) .............................................................................................. 17

8 C.F.R. § 212.5 ................................................................................ 24, 41, 42, 47

8 C.F.R. § 212.5(b) ......................................................................................... passim

8 C.F.R. § 235.3(c) ............................................................................................... 18

8 C.F.R. 212.5(c)-(d) ............................................................................................ 41

Rule 23 .................................................................................................................... 1

In accordance with this Court's decisions in *Mons v. McAleenan*, No. CV 19-1593 (JEB), 2019 WL 4225322, (D.D.C. Sept. 5, 2019), and *Damus v. Nielsen,* 313 F. Supp. 3d 317, (D.D.C., 2018)*,* and due to the likelihood of irreparable harm that COVID-19 poses to Plaintiffs-class members' well-being and safety, Plaintiffs move this Court to expeditiously grant their request for a preliminary injunction and order Defendants to act as follows: 1) immediately conduct individualized parole assessments for all present and future members of the provisional class, as defined by this Court in *Mons*[1]; 2) enjoin from denying parole to any provisional class members, absent an individualized determination that such provisional class member presents a flight risk or a danger to the community, as concluded pursuant only to the process[2] and limits on use of discretion provided in Enforcement Directive No. 11002.1 ("Directive"); 3) base individualized determinations of flight risk and danger to the community on the specific facts of each provisional class member's case, not categorical criteria; 4) provide class members with parole determinations that conform to all substantive and procedural requirements of the Directive; 5) given the dangers posed by COVID-19, ensure compliance with parole standards pertaining to individuals with a) serious medical conditions, and/or b) whose continued detention is not in the public interest, pursuant to the Immigration and Nationality Act ("INA") and its implementing regulations.

---

[1] The Court finds that this proposed class meets the conditions supplied by Rule 23 for substantially the same reasons that the *Damus* plaintiffs satisfied those same requirements. *See Damus*, 313 F. Supp. 3d at 329–35. *Mons v. McAleenan*, 2019 WL 4225322, at *8.

[2] Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

## INTRODUCTION

Plaintiffs' travails are not novel to this Court.[3] Despite this Court's prior Order, over seventy-five percent of Plaintiffs are still denied parole without an individualized assessment.[4] The harrowing COVID-19 pandemic that has ravaged most of the world is sweeping through the United States, presenting a grave threat of irreparable harm to Plaintiffs-class members.  Plaintiffs first discuss the nature and scope of this deadly, novel disease, the magnitude of which is unprecedented, and the conditions present in the facilities where Plaintiffs-class members are detained, rendering them vulnerable to imminent risk of irreparable harm and death during the pandemic.  Plaintiffs also present evidence supporting their request for immediate, individualized assessments of parole eligibility for all present and future class members; and urge this Court to require NOLA ICE officials to comply with the applicable regulations and parole standards when engaging in these immediate, individualized parole assessments, including standards applicable to class members with serious medical conditions, and whose continued detention is not in the public interest, given the dangers posed by the COVID-19 pandemic.

## I.      FACTUAL BACKGROUND

### A.  The Parties

Plaintiffs are all present and future members of the class that this Court has provisionally certified, (Doc. No. 33), i.e., arriving aliens eligible for parole, who are currently detained or will be detained by Defendant NOLA ICE. Plaintiffs are or will be detained at the various detention

---

[3] *See* Order granting preliminary injunction and provisional class certification, R. Doc. 33.
[4] Since this Court's September 5 Order, Defendants have submitted five reports which Plaintiffs discuss in more detail in Section III(B)(2), *infra*.

facilities that the NOLA ICE region comprises,[5] as they await the final adjudication of their civil immigration removal proceedings.

Many Plaintiffs are older adults or have medical conditions that lead to high risk of serious COVID-19 infection, including diabetes, asthma, hypertension, human immunodeficiency virus (HIV), weakened immune systems from prior treatments for cancer, and psychiatric illness.[6] The State of Louisiana is home to the largest number of immigration detention facilities in the NOLA ICE region, with Mississippi a distant second.

The danger posed by Plaintiffs' detention during the current outbreak of COVID-19 is so grave and imminent that it must be properly weighed by ICE in an immediate assessment of parole for all class members, particularly as it relates to the Directive's express language regarding people who have serious medical conditions, and people whose continued detention is not in the public interest. For these reasons, Plaintiffs request a preliminary injunction requiring Defendants to conduct immediate, individualized parole assessments for all class members presently detained in the NOLA ICE region and for all future class members thereafter.

---

[5] including but not limited to Adams County Detention Center ("Adams"), Catahoula Correctional Center ("Catahoula"), Pine Prairie ICE Processing Center ("Pine Prairie"), Richwood Correctional Center ("Richwood"), River Correctional Center ("River"), South Louisiana Detention Center ("South Louisiana"), Tallahatchie County Correctional Facility ("Tallahatchie"), LaSalle ICE Processing Center ("LaSalle"), and Winn Correctional Center ("Winn").

[6] "In South Korea, 20% of deaths occurred in what they defined as Psychiatric Illness," Franco-Paredes Exp. Decl. ¶17, Table 1.

**B.  The COVID-19 Virus**

The novel COVID-19 virus has led to a global pandemic. Over the last several months, 634,835 people worldwide have received confirmed diagnoses of COVID-19, and over 29,895 people have died.[7] The United States now leads in the number of confirmed cases globally.[8]

There is no vaccine against COVID-19 and there is no known cure.[9] According to preliminary data from China, South Korea, Italy, Spain, and the United States, 80 percent of confirmed cases tend to occur in persons 30 to 69 years of age regardless of underlying medical conditions, and 20 percent of those individuals develop severe symptoms or become critically ill. Franco-Paredes Exp. Decl.  ¶17. COVID-19 is most likely to cause serious illness and elevated risk of death for older adults and those with certain medical conditions or underlying disease. Franco-Paredes Exp. Decl. ¶12. Those particularly vulnerable includes people with weakened immune systems (including due to cancer treatment), chronic lung disease, asthma, serious heart conditions, diabetes, renal failure, liver disease, and possibly pregnancy.[10]

Among those with severe clinical manifestations, regardless of their age or underlying medical conditions, the virus progresses into respiratory failure, septic shock, and multiorgan dysfunction requiring intensive care support including the use of mechanical ventilator support. Franco-Paredes Exp. Decl. ¶17. The only known effective measures to reduce the risk of serious

---

[7] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-69, March 29, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200329-sitrep-69-covid-19.pdf?sfvrsn=8d6620fa_4.

[8] "The U.S. Now Leads the World in Confirmed Coronavirus Cases," New York Times, March 26, 2020, https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html.

[9] Expert Declaration of Joshua Sharfstein, ¶ 6, filed in support of Plaintiffs' Motion for Temporary Restraining Order in *Las Americas v. Trump*, available at https://www.splcenter.org/sites/default/files/documents/0029._03-27-2020_emergency_motion_for_tro.pdf. ("Sharfstein Decl."). See also, World Health Organization, Q & A on COVID-19, March 9, 2020, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[10] *Id.*

illness or death caused by COVID-19 are social distancing and improved hygiene, which have led to unprecedented public health measures around the world and in the United States.[11]

Detention of any kind requires large groups of people to be held together in a confined space and creates the worst type of setting for curbing the spread of a highly contagious infection such as COVID-19. Franco-Paredes Exp. Decl. ¶23. People who are confined in detention centers will find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with thoughtful guidance and plans in place. Franco-Paredes Exp. Decl. ¶¶11,12. For this reason, several jurisdictions  at the urging of public health experts, are ordering the release of people from jails, prisons and detention centers.[12]

Moreover, a release of and moratorium on the detention of future class members allows for greater risk mitigation for all people detained or working in these detention centers. Franco-Paredes Exp. Decl. ¶¶ 22,28.  Release of *Mons* class members from custody would also reduce the burden on the region's limited health care infrastructure, as it lessens the likelihood of an overwhelming number of people becoming seriously ill from COVID-19 at the same time. Franco-Paredes Exp. Decl. ¶27. Louisiana Governor John Bel Edwards recently reported that Louisiana has seen the fastest rate of growth of COVID-19 virus in the world.[13] The situation is so dire in

---

[11] Expert Declaration of Dr. Robert Greifinger, ¶ 4, available at https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-robert-greifinger.

[12] Prison Policy Initiative, "Responses to the Covid-19 Pandemic," March 27, 2020, available at https://www.prisonpolicy.org/virus/virusresponse.html. *See also* BBC News, "US jails begin releasing prisoners to stem Covid-19 infections," March 19, 2020 available at https://www.bbc.com/news/world-us-canada-51947802 (noting efforts in the states of Ohio, California, Colorado, New York, Alabama, New Jersey, South Carolina, Florida, Texas, Washington, Utah and Louisiana ordering the release of people from incarceration and detention)

[13] Hollie Silverman, *Louisiana Governor says his state has the fastest growth rate of coronavirus cases in the world*, CNN.COM (March 24, 2020), https://www.cnn.com/2020/03/23/us/louisiana-coronavirus-fastest-growth/index.html (accessed March 26, 2020).  *See also,* Louisiana Governor's Office of Homeland Security and Emergency Preparedness, *COVID-19 Louisiana Case Info*, https://gov.louisiana.gov/assets/docs/covid/govCV19Brief-2.pdf (releasing data by a researcher at

Louisiana that on March 22, 2020, Governor Bel Edwards issued a statewide "stay-at-home" order, in an attempt to stem the horrific growth of the COVID-19 virus in the state.[14]

### C. COVID-19 Poses a Grave Risk of Harm to Persons in Congregate Unhygienic Environments Such as the Facilities Currently Housing All Class Members.

Immigration detention centers in the United States are tinderboxes for the transmission of highly transmissible infectious pathogens including the SARS-CoV-2, which causes COVID-19. Franco-Paredes Exp. Decl. ¶15. In addition, these detention centers are often unhygienic environments. Scharf Exp. Decl. ¶18 at (a)(i). Once an outbreak is underway inside a detention facility, a person in such a facility is expected to be at a high risk of acquiring the virus and transmitting it to others inside.[15] Infectious diseases that are communicated by air or touch are more likely to spread in these environments. Franco-Paredes Exp. Decl. ¶23. A recent study showed that the virus could survive for up to three hours in the air, four hours on copper, up to twenty-four hours on cardboard, and up to two to three days on plastic and stainless steel.[16] This presents an increased danger for the spread of COVID-19 if and when it is introduced into a detention facility. Franco-Paredes Exp. Decl. ¶¶18,20.

---

the University of Louisiana Lafayette found that Louisiana presently has the fastest spread of COVID-19 of any region in the world).

[14] Same Karlin, *John Bel Edwards urges residents to heed stay-at-home order*, THE ADVOCATE (March 23, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_df60a9ec-6d5c-11ea-ac94-c3207fa0a583.html (accessed March 26, 2020); Office of the Louisiana Governor, https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf (last accessed March 26, 2020).

