# EXHIBIT

# 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Ángel Alejandro Heredia Mons et al.** ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civ. No.: 1:19-cv-01593 |
| ) | |
| **Kevin K. McALEENAN et al.** ) | |
| ) | |
| *Defendants/Respondents.* ) | |
| ) | |

## DECLARATION OF K.S.R.

I, K.S.R., declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I was born in Holguin, Cuba. I am a 27-year-old asylum seeker detained at the South Louisiana Correctional Facility in Basile, Louisiana ("S. Louisiana"). I am a native Spanish speaker and I do not speak English.

**Synopsis of Past Persecution**

2. In Cuba my husband ran a secret internet computer service. He provided access to United States (US) television programs and news sources against the Cuban dictatorship to local community members. He was found out, arrested and abused by Cuban police. He fled Cuba as soon as he was released and able to leave. Not long after he left, I was forcibly dragged by authorities to jail in Cuba, where I was also mistreated.

3. Other than this politically motivated arrest, I have no criminal history or record. As soon as I was released, I fled the island and sought to reunify with my husband so that we could

seek asylum in the US as political dissidents because we feared for our lives and safety. I flew to Uruguay in or about July 2018. My husband and I were reunified.

**Journey to the United States**

4. The journey from Uruguay to Mexico was long and treacherous, including paths through a deadly jungle across several countries. We finally made it to the US - Mexico border in or about July 2019. I was informed by Mexican authorities that we would be assigned numbers by US authorities and forced to wait in Mexico until our numbers were called.

5. After months of waiting and scraping by in Mexico, my husband and I were processed through a port of entry on or about October 1, 2019. US border authorities took us into custody and immediately separated us. I was then transferred to the custody of Immigration and Customs Enforcement ("ICE"). ICE has in its possession my original government-issued photo-identity documents from Cuba.

**Frustration of Access to Parole**

6. On or about October 11, 2019, I was provided a credible fear interview. On or about November 3, 2019, I was transferred to S. Louisiana. On or about December 3, 2019, I received my positive credible fear finding. Meanwhile, on or about November 27, 2019, my husband was granted parole from a facility in a different region. He was released to live in Tampa, FL, where he continues to reside with our sponsor.

7. On or about December 3, 2019, an ICE officer gave me the parole advisal in English and told me that I had until December 7, 2019 to turn in all my evidence in support of a parole application. I immediately requested two additional days to present all evidence as I knew I would not receive all my supporting documents on time. I turned my parole application in on or about December 9, 2019. I was not provided an interview. On or about December

17, 209, I was provided a parole denial letter in English with a box checked off indicating I was a flight risk. I was given no other information. I noticed that the denial letter was marked as denied on December 3, 2019, the same day I was given the parole advisal.

8. Since then, I have applied for a redetermination of my parole request approximately three times, each time providing additional evidence. All my efforts have failed. My proposed sponsor is the same person who served as my husband's sponsor. He is my US citizen cousin who lives in Tampa, FL. I have presented to ICE the following evidence: of my cousin's 2018 tax returns, evidence of his US citizenship, copies of his bills, additional letters of support from family and friends residing lawfully in the US, documentation of my clean criminal history, and a copy of my birth certificate. However, ICE refuses to release me, continuing to provide denial letters checking off the "flight risk" rationale without further explanation. I have been separated from my husband for about five months.

9. Here, Deportation Officers (DOs) provide us misinformation or conflicting information when they visit the dorms. Sometimes they tell us no one will be granted parole. Sometimes they tell us our requests will be denied if the sponsor is not an immediate relative. Other times they tell us the requests will be denied if the proposed sponsor does not make more than seventy-thousand dollars ($70,000) annually.

**Conditions of Confinement**

10. The conditions in this facility are terrible. Water constantly drips from the walls in my dorm and my bed sheets always wet. The food we are provided is often frozen and always undercooked. It is also lacking in nutrition and frequently gives us all diarrhea. We are mistreated by GEO officers, humiliated and yelled at like we are violent prisoners.

11. On or about March 3, 2020 I grew very ill. I had a high fever, vomiting, and coughing. I was taken to the medical unit and tested for influenza. I tested positive for H1N1. I was placed in isolation, in a small room within the medical unit. I was then left in that room for approximately eight hours without any medicine to reduce my high fever, from about 1PM to about 9PM, at which time they gave me Tylenol.

