# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Ángel Alejandro Heredia MONS, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | **Civ. No.: 1:19-cv-01593** |
| | ) | |
| Chad WOLF, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF THE PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE, EXPEDITED DISCOVERY, AND APPOINTMENT OF SPECIAL MASTER

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 2

II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND ................................ 5

  A.    The Preliminary Injunction Order .................................................................... 6

  B.    Evidence Reveals Serious, Ongoing Violations of the Directive's Procedural and
  Substantive Requirements, and Therefore, the Court's Order. ............................. 6

    1.    Procedural Violations ............................................................................... 7

    *i.    Per the Directive, ICE must provide arriving asylum-seekers with a Parole Advisal
    and Scheduling Notification ("Parole Advisal"). The contents therein shall be explained
    in a language the asylum seeker understands, and if necessary, through an interpreter.
    Directive §§ 6.1, 8.1.* ........................................................................... 7

    *ii.    Class members must be provided time to submit documents in support of parole, and
    instructions on where to submit them. Directive § 8.1.* ....................................... 7

    *iii.    ICE officers must interview arriving asylum seekers to assess their eligibility for
    parole, no later than seven days after a positive credible fear finding. Directive § 8.2.* ...... 8

    *iv.   ICE shall provide arriving asylum-seekers "written notification of the parole
    decision, including a brief explanation for any decision to deny parole." These
    notifications shall be provided to the asylum-seeker and "if represented, their
    representative within seven days of the date [the asylum-seeker] is initially interviewed for
    parole or the date [the asylum-seeker] requests a parole redetermination, absent
    reasonable justification for delay in providing such notification." Officers "shall ensure
    reasonable access to translation or interpreter services ...." Directive §§ 6.5, 6.6, 8.2* ........ 9

    *v.    "The supporting documents … and any other documents related to the parole
    adjudication should be placed in the [asylum-seeker]'s A-file in a record of proceeding
    format." Directive § 8.10* ....................................................................... 12

    2.    Substantive Violations ............................................................................ 12

    *i.    "The applicable regulations describe five categories of [asylum-seekers] who may
    meet the parole standards based on a case-by-case determination, provided they do not
    present a flight risk or security risk" including individuals "who have serious medical
    conditions, where continued detention would not be appropriate" and those "whose
    continued detention is not in the public interest." Directive § 4.3* ..................... 12

    *ii.    "In order to be considered for release" an asylum-seeker "must present sufficient
    evidence demonstrating his or her likelihood of appearing when required." The Directive
    instructs that factors appropriate for consideration of this requirement include
    "community and family ties, employment history, manner of entry and length of residence
    in the United States, stability of residence in the United States, record of appearance for*

*prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available" to the asylum-seeker. "Officers should exercise their discretion to determine what reasonable assurances … are warranted on a case-by-case basis to mitigate flight risk." ICE officers are also encouraged to "request that parole applicants provide any supplementary information that would aid [them] in reaching a decision." Directive §§ 8.3 (2), 8.4* ..................................................................... 13

**C.   A Careful Examination of Data Provided by Defendants Reveals Continued Noncompliance with the September 5th Order and Subsequent Orders** ....................... 14

*i.    Available Reports Show that Starting in February 2017 There Was a Dramatic Jump in Denials Relative to Grants that Continues Today* .......................................... 15

*ii.   Use of Flight Risk as a Reason for Denial Has Inexplicably Become Extensive* ....... 16

*iii.   Data Provided by Defendants' Shows Inconsistencies and Deficiencies in Record-Keeping and Reporting* ..................................................................................... 18

*iv.   Parole Redeterminations at Some Detention Centers Are Particularly Low and Have Only Shown Modest, Inconsistent Improvement in Parole Grants* .................................. 20

**III.    LEGAL STANDARD FOR CONTEMPT** .................................................. 21

**IV.    ARGUMENT** ................................................................................ 23

**A.   Defendants' Noncompliance Satisfies the Legal Standard for Civil Contempt, Enabling the Court to Exercise its Inherent Power to Enforce its Order.** ......................... 23

**1.   This Court issued a clear and unambiguous order on September 5, 2019.** ............ 24

*i.    The Court's September 5th Order is Clear and Unambiguous.* ................................. 24

*ii.   Defendants understood the clear and unambiguous Order.* ..................................... 25

**2.   Pursuant to the Court's September 5th Order, the Court required Defendants to engage in specific conduct to comply with the Order.** ........................................ 26

**3.   Defendants have failed to comply with the Court's September 5th Order.** ............. 26

*i.    Defendants continue denying parole to an overwhelming number of class members without individualized determinations.* ..................................................... 27

*ii.   Defendants persistently fail to make such individualized determinations in consideration of specific facts of class members' cases.* .................................... 28

*iii.   Defendants fail to provide to class members all substantive and procedural requirements under the Directive.* ...................................................................... 28

*iv.   Defendants are unlikely to demonstrate justifiable reasons for their failure to comply with the Court's Order.* .................................................................... 30

**B.   Plaintiffs have presented a quantum of proof adequate to demonstrate to a reasonable certainty that a violation occurred, therefore satisfying the clear and convincing standard of proof.** ....................................................................... 32

**IV. REQUEST FOR RELIEF**.................................................................................... 32

*A. Plaintiffs merit expedited discovery as their requests pass both the "Notaro" and "Reasonableness" tests, meriting a grant of the discovery, and Defendants should therefore be required to respond to such requests in a timely manner.* ................................. 33

**1) Plaintiffs' request for expedited discovery satisfies the *Notaro* test, indicating that Plaintiffs merit a grant of their request.**........................................................ 33

*i) Defendants' contemptuous actions continue to cause irreparable injury to Plaintiff-class members, eight months after such actions were ordered enjoined by the Court.* ..... 34

*ii) Plaintiffs establish a connection between their expedited discovery request and avoidance of irreparable harm and provided evidence that harm will result without it.* ... 34

*iii) Plaintiffs are likely to succeed on the merits of their claims.*................................. 35

*iv) No undue burden would be imposed on Defendants if Plaintiffs' requests for expedited discovery were granted.*........................................................................ 35

**2) Plaintiffs' request for expedited discovery satisfies the "reasonableness" test, indicating that they merit such expedited discovery.**...................................... 38

*i) No preliminary injunction is pending in Heredia-Mons.* ................................. 38

*ii) Plaintiffs' expected discovery requests are within the scope of and narrowly tailored to the Court's Order, thus the breadth of Plaintiffs' requests is appropriate in scope.* ......... 38

*iii) Plaintiffs seek expedited discovery for the purpose of enabling the parties and Court to determine how best to develop a plan of action to bring Defendants into full compliance.* ................................................................................................ 39

*iv) Plaintiffs allow ample time for Defendants to comply with their request for expedited discovery.* ........................................................................................................ 40

**B. Plaintiffs' claims merit the appointment of a Master to monitor and evaluate Defendants' noncompliance, as well as provide and implement solutions to obtain full compliance.**.......................................................................................... 40

*i) Defendants have had numerous, and sufficient, opportunities to be heard prior to Plaintiffs' present request for relief, including the appointment of a Master.* ................. 41

*ii) This Court has established that a Master may be appointed where a party fails to comply with a court order, such as Defendants have failed to comply in this case.* .......... 42

*iii) Despite copious circumstantial and statistical evidence to the contrary, demonstrating rampant abuse of the parole process, little improved parole rates, and violation of this Court's Order, ICE maintains that it is nonetheless in compliance with this Court's Order, and in turn, with the Directive.* .............................................. 43

*iv) DHS itself has acknowledged ICE's failure and indifference to ensuring accountability, adequate recording of data, compliance with its policies and standards, and imposition of remedial measures where noncompliance exists.* ................................. 44

**v) The efficacy of the Master is not diminished by the unprecedented circumstances that the pandemic presents.** ........................................................................... 46

**V.  CONCLUSION** ............................................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*National Law Center on Homelessness & Poverty v. U.S. Veterans Admin.*,
   98 F.Supp.2d 25 (D.D.C. 2000) ........................................................................33

*Armstrong v. Exec. Office of the President*,
   1 F.3d 1274 (D.C.Cir.1993) ............................................................................22

*SEC v. Bilzerian*,
   112 F.Supp.2d 12 (D.D.C.2000) .....................................................................22

*NLRB v. Blevins Popcorn, Co.*
   659 F.2d 1173 (D.C. Cir. 1981) ......................................................................22

*Cobell v. Babbitt*,
   37 F.Supp. 2d 6 (D.D.C. 1999) .......................................................................21

*SEC v. Current Fin. Servs., Inc.*,
   798 F.Supp. 802 (D.D.C.1992) ...................................................................23, 30

*D. Patrick, Inc. v. Ford Motor Co.*,
   8 F.3d 455 (7th Cir. 1993) ...............................................................................24

*SEC v. Diversified Growth Corp*,
   595 F.Supp. 1159 (D.D.C. 1984) .....................................................................21

*Evans v. Fenty*,
   480 F.Supp.2d 280 (D.D.C. 2007) ...............................................................42, 43

*In re Fannie Mae Derivative Lit.*,
   227 F.R.D. 142 (D.D.C. Feb. 23, 2005) ...................................................33, 34, 38

*Gompers v. Bucks Stove & Range Co.*,
   221 U.S. 418 (1911) ......................................................................................23

*Guttenberg v. Emery*,
   26 F.Supp. 3d 88 (D.D.C. Mar. 19, 2014) ....................................................38, 39

*Heredia Mons v. McAleenan*,
   2019 WL 4225322 (Nov. 8, 2019) ...........................................................34, 41, 43

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
   456 U.S. 694 (1982) ......................................................................................33

*Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal &*
  *Glass LLC,*
    736 F.Supp.2d 35 (D.D.C.2010) ........................................................22, 23, 28, 30

*La Buy v. Howes Leather Co.,*
    352 U.S. 249 (1957)..............................................................................................40

*United States v. Latney's Funeral Home, Inc.,*
    41 F.Supp.3d 24 (D.C.Cir. 2014) ................................................................ *passim*

*McComb v. Jacksonville Paper Co.,*
    336 U.S. 187 (1949)..............................................................................................23

*NAACP, Jefferson County Branch, v. Brock,*
    619 F.Supp. 846 (D.D.C. 1985) ............................................................................22

*Newton v. Consol. Gas Co. of N.Y.,*
    259 U.S. 101 (1922)..............................................................................................40

*Notaro v. Koch,*
    95 F.R.D. 403 (S.D.N.Y. 1982) ......................................................................33, 34

*Ex parte Peterson,*
    253 U.S. 300 (1920)..............................................................................................40

*Phillips v. Mabus,*
    894 F.Supp.2d 71 (D.D.C. 2012) ..........................................................................25

*Schmidt v. Lessard,*
    414 U.S. 473 (1974)..............................................................................................24

*Shillitani v. United States,*
    384 U.S. 364 (1966)........................................................................................21, 33

*Smartdoor Holdings, Inc. v. Edmit Indus., Inc.,*
    No. 14-657 (JEB), 2016 WL 11004352 (D.D.C. 2016).........................................33

*The Court's September*
  *5th Order is Clear and Unambiguous* ..................................................................24

*United States v. United Mine Workers of America,*
    330 U.S. 258 (1947)..............................................................................................32

**Statutes**

44 U.S.C.A. § 3101 ....................................................................................................36

18 U.S.C. § 2017 ........................................................................................................36

44 U.S.C. § 3301 ............................................................................................36, 37

44 U.S.C. § 3302 ................................................................................................36

**Other Authorities**

Fed. R. Civ. P. Rule 26 ........................................................................................33

Fed. R. Civ. P. 53 ................................................................................................40

Fed. R. Civ. P. 53(a)(2) ......................................................................................41

Fed. R. Civ. P. 53(b)(1) ......................................................................................41

Fed. R. Civ. P. 53(b)(2)(A)-(E) ..........................................................................41

Fed. R. Civ. P. 53(c)(1)(A)-(C) ..........................................................................41

Fed. R. Civ. P. 65(d) ..........................................................................................24

Plaintiffs respectfully request the following: (1) issuance of an order requiring Defendants, Immigration and Customs Enforcement, New Orleans Field Office (hereinafter "NOLA ICE" or "Defendants"), to show cause why they should not be held in contempt for contravening this Court's Preliminary Injunction Order, entered on September 5, 2019 (hereinafter "the Court's Order" or "the September 5th Order"); (2) expedited discovery in support of said Motion to Show Cause; and (3) should this Court grant Plaintiffs' Motion to Show Cause, the appointment of a Special Master (hereinafter "Master") to ensure compliance with this Court's September 5th and subsequent, related Orders.