[15] Tulane Open Letter, available at https://sph.tulane.edu/open-letter-covid19-jail, last accessed Mar. 26, 2020.

[16] *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show.* TIME (https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/) (last visited March 26, 2020). A new study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was a communal mall bathroom. Cai J, Sun W, Huang J, Gamber M, Wu J, He G. Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020. Emerg Infect Dis. 2020 Jun. (https://doi.org/10.3201/eid2606.200412) (last visited March 26, 2020).

Enclosed group environments, like cruise ships or nursing homes, have become the sites for the most severe outbreaks of COVID-19.[17]  Immigration detention facilities have even greater risk of infectious spread because of crowding, the proportion of vulnerable people detained, and often scant medical care resources. Franco-Paredes Exp. Decl. ¶¶12,13. People living in such close quarters cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Franco-Paredes Exp. Decl. ¶12. *See also* Scharf Exp. Decl. ¶¶24,26. In addition, many immigration detention facilities lack adequate medical infrastructure to address the spread of infectious disease and treatment of people most vulnerable to illness in detention. Franco-Paredes Exp. Decl. ¶ 13.

Class members are held in crowded confinement with dangerously unsafe hygienic conditions. At Richwood, for example, some are housed in dorms with as many as 100 men who are forced to share four toilets, four sinks, and five showers in a shared room. O.M.H. Decl. ¶10. At Adams, some are housed in dorms holding as many as 240 men who are forced to share six toilets, 12 sinks, and one shower room with 12 showerheads in close proximity. S.U.R. Decl. ¶13. At South Louisiana, as many as 72 women are housed in a single dorm with beds less than two feet apart from one another and forced to share three toilets, three sinks, and six phones, none of which are properly sanitized. K.S.R. Decl.¶15; L.P.C. Decl. ¶¶14,16. These women also report that they are not provided enough toilet paper and had no toilet paper for nearly a week in March 2020. *Id.* At LaSalle, some class members are housed in dorms with more than 90 men who are forced to share five toilets, eight sinks and one shower room. T.M.F. Decl. ¶14.

---

[17] Centers for Disease Control and Prevention,
https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship;
https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/prevent-spread-in-long-term-care-facilities.html, last accessed March 26, 2020.

Class members also report suffering from diarrhea and lack of nutrition due to the poor quality of food they are provided. S.U.R. Decl. ¶13; O.M.H. Decl. ¶10; K.S.R Decl. ¶10; R.P.H. Decl. ¶19; and L.P.C. Decl. ¶23. At most of the facilities, class members report that detention center staff are not taking recommended precautions, are not providing COVID-19 education, are not consistently utilizing masks or gloves, and are not providing hand sanitizer, disinfectant or sufficient soap for detainees to clean themselves. T.M.F. Decl. ¶¶15-16, 19; Y.P.T. Decl. ¶¶15-16, 22-23; R.P.H. Decl. ¶¶19-21; L.P.C. Decl ¶¶15, 22; O.M.H. Decl. ¶ 8; S.U.R. Decl. ¶¶ 14-15; and K.S.R. Decl. ¶¶14,18. Many who are desperate for information related to COVID-19 have been met with force or harm in these facilities.[18] Under these conditions, class members cannot practice proper social distancing or hygiene, the only known methods to stem the rapid spread of COVID-19. Franco-Paredes Exp. Decl. ¶¶11,12; *see also* Scharf Exp. Decl. ¶24.

Moreover, given the high population density of these facilities and the ease of transmission of this viral pathogen, the infection rate will be exponential if even a single person, with or without symptoms, who is shedding the virus enters a facility. Franco-Paredes Exp. Decl. ¶20. Of those infected, about one-fifth will get so ill that they require hospital admission. *Id*. About ten percent will develop severe disease requiring treatment only available in the intensive care unit, at least five percent of whom will likely die from respiratory failure, septic shock and multiorgan failure. *Id*. If those who require it cannot be hospitalized, many more will die in detention without access to necessary medical equipment, such as ventilators. *Id.* at ¶21.

---

[18] Mother Jones, "ICE Detainees Were Pepper-sprayed During a Briefing on Coronavirus," March 26, 2020, available at https://www.motherjones.com/politics/2020/03/ice-detainees-were-pepper-sprayed-during-a-briefing-on-coronavirus/?fbclid=IwAR0vM4J5UTiubdNO_X-Cc5m2MWYyVf2vU1FFzwjNuU-KTAWGz01nA2Y6V1A. *See also* Mother Jones, "ICE Detainee Reports He was Pepper-Sprayed and Sent to Isolation," March 25, 2020, available at https://www.motherjones.com/politics/2020/03/ice-geo-detention-pine-prairie-pepper-spray-louisiana/.

**D. Older Adults and Those with Certain Medical Conditions Are Particularly Vulnerable to the Grave Risk of Harm, Including Serious Illness or Death.**

The COVID-19 pandemic is devastating the United States. As of March 29, 2020, there have been 103,321 confirmed cases and 1,668 deaths.[19] Moreover, the transmission of COVID-19 grows exponentially. Franco-Paredes Exp. Decl.  ¶20-21. People over the age of 50 and those with certain medical conditions face greater chances of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious COVID-19 disease for people of any age, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, cancer treatment, HIV, or other autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, pregnancy and psychiatric illness. Franco-Paredes Exp. Decl. ¶16, Table 1.

In most people, COVID-19 causes fever, cough, and shortness of breath. But for people over fifty or with high-risk medical conditions, the shortness of breath can often be severe.[20] Even in younger and healthier people, infection of this virus requires supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[21]  Most people in higher risk categories who develop serious disease, however, will need advanced support. Franco-Paredes Exp. Decl. ¶24. This level of support can quickly exceed local health care resources. Franco-Paredes  Exp. Decl. ¶26.[22]

---

[19] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-69, March 29, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200329-sitrep-69-covid-19.pdf?sfvrsn=8d6620fa_4.
[20] Expert Declaration of Dr. Jonathan Golob ¶5, available at https://www.aclu.org/legal-document/dawson-v-asher-expert-declaration-dr-jonathan-golob?redirect=dawson-v-asher-expert-declaration-dr-jonathan-golob.
[21] *Id.*
[22] According to recent estimates, the fatality rate of people infected with COVID-19 is about *ten times* higher than a severe seasonal influenza, even in advanced countries with highly effective health care

Preliminary data from China showed that twenty percent of people in high-risk categories who have contracted COVID-19 there have died.[23] Social distancing and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. Scharf Exp. Decl. ¶24. Projections by the Centers for Disease Control and Prevention (CDC) indicate that between 160 million and 214 million people in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention, with as many as 1.7 million deaths in the most severe projections.[24] Many Plaintiffs qualify as having high-risk vulnerability to COVID-19. *Infra* Note, Section IV.

### E.  People Detained in the Region Face an Elevated Risk of COVID-19 Transmission.

The NOLA ICE region comprises five states: Louisiana, Mississippi, Alabama, Arkansas, and Tennessee. The majority of class members  are housed in facilities located in Mississippi and Louisiana, with the latter state hosting the largest number of detention facilities, housing as many as 8,000 people[25] at any given time in aggregate.[26]

---

systems. For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent. Franco-Paredes  Exp. Decl. ¶26

[23] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer"); Wei-jie Guan et al., *Comorbidity and its impact on 1,590 patients with COVID-19 in China: A Nationwide Analysis*, medRxiv (Feb. 27, 2020), at 5.

[24] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, N.Y. TIMES (March 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html (accessed March 26, 2020).

[25] "[W]here the immigrant detainee population has surged in recent months and hit 8,000 earlier this year." PBS News, December 4, 2019, available at https://www.pbs.org/newshour/nation/ice-confirms-officers-in-louisiana-jail-pepper-sprayed-protesting-migrants.

[26] As stated *supra*, Louisiana has seen the fastest rate of growth of COVID-19 infection for the first 13 days of any area in the world, prompting the Governor to issue a "stay-in-place" order to stem the tide of COVID-19's rapid spread. See Office of the Louisiana Governor, https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf (last accessed March 26, 2020).

As of March 29, 2020, there were 3,540 confirmed cases of COVID-19 and 151 deaths from COVID-19 reported in Louisiana.[27] As of March 29, 2020, there were 847 confirmed cases and 16 deaths from COVID-19 reported in Mississippi.[28] The COVID-19 outbreak in Louisiana has resulted in unprecedented health measures to facilitate and enforce social distancing, as evidenced by the Governor's "stay-in-place" order issued March 22, 2020.[29] While schools, businesses, and government facilities close around the state, a high risk remains that COVID-19 will spread at the numerous immigration detention facilities in the State. Franco-Paredes Exp. Decl. ¶ 15.

Louisiana has the highest per capita rate of COVID-19 incidence in the world. Scharf. Exp. Decl. ¶17 at (h). The areas in which ICE NOLA centers are located are characterized by low medical access and public citizen health illiteracy. *Id* at (i). The managers hired by the region's ICE contractors (namely the GEO Group and LaSalle Corrections) have little training to cope with infectious disease. *Id* at (j).[30] COVID-19 has already begun to spread within Louisiana's carceral system. At the Federal Correctional Center in Oakdale, Louisiana which is located a few feet away from the Oakdale Immigration Court and a mere twenty-minute drive from Pine Prairie, at least sixty inmates are in quarantine and at least one has died due to a COVID-19 outbreak.[31]

---

[27] Louisiana Department of Health statistics, updated daily, available at: http://ldh.la.gov/Coronavirus/.
[28] Mississippi Department of Health statistics, updated daily, available at: https://msdh.ms.gov/msdhsite/_static/14,0,420.html.
[29] Office of the Louisiana Governor, https://gov.louisiana.gov/assets/Proclamations/2020/JBE-33-2020.pdf (last accessed March 26, 2020).
[30] *See also* Declaration of Laura G. Rivera, Esq.
[31] Washington Post, "An explosion of coronavirus cases cripples a federal prison in Louisiana," March 29, 2020, available at https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

**F.  Many Class Members Present High-Risk Vulnerability to COVID-19.**

People who are over fifty or of any age with certain specified medical conditions, "are deemed to be at high risk of developing severe disease and dying from COVID-19." Franco-Paredes Exp. Decl. ¶16. R.P.H. is a 50-year-old Cuban national currently detained at South Louisiana. R.P.H. Decl. ¶1. She has been detained by ICE since July 25, 2019. *Id* at ¶13.  R.P.H. is a breast cancer survivor who has undergone multiple rounds of radiation throughout her life and is currently experiencing spinal cord inflammation affecting her nervous system. *Id* at ¶¶4-5,20. She is eligible for parole, but she has been denied four times despite submitting requests supported by evidentiary documents. *Id* at ¶14. R.P.H.'s health is rapidly deteriorating in detention, where she has experienced flu-like symptoms including body pain, sore throat, ear pain, fever, dizziness, nausea, headaches, and loss of vision. *Id* at ¶¶15-18. She is exposed to at least seventy-two other detained women, with many presenting flu-like symptoms and is unable to practice social distancing. *Id* at ¶¶22,25. R.P.H. is critically vulnerable to COVID-19 because of her weakened immune system, history of recurring cancer, and the conditions of confinement at South Louisiana.