12. The staff did not tell me how long I would be kept in isolation. The six days I spent in that room were some of the worst of my life. I struggled with suicidal ideation. The door to the room was largely a clear glass window. The shower in the room directly faced the window and there was no curtain. Staff and officers saw me naked when I attempted to bathe. I was not provided any soap or shampoo to clean myself. I was not provided clean clothes.

13. I was suffering cold sweats from the fever. I was very cold all the time, especially at night. I begged for another sheet to cover myself. They refused to bring me one. I did not receive medical attention in that room. The only medicine I was given was Tylenol to reduce fever and this did not happen regularly or even daily. There were times they forgot to feed me. I would get so hungry that I would wait hours in front of the glass door trying to get someone's attention and plead with them to notify the officers that I had not been fed.

14. After six days of isolation, I was transferred to a dorm with five other women who had also tested positive for H1N1 influenza. On the thirteenth day, they transferred me to a regular dorm with about fifty-one (51) other women. Here in the dorm we do not have disinfectant, bleach or sanitizer. They barely provide us soap. The only soap we are given is four-ounce (4 oz) bottles of liquid, all-purpose soap. They are supposed to give us two bottles each about every eight (8) days. Often many more days pass before we are provided more. This is all we are given to wash our hands, bodies and hair.

15. Our beds are approximately sixty (60) centimeters apart and it is impossible to practice social distancing. We all use the same three (3) tablets and six (6) phones to communicate with our loved ones within the dorm. We are forced to share three (3) toilets and (2) sinks. There are three sinks, but one is broken and the remaining two are clogged, often accumulating still, dirty water. The showers do not have curtains and are in close proximity to one another. The toilet paper we are given is of poor quality and does not last. We went approximately six days this month without any toilet paper. Those who can, supplement toiletries and food by purchasing items at the commissary.

16. We are terrified of a COVID-19 outbreak, especially after seeing how they handled the H1N1 influenza situation. In this dorm we have people who are vulnerable to coronavirus. There are elderly women detained here, some as old as seventy (70). Other women have diabetes, heart problems or are survivors of cancer.

17. Not long ago, a woman in her fifties suffered an attack. The medical staff came to the dorm, but they did not know what to do. The woman was on the floor suffering seizure-like convulsions. We all watched as they just looked at her writhing on the floor. This lasted for about fifteen (15) minutes. At that point she passed out and they took her away in a wheelchair. The very next day she was brought back to the dorm.

18. The officers and staff do not appear to be taking any precautions to keep us safe from coronavirus. They sometimes come to work sick. I have witnessed officers coughing in our eating areas. They do not wear gloves. They do not wear masks. I heard some of them have quit because they see there are no precautions being taken here.

19. We are not being provided any COVID-19 information or education. We beg them for information daily. There are already three dorms under quarantine due to influenza. We

noticed, however, that one dorm's quarantine is being taken much more seriously. Officers do not enter that dorm. They feed the women through a slot. This is the Alpha Bravo dorm, which we suspect had a confirmed case of COVID-19.

20. We know from the limited news we are able to watch and from our loved ones on the outside with whom we communicate, that this virus will spread very quickly under these conditions. Some of the women detained here are doctors in their home countries and they try to educate us as well. We are afraid we will be left to die in this place. It is a heartbreaking irony, after so many of us fled to the US for fear of death in our home countries.

**Plans if Released on Parole**

21. If I am released on parole, I plan to reunite with my husband who lives with my cousin and our designated sponsor in Tampa, FL. I plan to self-quarantine to keep us safe from COVID-19 infection and to keep fighting my asylum case with the help of my family outside of this facility.

VERIFICATION

I, K███ S███ R███ am the individual referred to as K.S.R. in the attached declaration. I declare under penalty of perjury that the foregoing is true and correct.

I have authorized my legal counsel in the *Heredia Mons* litigation to sign on my behalf given the difficulty of arranging visitation and travel in light of the current COVID-19 pandemic. I am also foregoing the option to sign documents sent by mail due to the urgency of the COVID-19 situation and due to reasonable fear of destruction of mail or retaliation by officials at this facility. If required to do so, I will provide a signature when I am able.

_____   Date: March 23, 2020
Michelle P. Gonzalez, Esq.
*On behalf of witness Karina Serrano Rodriguez*

CERTIFICATION

I, Michelle P. Gonzalez, declare that I am proficient in the English and Spanish languages. On March 23, 2020, I read the foregoing declaration and orally translated it faithfully and accurately into Spanish over a telephonic call with the declarant. After I completed translating the declaration, the declarant verified that the contents of the foregoing declaration are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2020

_____
Signature