Careful review of data from the Defendants' monthly reports to this Court, yearly parole data for the NOLA ICE region compiled by the Defendants over the past few years, documentation and firsthand anecdotal information provided by witness declarants and their legal counsel, reveal that Defendants have defied the Court's Order in the following respects: (1) Defendants have consistently failed to conform to all of the substantive and procedural requirements of U.S. Immigration and Customs Enforcement, Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 9, 2009) (hereinafter "the Directive"), denying class members important procedural safeguards in the parole application process, (*see* Ct. Order, ¶ 3-5, No. 19-1593 (JEB) (Sep. 5, 2019)); (2) Defendants have continued to deny parole to provisional class members "absent individualized determination[s] of flight risk and danger to the community. . . based on specific facts of each provisional class-member's case," regardless of the supporting evidence provided by each class member and/or their legal counsel; and (3) Defendants have defied this Court's Order to provide complete and accurate parole adjudication data via monthly reports filed with the Court.

1

The evidence before the Court will sufficiently support a finding that Defendants are in contempt of the September 5th Order (*See* Ct. Order ¶ 1-9); and continue to disregard the Directive in violation of the Court's Order. More than eight months have elapsed since this Court issued the September 5th Order, enjoining Defendants from disavowing the Directive and from continuing to implement its blanket, categorical, parole-denial policy. Defendants, however, continue to defy the Court's Order and the Directive in several ways. Accordingly, to remedy Defendants' continued defiance of the September 5th Order, Plaintiffs request that the Court order Defendants to respond to expedited discovery requests to identify and provide detailed information about the processes that Defendants have implemented to comply with the Court's Order and consequently, the Directive, and to determine the effectiveness of these processes in securing compliance with both.

Plaintiffs also request that the Court appoint a Master to enforce the terms and obligations set forth in the Court's Order; to ensure consistency in and monitor compliance with the application of the Order among each one of the detention facilities under the jurisdiction of NOLA ICE; and to ensure that Defendants' present and future Directive obligations are met.

## I.   **INTRODUCTION**

As the Court noted in its Memorandum Opinion for the September 5th Order, "[i]n 2016, the NOLA ICE Field Office denied parole in only 24.5 percent of the 229 decisions made." *See* Ex. 1A*; see also* Prelim. Inj. Mem. Op., ECF No. 32, 20. Although NOLA ICE has improved marginally upon a grant rate of zero in September 2019, it remains far below the 75.5 percent grant rate that prevailed in 2016. *See* Exs. 1A, 1B. Redacted Credible Fear Report records show that in 2016, 75.5 percent of parole applications were granted; however, this number significantly decreased in the following years. For example, less than two percent were approved in 2018. *See*

2

Ex. 1A. Declarations by NOLA ICE Supervisory Detention and Deportation Officer Jacques Metoyer (hereinafter the "Metoyer Declarations") reinforce this finding, showing that after the Court's Order, parole-grant rates remained at 6.5 percent for first-time applicants and 16.9 percent for applicants seeking redetermination. *See* Ex. 1B. The Metoyer Declarations further show that, in March and April of 2020, parole-grant rates remained below 25 percent for parole-redetermination applications and below 20 percent for first-time applicants. *See* Ex. 1B.

The Metoyer Declarations show that over the past two months (i.e., March 1, 2020 through April 17, 2020), fewer than ten and as few as **zero** parole redetermination adjudications occurred at several facilities (emphasis added). *See* Ex. 1C. This is alarming for three reasons: first, the detained population that NOLA ICE oversees has more than doubled since 2016;[1] second, upon information and belief, Plaintiffs' class members are filing more requests, not fewer, due to fear of imminent illness and potential death at the hands of the unprecedented COVID-19 viral pandemic during the reported months;[2] and third, in 2016, Defendants were not required to take this deadly pandemic into account when weighing public interest under of the Directive.[3] Defendants do not offer an explanation for these reportedly low numbers of parole-redetermination adjudications.

---

[1] "According to … ICE data … the number of detainees in facilities contracted by [ICE] in Louisiana and Mississippi surged from just over 2,000 at the end of 2017 to more than 8,000 as of July [2019]." NBC News, August 15, 2019 available at https://www.nbcnews.com/politics/immigration/ice-detainments-surge-mississippi-louisiana-alarming-immigration-advocates-n1042696; *see also* "'Detainment for the New Orleans field office …is about 5,200 persons currently,' [ICE spokesman] Cox said." Alabama News, May 4, 2020, available at https://www.al.com/news/2020/05/i-am-scared-of-dying-in-here-lawsuit-demands-release-of-18-immigrants-from-alabama-ice-facility.html.

[2] *See* Huber Decl. at ¶ 5; KSR Decl. at ¶ 21.

[3] Directive at § 4.3 (5), *see also COVID-19 Detained Docket Review*, Updated ERO Guidance at p. 3, ECF No. 66 (April 4, 2020).

In the eight months since the Court's Order has been in effect, NOLA ICE has reportedly granted a mere 13.5 percent of 2,052 parole requests. *See* Ex. 1D. Indeed, Plaintiffs fear that the effective grant rate is much lower, because at least 17 class members received parole denial letters that were not reflected in Defendants' monthly reports, and as few as 36 and as many as 300 class members have not received parole determinations at all. *See* Ex. 1D (reflecting 20 pending requests); Ex. 24 (Copies of Parole Denial Letters Issued to Class Members and Not Reflected in Defendants' Monthly Reports); *see also* Huber Decl. at ¶ 2d; RCL Decl. at ¶ 21; LPC Decl. at ¶ 17; KSR Decl. at ¶ 22 (reporting that an ICE officer recently stated, "there are only four of us, 300 of you and everyone has applied for parole"). Moreover, Defendants failed to report parole data on the following facilities within the NOLA ICE region: Tallahatchie County Correctional Facility (hereinafter "Tallahatchie"); Etowah County Detention Center; and the Alexandria Staging Facility. Yet, several class members report blanket denials of their parole requests at Tallahatchie since the Court's Order. *See* CLH Decl. at ¶¶ 5-6; DAA Decl. at ¶ 7; YPT Decl.at ¶ 6; YMT Decl. at ¶ 6; MB Decl. ¶¶ 7-8.

During parole reviews, NOLA ICE continues to engage in the very practices—including failure to provide parole interviews, failure to ensure language access and denying parole on non-individualized, categorical grounds — that the Court enjoined in its September 5th Order. ECF No. 33 at ¶¶ 4-5. In the face of these facts, the Court should find that NOLA ICE is in contempt of the September 5th Order.

Plaintiffs do not move for contempt lightly. Plaintiffs raised many of these ongoing issues with Defendants' counsel on numerous occasions via electronic correspondence and requested

assistance in getting Defendants to address them. *See generally* Exs. 30-38.[4] Plaintiffs' concerns have been met with reluctance or silence. *Id*. Plaintiffs waited eight months since the Court's Order was issued in the hopes that the parole practices and grant rate by NOLA ICE would substantively improve. They have not. Accordingly, Plaintiffs file the instant motion for contempt.

## II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The Directive provides that, absent exceptional circumstances, ICE should release asylum-seekers who establish their identity and show that they are neither a flight risk nor a danger to the community. On May 30, 2019, Plaintiffs filed a complaint against NOLA ICE for their failure to comply with the Directive. Complaint, ECF No. 1. On June 28, 2019, Plaintiffs filed a motion to certify a class. Class Cert. Mot., ECF No. 15, (Jun. 28, 2019). On July 18, 2019, Plaintiffs filed a motion for preliminary injunction on behalf of its class. Prelim. Inj. Mot., ECF No. 22, (Jul. 18, 2019). On September 5, 2019, the Court issued a memorandum opinion and order granting Plaintiffs' motions. Prelim. Inj. Mem. Op., ECF No. 32 (Sep. 5, 2019); Prelim. Inj. Order, ECF No. 33 (Sep. 5, 2019).

---

[4] Ex. 30 (identifying, for the second time, that underreporting is a concern which must be addressed to which Defendants' Counsel insisted that without more details and A numbers, his clients would not address said concerns; evoking Plaintiffs' Counsel's response that Defendants should "proceed in good faith" by detailing processes for tracking parole submissions and initiating a query into reported misconduct, reminding Counsel that Defendants control the information needed for investigation); Ex. 31 (showing that Defendants' Counsel never replied to an email from Plaintiffs' Counsel seeking cooperation in addressing concerns that data provided by Defendants' is inaccurate, since Plaintiffs' Counsel discovered dozens of class members not reflected in Defendants' monthly reports); Ex. 32 (showing that Defendants' Counsel never replied to an email from Plaintiffs' Counsel, seeking cooperation from Defendants regarding the case of a high-risk COVID-19 vulnerable individual who had been in custody for 305 days and whose parole request had been denied); Ex. 34 (showing Defendants' Counsel's refusal to provide translation of parole notification); Ex. 38 (showing that Defendants' Counsel never replied to an email from Plaintiffs' Counsel seeking cooperation from Defendants' Counsel by sharing a list of high-risk individuals, compiled by Plaintiffs' Counsel in order to facilitate a prompt review of their parole eligibility).

### A.  The Preliminary Injunction Order

The Court entered a class-wide preliminary injunction on September 5, 2019 based on the unjustified, dramatic drop from historically consistent parole-grant rates that inexplicably occurred after 2016 within NOLA ICE, and on additional evidence reflecting violations of the Directive. Prelim. Inj. Order, ECF No. 33. Specifically, the Court enjoined Defendants from denying parole to any class member without an individualized determination regarding the necessity of detention "based on the specific facts of each provisional class member's case." *Id* at ¶ 4. The Court further required Defendants to "conform to all of the substantive and procedural requirements of" the Directive. *Id*. at ¶ 5. In so ruling, the Court found that Defendants were likely violating the Directive and that Plaintiffs faced irreparable harm from their continued detention. Prelim. Inj. Mem. Op., ECF No. 32, 22-24.

### B.  Evidence Reveals Serious, Ongoing Violations of the Directive's Procedural and Substantive Requirements, and Therefore, the Court's Order.

The Directive's stated purpose "is to ensure transparent, consistent, and considered ICE parole determinations for arriving [asylum-seekers] in the United States." Directive at § 1. To that end, it instructs ICE field offices to follow detailed procedures in making parole determinations and establishes reporting requirements "to ensure accountability and compliance with [its] procedures." *Id*. The Directive specifies that ICE "shall maintain national and local statistics on parole determinations and have quality assurance processes in place to monitor parole decision-making." *Id*. at § 6.3. Yet, careful analysis outlined *infra* illustrates that Defendants are violating this mandate.

Defendants have failed to comply with the Court's Order to adhere to the Directive's "substantive and procedural requirements" as follows:

### 1. Procedural Violations

> **i.    *Per the Directive, ICE must provide arriving asylum-seekers with a Parole Advisal and Scheduling Notification ("Parole Advisal"). The contents therein shall be explained in a language the asylum seeker understands, and if necessary, through an interpreter. Directive §§ 6.1, 8.1*.**

Since the Court's September 5th order and as recently as February 2020, Defendants have failed to ensure that class members are consistently provided with a Parole Advisal and rarely, if ever, do officers ensure that an interpreter or translation is provided to class members that are not English language proficient. *See* YPT Decl. at ¶ 9; CLH Decl. at ¶ 5; MB Decl. at ¶¶ 6-8; YCF Decl. at ¶ 4; KSR Decl. at ¶ 7; YPT Decl. at ¶ 13.