O.M.H. is a thirty-two year-old Venezuelan national detained at LaSalle. O.M.H. Decl. ¶1. He has been detained by ICE since May 2019, and was recently transferred from Richwood, where he spent most of his time in detention. *Id* at ¶¶1,4. He is eligible for parole, but his requests for release have not been granted and his last application remains pending. *Id* at ¶¶6,10. O.M.H. is HIV-positive and suffers from Hepatitis C, depression, and anxiety. *Id* at ¶¶1,6. O.M.H. was not provided medication to treat his HIV condition until about January 2020. *Id* at ¶6. Despite the threat of COVID-19 and the overcrowded dorms, ICE continued to transfer new detainees to Richwood as recently as March 23, 2020, without implementing any proper quarantine precautions. *Id* at ¶9. O.M.H. lost a significant amount of weight, necessitating at least two visits

to the nearest hospital. *Id* at ¶¶9,11. O.M.H. is vulnerable to COVID-19 because of his HIV and Hepatitis C diagnoses, as well as his deteriorating health due to his conditions of confinement.

B.A.E. is a Cameroonian national currently detained at LaSalle. B.A.E. Decl. ¶1. He has been detained by ICE since October 2019. *Id* at ¶6.  B.A.E. suffers from a chest muscle injury, a recurrent fever, and a wound in his throat. *Id* at ¶ 8-9. He is currently seeing blood in his stool and when he coughs. *Id*. He is eligible for parole and has applied three times, but all his requests were denied. *Id*. Despite his symptoms, LaSalle has not provided him with adequate medical care, refusing to run tests to determine the cause of his ailments. *Id*. B.A.E. is vulnerable to COVID-19 because of his current state of health and due to the conditions of confinement at LaSalle.

Y.P.T. is a thirty-year-old Cuban national detained at Catahoula. Y.P.T. Decl. ¶1. Y.P.T. has been detained by ICE since August 2019, and is eligible for parole. *Id* at ¶¶8,10. Y.P.T. applied for parole three times, but his requests were denied. *Id* at ¶¶10,27. In or about February 2020, he suffered a fall that resulted in a right foot fracture. *Id* at ¶18. He was forced to wait over one week before being taken to a hospital to get a proper diagnosis of his fracture. *Id*. His ankle and foot remain swollen. *Id*. Y.P.T. has been confined to a wheelchair for over one month and is unable to bathe or mobilize without the assistance of other detained men. *Id* at ¶19. During a recent hospital visit, Y.P.T. was openly exposed to at least twelve other individuals without any social distancing measures or other precautions to protect him and others. *Id*. Y.P.T. is vulnerable to COVID-19 due to his weakened health as a result of his immobility and his conditions of confinement.

S.U.R. is a 59-year-old Nicaraguan national detained at Adams. S.U.R. Decl. ¶1. S.U.R. has been detained by ICE for over 13 months *Id*. S.U.R. suffers from hypertension and a systolic heart murmur, requiring medication and medical supervision. *Id*. He is eligible for parole but was denied once without the opportunity to affirmatively apply. *Id* at ¶¶7-9. He filed a redetermination

request but never received a response. *Id*. S.U.R. is held in a dorm with 240 men, some of whom are over the age of fifty-five and others who suffer from illnesses including diabetes, asthma and hypertension. *Id* at ¶¶13,16. S.U.R. is critically vulnerable to COVID-19 because of his age and significant health conditions.

T.M.F. is a 44-year old Cameroonian national detained at LaSalle. T.M.F. Decl. ¶ 1. T.M.F. has been detained by ICE since October 28, 2019. *Id.* at ¶ 7. T.M.F. suffers from depression and chronic injuries due to torture he endured in Cameroon, including to his eyes, back, wrists and knees. *Id* at ¶ 13. He is eligible for parole and has applied twice, but both requests were denied. *Id* at ¶¶ 9-10. An immigration judge granted T.M.F. Withholding of Removal in early March 2020, but ICE refuses to release him from detention. *Id* at ¶¶10-11. Throughout his detention, T.M.F.'s conditions of confinement have been unsanitary and lacking in access to adequate medical care. *Id* at ¶¶12-15. T.M.F. is vulnerable to COVID-19 because of his chronic health issues and due to his conditions of confinement.

K.S.R. is a twenty-seven-year-old Cuban national detained at South Louisiana. K.S.R. Decl. ¶1. She has been detained by ICE since October 2019. *Id* at ¶5. She is parole-eligible but her multiple requests were denied, despite extensive supporting evidence in her applications. *Id*. ¶7. K.S.R. was diagnosed with H1N1 influenza in early March 2020, after she experienced high fever, vomiting, and coughing. *Id*. She continues to have flu-like symptoms with minimal improvement. *Id* at ¶9.  K.S.R. was placed in isolation for six days without being provided hygiene products, food, or medical attention. *Id* at ¶¶9-11. K.S.R. shares her dorm with at least fifty-two other women living in close proximity to each other. *Id* at ¶¶8,12-13. Some of K.S.R.'s dormmates are elderly women, cancer survivors, or suffer from chronic illnesses including diabetes, asthma, hypertension, and lupus. *Id* at ¶¶14-15. K.S.R. and the other detainees in her dorm are exposed to

guards who do not exercise safety precautions or provide education to prevent COVID-19 from spreading in the facility. *Id* at ¶¶16-17. K.S.R. is vulnerable to COVID-19 because of her weakened immune system as a result of contracting H1N1 influenza and her conditions of confinement.

### G. This Court Should Require NOLA ICE to Immediately Reassess Parole for All of Class Members and Should Prioritize the Cases Most Vulnerable to COVID-19.

As risk mitigation is the only known strategy that can protect people from COVID-19, public health experts with experience in immigration detention and correctional settings have recommended the release of vulnerable detainees from custody. Franco-Paredes Exp. Decl. ¶¶ 27-28. *See also* Scharf Exp. Decl. ¶¶ 18, 34. Dr. Peter Scharf, a correctional health expert, has concluded that "[t]he best epidemiological models available, based on valid scientific research, suggest widespread COVID-19 contagion in this region's ICE facilities, which will lead to broad contagion unless release efforts are initiated in a rapid timeframe." Exp. Decl. ¶ 4. Dr. Scarf added that, "[t]he reality that this region's ICE facilities are located in remote or rural areas with limited resources and that medical resources proximate to the relevant ICE detention facilities leads to the conclusion that, were a COVID-19 infection to occur, widespread, long-term morbidity and mortality are more probable than not." *Id.*

Dr. Carlos Franco-Paredes, an infectious diseases expert, recommends "releasing detain[ed] asylum seekers on parole from these centers" because it "constitutes a high-yield public health intervention that may significantly lessen the impact of this outbreak." Franco-Paredes Exp. Decl. ¶28. He further recommends that ICE should focus on "targeting the release of persons in the age groups at risk of severe disease and death and persons with underlying medical conditions" as it "may lessen the human and financial costs that this outbreak may impose." *Id.*

All class members are vulnerable to serious illness or death if they remain in civil detention in the facilities that NOLA ICE administers. Franco-Paredes Exp. Decl. ¶15. Class members risked

their lives to escape persecution and torture in their home countries for what they believed was a safe haven in the United States. These asylum-seekers now find themselves trapped in a what has essentially become a ticking-timebomb and, for many, a tomb.

## II.   <u>LEGAL STANDARD</u>

### A.  Preliminary Issues

#### 1)  *Jurisdiction.*

This Court has jurisdiction to adjudicate Plaintiffs' Emergency Motion for Preliminary Injunction.[32] As a result of the COVID-19 crisis, Plaintiffs seek an injunction requiring that NOLA ICE officials immediately administer to all present and future class members individualized parole assessments, in a method consisted with the applicable regulations and standards of the Directive; they are not seeking to challenge the outcome of the individualized parole assessments itself. *See Abdi v. Duke*, 280 F. Supp. 3d 373, 385 (W.D.N.Y. 2017) (federal district court had jurisdiction beyond the jurisdictional bar of § 1252(a)(2)(B)(ii), where plaintiffs were not asking the court to review the propriety of any given parole decision, but, instead, simply sought compliance with certain minimum procedural safeguards when parole decisions are made); *Zadvydas v. Davis*, 533 U.S. 678 (2001) (holding that §1252(a)(2)(B)(ii) does not entirely strip federal courts of jurisdiction over claims relating to the parole process).

Nor do Plaintiffs seek to violate the INA by enjoining the operation of any detention statute, in violation of *8 U.S.C. § 1252(f)(1)*. Rather, Plaintiffs assert that Defendants continue to defy this Court's injunction, by ignoring the regulations and standards of the Directive, and as a result, have placed current and future class members at risk of irreparable harm from exposure to COVID-19:

---

[32] *See, Mons* 2019 WL 4225322, at *4 ("the plaintiffs there and here, however, "are not challenging the <u>outcome</u> of ICE's decisionmaking, but the <u>method</u> by which parole is currently being granted (or denied)) (emphasis added); *Damus* 313 F. Supp. 3d at 327

"[b]ut '[w]here ... a petitioner seeks to enjoin conduct that allegedly is not even authorized[,] ... the court is not enjoining the operation of [the statute], and [INA] – § 1252(f)(1) therefore is not implicated.'" *Mons* 2019 WL 4225322, at *4 (internal quotations and citations omitted).

Therefore, Plaintiffs here challenge "'an overarching agency' action as unlawful – in this case, Defendants' systematic failure to follow the Directive [and this Court's September 5 Order], and to instead impose detention without its safeguards and individualized determinations." *Damus,* 313 F. Supp. 3d at 328. (citing *R.I.L-R. v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015)).  In this case, NOLA ICE's disavowal of the Directive will likely result in irreparable harm to the Plaintiffs, as outbreaks of the deadly COVID-19 are likely to sweep through the Louisiana detention facilities housing class members.

2)  *Class Certification*

Plaintiffs are part of the class that this Court certified, consisting of:

  "[(1)] [a]ll arriving asylum-seekers (2) who receive positive credible fear determinations; and (3) who are or will be detained by U.S. Immigration and Customs Enforcement; (4) after having been denied parole by the New Orleans ICE Field Office.'"
*Mons,* 2019 WL 4225322, at *8; *See also*, *Damus* 313 F. Supp. 3d at 329–35.