> **ii.    *Class members must be provided time to submit documents in support of parole, and instructions on where to submit them. Directive § 8.1.*_**

Many class members report difficulty determining who their assigned Deportation Officer (hereinafter "DO") is at any given time, let alone having the opportunity to communicate with or receive instructions from DOs on how to submit documents in support of their parole requests. *See* YPT Decl. at ¶ 19; LPC Decl. at ¶ 10; MB Decl. at ¶ 11; Crawford Decl. at ¶ 3b; Fonte Decl. at ¶ 2b; Giardina Decl. at ¶ 2.2; Huber Decl. at ¶¶ 2b-2c. Additionally, class members are given unreasonably short timelines to submit supporting documents. *Id. See also* Ex. 26; Ex. 27 (Copies of Parole Advisals with Two and One-Day Deadlines to Submit Supporting Documents). At some facilities under Defendant's purview, class members report officers refusing to accept, or review, documents submitted in support of their parole requests. *See* LPC Decl. at ¶¶ 8, 17; KSR Decl. at ¶¶ 7-9; YCF Decl. at ¶¶ 4-6; *see also* Ex. 25 (Copies of Forms Showing ICE Refusal to Consider Class Members' Written Requests). For example, LPC shared that her parole request was returned to her sealed and unopened with a blank Parole Advisal and a sticky note from her assigned DO,

in effect refusing to consider her supporting documents. LPC Decl. at ¶ 17; *see also* Ex. 22 (Photocopy of Sticky Note Provided to Class Member on Blank Parole Advisal).

Others report they are given misinformation about parole requests and what supporting documentation is required. *See* CLH Decl. at ¶¶ 11-14; MB Decl. at ¶¶ 12-14; RCL Decl. at ¶ 19; Fonte Decl. at ¶ 6; Giardina Decl. at ¶ 3; Crawford Decl. at ¶¶ 3b-3d. Some class members report officers at several facilities have expressly told them "there is no parole." *See* CLH Decl. at ¶ 8; MB Decl. at ¶ 12; DAA Decl. at ¶ 7. One man detained at the Winn Correctional Center (hereinafter "Winn") reports that "after the September 5th order … many of the officers were making comments on a weekly basis" saying "that no one would receive parole, that [they] would have to have stage-four cancer or be pregnant to get out, and that there was a zero percent chance of anyone being granted parole." RCL Decl. at ¶ 19. At Tallahatchie, there appears to be a continued pattern and practice of *de facto* denial for all initial parole requests without document review of any kind. *See* CLH Decl. at ¶¶ 5-6; DAA Decl. at ¶ 7; YPT at ¶ 6; YMT Decl. at ¶ 6; MB Decl. ¶¶ 7-8. Notably, Defendants never included data from this facility in their Court ordered monthly reports. *See* Exs. 1C, 1D.

> ### iii.   *ICE officers must interview arriving asylum seekers to assess their eligibility for parole, no later than seven days after a positive credible fear finding. Directive § 8.2.*

Class members report not receiving parole interviews. *See* YMT Decl. at ¶¶ 6, 9-10; YMT Decl. at ¶ 6; MB Decl. at ¶¶ 6-8, DAA at ¶ 7; YCF Decl. at ¶¶ 4-6; KSR Decl. at ¶ 7; CLH Decl. at ¶ 6; Fonte Decl. at ¶ 2b; Giardina Decl. at ¶ 1; Crawford Decl. at ¶ 3a. Since the Court's September injunction one advocate "worked on 25 parole requests for individuals detained in Louisiana" and shares that "23 of these 25 clients report not being given a parole interview after their parole application was submitted." Huber Decl. at ¶ 2a. One class member reports that he

never received a parole interview of any kind despite his numerous requests over the course of 10 months. *See* APE Decl.[5]

Others report receiving an English-language questionnaire without translation or interpretation assistance in lieu of an interview. *See* YCF Decl. at ¶¶ 8, 12; MPI Decl. at ¶ 10; KSR Decl. at ¶ 18. One class member reports that a parole denial letter issued to him wrongfully stated he had received a parole interview when he had not, and that his bunkmates shared this experience. *See* YMT Decl. ¶¶ 9-10. Another francophone class member reports that his interviewing ICE officer repeatedly refused to provide him an interpreter and this refusal led to an outcome determinative error. *See* MB Decl. at ¶¶ 14-16.

> ***iv.*** **ICE shall provide arriving asylum-seekers "written notification of the parole decision, including a brief explanation for any decision to deny parole." These notifications shall be provided to the asylum-seeker and "if represented, their representative within seven days of the date [the asylum-seeker] is initially interviewed for parole or the date [the asylum-seeker] requests a parole redetermination, absent reasonable justification for delay in providing such notification." Officers "shall ensure reasonable access to translation or interpreter services ...." Directive §§ 6.5, 6.6, 8.2**

Since the issuance of the Court's Order, class members and their legal representatives report not receiving notifications of parole decisions. *See* RCL Decl. at ¶ 14; CLH Decl. at ¶¶ 6, 16-17, 20; KSR Decl. at ¶¶ 12, 21; Fonte Decl. at ¶ 5 (chart); Crawford Decl. at ¶ 3e. Many also report not receiving translation or interpretation when needed. *See* MPI Decl. at ¶ 12; YPT Decl. at ¶ 14; MB Decl. at ¶¶ 14, 18; CLH Decl. at ¶ 8; KSR Decl. at ¶¶ 8, 17; Fonte Decl. at ¶ 6; Giardina Decl. at ¶ 3; Crawford Decl. at ¶¶ 3b-3d.

As recently as late April 2020, a class member detained at the South Louisiana ICE Processing Center (hereinafter "Basile") in Basile, Louisiana, shared that she "submitted a parole packet with

---

[5] Counsel for Plaintiffs raised APE's case with counsel for Defendants on April 17, 2020 and upon information and belief he was released from ICE custody on May 1, 2020. *See* Exs. 38-38A.

additional evidence requesting a redetermination," and that same evening "a private-prison guard returned [her] packet to [her] dorm … sealed and unopened" with "a sticky note [placed] on top of the packet with the following words handwritten on it 'Has to be an Immediate Relative. Mother, Brother, Papa, Sister. You have been denied 3 times and served your denial notice.'" LPC Decl. at ¶ 17; *see also* Ex. 22. Another class member shared a similar experience from December 2019 at the River Correctional Center: "[A]fter about a month without any response, I made a request on a sheet of paper to ICE asking about the decision on my parole. ICE wrote back on the same sheet that my parole was denied, but there was no explanation as to why. I didn't receive any other documentation" DAA Decl. at ¶ 14.

In February 2020, after being transferred to the LaSalle ICE Processing Center in Jena, Louisiana, DAA continued to seek a formal decision on his parole request: "I wrote to ICE on the tablet in my dorm asking why I hadn't yet received a reply and was told that my ICE deportation officer is in River, so I would need to write to him to find out what was going on with my parole application. However, I don't know my deportation officer's name and was never given any contact information for him. As such, it was impossible for me to contact him. That is the only response I've gotten from anyone here in Jena." DAA Decl. at ¶ 15. Similarly, in April 2020, one class member detained at Winn shared: "The last time I submitted a parole interview form and packet was on March 10, 2020, to my then-assigned DO, Officer Paredes. However, on March 12, 2020, DO Paredes and the other DOs from that time period left, and new ones arrived. Eventually, I was able to ask my newly assigned DO about the status of my previously submitted parole request. He informed me that it was denied … he never provided me the denial letter." RCL Decl. at ¶ 14.

10

One advocate reports that "between October 9, 2019 and March 23, 2020, [she] submitted 15 parole requests for clients detained in Pine Prairie … via email and mailed hard copies," but that 13 of these requests remain unacknowledged by ICE in any way. Huber Decl. at ¶ 2d. She further notes that 10 class members for whom she helped file requests were not reflected anywhere in Defendant's monthly reports. *Id.* at ¶ 2e. More recently, women detained at Basile asked ICE officers why they had not received determinations on their requests and were reportedly told "there are only four of us, 300 of you and everyone has applied for parole, and our supervisors are working from home." KSR Decl. at ¶ 21. KSR shared that she submitted her most recent redetermination request with additional documents on March 14, 2020 but has "yet to receive any response to this request." *Id.*

Even when class members do receive proper notification of determinations on their parole requests, it is rarely within the seven-day time frame required by the Directive. Defendants' monthly reports alone demonstrate this fact. In 61.6 percent of first-time parole determinations, over seven days pass between the day an asylum-seeker requested parole and the day ICE issues a parole determination. *See* Ex. 1E. On average, it takes NOLA ICE over two weeks to issue a parole decision for first-time applicants after they make a parole request. *See* Ex. 1E. In one case, it took NOLA ICE over six months to issue a decision after a first-time parole request. *See* Declaration of Jacques Metoyer, Ex. B (A number ending in 6193), ECF No. 71, (April 23, 2020), (reporting that the asylum seeker requested parole for the first time on September 9, 2019 and received a determination on March 11, 2020). The data that Defendants provide does not contain information on the dates that applications are submitted or adjudicated for parole redetermination requests. Therefore, it is impossible to verify compliance with this aspect of the Directive for individuals

seeking a redetermination. However, it is clear for those requests where information is available, NOLA ICE has not followed the Directive's requisite time guidelines.

> **v.   *"The supporting documents … and any other documents related to the parole adjudication should be placed in the [asylum-seeker]'s A-file in a record of proceeding format." Directive § 8.10***

One class member detained at Basile shared the following anecdote from March 2020: "An ICE officer approached the door of our dorm, and I asked her to please accept my packet of documents in support of my parole-redetermination request. … [S] cracked open the door and ordered me to place it on the floor. She then proceeded to kick it across the floor with her boots to the other side of the room. Luckily, I had placed all of the documents in a sealed envelope. … Worse still, when I spoke with my newly assigned DO days later, he told me he did not receive the packet and had not seen it anywhere. That packet was lost." LPC Decl. at ¶ 16.

Another class member detained at Winn reports, "During one particularly frustrating attempt, I submitted a thorough parole packet, with many documents. However, after the DOs shifted, the new DO informed me that he did not see any of my documents and had no idea where my parole packet was. I had to begin the process of collecting documents from within this jail all over again, including original notarized letters." RCL Decl. at ¶ 15.

## 2. Substantive Violations

> **i.   *"The applicable regulations describe five categories of [asylum-seekers] who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk" including individuals "who have serious medical conditions, where continued detention would not be appropriate" and those "whose continued detention is not in the public interest." Directive § 4.3***

Class members and their legal representatives report that NOLA ICE is not properly weighing "serious medical conditions" and "public interest" when reviewing parole requests, particularly in light of the COVID-19 pandemic and the serious health risks it presents to those

detained in the NOLA ICE region. *See* Isbister Decl.; Giardina Decl. at ¶ 5; KSR Decl. at ¶¶ 22-23; MPI Decl. at ¶ 11; DAA Decl. at ¶¶ 8, 16-18; YPT Decl. at ¶ 19; LPC Decl. at ¶ 22. Mr. Giardina represents seven class members who suffer chronic medical conditions that make them particularly vulnerable to grave illness or death should they contract COVID-19, and whom NOLA ICE "continues to deny access to parole without explaining what makes them a flight risk or a danger to the community." Giardina Decl. at ¶ 5.

> **ii.   *"In order to be considered for release" an asylum-seeker "must present sufficient evidence demonstrating his or her likelihood of appearing when required." The Directive instructs that factors appropriate for consideration of this requirement include "community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available" to the asylum-seeker. "Officers should exercise their discretion to determine what reasonable assurances … are warranted on a case-by-case basis to mitigate flight risk." ICE officers are also encouraged to "request that parole applicants provide any supplementary information that would aid [them] in reaching a decision." Directive §§ 8.3 (2), 8.4***

Legal advocates for class members report submitting thorough parole requests with extensive supplementary documentation and receiving boilerplate denial letters in response that suggest the evidence submitted was not taken into consideration by NOLA ICE. *See* Fonte Decl. at ¶ 2d; Giardina Decl. at ¶ 5; Crawford Decl. at ¶¶ 3d-3h; Isbister Decl. at ¶ 9; Huber Decl. at ¶ 3; *see also* Kelley Decl. and attached request; Arsolino Decl. and attached request. Class members broadly report that NOLA ICE continuously refuses to provide individualized reasons for determining that they are flight risks and that officers fail to properly consider extensive evidence they submit to the contrary. *See* MPI Decl. at ¶ 12; YCF Decl. at ¶ 13; YPT Decl. at ¶¶ 10-19; LPC Decl. at ¶¶ 12-13; MB Decl. at ¶18; RCL Decl. at ¶ 17; YMT Decl. at ¶¶ 7, 10.