## B.  Legal Framework Governing Parole Decisions

1)  *The INA and Implementing Regulations*

The Immigration and Nationality Act (hereinafter "INA"), sets out the process by which noncitizens can apply for asylum. *See* 8 U.S.C. § 1225(b)(1)(A)(ii).  Under the INA, if an interviewing immigration officer "determines that an asylum-seeker has a 'credible fear' of persecution in her home country, that person 'shall be detained for further consideration of [her] application.'" *Id.* § 1225(b)(1)(B)(ii); *see also* 8 C.F.R. § 208.30(f) (describing the procedures surrounding a positive finding of credible fear). In addition, the INA allows the Attorney General to temporarily parole detained asylum-seekers who have received a positive credible fear finding:

"permitting these individuals for 'urgent humanitarian reasons or significant public benefit.' *See* 8 U.S.C. § 1182(d)(5)(A).

The INA's implementing regulations further provide that DHS must exercise its parole discretion on a "case-by-case basis" and that it may parole arriving aliens who "present neither a security risk nor a risk of absconding" and "whose continued detention is not in the public interest". 8 C.F.R. § 212.5(b);  *Mons,* 2019 WL 4225322, at *1; *see also* 8 C.F.R. § 235.3(c).[33]

### 2) The Directive

The Directive defines circumstances under which there is a "public interest" in granting parole pursuant to the INA and implementing regulations. It provides that, absent exceptional overriding factors, an asylum-seeker who has established a credible fear of persecution should be granted parole in the "public interest," and released from detention while pursuing an asylum claim, so long as the individual establishes their identity and presents neither a flight risk nor danger to the community. Directive ¶ 6.2. In considering parole applications, the Directive requires that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits, and based on the facts of the individual alien's case." *Id.*

The Directive also delineates a number of procedural requirements for DHS's adjudication of parole applications. These prescribe that the agency must inform asylum-seekers that they have a right to seek parole in a language they understand," *id.* at ¶ 6.1; conduct a parole interview within "seven days following a finding that an arriving [noncitizen] has a credible fear," *id.* at ¶ 8.2; provide written notification of the parole decision that contains "a brief explanation of the reasons for any decision to deny parole" within seven days of the interview, *id.* at ¶ 6.5-6.6;

---

[33] "[a]gency regulations provide that the Secretary of Homeland Security may parole asylum-seekers who are 'neither a security risk nor a risk of absconding,' in the service of such 'urgent humanitarian reasons or significant public benefit." 8 C.F.R. § 212.5(b);  *Mons,* 2019 WL 4225322, at *1; *see also* 8 C.F.R. § 235.3(c)

notify applicants whose applications are denied that they may request a redetermination, *id.* at §
8.2;  and, consider whether setting a reasonable bond and/or" an alternative to detention program
would mitigate any flight risk concerns, *id*. at ¶ 8.3.2.c.

Moreover, the Directive's applicable regulations describe five categories of "aliens who
may meet the parole standards based on a case-by-case determination, provided they do not present
a flight risk or security risk . . ." *Id.* at ¶ 4.3.  Among the five categories are: "(1) aliens who have
*serious medical conditions*, where continued detention would not be appropriate;" and "(5) aliens
whose *continued detention is not in the public interest*."  *Id.* (emphasis added).

ICE Field Offices have historically relied on the Directive to grant parole to thousands of
asylum-seekers with credible fears of persecution, based on individualized findings that their
detention was unnecessary. This is not surprising, as the overwhelming majority of asylum-seekers
who establish a credible fear lack any criminal history, pose no threat to public safety, and do not
need to be detained to ensure their appearance for court proceedings.[34]  Since enacting the
Directive, DHS has not revoked or amended it.

This Court has acknowledged that, since approximately 2017, the NOLA ICE Field Office
has engaged in a blanket parole-denial policy, making NOLA ICE the region with lowest
percentage of parole grants in the United States: "the percentage of asylum-seekers that that Office
has released on parole has dramatically declined in recent years. The Office currently retains the
lowest release rate of any jurisdiction in the country, having denied 98.5% of release requests in

---

[34] *See, e.g.*, Mark Noferi, "A Humane Approach Can Work: The Effectiveness of Alternatives to
Detention for Asylum Seekers" at 1, 3 (July 2015) (summarizing research showing that asylum
seekers are predisposed to comply with legal processes), *available at:*
https://www.americanimmigrationcouncil.org/sites/default/files/research/a_humane_approach_ca
n_work_the_effectiveness_of_alternatives_to_detention_for_asylum_seekers.pdf.

2018 and 100% of requests made thus far in 2019 (internal citations omitted)." *Mons,* 2019 WL 4225322, at *2.

Pursuant to the Sept. 5 Order, Defendants have submitted monthly reports detailing the number of parole requests received, and whether the requests were granted or denied. Defendants have thus far submitted five reports, showing that the monthly parole-grant rates are as follows: November 2019 Report: 0.66 percent grant rate for redetermination requests and 1.3 percent grant rate for initial applications; December 2019 Report: 1.16 percent grant rate for redetermination requests and 1.7 percent grant rate for initial applications; January 2020 Report: 1.8 percent grant rate for redetermination requests and 2.59 percent grant rate for initial applications; February 2020 Report: 21 percent grant rate for redetermination requests and 47.6 percent grant rate for initial applications; and March 2020 Report: 27 percent grant rate for redetermination requests and 11 percent grant rate for initial applications.

While the Reports show a modest increase in parole grants, the parole-grant numbers are nowhere near the historical numbers for NOLA ICE region, e.g. the 75 percent parole grant rate reported in 2016, the year before this region saw a precipitous drop to a parole grant rate of 1.8 percent.  In addition, Plaintiffs have reason to believe that Defendants continue to circumvent this Court's Order by failing to conduct individualized assessments of parole submissions and re-submissions, as required by the Directive.  Moreover, Defendants' reports, (particularly the February 2020 report reflecting only twenty-one initial parole applications), may not accurately reflect the total number of parole requests received by deportation officers across the region's detention facilities.

Unfortunately, class members with serious medical conditions continue to languish in detention facilities in the NOLA ICE region, and with the specter of a COVID-19 outbreak, now

find themselves in conditions that pose an equal or graver threat to their lives, than the ones that forced them to flee their homelands and seek asylum in the United States.

For example, class member O.M.H. was denied parole despite having HIV and Hepatitis C and remains in detention. Decl. ¶1,5. Class member K.S.R. tested positive for H1N1 but was nonetheless denied parole and remains in custody despite a weakened immune system. Decl. ¶9. Class member L.P.C. knows individuals currently in detention without parole who suffer from medical conditions, such as asthma, diabetes, cancer, and lupus, that could result in death, should a COVID-19 outbreak take place. Decl. ¶22. Class member Y.P.T. remains in detention, after NOLA ICE officials denied all four of his parole requests, despite satisfying all parole requirements, providing all necessary evidence, and being confined to a wheelchair.  Decl., ¶ 19-26, 28. Class member B.A.E., reports coughing "clots of blood," having "blood in [his] feces, and suffering from continuous fever, but only receives Ibuprofen and remains detained in a crowded bunk. Decl., ¶ 10. Class member R.P.H., who was denied parole despite having been a cancer survivor, was explicitly told she would not receive parole unless her cancer returned. Decl., ¶ 4-5, 15.  And class member S.U.R.'s nephew remains detained despite having only one functioning kidney.  Decl., ¶ 12.

All Plaintiff-witnesses have applied for release on parole at least once.  Most suffer from serious medical problems and are considered part of high-risk populations that are being decimated by COVID-19.  There is no public benefit in keeping these asylum-seekers in detention, at the risk of irreparable injury.  The experts agree that keeping these vulnerable class members detained during the COVID-19 pandemic will result in risk of irreparable physical injury, and even death.

As the anecdotal evidence from class members shows, NOLA ICE officials continue to defy the Directive, even weeks after the dangers of COVID-19 became a reality.  Class members

languish in crowded detention centers, and those who are sick suffer without access to adequate health care. Experts warn that class members face a certainty of irreparable harm and death once these detention centers experience COVID-19 outbreaks, as they are congregate environments that are simply ill equipped to prevent and successfully navigate an outbreak of such unprecedented, deadly proportions. Franco-Paredes Exp. Decl. ¶¶ 12, 13.

## C.  Legal Requisites for Establishing a Preliminary Injunction

In deciding whether to issue a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted). Plaintiffs meet these requirements.

Plaintiffs bear the burden of showing that they meet all factors: "[t]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). This Court appeared to merge the last two factors in its analysis granting Plaintiffs' preliminary injunction motion: "these last two prongs pose no serious obstacle to Plaintiffs' request for a preliminary injunction." *Mons* 2019 WL 4225322, at *11.

### III.   **ARGUMENT**

**A.    Likelihood of success on merits**

In order to obtain injunctive relief, plaintiffs must demonstrate that they are likely to prevail on the merits of their claims. The determination as to whether a party has successfully demonstrated such likelihood is informed by the circumstances of the particular case and claims being made. *See Hi-Tech Pharmacal Co. v. United States FDA*, 587 F. Supp. 2d 1, 8 (D.D.C. 2008). While the four factors of injunctive relief are not considered in isolation from one another, a strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief, even if the plaintiff makes a less compelling showing on the other factors in injunctive-relief analysis. *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001); *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d at 7.

Plaintiffs re-assert the first two claims presented in their original complaint to the Court, but now make these assertions as the basis for injunctive relief requested to enjoin Defendants from acting in a manner specifically harmful to Plaintiffs' during the COVID-19 pandemic. Plaintiffs will demonstrate that they are likely to succeed on the merits of these claims, which consist of the following:

1) Defendants' policy and practice of ignoring the Directive is arbitrary, capricious, and contrary to the law in violation of [the APA *See* Compl., ¶ 133.

2) Defendants' "failure to provide individualized determinations of flight risk and danger" violate the INA and implementing regulations and the APA *See* Compl., ¶¶ 133-137.

The INA, codified in Title 8 of the U.S. Code, contains important provisions of U.S. immigration law. For example, the basis for the existing parole system in the U.S. is found in INA

§212(d)(5)(A), which grants the Secretary of DHS authority to make parole determinations pursuant to its provisions. INA §212(d)(5)(A). Furthermore, through the INA, Congress delegated rulemaking power to the Secretary, as it required that they "shall establish such regulations … as he deems necessary for carrying out his authority under the provisions" of the INA. 8 U.S.C. § 1182(d)(5)(A). The Secretary has delegated parole authority to the three immigration agencies which are components of DHS: USCIS, CBP, and ICE.[35]

The authority granted by the Secretary to ICE includes the non-law enforcement functions of parole programs, including the authority to make parole determinations for arriving aliens who have passed credible fear interviews, and are awaiting an asylum hearing. *Id*. In addition to delegating this authority over general parole determination, the Secretary also delegated to ICE the supplemental specific authority to grant parole to arriving aliens due to "urgent humanitarian interest" or "significant public benefit." 8 C.F.R. § 212.5. Groups whose need for parole constitute urgent humanitarian interest or significant public interest include, but are not limited to, individuals who "have serious medical conditions, where detention would not be appropriate," and "whose continued detention is not in the public interest." Directive at ¶ 4.3 (citing 8 C.F.R. § 212.5(b)).