Class members also express frustration at refusals to provide clarity on what supporting documents or underlying factors would sufficiently satisfy NOLA ICE that they are not flight risks. For example, one class member detained at Winn shares, "[m]y proposed sponsors are my brother, a Lawful Permanent Resident, and his wife, a US citizen. They are waiting to receive me in their home in Arizona." RCL Decl. at ¶ 10. RCL submitted letters of support, affidavits from each of his proposed sponsors, copies of their identity documents evidencing their immigration status, copies of their tax returns evidencing their ability to financially provide for him, and proof of their fixed residential address where he would live once released. *Id.* at ¶ 20. RCL also notes that ICE failed to take into consideration his eligibility for Lawful Permanent Residence should he be released parole. *Id.*

KSR arrived as the U.S. border with her husband, driven by the same fear of persecution by Cuban authorities because of their political opinions. KSR Decl. at ¶¶ 2-4. They had the same proposed U.S. citizen sponsor and strong supporting evidence in their parole requests. *Id.* at ¶¶ 6, 9-10. Yet, KSR's husband was released months ago by a different ICE field office, while she continues to languish in Basile. As a result of her prolonged detention, KSR contracted H1N1 influenza in March 2020, developed chronic hypertension in April 2020, and has now been waiting approximately two months for a decision on her most recent request for parole. *Id.* at ¶¶ 22-24.

### C. A Careful Examination of Data Provided by Defendants Reveals Continued Noncompliance with the September 5th Order and Subsequent Orders

The data sources provided by Defendants and relied on by Plaintiffs *infra* are summarized below:

1. Defendants court-ordered monthly data reports reflecting the parole-grant rate for NOLA ICE. *See* Minute Order, ECF No. 35 (Oct. 7, 2019). This data provides parole decisions from September 2019 to April 17, 2020, by the NOLA ICE Field Office for: 1) individuals seeking redetermination of their parole decision; and 2) individuals seeking a first-time parole decision from NOLA ICE.

14

2. Data received through Freedom of Information Act ("FOIA") requests by the American Civil Liberties Union ("ACLU") and relied upon by this Court in issuing the September 5th Order. This data summarizes parole decisions by the ICE Field Offices for arriving asylum-seekers found to have a credible fear from January 2016 to February 2019. *See* Beiers Decl. at ¶3, ECF No. 22-3.

> ### i. *Available Reports Show that Starting in February 2017 There Was a Dramatic Jump in Denials Relative to Grants that Continues Today*

The number of parole grants was typically *three times* the number of parole denials in all of 2016 and January 2017. (emphasis added) *See* Ex. 1F. In February 2017, this trend reversed, and the number of parole denials has vastly outnumbered the number of parole grants since. The cause of this sudden reversal is unclear. Plaintiffs are not aware of any changes in formal policies, procedures, or the population of individuals seeking parole. In fact, Defendants have represented to this Court on multiple occasions that the Directive remains in effect and unchanged.[6] ECF No. 2 at ¶¶ 44-45.

Unfortunately, and at the expense of irreparable harm to class members, this practice continues today with no explanation from NOLA ICE. The data included in the declarations provided by NOLA ICE as a result of the Court's Order, continue to show vastly fewer parole grants than denials for those seeking parole. This is true for individuals seeking parole redeterminations and for first-time applicants. *See* Exs. 1G, 1H. In fact, from September 2019 to April 17, 2020, only 276 of 2,052, or 13.5 percent, of total determinations resulted in a parole grant. S*ee* Ex. 1D. For every six parole denials, there was only one parole grant. This sharply contrasts with 2016, where for every six denials there were around *eighteen* parole grants. (emphasis added). This is true on a monthly basis as well. For example, in December of 2019, well after the Court's Order, NOLA

---

[6] Contrast with ECF No. 2-1, Ex. A, Email from Brian Acuna, New Orleans ICE Field Office to American Immigration Lawyers Association – Midsouth Chapter (Nov. 29, 2018) (wherein he indicated that the 2009 Directive was technically no longer in effect "by Executive Order").

ICE issued a mere 5 parole grants out of 166 total determinations, or 0.9 percent of all determinations. This is in stark contrast to December 2016, when NOLA ICE issued 11 parole grants out of 13 determinations, or 84.6 percent of all determinations. *See* Exs. 1B, 1I.

ICE has not offered evidence of changes in the population of individuals seeking parole that could explain this precipitous drop in parole grants. Further, as described below, NOLA ICE's reasons for denial, post-injunction, appear to be indiscriminate and are inconsistent with the mix of NOLA ICE's reasons for denial pre-injunction. As a result, NOLA ICE's reasons for denial are evidently not based on the individual facts and circumstances specific to each person seeking parole.

### ii.    *Use of Flight Risk as a Reason for Denial Has Inexplicably Become Extensive*

From January 13, 2016 to January 31, 2019, NOLA ICE denied 248 parole applications out of 437 parole determinations. *See* Ex. 1J. In data received through FOIA requests by the ACLU and relied upon by this Court in issuing the September 5th Order, ICE provided reasons for such denials. The bases for parole denials reflected in the data are consistent with the Directive and include: 1) inability to establish identity; 2) pose a flight risk; 3) pose a danger to the community; 4) exceptional or overriding factors; and 5) no justification for redetermination. In some instances in 2018, the data indicated more than one reason for denial. Directive at § 8.3; *see also* Ex. 1J.

In 2016, ICE denied 15.3 percent of its parole requests due to flight risk (35 out of 229 determinations). By comparison, the use of flight risk rose after 2016. From January 1, 2017 to January 31, 2019, 84 of the 208 determinations, or 40 percent, were denied due to "Flight Risk." During the entire pre-injunction period starting in 2016, the highest number of denials based on flight risk by NOLA ICE occurred in 2018. During 2018, 73 out of 127 determinations, or 57.5 percent, were based on NOLA ICE's determination of flight risk. *See* Exs. 1J, 1K.  The use of the

flight risk determination increased again post-injunction with substantially higher denials due to flight risk compared to the already elevated rates shown in 2017–2019. *See* Exs. 1L, 1M. From September 5, 2019 through April 16, 2020, NOLA ICE considered 1,393 requests for parole applicants seeking redetermination and deemed 1,132 as flight risks (81%). (Defendants fail to provide grounds for denials of first-time parole applications in their monthly reports. Metoyer Declarations, ECF Nos. 42, 44, 56, 58, 59, 71). NOLA ICE has not provided underlying documentation demonstrating the rationale for these flight-risk determinations. As a result, the reason for this percentage of flight-risk denials is unclear, but it evidently is not based on the individualized facts of parole redetermination requests. *Supra* section II.B1.iv., II.B.2., (individualized reasons for "flight risk" determinations were not provided to class members).

Defendants may claim the more prevalent use of flight risk denials is justified because the chances of parole applicants fleeing have somehow generally increased across the board. However, this cannot be true because if flight risk generally increased for all arriving asylum-seekers, parole grants would have dropped similarly across all field offices. This is not the case. *See* Ex. 1N. In 2018, NOLA ICE had the lowest parole-grant rate (1.6 percent) of any field office and the largest drop in paroles granted from 2016 to 2018 with the exception of Salt Lake City, Utah. *Id*. Further, 14 of the 23 other field offices reported an increase in the parole-grant rate from 2016 to 2018. *Id*. Notably, Salt Lake City reported only 68 parole decisions compared with 434 decisions reported by NOLA ICE during this time.

Anecdotal evidence provided by class members corroborates that other field offices are not systematically determining parole applicants to be flight risks. For example, two class members report that their spouses who were detained by other ICE Field Offices were released months ago based on the same evidence submitted in their own parole requests. *See* KSR Decl. at ¶¶ 9-10; MPI

Decl. at ¶ 10. Prior to her transfer to the Louisiana region, KSR was detained at the West Texas Detention Facility where "[she] witnessed that ICE officers took time to explain the parole process to people and to provide a thorough parole interview … [and that] women who were denied parole were expressly told what evidence would be helpful to ICE in making a positive determination in their parole request." KSR Decl. at ¶ 5.

### iii. *Data Provided by Defendants' Shows Inconsistencies and Deficiencies in Record-Keeping and Reporting*

NOLA ICE manually prepares parole determination reports for redetermination decisions and uses a computer-generated report for first-time parole decisions. *See* Metoyer Declaration at ¶¶ 4-6, ECF No. 71. Reports for first-time parole decisions do not indicate reasons for denial, even though ICE must provide a reason for denial in every parole consideration. Directive at § 8.2. Reports for first-time parole decisions do not identify the facilities where asylum-seekers are detained. Relatedly, class members are often transferred, and their assigned DOs are frequently shifted. *See generally* Exs. 2-12. Defendants also fail to provide submission dates for parole redetermination requests, making it impossible to discern if they are in full compliance with the Directive, and thus, the Court's Order. *See* Metoyer Declarations, ECF Nos. 42, 44, 56, 58, 59, 71.

Data provided by NOLA ICE in compliance with the Court's Oct. 7 Minute Order, reveal inconsistencies and deficiencies in its record-keeping and reporting. These inconsistencies and deficiencies should not be present if NOLA ICE followed the processes laid out in the Directive. Directive § 8.11. These errors also make verifying compliance with the Directive more challenging. For example, no parole-request date is recorded in 10 first-time parole decisions. *See* Ex. 1O. Additionally, some parole decision dates are reported in parole redeterminations *before* the date each asylum-seeker entered ICE custody (emphasis added). *Id.*

18

At least 14 class members received parole-denial letters issued on dates that directly contradict the dates of denial reflected in Defendants' monthly reports. *See* Group Ex. 23 Parole-related documents issued to class members by Defendants also contain errors. For example, one letter is addressed to two different women detained by NOLA ICE, and another alleges that the class member received a parole interview on a date when she had not yet entered the U.S. *See* Ex. 21, Ex. 24D.

NOLA ICE reported such errors with no notice in the relevant declarations and apparently did not correct these errors. These errors raise serious concerns about the quality of the data reported and whether it is accurate, which makes verifying compliance with the Directive more difficult. For example, at least 17 parole denial decisions and at least 10 class members do not appear anywhere in Defendants' monthly reports despite requesting parole sometime between October 9, 2019 and February 17, 2020. *See* Ex. 24; *see also* Huber Decl. at ¶ 2e. This evidence taken in its entirety demonstrates that NOLA ICE's record-keeping and reporting is insufficient to verify compliance with all aspects of the Directive and does not meet the quality assurance the directive aims to safeguard. Directive §§ 7.2, 7.3 (1), 8.11, 8.12.

Defendants' monthly reports also show that class members are frequently subjected to prolonged detention, likely due to NOLA ICE's failure to properly adjudicate their requests for release on parole. On average, Defendants' reports reflect that class members seeking redetermination have been in ICE custody for 190 days and up to 563 days from the date of their last determination. *See* Ex. 1E. The data for redetermination requests end on March 15, 2020, which means asylum seekers likely remained in ICE custody additional days beyond the 190-day average. For example, one class member seeking redetermination, RCL, has been in ICE custody for 374 days as of March 13, 2020, according to ICE's reported data. *See* Metoyer Declaration,

Ex. A (A No. ending in 2045), ECF No. 59 (March 23, 2020). As of today, RCL has been detained 439 days.

Defendants' reports reflect that KSR is a first-time parole applicant now awaiting a decision on her first redetermination request, and that she has been in ICE custody for 161 days as of March 12, 2020. *See* Metoyer Declaration, Ex. B (A No. ending in 5220), ECF No. 71 (April 23, 2020). The data further reflect that KSR was initially considered for parole on December 3, 2019 and waited nearly two weeks to receive notice of a denial determination. *See* Metoyer Declaration, Ex. B (A No. ending in 5220), ECF No. 56 (January 29, 2020). In fact, KSR has been detained for 224 days, denied parole three times, and has now been waiting 61 days for a determination of a fourth request she filed on March 14, 2020. KSR Decl. at ¶¶ 4, 22; *see also* Ex. 20, Copies of KSR's Three Parole Denial Letters. Furthermore, KSR was first provided a denial letter alleging that she received a parole interview, when in fact no such interview took place. *See* KSR Decl. at ¶8. Notably, the letter provided to KSR was left undated. *See* Ex. 20.