The power of an administrative agency to administer authority granted to it by Congress, such as the INA authority over parole determinations delegated to ICE by the Secretary, "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) (explaining that rulemaking power was necessary for an agency to carry out the powers delegated to it by the

---

[35] (Memorandum of Agreement Between USCIS, ICE, and CBP: Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(s)(A); Homeland Security Act, 6 U.S.C. § 251-98 (transferring authorities exercised exclusively by the former Immigration and Naturalization Service to DHS).

Secretary of the Interior under an act of Congress). Agencies are empowered by the delegation of authority to promulgate rules and policies that serve as implementing regulations. *Id*.

1) *Plaintiffs' Claims Arise under the APA.*

As aforementioned, DHS and ICE (hereinafter "Defendants") presently both possess parole authority under the INA, as of the delegation of such authority by the Secretary of DHS to ICE. As ICE must now implement the INA to exercise the parole determination authority it was granted, it is necessary for ICE to develop rules to fill gaps left by Congress in the INA. For example, while the INA grants the authority to release immigrants in custody on parole, it does not dictate the process that should be followed. For that reason, ICE was compelled to produce the Directive to provide guidance to its officials carrying out determinations, and to prevent those determinations from being made arbitrarily or on an ad hoc basis, in violation of the Administrative Procedures Act ("APA"). *Morton*, 415 U.S. at 232.

The APA, codified under Title Five of the U.S. Code, governs the actions of agencies, as well as the actions of federal executive departments, that delegate rulemaking power to agencies that are components of them. "Agencies," under the APA, are "each authority of the government of the [U.S.], whether or not it is within or subject to review by another agency," except for those expressly excluded in the APA's provisions. 5 U.S.C. § 701. The APA prohibits such acts by agencies from being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Actions of agencies governed by the APA include the process by which they promulgate rules, after they have been delegated the authority to do so. 5 U.S.C.A. § 553 A "rule" under the APA is defined as "the whole or a part of an agency statement of general or particular

applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…" 5 U.S.C. § 551.

The Directive satisfies the definition of a rule under the APA. . 5 U.S.C §551(4) *et seq.* (1946). It is a statement applicable to the particular agency action of making parole determinations that was promulgated by the Defendants – an administrative agency (ICE), and the federal executive department which delegated parole determination power to that agency (DHS). Dep't of Homeland Sec. Delegation No. 7030.2, *"Delegation of Authority to the Assistance Secretary for the Bureau of Immigration and Custom Enforcement"* (Nov. 13, 2004); ICE Delegations of Authority to the Directors No. 0001, *"Detention and Removal and Investigations to the Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement,"* (Jun. 6, 2003). The Directive was designed to prescribe policy for the implementation of the INA bysetting forth procedures and practice requirements to provide guidance on the future exercise of discretion by agency officials making parole determinations.  5 U.S.C. §551 et seq. (1946). As the Directive in question is a rule pursuant to the meaning under the APA, claims regarding the agency's actions with respect to the Directive are governed by the APA.

Plaintiffs are likely to succeed on the merits of their claims arising under the APA, as: 1) Plaintiffs validly challenge final agency action, entitling them to judicial review of their claims under the APA; 2) the Directive is a binding agency rule that ICE and DHS are required to adhere to under the *Accardi* doctrine of the Supreme Court; 3) Plaintiffs are likely to successfully demonstrate the Defendants do not adhere to this binding Directive; and 4) Defendants' failure and refusal to adhere to the Directive renders their actions arbitrary, capricious, and contrary to law in violation of the APA.

2) *The Directive is binding o nICE and DHS under the Accardi doctrine.*

The *Accardi* doctrine established that agencies are required to adhere to their own rules, including internal agency policies, such as the Directive. *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Morton*, 415 U.S. at 200, 235 (requiring an agency to comply with a directive that provides guidance on internal procedures, and holding that the agency's failure to comply constituted a violation of the APA as "arbitrary" and "capricious"). This remains true, even when procedures set out are potentially more rigorous than required. *Id*. Adherence by an agency to its rules is particularly significant where the rights of individuals are impacted by agency action and rulemaking. *Id.* at 235*; e.g. Aracely v. Nielsen*, 319 F.Supp.3d 110, 149, 157 (D.D.C. 2018) (holding that Defendants must re-evaluate plaintiff's request for parole in strict compliance with the ICE Directive of 2009, as that Directive impacts individual rights); *Vitarelli v. Seaton*, 359 U.S. 535 (1959); *Service v. Dulles*, 354 U.S. 363, 38 (1957); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

Prior to the filing of this motion, this Court already established that the specific Directive in question in *Mons* and this request is binding written agency policy for the following reasons: a) it impacts individual rights of arriving aliens, b) the boilerplate disclaimer language included in it is not effective, and 3) it imposes constraints on an agency's previously unfettered discretion over parole grants upon taking effect.

### a. The Directive is binding because it impacts rights of arriving aliens.

This Court has established that the Directive is binding written agency policy, as it impacts individual rights of arriving aliens, and legal consequences flow from DHS and ICE failure to implement the Directive in making parole determinations. *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997), *Aracely*, 319 F.Supp.3d at 150 (2018); *Damus*, 313 F.Supp.3d at 343. Agency action

impacts individual rights when rights or obligations of plaintiff's are determined by those actions, or legal consequences flow from those actions. 5 U.S.C. § 704.

The Directive sets out the definitions, guidance, internal procedures, and standards used to make a determination of parole, as well as the mitigating factors required to deny individuals parole. Directive ¶ 1-9. Freedom of movement is a fundamental personal liberty under the U.S. Constitution. *Aptheker v. Sec'y of State*, 378 U.S. 500, 505-509 (1964), U.S. Const. amend. V. Thus, the determination of whether Plaintiffs will be granted parole is simultaneously a determination of whether, and to what extent, Plaintiffs will be deprived of a liberty interest prior to their asylum hearings, or if they will instead be able to exercise their right to freedom of movement.

During the COVID-19 virus pandemic, the Directive has even more extensive impact on individual rights of arriving aliens than under circumstances where no public health emergency is present. Until the pandemic is abated, the Directive impacts Plaintiffs' individual rights to bodily integrity and reasonable safety. *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see also Youngberg v. Romeo*, 457 U.S. 324, 319 (1982). Additionally, while the Directive requires individualized parole determinations for all arriving aliens found to have a credible fear, it separately emphasizes that, for "urgent humanitarian reasons" or "significant public benefit," such individualized review is made available to individuals who "have serious medical conditions, where continued detention would not be appropriate" and "whose continued detention is not in the public interest." Directive at ¶ 4.3, citing 8 C.F.R. § 212.5(b). Thus, in addition to establishing the right of individualized review of parole eligibility for all arriving aliens with credible fear, the Directive specifically highlights that individuals of vulnerable health also have this right. Since it is established that the Directive is binding, the existence of these rights

persists despite any attempt by Defendants to disclaim the creation of rights using boilerplate language.

Therefore, as this Court has already established, and Plaintiffs further demonstrate, the Directive impacts individual rights and liberties of Plaintiffs, and is thus binding pursuant to the *Accardi* doctrine. *Aracely v. Nielsen*, 319 F.Supp.3d 110, 149, 157 (D.D.C. 2018).

### b.  The Directive is binding because the boilerplate language it contains is ineffective and does not enable Defendants to evade legal challenges.

Defendants included a disclaimer in the Directive, stating that it "is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States." Directive ¶ 10. In recent prior cases, arriving aliens have argued to this Court that Defendants' purpose in including this language is to attempt to prevent the Directive from becoming binding, in order to avoid APA claims from being brought against them. *See Aracely* 319 F.Supp.3d 110; *see also Damus*, 313 F.Supp.3d at 341–42,.

Nonetheless, this Court has established that an agency cannot use such boilerplate language to evade legal challenges or judicial review under the APA. *Aracely*, 319 F.Supp.3d at 152; *Damus*, 313 F.Supp.3d at 337-38; §706(2); 5 U.S.C. § 551. Such language is ineffective and does not enable Defendants to evade legal challenges. Thus, the Directive does, in fact, impact rights of individuals, and remains binding on the DHS and ICE, despite the use of boiler plate disclaimer language.

### i.    The Directive is binding as  it imposes constraints on those agencies' previously unfettered discretion over parole grants.

In its first paragraph, the Directive contains an explanation that describes its purpose, stating it "provides guidance" on agency officials' use of their "discretion to consider the parole

of arriving aliens." Directive ¶ 1. Though an agency's discretion over an issue or process may be subject to no, or fewer, limitations prior to the implementation of a relevant rule, once that agency "announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion'." *Lopez v. FAA*, 318 F.3d 242, 246–48 (D.D.C. 2003); *Damus v. Nielsen*, 313 F.Supp.3d at 337–38 (D.D.C. 2018). Since departure from any implemented rule limiting agency discretion results in invalidation of that departing action, rules imposing such constraints on agency discretion are binding upon implementation.

The aforementioned statement explaining the Directive's purpose effectively announced, in 2009, that the information contained in the Directive would govern the use of discretion in parole determinations by Defendants. While Defendants may not originally have been bound to perform parole determinations pursuant to factors, considerations, and measures such as those set out in the Directive, their discretion to ignore those measure ceased upon the date which the Directive went into effect. Thus, the Directive is binding on Defendants as of January 4, 2009.

3) *Defendants persistently refuse to adhere to the binding directive during the COVID-19 pandemic, despite the issuance of a prior order by this Court granting injunctive relief.*

In September 2019, this Court found Plaintiffs provided sufficient evidence to demonstrate that Defendants were not following the binding Directive. (Doc. No. 33) . To make that determination, the Court considered statistics demonstrating the abysmal rates of parole grants. *Id.* These statistics included that in the years immediately following implementation of the Directive, asylum-seekers were granted parole at a rate of ninety percent nationwide, but since 2017 the rates of release on parole dramatically declined, despite confirmation by the DHS and NOLA ICE that

the Directive was being followed. *Id*. NOLA ICE was shown to deny parole requests at a rate of 98.5% in 2018 and 100% in 2019, being the lowest release rate in the country. *Id*.