### iv.   *Parole Redeterminations at Some Detention Centers Are Particularly Low and Have Only Shown Modest, Inconsistent Improvement in Parole Grants*

Since the Court's Order, NOLA ICE data show few redeterminations at some detention centers and only modest, inconsistent improvement in parole-grant rates. Some detention facilities report few to no parole redeterminations in any given month relative their population size compared with other detention facilities. *See* Ex. 1C; *see also* Hartnett Declaration (reporting population sizes), ECF No. 64-2. For example, LaSalle Ice Processing Center and LaSalle Correctional Center report detaining over 1,300 people as of April 2020, but report only 19 redeterminations from September 2019 to April 2020, in the post-injunction data provided by Defendants. *Id. See also* Ex. 1Q. Catahoula Correctional Center reports detaining over 700 individuals as of April 2020, but reports only 9 redeterminations from September 2019 to April 2020. *Id.* Among the facilities that report

more redeterminations (e.g., Winn, Basile, Richmond, Jackson Parish), parole-grant rates for these have rarely exceeded 35 percent in any month since the Court's Order and sometimes drop after an increase. *Id.*

In December 2019, NOLA ICE facilities reported zero parole redetermination grants with the exception of Winn, where 3 percent of parole redeterminations were reportedly granted. *See* Ex. 1P. The reported monthly grant rates at the NOLA ICE detention facilities remain a fraction of the pre-February 2017 rates and do not show consistent improvement in either the number of parole redeterminations or the parole-grant rate.  *See* Exs. 1I, 1P.

### III.  <u>LEGAL STANDARD FOR CONTEMPT</u>

Courts have the inherent power and authority to enforce their orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also SEC v. Diversified Growth Corp,* 595 F.Supp. 1159, 1170 (D.D.C. 1984) (stating that it is within the court's civil contempt power to coerce obedience to a lawful Order). Once a court issues an injunction, those persons subject to it must obey terms of the order, as long as the injunction remains in effect: "`[a] court has the 'inherent power to protect [its] integrity and prevent abuses of the judicial process' by holding parties in contempt and ordering sanctions for violations of the court's orders." *Cobell v. Babbitt*, 37 F.Supp. 2d 6, 9 (D.D.C. 1999) (citing *Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C.Cir.1998)).  This power to enforce, or civil contempt power, "is essential to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *United States v. Latney's Funeral Home, Inc.*, 41 F.Supp.3d 24, 29 (D.C.Cir. 2014) (citing *Broderick v. Donaldson,* 437 F.3d 1226, 1234 (D.C.Cir.2006)).

When a party invokes a court's civil contempt power by alleging a violation of a court order, the party moving for a civil contempt finding "bears the initial burden of demonstrating by clear

and convincing evidence that: (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by Defendants; and (3) Defendants failed to comply with that order." *Latney's Funeral Home, Inc.*, 41 F. Supp. 3d at 30 (citing *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC,* 736 F.Supp.2d 35, 38 (D.D.C.2010)); *NLRB v. Blevins Popcorn, Co.* 659 F.2d 1173 (D.C. Cir. 1981); *Armstrong v. Exec. Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993); *SEC v. Bilzerian,* 112 F.Supp.2d 12, 16 (D.D.C.2000).

This "clear and convincing" standard "requires a quantum of proof adequate to demonstrate reasonable certainty that a violation occurred." *Latney's Funeral Home, Inc.,* 41 F. Supp. 3d at 30 (citing *Phillips v. Mabus,* 894 F.Supp.2d 71, 91 (D.D.C. 2012)) (quoting *Breen v. Tucker,* 821 F.Supp.2d 375, 383 (D.D.C. 2011)).  Once a predicate for contempt has been established, a court must consider whether a party can be held in civil contempt in light of the evidence before it and any mitigating factors: "[o]nce the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance by, for example, demonstrating … its good faith attempts to comply." *Int'l Painters & Allied Trades Indus. Pension Fund,* 736 F.Supp.2d at 38 (citing *Bilzerian,* 112 F.Supp.2d at 16–17); *NAACP, Jefferson County Branch, v. Brock,* 619 F.Supp. 846, 849 (D.D.C. 1985).

Further, a violation need not be *willful or intentional* because the intent of the party is irrelevant in a civil contempt proceeding: "when making a civil contempt determination, "[a] court 'need not find that [the] failure to comply with the orders was willful or intentional' because a party's intent is irrelevant . . ." *Blevins,* 659 F.2d at 1184; *Bilzerian,* 112 F.Supp.2d at 16. "The alleged contemnor must justify its noncompliance 'categorically and in detail.'" *Int'l Painters & Allied*

*Trades Indus. Pension Fund,* 736 F.Supp.2d at 40; *see also SEC v. Current Fin. Servs., Inc.,* 798 F.Supp. 802, 808 (D.D.C.1992) (emphasis added).

The D.C. Circuit has considered "good faith substantial compliance" efforts or a party's inability to comply with a court's orders, as defenses which call for mitigation of contempt sanctions, but "to meet this standard, the contemnor must show that it 'took all reasonable steps within [its] power to comply'" with the court order. *Int'l Painters & Allied Trades Indus. Pension Fund,* 736 F.Supp.2d at 40, (quoting *Food Lion, Inc.,* 103 F.3d at 1017). The contemnor must show "adequate detailed proof" of good-faith efforts to substantially comply with the court order. *Id.* at 38. Good faith alone is nonetheless insufficient to simply claim actions constituted diligent or good-faith efforts toward compliance: "absence of wil[l]fulness does not relieve [a party] from civil contempt . . ." *Latney's Funeral Home, Inc.,* 41 F. Supp. 3d at 34; *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191 (1949).

## IV.   **ARGUMENT**

### A.   **Defendants' Noncompliance Satisfies the Legal Standard for Civil Contempt, Enabling the Court to Exercise its Inherent Power to Enforce its Order.**

As parties to the original action, the Plaintiffs may invoke the Court's power by initiating a proceeding for civil contempt. *See Latneys' Funeral Home*, 41 F.Supp.3d at 30*; see also Gompers v. Bucks Stove & Range Co*., 221 U.S. 418, 444-45 (1911). Plaintiffs have demonstrated by clear and convincing evidence that they have met their initial burden of satisfying the three factors for civil contempt: 1) there was a clear and unambiguous court order issued by this Court on September 5, 2019; 2) the Court's Order required Defendants to take specific steps to comply with the Order and the Directive; and 3) Defendants have failed to comply with both. *Latney's Funeral Home*, 41 F.Supp.3d at 30, (citing *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC,* 736 F.Supp.2d 35, 38 (D.D.C.2010); *Armstrong v. Exec. Office*

*of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993); *SEC v. Bilzerian,* 112 F.Supp.2d 12, 16 (D.D.C.2000)).

### 1.   This Court issued a clear and unambiguous order on September 5, 2019.

Defendants have taken contemptuous action by violating specific prohibitions and requirements in the Order, because the September 5th Order is unambiguous, and Defendants understood the clear and unambiguous Order issued by the Court.

#### i.   *The Court's September 5th Order is Clear and Unambiguous.*

Rule 65(d) of the Federal Rules of Civil Procedure provides:

> "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.Pro. 65(d).

The Court's Order is valid, clear, unambiguous and meets the Fed. R. Civ. P. 65(d) requirement that injunctions describe in reasonable detail the acts sought to be restrained. *See Schmidt v. Lessard,* 414 U.S. 473, 475 (1974); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 461 (7th Cir. 1993); *Stotler*, 870 F.2d at 1163. The specificity provisions of Rule 65(d) are not mere technical requirements. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is enjoined.

In the present case, this Court's Order details with particularity the precise nature of the conduct it prohibits, stating in plain language:

> "Defendants are hereby ENJOINED from denying parole to any provisional class members absent an individualized determination, through the parole process, that such provisional class

member presents a flight risk or a danger to the community." *See* Ct. Order ¶ 3. "The individualized determinations of flight risk and danger to the community referenced above shall be based on the specific facts of each provisional class member's case. Such determinations, moreover, shall not be based on categorical criteria applicable to all provisional class members." *Id*. at ¶ 4. "Defendants shall provide provisional class members with parole determinations that conform to all of the substantive and procedural requirements of U.S. Immigration and Customs Enforcement, Directive No. 11002.1 [the Directive]." *Id*. at ¶ 5.

Thus, the Court's Order constitutes a clear and unambiguous order that required certain specified conduct by Defendants. *See, Latney's Funeral Home*, 41 F.Supp.3d at 31. *See also Phillips,* 894 F.Supp.2d at 91 (explaining that "An order granting injunctive relief is enforceable by the district court's power of contempt.") (citing *Gunn v. Univ. Comm. to End War in Viet Nam,* 399 U.S. 383, 389 (1970)).

## ii. *Defendants understood the clear and unambiguous Order.*

Defendants had knowledge of the Court's Order and what was required of them. Defendants demonstrated their knowledge of the Court's Order by initially agreeing to its terms, conferring with Plaintiffs' Class counsel regarding the notice to be provided to provisional class-members, and stipulating to a protective order which they signed and negotiated with Plaintiffs' counsel.  *See* Stipulated Protective Order, ECF No. 40. When Defendants needed clarification from the Court regarding the dissemination of the Parole Notice, the Court promptly clarified its Order to eliminate any miscommunications or misunderstandings. *See* Defendants' Motion to Clarify the Court's Order of October 7, 2019 Regarding Dissemination of Class Notice, ECF No. 43; *see also* Order Regarding Class Notice, ECF No. 51. This Court expeditiously and effectively addressed Defendants' request for clarification, eliminating any discrepancies or doubts, and Defendants

have not sought additional clarification regarding any other aspect of the Court's Order that the Court has failed to address.

### 2. Pursuant to the Court's September 5th Order, the Court required Defendants to engage in specific conduct to comply with the Order.

As stated *supra*, the Court's Order enjoined Defendants from denying parole to any class member without an individualized determination regarding the necessity of detention "based on the specific facts of each provisional class member's case." Prelim. Inj. Order, ECF No. 33, ¶ 4. As explained *infra*, the data from Defendants' monthly reports establish that Defendants have continued to implement an indiscriminate parole-denial policy without regard to this Court's requirement that they provide individualized, case-by-case determinations to parole applicants.

The Court's Order further required Defendants to abide by the procedural and substantive requirements of the Directive. *Id*. at ¶ 5. These extensive, detailed requirements are outlined *supra* section II.B. The Court's Order and the Directive are unambiguous regarding the specific actions required by Defendants to comply with both. Unfortunately for the Plaintiffs, though more than eight months have elapsed since the Court's Order, Defendants continue to disavow the requirements of the Directive, and consequently, this Court's Order.

### 3. Defendants have failed to comply with the Court's September 5th Order.

This Court should grant Plaintiffs' Motion for an Order to Show Cause because Defendants have failed to comply with the Court's September 5th Order. Specifically, Defendants a) continue denying parole to an overwhelming number of class members without individualized determinations; b) persistently fail to make such individualized determinations in consideration of the specific facts of each class member's case; c) fail to provide to class members the substantive and procedural requirements under the Directive; and d) are unlikely to demonstrate justifiable reasons for their noncompliance. *See* Order at ¶¶3-5.

26

> ### i. *Defendants continue denying parole to an overwhelming number of class members without individualized determinations.*

While showing sporadic, marginal improvement, parole data demonstrate that Defendants continue denying parole to an overwhelming number of eligible class members without engaging in individualized, case-by-case determinations, as required by the Court's Order and the Directive. Since the Court issued its Order on September 5, 2019, the parole-grant rate for asylum-seekers detained by NOLA ICE is 13.5 percent of out of a total of 2,052 parole requests. *See* Ex. 1D. In other words, of 2,052 persons who reportedly applied for parole since the Court's Order, NOLA ICE granted freedom to only 277. While this is a small increase from the near-zero percent parole-grant rates from 2017-2019, it is a marked departure from the parole-grant rate of 75 percent, which characterized the NOLA ICE region prior to January 2017. In fact, Plaintiffs are concerned that the effective grant rate is likely much lower. *Supra* section I.

More troubling is the fact that Defendants' April monthly report shows a downward trend in parole decisions and grants. *See* Ex. 1B. According to the last two monthly reports, fewer than ten and as few as zero parole-redetermination adjudications occurred at several facilities. *See* Ex. 1C. This is alarming for the reasons outlined *supra* section I. Defendants do not offer an explanation for these reportedly low numbers of parole-redetermination adjudications.