Additionally, affidavits of arriving aliens supported that numerous individuals who had met all requirements for parole eligibility under the Directive were denied parole, whether they had submitted all required documents or, as occurs many times, had not been given sufficient time to submit documents. Affidavits also evidenced failure to provide parole interviews, failure to provide information regarding rights to and engagement in the parole process, failure to translate or explain the contents of documents or processes to detainees, neglect and inattention to detainees who tried to seek answers, and the regular vocalization of comments assuring that parole would not be granted to detainees in adherence to the Directive.

The Court should again find that Plaintiffs provide sufficient evidence to demonstrate continued failure to follow the binding Directive and provide individualized determinations of flight risk and danger.

### a. Parole grant rates continue to be abysmal and a departure from previous application of the Directive, with no rational justification.

Plaintiffs now provide the most recent statistics on the most recent parole grant rates, which still evidence an irrational departure from binding agency policy in the Directive, despite the issuance of the Order providing injunctive relief in September. *INS v. Yang*, 519 U.S. 26 (1996). Plaintiffs remind the Court that, in 2016, about 75% of parole applications were successful. (Scharf Decl., ¶ 14). In 2018, fewer than 2% of parole applications were granted. *Id*. At the present time, in March 2020, data reported by Defendants demonstrate that parole rates are as follows: 12% at Atlanta City Detention Center, 30% at Jackson Parish Correctional Center, 32% at Winn, 35% at Richwood, 19% at Basile Detention Center, 34% percent at River, 41% percent at Pine Prairie,

zero percent at La Salle, zero percent at Catahoula, and zero percent at Allen Parish Correctional Center.

Though rates did appear to begin to grant rise slightly in 2020, statistics demonstrating such increases are missing relevant data. *Id*. Additionally, the rise that has occurred is still an astounding departure from previous grant rates, with no justification for such decline (as discussed below). *Id*.

Furthermore, witnesses continue to provide testimony of continued egregious behavior of Defendants in violation of the Directive, despite the injunctive relief and measures ordered by this Court in September 2019. Witness testimony evidences that determinations over parole persistently fail to be individualized.

> **b. Defendants often deny parole without arriving aliens ever having applied, indicating that they are not conducting individualized determinations as required by the Directive.**

Arriving aliens have been denied parole without ever being given information about parole or the opportunity to apply. B.A.E. Decl., ¶ 8 (stating that a denial was given only three days to apply for parole and was denied without ever applying when was not able to meet the deadline); O.M.H. Decl., ¶ 5 (informing that arriving alien was denied parole without having applied for it); S.U.R. Decl., ¶ 7 (explaining that arriving alien was denied parole about three days after passing credible fear interview, without ever having applied for parole); Y.P.T. Decl., ¶ 12 (informing that arriving alien was denied parole before even being given opportunity to apply). At times, it is upon receipt of their denial notice that they learn about parole. *Id*. Denial has often happened just days after arriving aliens having been found to have credible fear. *Id*. As the Directive requires individualized determinations of flight risk or danger to be made, Defendants have violated the Directive, since it is impossible to make an individualized determination without having an

application informing decisionmakers of the particular circumstances of an individual to be considered. Directive at ¶ 4.3, citing 8 C.F.R. § 212.5(b).

### c. Defendants explicitly state that applying for parole is futile, and parole grants will not be issued.

Arriving aliens are often discouraged from applying for parole by officers who make comments explicitly assuring them of the futility of submitting a parole application. B.A.E. Decl., ¶ 9 (revealing that arriving aliens were told by ICE officials at River that ICE "does not grant parole to anyone in Louisiana"); T.R.O. Decl., ¶ 12 (was told by ICE Officer Silva that "parole is not granted in Louisiana."); R.P.H. Decl., ¶ 15 (revealing that declarant has been told by ICE agents, on multiple occasions, that she will not be granted parole unless her cancer returns); T.M.F. Decl., ¶ 9 (revealing that declarant was told by an ICE officer not to place hope in parole). Officers have told arriving aliens that they will not be getting parole. Sometimes, they have stated that denials will be given under all circumstances, and other times, they have stated that grants will only be given to certain persons, such as those who have cancer. R.P.H. Decl., ¶ 15 (revealing that declarant has been told by ICE agents, on multiple occasions, that she will not be granted parole unless her cancer returns). Other times, comments have been made such that parole is not granted to anyone at all in Louisiana. B.A.E. Decl., ¶ 9 (revealing that declarant was told by ICE officials at River that ICE does not grant parole to anyone in Louisiana).

These comments further indicate Defendants' failure to adhere to the Directive, as the only reasons for which a person should be denied parole under the Directives are if, after an individualized review of their request, they are determined to be a flight risk or a danger to the community. § 212.5(b)(5); Directive Par. 6.2, 8.3; *Aracely*, 319 F.Supp.3d 110 (Jul. 3, 2018). Otherwise, parole should be granted as continued detention is not in the public interest. *Id*.

### d. Defendants fail to provide a reasonable amount of time for arriving aliens to submit parole applications.

When Defendants do accept parole applications, they do not provide a reasonable amount of time for arriving aliens to submit required documents. B.A.E. Decl., ¶ 8 (explaining that declarant was given only three days to apply for parole and was not able to meet the deadline). In order to apply for parole, an individual must first determine who will serve as their sponsor. S.U.R. Decl., ¶8-9. Then, they must collect several documents to demonstrate their eligibility for parole, and their sponsor's ability to serve as such. *Id*. This involves collecting evidence such as identity documents, often from a country individuals have just fled in fear of persecution, tax documents from sponsors, proof of homeownership, utility bills, and letters of support from the sponsor and any other individuals available to attest to the good character of the applicant. Directive Par. 8.3-8.4; S.U.R. Decl., ¶8-9. In some instances, parole applicants have been given as little as three days to collect these documents and determine where to submit them, with little, if any, guidance from officers. B.A.E. Decl., ¶8 (revealing declarant was given three days to apply for parole and was not able to meet the deadline).

These acts by Defendants confirm they do not have an interest in providing an individualized determination of eligibility for parole. By failing to allow a reasonable amount of time for individuals to submit all required materials, Defendants effectively deprive arriving aliens of the opportunity to sincerely undergo an individualized determination of their eligibility as required by the Directive.

### e. Defendants continue to determine flight risk and danger arbitrarily, despite mounting evidence in favor of granting parole.

Denials continue to be issued despite mounting evidence in favor of applicants' eligibility and satisfaction of all requirements for parole. B.A.E. Decl., ¶9; R.P.H. Decl., ¶15. These denials

continue to be categorical, and if any notice of denial is provided, at all such notice does not explain how the applicant falls into the category for which they were denied, usually "flight risk." This action by Defendants indicates that such determinations are made arbitrarily and without reasoning based on particular facts of applicants' circumstances and cases. B.A.E. Decl., ¶9 (informing that the parole applicant was denied parole for alleged "flight risk" despite submitting all required evidence to the contrary and received no further explanation); R.P.H. Decl., ¶15 (explaining that applicant is eligible for parole and has applied four times, but was denied repeatedly, three times for "flight risk" despite having extensive family in Florida to sponsor her, and the last for "lack of additional documents.").

Many denied applicants have sponsors who are U.S. citizens, and who provide all necessary evidence of citizenship, can attest to the arriving alien's good character, and have a close relationship, willingness, and ability to support them. B.A.E. Decl., ¶9 (explaining that arriving alien was denied as a "flight risk" even though her husband, who was released on parole in another region and is making an asylum claim under the same facts as this arriving alien, has same parole sponsor, who is a U.S. citizen cousin who lives in Tampa, Florida, and has presented evidence in support of the arriving alien's request for parole numerous times, including copies of their 2018 tax returns, evidence of U.S. citizenship, copies of bills, additional letters of support, documentation of arriving alien's clean criminal history, and a copy of arriving alien's birth certificate); R.P.H. Decl., ¶15 (stating that although eligible for parole and having applied four times, arriving alien has been denied repeatedly, the first three times for "flight risk" despite having extensive family in Florida to sponsor her, and the final time for "lack of additional documents."); K.S.R. Decl., ¶7 (explaining that their sponsor is a U.S. citizen); O.M.H. Decl., ¶11 (explaining that their sponsor is a U.S. citizen); S.U.R. Decl., ¶8 (explaining that their sponsor is a U.S. citizen);

T.M.F. Decl., ¶23 (explaining that their sponsor is a U.S. citizen); L.P.C. Decl., ¶11 (explaining that their sponsor is a U.S. citizen).

Many others have sponsors who are lawful permanent residents in the U.S., willing to take responsibility for them, but are denied, nonetheless. Y.P.T. Decl., ¶28 (explaining that their sponsor is a lawful permanent resident). While not absolutely dispositive of an arriving alien's merit of release on parole under an individualized review, the fact that grants of parole have been made in different regions for persons whose asylum cases stem from the same set of facts as those in a denied class member's case suggests that individualized review has not occurred before denial. K.S.R. Decl., ¶7 (has same sponsor as husband, and same set of facts leading to her request for asylum yet was denied parole though her husband was granted parole in a different region).

After receiving submissions of parole applications, Defendants sometimes fail to conduct parole interviews. S.U.R. Decl., ¶8-10 (explaining declarant was never provided a parole interview or a response on their application despite having their attorney prepare a parole application on their and their U.S. citizen sponsor's behalves, despite submitting all required documentation). The failure to conduct parole interviews after receiving submissions, while still issuing denials despite having received mounting evidence of eligibility, demonstrates that Defendants decisions to deny are made arbitrarily and irrationally. In the face of mounting evidence of eligibility, it would only be rational for Defendants to seek clarification of any facts that may indicate ineligibility through a parole interview. Thus, failure to conduct such interviews indicate that Defendants are not interested in assessing the particular circumstances of each person's individual case and are predisposed to deny regardless of any evidence provided by arriving aliens.

Often, arriving aliens commonly receive no notice at all informing them why they were denied, let alone the insufficient notice described above. S.U.R. Decl., ¶8-10 (was never provided

a response on their application despite having their attorney prepare a parole application on their behalf, having a U.S. citizen sponsor, and having submitted all required documentation).

Officials at the detention centers have sometimes refused to accept applications requesting parole at all. T.R.O. Decl., ¶11-12 (describing that, despite many attempts to request parole, ICE officers refused to accept parole application, and individual was told that she would have to wait until her court date); O.M.H. Decl., ¶9 (explaining that ICE officers stopped visiting detainees and refused to accept parole requests or provide information despite being asked). Such actions are evidently contrary to the individualized determination requirement in the Directive.

### f. Defendants disregard the vulnerability of individuals with medical issues and ignore provisions that parole of such persons is justified.