Not only have the parole-grant rates failed to significantly improve, Defendants continue to ignore the Court's and the Directive's requirement of providing individualized, case-by-case determinations. *Supra* section II.B.2.ii. Additionally, Defendants are not giving due weight to "serious medical conditions" and "public interest" when reviewing parole requests, particularly in light of the COVID-19 pandemic and the serious health risks it presents to those detained in the NOLA ICE region. *Supra* section II.B.2.i.

Simply put, since this Court's Order, Defendants have underreported the number of parole denials issued, failed to report on parole requests at three facilities, failed to report on pending requests, failed to complete individualized parole determinations and still only shown marginal improvement in their reported parole-grant rates. While Plaintiffs posit that this data is sufficient to show noncompliance with the Court's Order, Plaintiffs also provide anecdotal evidence showing that Defendants continue to shirk their obligation to abide by the procedural and substantive safeguards of the Directive, undoubtedly resulting in the little improved parole-grant rates. Defendants have not shown that they have "[taken] all reasonable steps within [their] power to comply" with the Court's Order. *Int'l Painters & Allied Trades Indus. Pension Fund,* 736 F.Supp.2d at 40, (quoting *Food Lion, Inc.,* 103 F.3d at 1017).

### ii. *Defendants persistently fail to make such individualized determinations in consideration of specific facts of class members' cases.*

Plaintiffs have presented substantial evidence of Defendants' continued failure to provide individualized, case-by-case determinations to parole applicants. This is bolstered by data that reflects a sudden, unexplained and indiscriminate use of "flight risk" as the rational for parole denials within NOLA ICE. *Supra* section II.C.ii. Moreover, this phenomenon appears unique to the NOLA ICE region as a general increase in flight risk of the general asylum seeker population is not reflected in the parole data from other ICE field offices. *Id.* Given the clarity and unambiguity of the Court's Order and Directive, and the time elapsed since the Order, this continued violation is unreasonable, if not willful. Defendants have not taken "all reasonable steps [in their] power to comply." *Latney's Funeral Home, Inc.,* 41 F.Supp.3d at 24, 40.

### iii. *Defendants fail to provide to class members all substantive and procedural requirements under the Directive.*

Data and anecdotal evidence establish that Defendants continue defying the Court's Order by refusing to adhere to the Directive's substantive and procedural requirements. *Supra* section II. For example, Defendants have failed to provide Plaintiffs time to submit documents in support of parole, and instructions on where to submit pursuant to Directive § 8.1. *Supra* section II.B.1.ii. Class members and their representatives report difficulty in determining assigned DOs and even when able to communicate with officers, are met with refusals to accept or review documents or are given misinformation about the parole process. *Id*. Such lack of transparency and unreasonable barriers to the parole process clearly violate the spirit of the Directive's procedural safeguards. *Id*. *See also* Ex. 26, Ex. 27. At least six declarants expressed that at Tallahatchie, ICE officials appear to engage in *de facto* denial for all initial requests, with no document review. *Supra* section II.B.1.ii.

Class members also report not receiving parole interviews, a violation of § 8.2 of the Directive. *Supra* section II.B.1.iii. Defendants also fail to provide language assistance to class members seeking parole. *Id.* In some cases, Defendants' failure was outcome determinative. *Id.* Yet, Defendants' counsel has represented to the Court, that Defendants "find unreasonable and do not consider their obligation the provision of parole advisals in a language understood by arriving aliens." Ex. 28 at 17-20.

Defendants are not in compliance with notification requirements of the Directive, despite the Court's Order. *See Directive* §§ 6.5, 6.6, 8.2. Plaintiffs present ample evidence of Defendants' rampant refusal to provide notice of parole decisions. *Supra* section II.B.1.iv. Defendants also flout the Directive's seven-day time frame by which to issue a determination. *Id.* Finally, the evidence shows that Defendants, in many cases, do not adhere to the Directive's required record-keeping practices regarding documents that class members submit in support of their parole request.

Directive§ 8.10. Several class members report NOLA ICE officials refusing to accept or claiming to have never received parole documents in support of an application. LPC Decl. at ¶ 16; RCL Decl. at ¶ 15.

### iv. Defendants are unlikely to demonstrate justifiable reasons for their failure to comply with the Court's Order.

Plaintiffs have presented a plethora of evidence supporting the conclusion that Defendants have defied the Court's Order and continue to disregard the requirements of the Directive.  The burden now falls upon Defendants to show that they have "taken all reasonable steps within [their] power to comply" with the Court's Order: "[o]nce the court determines that the movant has made the above three-part showing, the burden shifts to the defendant to justify the noncompliance." *Int'l Painters & Allied Trades Indus. Pension Fund,* 736 F.Supp.2d at 38, 40 (requiring "adequate detailed proof" of good faith substantial compliance).

While Plaintiffs acknowledge that parole-grant rates have seen modest improvement per Defendants monthly reports, the overwhelming evidence shows that Defendants have not taken all the reasonable steps to comply with the Court's Order that they provide Plaintiffs with individualized, case-by-case determinations of their parole requests, and comply with the substantive and procedural requirements of the Directive. The alleged contemnor must justify its noncompliance "categorically and in detail." *Id.* at 40 (citation omitted); *SEC v. Current Fin. Servs., Inc.,* 798 F.Supp. 802, 808 (D.D.C.1992) (citation omitted).

 Defendants will likely allege that the court-ordered monthly reports that they submit to the Court show an increase in parole-grant rates for the NOLA ICE region.  Defendants' reliance on these monthly reports, however, is misplaced. The data provided by Defendants show inconsistencies, omissions, and deficiencies in NOLA ICE's record-keeping and reporting, calling into question the accuracy and reliability of the court-ordered monthly reports.

30

NOLA ICE is solely responsible for ensuring the reliability and accuracy of these reports. Defendants manually prepare parole determination reports for redetermination decisions, and they use a computer-generated report for first-time parole decisions. *See* ECF No. 71, Metoyer Declaration at ¶¶ 4-6. As outlined, *supra* section II.C.iii., data provided by NOLA ICE in compliance with this Court's Oct. 7 Minute Order, reveal inconsistencies and deficiencies in its record-keeping and reporting, calling into question the reliability and accuracy of the reported parole-grant rates.

Despite the fact that Defendants are required to do so for every parole determination, the reports for first-time parole decisions omit the reasons for parole denial. Directive at § 8.2. The monthly reports also omit information regarding the submission dates for parole redetermination requests, making it impossible to determine whether they are in full compliance with the Directive, and therefore, the Court's Order. *See* Metoyer Declarations, ECF Nos. 42, 44, 56, 58, 59, 71. Further, Defendants' monthly reports demonstrate that class members are frequently subjected to prolonged detention, at least in part due to NOLA ICE's failure to properly adjudicate their requests for release on parole. *Supra* section II.C.iii. Defendants' errors and omissions extend to the parole-related documents that it issues to class members. *See* Group Exs. 23, 24. For example, Defendants have issued letters meant for one class member to another. *See* Ex. 21.

While NOLA ICE is likely aware of these omissions, inaccuracies, and other acts of noncompliance, it does nothing to correct these errors. For example, Plaintiffs have raised the concerns regarding the reliability and accuracy of the court-ordered monthly reports to no avail. *See* Exs. 32-38, *supra* note 4. The Court need not find that Defendants willfully violated the order. *Latney's Funeral Home*, 41 F.Supp.3d at 30 (citing *Goluba v. School Dist. of Ripon*, 45 F.2d 1035, 1037 (7th Cir. 1995)). It must only find that they have not been "reasonably diligent and

energetic in attempting to accomplish what was ordered." *Id*. If the Court makes this finding, it can hold Defendants in contempt, and it may impose civil sanctions to coerce compliance with the Court's Order and compensate parties for harm suffered. *See United States v. United Mine Workers of America*, 330 U.S. 258, 303-4 (1947).

The omissions and inaccuracies contained in Defendants' court-ordered monthly reports, coupled with the extensive evidence showing other acts of noncompliance delineated in this Motion, are tantamount to a blatant disregard of the Court's Order, and suggest that Defendants may not be engaging in good-faith compliance. Defendants' "failure to satisfy these court-ordered obligations further demonstrates an overall inability to comply with the Injunction," and as such, justifies a finding of contempt. *Latney's Funeral Home, Inc.*, 41 F. Supp. 3d at 35.

**B.     Plaintiffs have presented a quantum of proof adequate to demonstrate to a reasonable certainty that a violation occurred, therefore satisfying the clear and convincing standard of proof.**

Plaintiffs have established by a quantum of proof that Defendants continue to defy ¶¶ 3-5 of the Court's Order: "'In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred.'" *Latney's Funeral Home*, 41 F.Supp.3d at 30 (quoting *Phillips v. Mabus,* 894 F.Supp.2d 71, 91 (D.D.C. 2012). Plaintiffs present overwhelming evidence of Defendants' myriad acts of noncompliance with the Court's Order and the Directive. This Court has given Defendants over eight months to analyze, understand, and come into compliance with its Order. Yet, Defendants continue in their defiance, failing to take reasonable steps fully within their power to comply, leaving the Court little choice but to render them in contempt of the Court's Order.

### IV. <u>REQUEST FOR RELIEF</u>

"A court's powers to enforce its own injunction by issuing additional orders is broad [particularly] where the enjoined party has not fully complied with the court's earlier orders"

*National Law Center on Homelessness & Poverty v. U.S. Veterans Admin.,* 98 F.Supp.2d 25, 26–27 (D.D.C. 2000)). Courts may inquire into disobedience of their orders, and issue sanctions ensuring compliance, which are just, specifically related to the claim at issue, and tailored to violations. *See Shillitani v. United States,* 384 U.S. 364, 370 (1966); *Williams,* 306 F.Supp. 617 (D.D.C. 1969); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707 (1982); *Smartdoor Holdings, Inc. v. Edmit Indus., Inc.*, No. 14-657 (JEB), 2016 WL 11004352 (D.D.C. 2016). Plaintiffs have shown their claim of Defendants' disobedience, prima facie, necessitating the issuance of sanctions. *See Supra* section IV.

### A. Plaintiffs merit expedited discovery as their requests pass both the "Notaro" and "Reasonableness" tests, meriting a grant of the discovery, and Defendants should therefore be required to respond to such requests in a timely manner.

The Court can inquire into compliance by requiring responses to expedited discovery. Fed. R. Civ. P. Rule 26. Two approaches have been adopted by this Court to determine appropriateness of expedited discovery: 1) the *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982) test, and 2) the "reasonableness test." *In re Fannie Mae Derivative Lit.*, 227 F.R.D. 142 (D.D.C. Feb. 23, 2005). Expedited discovery will address Defendants' noncompliance by providing information pre-requisite to identify problems, solutions, and relief; prevent further irreparable harm to Plaintiffs; and establish a road to compliance. Plaintiffs will seek discovery on: 1) methods for collection of applicant data (recording systems tracking collection and status of applications, technical functions of systems, personnel managing such systems); and 2) Implementation of required procedures and safeguards, documentation regarding denial, and relevant depositions.

### 1) Plaintiffs' request for expedited discovery satisfies the *Notaro* test, indicating that Plaintiffs merit a grant of their request.

In *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982), the court determined that issuing expedited discovery should require plaintiff to demonstrate i) irreparable harm, ii) connection

between expedited discovery and the avoidance of that harm, and evidence that the harm will result without the discovery, and iii) some probability of success on the merits, which is greater than the injury to defendant if discovery is granted. *Id*. at 142 (implementing the *Notaro* standard).

> ### *i) Defendants' contemptuous actions continue to cause irreparable injury to Plaintiff-class members, eight months after such actions were ordered enjoined by the Court.*

This Court stated "there is irreparable harm just by being detained when you shouldn't be detained… detention alone is irreparable harm if you are not supposed to be detained." Ex. 29, at 23. It also described irreparable harm as an "easy claim for Plaintiffs," stating "I'm not really worried about that." *Id*. As this Court noted when issuing its Order, "detention irreparably harms individuals 'in myriad ways,' and the injuries at stake there and here are 'beyond remediation.'" *Mons*, No. 19-1593 (JEB), 2019 WL 4225322, 23 (D.D.C. Sep. 5, 2019). Since the Court's Order, Defendants' noncompliance has persisted, causing Plaintiffs to continue suffering irreparable harm. *See* Exs. 2-12; Exs. 13-27; Exs. 1A-1Q.