The Directive contains provisions in favor of granting parole to class members who "have serious medical conditions, where continued detention would not be appropriate," and "whose continued detention is not in the public interest." Directive at ¶4.4 (citing 8 C.F.R. § 212.5(b)). Defendants disregard those provisions by continuously keeping individuals with underlying health conditions in detention, and even more extensively violate those provisions during the COVID-19 pandemic, due to those individuals' particular vulnerability. Numerous individuals with underlying health conditions and serious medical concerns remain in detention and have been denied parole, including those with asthma, diabetes, lupus, H1N1, HIV, hepatitis, cancer and others. K.S.R. Decl., ¶9 (tested positive for H1N1, but denied parole nonetheless); L.P.C. Decl., ¶22 (individuals who she has witnessed remain in detention without parole include those who suffer from asthma, diabetes, cancer, and lupus); Y.P.T. Decl., ¶19-26, 28 (denied four times despite satisfying all requirements, providing all necessary evidence, and now being confined in a wheelchair due to the neglect of the government to an injury he sustained). Such continued detention is in direct violation of the aforementioned provisions of the Directive. O.M.H. Decl.,

¶1,5 (explaining declarant was denied parole without ever having applied, despite being positive for HIV and Hepatitis C).

4) *Plaintiffs' claims validly challenge final agency action, entitling them to judicial review of those claims under the APA.*

As the claims brought by Plaintiffs' challenge final agency action, Plaintiffs are entitled to judicial review of those claims. 5 U.S.C. § 704. The APA grants the authority to bring legal action, including writs of prohibitory or mandatory injunction, in a court of competent jurisdiction, as the Plaintiffs have done in *Mons*. 5 U.S.C. § 704. Persons suffering legal wrongs because of agency action, or adversely affected or aggrieved by agency action are entitled to judicial review thereof if the actions in question: 1) impact plaintiffs' rights, and 2) are final agency actions. 5 U.S.C. § 704; *See Aracely v. Nielsen*, 319 F.Supp.3d 110, 138-139 (D.D.C. 2018); *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

In order to be reviewable as a final action, the agency action at issue does not need to be in writing. *See Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.D.C. 2008) (entertaining an APA challenge to the agency's "decision ... to adopt [an unwritten] policy of disclosing confidential information without notice" because such a policy is "surely a consummation of the agency's decision making process" and it impacted the plaintiff's rights); *R.I.L–R v.* , 80 F.Supp.3d 164, 184 (holding that ICE's deterrence policy is a final agency action subject to APA review, despite the lack of a writing memorializing the policy).

This Court has established that routine and systematic failure to adhere to the statutory directives requiring factors to be considered in making custody determinations by agencies such as ICE constitutes final agency action under the APA, and is thus subject to judicial review by a court. *Ramirez v. U.S. Customs & Enf't*, 310 F.Supp.3d 7, 8 (D.D.C. 2018) (holding that ICE's

failure to adhere to directive constituted final agency action subject to judicial review under the APA).

As in *Ramirez*, Plaintiffs challenge the routine and systematic failure of Defendants to adhere to the Directive, which serves to implement parole procedures under the INA. Action being challenged by Plaintiffs also similarly includes Defendants' failure to follow the Directive's instructions to provide individualized review when making custody determinations regarding whether to grant parole, as required by the INA. *See* Compl., ¶133-137. As such actions by agencies like ICE have been established by this Court to constitute final agency action, Plaintiffs validly challenge Defendants' actions under the APA and are entitled to judicial review of their claims.

5) *Defendants' refusal to adhere to the Directive renders their actions arbitrary and capricious under the INA, requiring their actions to be overturned under the APA.*

The APA presents grounds that authorize and require a reviewing court to overturn agency action as being in violation of its provisions. These grounds include agency action being 1) arbitrary and capricious, and 2) contrary to law. 5 USC § 706.

**a.  Defendants' actions are arbitrary and capricious under the APA.**

Agency actions may be arbitrary and capricious under the APA when they do not comply with binding internal policies governing the rights of individuals. 5 U.S.C. § 706(2)(A); *see Morton v. Ruiz*, 415 U.S. 199, 204-06 (1974); *Aracely*, 319 F.Supp.3d at 150. The Supreme Court has established that the APA was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to ascertained and established procedures, such as the Directive. This requirement set out by the APA serves to ensure agency rules are not applied in an ad hoc manner, as unpublished ad hoc determinations are inherently arbitrary in nature. *Morton*, 415 U.S. at 232.

In *INS v. Yang*, 519 U.S. 26 (1996), the Supreme Court held that an irrational departure from policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as "arbitrary [or] capricious," within the meaning of the APA, 5 U.S.C. § 706(2)(A).  In contrast to the behavior of defendants in *Yang*, Defendants in *Mons* are not merely narrowing or expanding a definition, but instead entirely disregarding a binding directive requiring the provision by the agency of an individualized *determination* of eligibility. *Yang*, 519 U.S. at 32 (finding that taking a narrow view of what constitutes a term in a statute where no definition was provided by that statute, while still adhering to the provision containing the term, does not violate the APA).

The issue with Defendants' actions in *Mons* is not whether Defendant agencies can elaborate what constitutes a flight risk or danger where there is no definition provided under the INA. Instead, the issue consists of Defendants' failure to conduct individualized determinations to Plaintiffs as required by the INA, as demonstrated by their failure to provide any reasoning as to why they consistently conclude that each of the individuals, in the vast majority of applicants denied parole by Defendants, present a flight risk or danger.[36]

This Court explained that it found Defendants offered "absolutely no explanation for the precipitous nosedive in the parole-grant rates issued by an Office that has allegedly preserved the same underlying policy for making those decisions all along."  *See Mons*, No. 19-1593 JEB, 2019 WL 4225322 at 21. Approximately seven months later, Defendants still have not offered an explanation for continued abysmal parole-grant rates and persistent departure from the Directive.

---

[36] Class members report that ICE officers  merely check a box next to select a category, such as "flight risk" or "danger" and provide no further explanation or rational for how they determined that individuals fall under such categories, based on the facts specific to their situation or application for parole. S.U.R. Decl., ¶ 8-10; R.P.H. Decl., ¶ 15; B.A.E. Decl., ¶ 9.

Nor have Defendants made an avowed alteration of the Directive. As no explanation has been provided, no avowed alteration has occurred, and no lawful or valid explanation is readily apparent, Defendants actions constitute an irrational departure from binding agency policy. Thus, their actions are arbitrary and capricious under the APA.

### b. Defendants' actions are contrary to law, as they violate the INA.

As set forth in the INA, parole applications are to be granted on a "case-by-case" basis for "urgent humanitarian reasons or significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. INA § 212(d)(5)(A).

While the act does not provide definitions of "urgent humanitarian reasons" or "significant public interest," it does provide examples of what would be considered to constitute such terms. *Id*. These examples are not an exhaustive list. *Id*. Instead, these are groups of persons highlighted as specifically justifiable. *Id*. The INA further establishes this list as a floor, not a ceiling, as it states that all other arriving aliens may also be granted parole, so long as they meet initial eligibility conditions, are provided with an individualized review, and are not concluded to be risk of flight or danger as a result of that individual review. 8 C.F.R. 212.5(c)-(d).

The practice of providing notice in the form of a "check" indicating a category for denial with no further explanation indicates that individualization on a "case-by-case" of review has not occurred, as required by the INA. 8 C.F.R. § 212.5. Additionally, as discussed earlier in this motion, Defendants persistently engage in other actions that demonstrate failure to provide individualized determinations in violation of the INA, such as denying Parole toarriving aliens who have not applied, explicitly stating that applying for parole is futile as no parole grants will be issued, failing to provide a reasonable amount of time for arriving aliens to submit documents to be evaluated,  and failing to conduct parole interviews prior to denial of parole applications.

41

S.U.R. Decl., ¶7-10; B.A.E. Decl., ¶8-9; T.R.O. Decl., ¶12; R.P.H. Decl., ¶15; O.M.H. Decl., ¶5; Y.P.T. Decl., ¶12. These actions impede the receipt of facts, without which no individualized determination can occur, demonstrating Defendants' lack of intent to consider the individual facts of arriving aliens' cases, in violation of the INA. *Id*; 8 C.F.R. § 212.5.

Furthermore, as the Directive provides binding agency policy on the technical details and implementation of parole, about which Congress provided no guidance, it is the authority for parole procedures, where the INA has not set forth or elaborated on. 5 U.S.C.A. § 553. Thus, since the Directive provides the authority for parole implementation under the INA, Defendants inherently violate the INA when it does not abide by the Directive. *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997), *Aracely*, 319 F.Supp.3d at 150 (2018); *Damus*, 313 F.Supp.3d at 343.

For these reasons, Defendants' actions are likely to be found arbitrary, capricious, and contrary to law under the APA, and Plaintiffs are likely to succeed on the merits of their claims.

**B.      Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.**

In order to establish irreparable harm, the moving party must show that the injury is "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The injury must also be "both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisconsin Gas*, 758 F.2d at 674). Finally, the injury must be "beyond remediation." *Id.*

In its earlier holding, this Court noted that: "[l]ike the plaintiffs in <u>*Damus*</u>, Plaintiffs here have established that they will suffer irreparable harm without injunctive relief." As the Court there noted, detention irreparably harms individuals "in myriad ways," and the injuries at stake

there and here are "beyond remediation." 313 F. Supp. 3d at 342.  *Mons* 2019 WL 4225322, at

\*11.  The Court recognized that Defendants' non-compliance with the Directive subjected asylum-

seekers to prolonged detention and suffering.  *Id*.  The COVID-19 pandemic is not theoretical; it is

a very real, deadly threat to the physical well-being of Plaintiffs.  Should COVID-19 strike NOLA

ICE's detention facilities, most Plaintiffs will suffer irreparable harm beyond remediation. As

Professor Scharf concludes:

> "[d]espite explicit guidelines and standards mandating proactive efforts to reduce disease
> in the facilities, [] ICE has failed to respond to obvious warnings, risk factors and direct
> information to reduced the risks of COVID-19 posed to people detained in their custody.
> The risks of irreparable harm posed to these individuals, including the more probable than
> not consequence of long-term illness and death, is in my opinion substantial and avoidable
> if appropriate release mechanisms are adopted in a rapid timeframe."
> Scharf Exp. Decl., Summary Opinion.

1) *Plaintiffs Will Become Infected with COVID-19 if They Remain in Detention.*

Plaintiffs have presented evidence showing that they are suffering or will suffer irreparable

harm absent this Court's intervention.  They have shown that ICE continues to deprive them of

"the protections of the ICE Directive. . . .  instead, they are subject to a *de facto* 'no-parole' reality,

under which detention has become the default option . . . being deprived of the safeguards of the

Directive harms putative class members in a myriad ways."  *Damus* at 342.  NOLA ICE's

reluctance to abide by the principles of the Directive and this Court's Order, demonstrated by the

continued paucity of parole grants, has left hundreds of asylum-seeking class members trapped in

detention facilities that are simply ill equipped to protect them from the irreparable harm that

COVID-19 will wreak upon them.