> ### *ii) Plaintiffs establish a connection between their expedited discovery request and avoidance of irreparable harm and provided evidence that harm will result without it.*

As aforementioned, Plaintiffs continue suffering irreparable harm while Defendants continue disavowing the Court's Order. Plaintiffs seek expedited discovery to learn the extent of disobedience and harm by Defendants. The discovery would enable identification of the improvements needed to achieve compliance. For example, the parties will identify 1) the parole processes that NOLA ICE has put into place, and determine whether sufficient measures are in place to ensure class members are provided "with parole determinations that conform to all of the substantive and procedural requirements" of the Directive (Ct. Order, No. 19-1593 (JEB), ¶¶3-5,

(Sep. 5, 2019)); and 2) the individuals responsible for implementing these processes, and the improvements necessary to ensure accountability, oversight, and transparency.

Securing adherence by Defendants to substantive and procedural requirements of the Directive, as ordered by the Court, would address the harm of unnecessary prolonged detention, described in the facts, declarations, and other pleadings accompanying this brief. To provide a few illustrative examples, ongoing violations of the Order include officials unjustified refusal to issue determinations for months after submission; lack of uniform, continuous parole-adjudication process in the NOLA ICE region, supported by wildly varying parole-grant rates among its facilities; and lack of attention to detail and inaccuracy of Defendants' monthly reports to the Court; all resulting in prolonged confinement. *See* Exs. 2-18; *see also* 1A-1Q. This irreparable harm, resulting from Defendants' contempt, is likely to continue, unless this Court takes extraordinary steps – including granting Plaintiffs' request for expedited discovery – to make Defendants accountable. Expedited discovery would enable the Court and parties to develop a roadmap to guide Defendants to compliance. But, as evidenced by Defendants' past behavior, the Court cannot trust Defendants to achieve compliance with the Court's Order or the Directive on their own.

### iii) Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs presented their arguments for likelihood of success on the merits in their recent Emergency Motion for Preliminary Injunction and refer the Court to the relevant section of that Motion in order to avoid submitting duplicative materials to the Court. E.C.F. No. 61-1.

### iv) No undue burden would be imposed on Defendants if Plaintiffs' requests for expedited discovery were granted.

Through their request for expedited discovery, Plaintiffs seek additional evidence of Defendants' noncompliance with the Court's Order  Plaintiffs seek specific, limited discovery,

such as testimony from NOLA ICE officials responsible for in implementing compliance with the Court's Order and the Directive; information about systems in place, methods used to track processing and outcomes of parole applications, and existing measures for accountability and transparency during the parole-adjudication process. As Defendants employ numerous officials to carry out these functions, such as officers who collect and review parole applications, it should not be overly burdensome for Defendants to produce employees who would have knowledge on the issues Plaintiffs seek to clarify through expedited discovery.

Furthermore, Defendants are legally required to compile and retain data and information pursuant to The Federal Records Act (hereinafter "the Records Act"). *See* "The Federal Records Act", 44 U.S.C.A. § 3101 (stating that "the head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities"). Defendants are also prohibited by law from, "willfully and unlawfully concealing, removing, or destroying" any records, paper, document in any public office, or risk fines or imprisonment. 18 U.S.C. § 2017. [7] Records possessed by federal agencies, such as Defendants, should not have been destroyed, as procedures under the law authorizing disposal of records required digital copies to be made and procedures to be followed prior to disposal of original records. 44 U.S.C. § 3302. "Records" are defined by 44 U.S.C. § 3301 as "includ[ing] all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and

---

[7] Plaintiffs clarify that, though it is within their right to request imprisonment or fine as sanctions in this motion, they forego exercising it in order to expedite resolving Defendants' noncompliance and preventing the continued irreparable harm to Plaintiffs-class members that it has caused.

preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them," and would therefore encompass the information on the parole process which Plaintiffs seek. *Id.* Thus, as it is required by law that federal agencies such as Defendants, NOLA ICE, maintain such records, it should not be unduly burdensome for Defendants to produce those records in response to a request for expedited discovery.

This Court's Order does not require – nor are Plaintiffs asking – Defendants to take on any new responsibilities or burdens. Defendants have repeatedly complained about burdens associated with compliance with the Court's record-keeping requests, raising the burden of administrative costs and lack of resources as excuses for not including additional information – such as the language spoken by class members – in their monthly reports. *See* Ex. 28;[8] *see also* Ex. 29; Directive. Yet, under administrative law, Defendants, like any agency which promulgates directives, have always had the obligation to fully comply with the Directive, including its record-keeping requirements. *See* Pl.[s'] Emergency Mot. for Prelim. Inj., at p. 27-41 (ECF. No. 61-1).

Thus, the burden of compliance with this Court's Order, the very subject upon which Plaintiffs seek discovery, is no greater on Defendants than the burden of complying with the law. Therefore,

---

[8] *See* Ex. 28 at 4-5, 14-17 (identifying, as Plaintiff's Counsel, that Defendants failed to disseminate information about parole as ordered by the Court, and took an unreasonable length of time to communicate to the Court that this noncompliance arose from a lack of clarity, despite previously agreeing that the Court's order and instructions were unambiguous); *Id.* at 17-20 (arguing, as Defendants' Counsel, that it is not Defendants' responsibility to provide advisals in a language understood by class members); *Id.* (failing, as Defendants Counsel, to address the Court's assertion that an interpreter should be provided to interpret untranslated advisals); *Id.* at 20, lines 19-22 (showing, as Plaintiffs' Counsel, that parole advisals existed in Spanish only because Plaintiffs' Counsel provided written translations after Defendants refused to meet this obligation).

there should be no difficulty in responding to requests for demonstration of that compliance. Compliance with the law is a duty which Defendants cannot escape no matter how burdensome they may argue it is. But given Defendants' existing record-keeping requirements, Plaintiffs' request for expedited discovery would not cause any undue burden to Defendants.

**2) Plaintiffs' request for expedited discovery satisfies the "reasonableness" test, indicating that they merit such expedited discovery.**

The "reasonableness test" calls for the Court to decide the appropriateness of expedited discovery based on "the reasonableness of the request in light of all of the surrounding circumstances ..." *In re Fannie Mae Derivative Lit.*, 227 F.R.D. at 142 (citing *Entm't Tech. Corp. v. Walt Disney Imagineering*, No. 03-3546, WL 22519440, at 3-5 (E.D. Pa. 2003)). The factors to be considered by the Court in making that determination include: i) whether a preliminary injunction is pending; ii) the breadth of the discovery requests; iii) the purpose for requesting the expedited discovery; iv) the burden on the defendants to comply with the requests; and v) how far in advance of the typical discovery process the request was made. *Id.* at 143. (citing *Entm't Tech.,* 2003 WL 22519440, at 3-5).

Plaintiffs seek discovery on two particular subjects: 1) discovery regarding the methods used for collection of parole applicant data, and 2) discovery regarding the implementation of Directive procedures and safeguards, required by the Court's Order.

### *i) No preliminary injunction is pending in Heredia-Mons.*

At this time, no preliminary injunction is pending.

### *ii) Plaintiffs' expected discovery requests are within the scope of and narrowly tailored to the Court's Order, thus the breadth of Plaintiffs' requests is appropriate in scope.*

Plaintiffs' discovery requests are narrowly tailored to reveal information specifically related to the Court's Order. *Guttenberg v. Emery*, 26 F.Supp. 3d 88, 98 (D.D.C. Mar. 19, 2014). The answers

and subject matter being sought by Plaintiffs does not exceed the scope of the Court's Order, which required: individualized determinations of whether class members present a flight risk or danger to community when determining parole grant or denial (not categorical or automatic determinations), determinations based on the specific facts of each provisional class member's case, and Defendants to conform to all of the substantive and procedural requirements of the Directive. ECF No. 32; s*ee Guttenberg v. Emery*, 26 F.Supp 3d 88, 98 (Mar. 19, 2014).

Plaintiffs' discovery requests are firmly ensconced within the bounds set by the Court's Order. *See Guttenberg v. Emery*, 26 F. Supp 3d. at 98 (stating that Plaintiffs' discovery requests needed to be narrowly tailored to reveal information related to the preliminary injunction, as opposed to the case as a whole). Plaintiffs have delineated that they seek only information related to Defendants' compliance with the Directive pursuant to the Court's Order.

For example, deposition testimony from deportation officers would provide insight into the parole determinations process; the systems that are in place to record and track parole determination outcomes; knowledge of how such systems are utilized and implemented with regard to the parole process; identification of NOLA ICE officials responsible for making these determinations in the parole process; and identification of the individuals responsible for implementing accountability measures regarding the parole process. Thus, the requests for expedited discovery are tailored to and exist within the scope of this Court's Order. ECF No. 33 ¶¶3-5. As Plaintiffs' expected discovery requests are tailored to and within the scope of this Court's Order, the breadth of Plaintiffs' requests is appropriate and should be granted.

### iii) *Plaintiffs seek expedited discovery for the purpose of enabling the parties and Court to determine how best to develop a plan of action to bring Defendants into full compliance.*

Through the requested expedited discovery, Plaintiffs seek to bring Defendants into compliance to avoid further irreparable harm to Plaintiffs. The information Plaintiffs seek through

expedited discovery would enable the Court and the Parties to identify the exact processes and procedures that Defendants are implementing to comply with the Court's Order, and the areas where compliance is lacking. Section IV(A)(1)(ii) of this Memorandum sheds light on how a grant of expedited discovery would result in the avoidance of further irreparable harm to the Plaintiffs. Because Plaintiffs seek expedited discovery for the ethical and lawful purpose of establishing and remedying Defendants' noncompliance, Plaintiffs request should be granted.

*iv*) *Plaintiffs allow ample time for Defendants to comply with their request for expedited discovery.*

Plaintiffs satisfy both tests recognized by this Court for the granting of expedited discovery but have not yet submitted a formal motion for specific discovery. Furthermore, Plaintiffs leave to the judgement of the Court the determination of appropriate deadlines for the expedited discovery requested should the Court grant this motion. Plaintiffs and their counsel ask the Court, on behalf of all class members, to consider that each passing day is another day upon which unnecessary confinement deteriorates class members' physical and mental health, violates their civil rights, and inhibits the preparation of their asylum cases to the best of their abilities causing irreparable harm.

**B. Plaintiffs' claims merit the appointment of a Master to monitor and evaluate Defendants' noncompliance, as well as provide and implement solutions to obtain full compliance.**

Under Fed. R. Civ. P. 53, Plaintiffs may seek the appointment of a Master to oversee Defendants' failure to comply with the Preliminary Court's Order. A Master is a judicial adjunct used to aid the judge in the performance of specific judicial duties, such as ensuring enforcement of their orders and decrees. *La Buy v. Howes Leather Co*., 352 U.S. 249, 256 (1957). A court may appoint a master pursuant to the court's inherent authority in fashioning equitable remedies. *See Ex parte Peterson*, 253 U.S. 300 (1920). Masters are obligated to be impartial and objective in the pursuit of their duties. *See Newton v. Consol. Gas Co. of N.Y.*, 259

U.S. 101 (1922) (explaining that a Master "occupies a position of honor, responsibility, and trust; the court looks to him to execute its decrees thoroughly, accurately, impartially, and in full response to the confidence extended…"); Fed. R. Civ. P. 53(a)(2). The Court must give the parties notice and an opportunity to be heard before appointing a Master. Fed. R. Civ. P. 53(b)(1).

Pursuant to the Federal Rules of Civil Procedure, the Court must also issue an appointing order, directing the master to proceed with "all reasonable diligence" and must state various details regarding the conduct of the master, including duties, limitations, conditions for *ex parte* communication, the nature of materials to be preserved and filed, time limits, filing methods, and compensation. Fed. R. Civ. P. 53(b)(2)(A)-(E). Unless the appointing order directs otherwise, a master may regulate proceedings, take appropriate measures to perform the assigned duties fairly and efficiently, and exercise the appointing court's power to compel, take and record evidence. Fed. R. Civ. P. 53(c)(1)(A)-(C).