Without injunctive relief, present and future class members are likely to become infected with

COVID-19.   Plaintiffs' experts warn that "[i]mmigration detention centers in the United States

are tinderboxes for the transmission of highly transmissible infectious pathogens including the

SARS-CoV-2, which causes the Coronavirus Disease (COVID-19)." Franco-Paredes Exp. Decl. ¶15. "Given the large population density of immigration detention centers, and the ease of transmission of this viral pathogen, the attack rate inside these centers may reach exponential proportions consuming significant medical care and financial resources." *Id*. In addition, these detention centers "are often unhygienic environments" exacerbating the propagation of COVID-19. Scharf Exp. Decl. ¶18 at (a)(i).

Class members relate harrowing conditions that will make the spread of COVID-19 among these detained asylum-seekers inevitable: Plaintiffs are housed in dorms with as many 100 men, forced to share four toilets, four sinks, and five showers in a shared room. O.M.H. Decl. ¶10. At Adams, some are housed in dorms holding up to 240 men , who are forced to share six toilets, twelve sinks, and one shower room with twelve showerheads in close proximity. S.U.R. Decl. ¶13. At South Louisiana, as many as 72 women are housed in a single dorm with beds less than two feet apart from one another, and forced to share three toilets, three sinks, and six phones, none of which are ever properly sanitized. K.S.R. Decl. ¶15; L.P.C. ¶14,16. These women also report that they are not provided sufficient toilet paper and had no toilet paper for nearly a week in March 2020. *Id*. At LaSalle some Plaintiffs' class members are housed in dorms with more than 90 men, who are forced to share have five toilets, eight sinks and one shower room with five showerheads. T.M.F. Decl. ¶14.  In these environments, Plaintiffs' cannot practice proper social distancing or hygiene, the only known methods to stem the rapid spread of COVID-19. Franco-Paredes Exp. Decl. ¶11,12. *See also* Scharf Exp. Decl. ¶ 24.

The facts are stark and frightening.  Given the high population density of these facilities and the ease of transmission of this viral pathogen, the infection rate will be exponential if even a single person, with or without symptoms, that is shedding the virus enters a facility. Franco-

Paredes Exp. Decl. ¶20. Plaintiffs describe residing in a petri dish-like environment.  Experts agree that given the poor conditions present in the immigration detention facilities in Louisiana and Mississippi, and high population density (exacerbated by Defendants' refusal to comply with the Directive), the spread of COVID-19 is inevitable.

2)  *Plaintiffs Will Likely Become Ill and/or Die from Infection if They Remain in Detention.*

Plaintiffs here have established that they will suffer irreparable harm without injunctive relief. As this Court previously recognized, detention irreparably harms individuals "in myriad ways," and the injuries suffered by asylum-seeking Plaintiffs from prolonged detention are "beyond remediation." *Mons* 2019 WL 4225322, at *11. In requiring Defendants to comply with the Directive, this Court acknowledged the physical and mental harm caused by prolonged detention on Plaintiff's well-being.  Plaintiffs now come before this Court again, to ask for their lives.  For as long as NOLA ICE officials continue to defy the regulations and procedures of the Directive, many, if not most, asylum-seekers who remain in detention during a COVID-19 outbreak will suffer irreparable harm from this disease, if not death.

The Directive recognizes that "aliens who have serious medical conditions" should be paroled. Directive ¶ 4.3.  Many class members suffer from serious medical conditions that render them vulnerable under normal conditions of confinement but will likely result in their death, should they be exposed to COVID-19.  According to recent estimates, the fatality rate of people infected with COVID-19 is about *ten times* higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[37] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent. Franco-Paredes  Exp. Decl. ¶ 26.

---

[37] *Id* at ¶ 4.

There is little doubt that, should any of the detention facilities that house Plaintiffs suffer a COVID-19 outbreak, Plaintiffs will suffer irreparable harm.   Given the fast spread of this unprecedented disease, Plaintiffs' risk of injury is imminent and certain. As such, the injuries caused by the Defendants' continued non-compliance with the Directive are "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (internal quotation marks and citation omitted).

3) *Current Protocols of ICE to Address COVID-19 Do Not Address, and Instead Worsen and Increase Likelihood of, Infection and/or Death from COVID-19.*

As this Court recognized, Plaintiffs have already experienced unspeakable trauma in their home countries and journies to the United States.  Plaintiffs' injuries from a COVID-19 outbreak would sure be "beyond remediation." Plaintiffs do not seek monetary compensation for their injuries. Rather, they seek injunctive and declaratory relief that requires NOLA ICE to immediately provide individualized parole assessment to all present and future class members, and to comply with all of the Directive's regulations and procedures, including those that recognize the need to parole persons with serious medical issues, and those whose release would benefit the public interest.

According to experts, risk mitigation is the only known strategy that can protect vulnerable groups from COVID-19, and release of vulnerable detainees from custody is the best mitigation strategy. Franco-Paredes Exp. Decl. ¶¶ 27-28. *See also* Scharf Exp. Decl. ¶¶ 18, 34. Dr. Peter Scharf has concluded "[t]he reality that this region's ICE facilities are located in remote or rural areas with limited resources and that medical resources proximate to the relevant ICE detention facilities leads to the conclusion that, were a COVID-19 infection to occur, widespread, long-term morbidity and mortality are more probable than not." *Id.* at ¶ 34. Because ICE protocols are insufficient to protect Plaintiffs from the specter of grave illness and death, Plaintiffs urge this

Court to require Defendants to fully comply with the Directive, and immediately give all present and future Plaintiffs fair, individualized parole reviews.

### C.    The Balance of Harms and the Public Interest Both Favor Injunctive Relief.

In 2018, this Court established that issuance of injunctive relief is in the public interest, when the same Defendants present in *Mons* failed to comply with the same Directive presently at issue. *Aracely v. Nielsen*, 319 F.Supp.3d 110 (Jul. 3, 2018) (holding that granting injunctive relief is in the public interest where the government and its agencies have failed to comply with the Directive).

While the INA issuing the authority to make parole determinations does not elaborate on the meaning of the term "public interest" within its provisions, ICE has permissibly, under the APA, elaborated on its meaning through the promulgation of a guide for implementation of the INA, in order to "fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974); 8 C.F.R. § 212.5.

The Directive mandates that an alien's "continued detention is not in the public interest." Directive ¶ 6.2. It states the public interest is met when an arriving alien is paroled who is found to have a credible fear of persecution, establishes, to the satisfaction of ICE, his or her identity and that he or she presents neither a flight risk nor a danger to the community, and presents no additional factors that weigh against release. § 212.5(b)(5); Directive Par. 6.2, 8.3; *Aracely*, 319 F.Supp.3d 110 (Jul. 3, 2018). In other words, the Directive establishes that, once these requirements are met, an individual should be released on parole "on the basis that his or her continued detention is not in the public interest." *Id.*[38]

---

[38] This Court has established that, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." R.I.L–R, 80 F.Supp.3d at 191 (citing N. *Mariana*

Defendants consistently disregard the public interest by refusing to apply the binding Directive, pursuant to the APA, as they fail to release individuals who evidently meet the aforementioned requirements, without providing any justification or explanation as to why those individuals fall into categories meriting denial despite their obvious eligibility and satisfaction of all requirements. This action by Defendants results in the "continued detention" the Directive explicitly sets out as not being in the public interest. Directive ¶ 6.2, 8.3; *see Aracely*, 319 F.Supp.3d 110 (Jul. 3, 2018).

Most notably, among those consistently denied in violation of the Directive, and thus in violation of the public interest, are individuals who have serious medical conditions, where continued detention would not be appropriate." Directive at ¶ 4.4 (citing 8 C.F.R. § 212.5(b)). While Defendants' non-compliance violates this particular provision on a regular basis, the extent of Defendants' violation is even greater during the COVID-19 pandemic, as the heightened vulnerability of those individuals makes their continued detention even more inappropriate at this time.

This court has established that the public interest "surely does not cut in favor of permitting an agency to fail to comply with its own binding policies impacting the rights of individuals." *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977) (recognizing that "there is an overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate"). Furthermore, Plaintiffs find no harm that could result from this Court requiring Defendants to comport with existing regulations that require an orderly process for granting freedom to asylum-seekers meriting such. Therefore, in order to

---

*Islands v. United States*, 686 F.Supp.2d 7, 21 (D.D.C. 2009)); *Klayman v. Obama*, 957 F.Supp.2d 1, 43 (D.D.C. 2013)); *Damus*, 313 F.Supp.3d at 341–42, 2018 WL 3232515.

serve the public interest, and to prevent this non-compliance that is harmful to and violative of individual rights and the public interest during the COVID-19 pandemic, a grant of the injunctive relief requested is necessary.

## CONCLUSION

For the foregoing reasons, Plaintiffs' emergency motion for a preliminary injunction should be GRANTED.

Respectfully submitted:

MELISSA CROW (D.C. Bar #453487)
Senior Supervising Attorney

Michelle P. Gonzalez
Victoria Mesa-Estrada
**SOUTHERN POVERTY LAW CENTER**
2 South Biscayne Blvd., 32nd Floor
Miami, FL 33131
Tel: (786) 753-1383
mich.gonzalez@splcenter.org
victoria.mesa@splcenter.org

Bruce Hamilton
**AMERICAN CIVIL LIBERTIES UNION OF LOUISIANA FOUNDATION**
P.O. Box 56157
New Orleans, LA 70156
Tel: (504) 522-0628
bhamilton@laaclu.org

_____//s// Luz Virginia López_____
Luz Virginia López
**SOUTHERN POVERTY LAW CENTER**
1101 17th St., NW, Suite 750
Washington, DC 20036
Tel: (202) 355-4471
luz.lopez@splcenter.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 31, 2020, I electronically filed the attached MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this case.

Respectfully submitted:

MELISSA CROW (D.C. Bar #453487)
Senior Supervising Attorney

//s// Luz Virginia López

Bruce Hamilton
**AMERICAN CIVIL LIBERTIES UNION**
**OF LOUISIANA FOUNDATION**
P.O. Box 56157
New Orleans, LA 70156
Tel: (504) 522-0628
bhamilton@laaclu.org

Luz Virginia López
**SOUTHERN POVERTY LAW CENTER**
1101 17th St., NW, Suite 750
Washington, DC 20036
Tel: (202) 355-4471
luz.lopez@splcenter.org

Michelle P. Gonzalez
Victoria Mesa-Estrada
**SOUTHERN POVERTY LAW CENTER**
2 South Biscayne Blvd., 32nd Floor
Miami, FL 33131
Tel: (786) 753-1383
mich.gonzalez@splcenter.org
victoria.mesa@splcenter.org

*Attorneys for Plaintiffs*