### i) Defendants have had numerous, and sufficient, opportunities to be heard prior to Plaintiffs' present request for relief, including the appointment of a Master.

Defendants have had many opportunities to be heard prior to Plaintiffs' request for this Court to appoint a Master. Defendants had the opportunity to be heard during the hearing on the Motion for Preliminary Injunction, and this Court has presided over various status conferences where the parties discussed the progress of Defendants' compliance with the Court's Order. During a second emergency preliminary injunction hearing necessitated by the COVID-19 pandemic, the Court stated to Plaintiffs that a motion for contempt would be a more appropriate venue for bringing a claim of non-compliance against Defendants. *See* Transcript of Apr. 23, 2020, Status Hearing, *Heredia Mons v. McAleenan*, 2019 WL 4225322 (Nov. 8, 2019) (No. 19-1593 (JEB)); Therefore, the requirement for parties to be heard prior to the appointment of a Master has been amply satisfied.

41

***ii) This Court has established that a Master may be appointed where a party fails to comply with a court order, such as Defendants have failed to comply in* this case*.***

This Court has established that a Master may be appointed where a party fails to comply with a court order. In *Evans v. Fenty*, 480 F.Supp.2d 280 (D.D.C. 2007), this Court appointed multiple masters to make findings and recommended solutions addressing defendants' non-compliance. *Evans* dealt with failure to comply with a consent decree and consent orders. Plaintiffs in *Evans* filed a motion to find defendants in noncompliance and appoint a receiver. The Court concluded that there had been "systemic, continuous, and serious noncompliance with many of the Court's Orders" meriting the appointment of Masters. *Evans*, 480 F. Supp.2d at 325.

Unlike the defendants in *Evans*, Defendants have never admitted to violating the Court's Order or Directive. They instead allege they are in compliance with the Directive and have shown no willingness to cooperate with Plaintiffs to mitigate any harm. *Cf. Id*. at 282 (admitting that defendants acknowledge the level of care and habilitation has never been that which any of the parties to the action desire); *see also supra* note 4.Any improvements in the rate of parole grants appear to be the result of this Court's actions to urge Defendants' compliance. *Id*.

While in *Evans*, the parties jointly agreed to a "Plan for Compliance," Defendants' unwillingness to cooperate necessitates deeper court involvement and orders mandating Defendants compliance. *Id*. *See also* ECF No. 32, ECF No. 33; *see also* Ex. 28. Defendants in this case, unlike in *Evans*, have never acknowledged their noncompliance, even after the Court found that Plaintiffs' were likely to succeed in proving that Defendants were in violation of the Directive. *See* Ex. 28 at 6, lines 6-10, *supra* note 4; *see also* Ex. 29 at 27-29. It is therefore not surprising that Defendants are not close to achieving compliance several months after this Court ordered compliance. Exs. 1A-1Q.

Defendants' continued noncompliance further accentuates the need for a Master, as Defendants appear unmoved by the Court's Order, and refuse to take remedial action when Plaintiffs have raised concerns involving compliance with the Court's Order. Therefore, as Defendants have repeatedly demonstrated their unwillingness to address on their own issues of noncompliance that Plaintiffs have raised, voluntary measures as in *Evans* would not be sufficient to enforce compliance with the Court's Order. *See* Exs. 28-38, *supra* notes 4, 9.

### iii) Despite copious circumstantial and statistical evidence to the contrary, demonstrating rampant abuse of the parole process, little improved parole rates, and violation of this Court's Order, ICE maintains that it is nonetheless in compliance with this Court's Order, and in turn, with the Directive.

Disconcertingly, Defendants refuse to acknowledge that they are not in compliance with the Court's Order and the Directive. *Supra* note 4. Defendants point to an increase in parole-grant numbers for the NOLA ICE region.  But, the monthly reports on which Defendants rely to show compliance contain inaccurate information or omit data, calling into question the reliability of these reports. *See* Exs. 1A-1Q.

> a) **Plaintiffs' counsel have provided ample evidence of rampant abuse and violation of the parole process by Defendants, as even DHS has reported ICE cannot be relied upon to provide the kind of accurate data and information that would serve as direct evidence in *Mons*.**

Defendants have also called into question the numerous declarations by Plaintiff asylum-seekers, detailing the harms to which they are exposed in prolonged detention, and the numerous ways that Defendants continue to disregard the Court's Order and the Directive. *See* Ex. 28 at 6, lines 6-10, *supra* note 4. When this Court has called upon Defendants to maintain accurate records about their processes, Defendants have not been responsive to the challenge.  Thus, it is unlikely that Defendants would provide direct evidence of their noncompliance without an order from this Court.

43

**b) Without this Court ordering expedited discovery, Plaintiffs would be unable to access evidence regarding Defendants' parole processes and policies, and their efforts to comply with the Court's Order and consequently, the Directive.**

Due to the lack of access to Defendants' processes and records, Plaintiffs have had to rely on witness declarations and exposing the unreliability of Defendants' monthly reports, which they submit only because this Court has ordered it. *Supra* section II.B., II.C.

*iv) DHS itself has acknowledged ICE's failure and indifference to ensuring accountability, adequate recording of data, compliance with its policies and standards, and imposition of remedial measures where noncompliance exists.*

ICE has pre-existing, systemic, and long-entrenched failures to conduct meaningful oversight, which have recently been reported in government reports.[9] DHS, the government agency of which ICE is a component and which is a Defendant in the present case, has reported on failures by ICE to manage, impose consequences upon, and ensure accountability of those it trusts to implement its policies, procedures, and standards. As recently as January 2019, DHS released a report discussing ICE's failure to hold detention facility contractors accountable for failing to meet ICE standards, and its apparent apathy regarding noncompliance with these policies, procedures, and standards. While the report specifically discusses ICE's apathy and lack of accountability regarding the discriminatory conduct in which its contractors allegedly engage, the report nonetheless speak volumes about the overall systemic misconduct in which ICE engages and its permissiveness and apathy toward violations of its policies, procedures, standards, which impact the rights and safety of the detainees in its care.

---

[9] *See* e.g. Off. of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-19-18: *ICE Does Not Fully Use Contracting Tools to Hold Det. Facility Contractors Accountable for Failing to Meet Performance Standards*, at 5 (Jan. 29, 2019), available at https://www.oig.dhs.gov/ sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf; *see also* Off. Of Inspector Gen., U.S. Dep't of Homeland Sec., OIG-18-55: *Immigr. and Customs Enf't Did Not Follow Fed. Procurement Guidelines When Contracting for Det. Servs.,* at 19 (Feb. 21, 2018), available at https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.

Government reports expose that ICE, in practice, does not adequately require those it entrusts to comply with its policies, procedures, and standards, nor does it implement accountability for noncompliance with those measures. This is the reality of ICE's conduct, despite ICE's claims on paper that it employs management, oversight, and accountability systems. OFF. OF INSPECTOR GEN., *supra* note 10. This level of apathy and inaction endangers Plaintiffs, who also cannot trust ICE to ensure that violations of the Directive are prevented, addressed and resolved, to spare them from the harm of unnecessary prolonged detention.

 DHS has revealed ICE's unreliability and failure to properly keep and utilize data. Not only has DHS reported that ICE fails to track and use data to analyze effectiveness, it has also reported that ICE has sometimes failed to gather or keep data at all. *Id*. at 11. DHS has also reported lack of direct access to important files and information controlled by ICE, which has prevented "key stakeholders" from obtaining said information, despite ICE being required by DHS to maintain such recording systems. *Id*. at 17. Even more concerning, is the statement by DHS that it sometimes has "no way of verifying whether any of [the] deficiencies ha[ve] been corrected." *Id*. at 11.

This report by DHS exposes that ICE is either unable or unwilling to provide transparency to the details of the processes in which it engages, particularly with respect to creating exceptions to and allowing noncompliance with ICE policies, procedures and standards. *Id*. at 12. If even DHS itself cannot obtain data from ICE, an agency within its control, Plaintiffs and the Court are even less likely to obtain data and information absent expedited discovery and the appointment of a Master.

In addition to failure to be transparent by not keeping, analyzing, and providing data, DHS reports show that ICE officials fail to communicate effectively across its internal departments. *Id*. at 15. Poor internal communication within ICE leads to confusion, misinformation, and failure to

disseminate information.  So, it is therefore not a surprise that Plaintiffs report not receiving parole adjudications, or experiencing difficulty identifying and contacting NOLA ICE officials responsible for their parole adjudications. *Id*. at 15; *see also* Exs. 2-18.

While Plaintiffs recognize that the report by DHS involves ICE's engagement with contractors, Plaintiffs nonetheless reiterate that the lack of accountability for violation of policies, procedures, and standards that ICE displays in the report is similar to NOLA ICE's approach in this case. ICE's rampant ineffectiveness, lack of accountability, and worst of all, apathy towards disregard for the standards, policies and guidance reported by DHS demonstrates that neither DHS nor ICE can be entrusted with the enforcement of measures to the extent necessary to ensure compliance with the Court's Order. Since DHS itself provides ample evidence that ICE cannot be trusted to implement its own internal accountability measures, and DHS has no control over such failure by ICE, Defendants conduct, both systemic and particular to this case, necessitates the appointment of a master to obtain compliance with the Court's Order.

### v) The efficacy of the Master is not diminished by the unprecedented circumstances that the pandemic presents.

Plaintiffs assert that a Master would be capable of playing an important role in securing compliance by Defendants during the duration of the pandemic, despite the limitations on travel to detention facilities in the NOLA ICE region.

Defendants can provide the Master with a list of the relevant NOLA ICE officials from whom he or she can seek information on compliance, and with whom he or she can work to ascertain both relevant policies and systems in place, as well as determine whether Defendants are actually implementing these on a consistent basis. For example, a Master could be provided with lists, on a rolling basis, of reviewing officers, deportation officers, field officers, and all officials employed by Defendants and engaged in the parole process. Additionally, NOLA ICE can provide the Master

lists, on a rolling basis, of the individuals detained at each center under Defendants' custody who qualify for parole determinations; information on the dates that applications are submitted, their statuses, notes taken during review of applications or from ICE-initiated parole determinations; copies of receipts confirming submissions; and a log containing dates of receipt of parole applications and the determination dates. Using the lists and data, as well as other information he or she may determine is needed, a Master could conduct interviews to evaluate compliance, identify problem areas, and develop tailored resolutions to issues inhibiting full compliance. After the resolution of the pandemic, a Master could safely conduct detention center visits.

## V.   **CONCLUSION**

Class members continue to be vulnerable at the hands of Defendants, and they again place their faith in the justice system. For the foregoing reasons, Plaintiffs request that this Court require Defendants to show cause that they are not in contempt of the Court's Order, order expedited discovery to determine the extent of Defendants' contempt, and appoint a Master to ensure that Defendants do not continue to disavow their legal responsibilities to this Court.

Respectfully Submitted:

//s// Luz Virginia López
Luz Virginia López
Melissa Crow (D.C. Bar No. 453487)
**SOUTHERN POVERTY LAW CENTER**
1101 17th St., NW, Suite 750
Washington, DC 20036
Tel: (202) 355-4471
luz.lopez@splcenter.org

## CERTIFICATE OF SERVICE

I hereby certify that, on May 13, 2020, I electronically filed the attached MEMORANDUM IN SUPPORT OF THE PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE, EXPEDITED DISCOVERY, AND APPOINTMENT OF SPECIAL MASTER with the Court via the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this case.

Respectfully submitted:

//s// Luz Virginia López

Michelle P. Gonzalez
Victoria Mesa-Estrada
**SOUTHERN POVERTY LAW CENTER**
2 S. Biscayne Blvd., 32nd Floor
Miami, FL 33131
Tel: (305) 537-0579
mich.gonzalez@splcenter.org
victoria.mesa@splcenter.org

Bruce Hamilton
**AMERICAN CIVIL LIBERTIES UNION OF LOUISIANA FOUNDATION**
P.O. Box 56157
New Orleans, LA 70156
Tel: (504) 522-0628
bhamilton@laaclu.org

Luz Virginia López
Melissa Crow (D.C. Bar No. 453487)
**SOUTHERN POVERTY LAW CENTER**
1101 17th St., NW, Suite 750
Washington, DC 20036
Tel: (202) 355-4471
luz.lopez@splcenter.org

*Attorneys for Plaintiffs*