UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Heredia Mons, *et al*.,                          )
                                                 )
            Plaintiffs,                          )
                                                 )          No. 19-cv-1593 (JEB)
v.                                               )
                                                 )
Chad Wolf, *et al.*,                             )
                                                 )
            Defendants.                          )

DEFENDANTS' OPPOSITION TO
MOTION TO SHOW CAUSE, FOR EXPEDITED
DISCOVERY AND FOR APPOINTMENT OF SPECIAL MASTER

Defendants Chad Wolf, Acting Secretary of the U.S. Department of Homeland Security

("DHS"); Matthew T. Albence, Deputy Director and Senior Official Performing the Duties of the

Director of U.S. Immigration and Customs Enforcement ("ICE"); Enrique M. Lucero, Executive

Associate Director of ICE Enforcement and Removal Operations; and Diane L. Witte, Director

of ICE's New Orleans Field Office, in their official capacities (collectively, "Defendants"), file

this opposition to Plaintiffs' motion to show cause, for expedited discovery and for appointment

of a special master.

## SUMMARY OF ARGUMENT

On September 5, 2019, this Court granted Plaintiffs' motion for preliminary injunction

and entered an order that, in relevant part, enjoined Defendants "from denying parole to any

provisional class members absent an individualized determination, through the parole process,

that such provisional class member presents a flight risk or a danger to the community."[1] The

---

[1]     Although the Court's order does not reference insufficient proof of identity as a basis for
a parole denial, that remains a basis for denying parole under the Parole Directive (Parole
Directive ¶¶ 6.2, 8.3) and ICE does not understand the Court to have ruled otherwise.

order further provided that "individualized determinations of flight risk and danger to the community referenced above shall be based on the specific facts of each provisional class member's case" and "shall not be based on categorical criteria applicable to all provisional class members."

On May 12, 2020, Plaintiffs filed a Motion for an Order to Show Cause, Expedited Discovery, and Appointment of Special Master, asserting non-compliance with the September 5, 2019 order. Plaintiffs, however, have failed to demonstrate by "clear and convincing" evidence that Defendants are in violation of that order.

The Complaint in this case, as pled by Plaintiffs, is limited to two claims under the APA based on ICE's alleged categorical denial of parole for asylum seekers who have been issued a credible fear determination and who are detained at facilities within ICE's New Orleans Field Office.   Specifically, Plaintiffs alleged that, at the time the Complaint was filed in May 2019, DHS had "effectively rescinded the 2009 Parole Directive" in the New Orleans Field Office and that the parole determinations pertaining to them, as well as to members of the putative class, were denied categorically without an individualized determination.   (Compl. ¶¶ 129-137)   The above-cited aspects of the Court's preliminary injunction order sought to address these allegations, which is how Plaintiffs framed their claims before the Court.

Following the Court's preliminary injunction order, Defendants have provided monthly reports providing data on the parole determinations made during the period specified in the reports and, as to those determinations, a breakdown of the number of determinations that were denials and the number in which parole was granted.   Plaintiffs acknowledge that recent monthly reports by the agency reflect parole grant rates approaching (and even exceeding) 40

percent at some facilities.    (ECF No. 74-16) (Plaintiffs' chart of redetermination grant rates by facility)    Based on this Court's prior analysis, which considered the near-zero parole grant rate to be indicative of non-compliance with the Parole Directive, this substantial increase in grant rates demonstrates that individualized determinations are occurring consistent with the Court's September 5, 2019 order.[2]    Indeed, Plaintiffs' own anecdotal evidence reflects this as well. (ECF No. 74-29, Crawford Decl. at ¶ 3(d) (referencing a grant of parole after an ICE officer reconsidered a denial when the detainee provided additional information regarding the detainee's individual circumstances); *see also* Def. May 26, 2020 Report, Ex. A to Metoyer Decl., reflecting that A.P.E. (declaration at ECF No. 74-21) was granted parole on April 30, 2020; Hartnett Decl. ¶ 23 stating that K.S.R. (declaration at ECF No. 74-18) was granted parole on May 29, 2020 and *id.* ¶ 30 stating that M.P.I. (declaration at ECF No. 74-20) was granted parole on May 15, 2020).    Accordingly, Plaintiffs have failed to demonstrate by "clear and convincing" evidence non-compliance with the requirement in the Court's September 5, 2019 order that ICE conduct individualized parole determinations.

The September 5, 2019 order also stated more generally that "Defendants shall provide provisional class members with parole determinations that conform to all of the substantive and procedural requirements" of the 2009 Parole Directive.    Although alleged deficiencies in parole procedure are not the focus of Plaintiffs' APA claims in this litigation, and were referenced only

---

[2]    Defendants continue to maintain that the use of grant rates as a benchmark for compliance with the Parole Directive is improper, but, as that is something that this Court (and Plaintiffs) have previously relied on as being indicative of non-compliance over Defendants' objection, consistency demands that the Court likewise recognize that a substantial increase in grants necessarily is evidence of compliance.

tangentially in the Complaint and original preliminary injunction motion, they are the principal focus of Plaintiffs' contempt motion.   (Pl. Mem. at 1, listing procedural non-compliance as the first ground for the motion).   Plaintiffs are thus relying on the generalized language in that order that ICE "conform to all of the substantive and procedural requirements" of the Parole Directive to search for a reason to move for contempt.   While they profess that they do not move for contempt "lightly" (Pl. Mem. at 4), the focus of their motion demonstrates otherwise.

The breadth of alleged procedural issues on which Plaintiffs base their contempt motion – extending even to maintenance of detainees' A-files (Pl. Mem. at 12) – demonstrates how far Plaintiffs stray from the narrow focus of this lawsuit and raises significant questions as to whether Defendants have been fairly placed on notice of such issues.   Although the September 5, 2019 order references "all" procedural requirements in the Parole Directive, that language is reasonably understood in the context of the narrow issues raised in the Complaint as referring to procedures that facilitate individualized parole determinations and as not reaching to administrative matters such as maintenance of the A-file.   In that regard, the Complaint and original preliminary injunction motion concerned the following alleged procedural deficiencies: the alleged failure to provide a parole advisal, the alleged failure to afford an initial interview, the alleged failure to provide sufficient time to provide documentation, the alleged failure to provide a detailed explanation for parole denials, and the alleged failure to issue a written parole decision.   (Compl. ¶¶ 60, 64, 70, 75, 79, 93, 102, 103, 108, 112; *see also* ECF No. 22-1 at 10-12)   The Court should thus reject Plaintiffs' position that absolute perfection in every parole procedure over thousands of detainees is the measure by which compliance with this Court's September 5, 2019 order should be judged.

In any event, as discussed below, Plaintiffs' arguments as to alleged procedural non-compliance are exaggerated, misleading and weighted towards conduct occurring in the period immediately after issuance of the September 5, 2019 order rather than the more recent (and more relevant) time period.   They also are largely based on Plaintiffs' preferred interpretation of the Parole Directive's procedural requirements rather than explicit language in the Directive. However, because a contempt motion requires non-compliance with a "clear and unambiguous" court order, and the order at issue incorporates generally the "procedural" requirements of the Parole Directive, the Court's analysis is limited by the precise terms of the Parole Directive. Plaintiffs' interpretation of ambiguities in the Parole Directive to create additional procedural requirements not clearly specified in the Directive cannot form the basis for a finding of contempt even were the Court to consider Plaintiffs' interpretation to be a reasonable one.

Plaintiffs also fail to consider the volume of determination requests being processed. Since the issuance of this Court's September 5, 2019 order, the New Orleans Field Office has issued approximately 1,700 parole decisions on redetermination requests made following the Court's order and issued over 700 initial parole determinations.   (Hartnett Decl. ¶¶ 32-33; *see also* ECF No. 74-15 (Plaintiffs' table showing over 2,000 parole decisions for the period ending April 16, 2020).   That translates to approximately 2,400 parole determinations in a roughly eight month time period.   In comparison, only 229 determinations were made for all of 2016 according to Plaintiffs' graphs (ECF No. 74-1, 74-9), which Plaintiffs treat as the benchmark for alleged "compliance" with the Parole Directive.

During this eight month time period, moreover, ICE's resources have been stretched thin not only by the volume of determination requests, but by high turnover rates of staff within the

New Orleans Field Office and, more recently, the demands associated with the recent COVID-19 situation.   (Hartnett Decl. ¶¶ 7, 15, 35)    Under these circumstances, even if Plaintiffs could identify some instances in which ICE has been delayed in responding to requests or otherwise failed to fully meet the letter of the Parole Directive, that is not "clear and convincing" evidence of non-compliance with this Court's order.

Plaintiffs also devote much of their so-called evidence challenging the sufficiency of the explanation that ICE provides in its denial letter which follows a standard form.   But the Parole Directive requires only a "brief explanation" of the reason for a denial (Parole Dir. ¶ 6.5), and nothing in this Court's September 5, 2019 order requires ICE to provide explanations beyond those set forth in its form denial letter.   Plaintiffs' preference for a more lengthy explanation of parole denials is not "clear and convincing" evidence of non-compliance with this Court's order. In the same vein, Plaintiffs make several arguments that go to the merits of the parole decisions themselves, contending, for instance, that ICE fails to give sufficient weight (in Plaintiffs' view) to certain factors over others.   However, this Court lacks jurisdiction to evaluate individual parole determinations, which are discretionary determinations made by ICE, as this Court has previously held.

For all of these reasons, which are addressed more fully below, the Court should deny Plaintiffs' show cause motion, and also should deny Plaintiffs' request for expedited discovery and appointment of a special master.

## FACTUAL AND PROCEDURAL BACKGROUND

This case as pled by Plaintiffs is limited to two claims under the APA based on ICE's alleged categorical denial of parole for asylum seekers who have been issued a credible fear

determination and who are detained at facilities within ICE's New Orleans Field Office. Specifically, Plaintiffs alleged that, at the time the Complaint was filed in May 2019, DHS had "effectively rescinded the 2009 Parole Directive" in the New Orleans ICE Field Office and that the parole determinations pertaining to them, as well as to members of the putative class, were denied categorically without an individualized determination.   (Compl. ¶¶ 129-137)   In support of these claims, they alleged that parole was denied in "virtually all cases in 2018" (Compl. ¶ 48) and also cite to a statement made in November 2018 by the Assistant Field Office Director for the New Orleans Field Office, Brian Acuna, that they view as an admission that the New Orleans Field Office was not following the directive at that time.[3]

Plaintiffs argued that the alleged "categorical denial" of parole violates the provisions of the Parole Directive, which Plaintiffs contend imposes certain requirements on ICE in the manner by which it exercises its discretion in making parole determinations that are subject to that directive.   As this Court has previously recognized, by statute the decision whether or not to grant parole under any of the subsections of 8 C.F.R. § 212.5(b) is a discretionary one that is not subject to judicial review under the APA.   *See Damus v. Nielsen,* 313 F. Supp. 3d 317, 327 (D.D.C. 2018) ("[t]o the extent Plaintiffs are challenging the [parole] determinations themselves – i.e., the actual balancing of the merits of each application for parole – this Court agrees that it lacks jurisdiction").   This Court, however, has permitted Plaintiffs' APA claims here to proceed

---

3       Mr. Acuna has clarified that he misspoke in connection with the response that he provided in November 2018, and confirms that all offices within the New Orleans area of responsibility are adjudicating parole requests in accordance with the 2009 parole directive." (ECF No. 26-3, Acuna Decl. ¶ 14)   In any event, this allegation does not speak to whether ICE currently is complying with the Parole Directive.

because Plaintiffs purportedly are not challenging individual parole determinations but instead challenge more narrowly the agency's alleged practice of categorically denying all parole requests (and thus not engaging in individualized determinations).

Plaintiffs' APA claims[4] thus survived Defendants' motion to dismiss solely on the basis of the "*Accardi* doctrine," which, as applied by this Court,[5] can form the basis for an APA claim when an agency allegedly fails to follow guidelines that it has established to govern the agency's discretionary decisionmaking. (ECF No. 32, Mem. Op. at 18)   Relying on the *Accardi* doctrine, this Court found the Parole Directive to constitute binding guidance over the agency's discretionary decisionmaking in parole determinations, and thus permitted Plaintiffs to proceed with their APA claim based on Plaintiffs' allegations that ICE failed to conduct individualized parole determinations and instead followed a practice of categorically denying parole contrary to the directive.   (ECF No. 32, Mem. Op. at 19)

On September 5, 2019, this Court also granted Plaintiffs' motion for preliminary injunctive relief which was based on, and necessarily framed by, the allegations in the Complaint, and ordered ICE to conduct individualized parole determinations in accordance with the provisions of the Parole Directive.   In a separate order dated October 7, 2019, the Court directed ICE to provide monthly reports "in the manner" that Defendants had proposed in the parties' October 2, 2019 status report.   Since that order, ICE has been providing monthly reports

---

[4]      Plaintiffs also asserted a claim for violation of due process under the Fifth Amendment for alleged non-compliance with the procedures of the Parole Directive, but the Court dismissed that claim without prejudice by order dated September 5, 2019.   (ECF No. 33)

[5]      Defendants continue to reserve their position that the *Accardi* doctrine is not applicable to the Parole Directive, and are simply discussing above this Court's ruling on Defendants' motion to dismiss.

to the Court reflecting the rate at which parole is now being granted at its facilities within the New Orleans Field Office.   ICE also has provided regular training to officers within the New Orleans Field Office.   (Hartnett Decl. ¶¶ 8-9)

To the extent the Court views the grant rate as indicative of compliance, Defendants submit that the relevant time period for evaluating Plaintiffs' motion is the more recent time period since January 2020.   Indeed, at the hearing on January 7, 2020, the Court observed that it made sense to "wait a little longer" before drawing any conclusion about compliance with the Court's order to allow for more data to be provided.   (ECF No. 52, Tr. Jan. 7, 2020 at 23) Accordingly, Plaintiffs' attempt to distort the recent, favorable statistical trend by asserting that the overall grant rate since the Court's order is "a mere 13.5 percent" (Pl. Mem. at 4) mischaracterizes the question presented, which is whether Defendants currently are in compliance with this Court's order.

Although Defendants recognize that the parole grant rate remained low for the first three months following this Court's preliminary injunction order, the overall grant rate for the period since the first of the year has consistently exceeded 20 percent and has regularly approached 30 percent.   In that regard, the report filed on February 24, 2020, which covered the period from early January 2020, reflected a grant rate for redeterminations of approximately 21 percent and a grant rate for initial determinations of approximately 37 percent for a combined rate of approximately 22.4 percent.   The report filed on March 23, 2020, reflected a 29 percent grant rate for redeterminations and a 13.6 percent grant rate for initial determinations for a combined rate of approximately 27.4 percent.   The report filed on April 24, 2020, reflects a grant rate for redeterminations of 18.5 percent (27 grants out of 146 requests), but also noted that an additional

9

38 individuals were released as of April 20, 2020 pursuant to the individualized review of the specific COVID-19 risk factors.   The April 24, 2020 report also reflected a grant of approximately 20 percent for initial determinations.   The combined grant rate for this report is approximately 19 percent (45 out of 237) but approaches 30 percent when the additional 38 individuals are included as shown in the table below.   Finally, the May 26, 2020 report reflects a grant rate of approximately 33 percent for redetermination requests and 13 percent for initial determinations for a combined rate of approximately 29 percent.



Accordingly, for the last several months, ICE has been granting parole at rates approaching (and at times exceeding) 30 percent.   In contrast, at the time this lawsuit was filed, the grant rate was near zero according to Plaintiffs' allegations. (ECF No. 74-1)   That evidence figured prominently in their allegation of "categorical" denials that formed the basis for their Complaint and this Court's granting of preliminary injunctive relief.   Under the same reasoning, the sustained increase in the parole grant rate over the last several months is evidence that ICE is making individualized parole determinations in accordance with the September 5, 2019 order.

## LEGAL STANDARD

Courts have "inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "A party moving for a finding of civil contempt must show, by clear and convincing evidence, that: (1) there was a court order in place; (2) the order required certain conduct by the defendant; and (3) the defendant failed to comply with that order." *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 35, 38 (D.D.C. 2010). A party moving for civil contempt must also show that the court's "order was clear and unambiguous."  *Id.*

Perfection, moreover, is not the standard.   *In re Fannie Mae Secs. Litig.,* 552 F.3d 814, 822 (D.C. Cir. 2009) ("contempt may be inappropriate when a party in good faith substantially complies with a court order").   Rather, "diligent, good faith efforts, culminating in substantial compliance" is sufficient to avoid a finding of contempt even if Plaintiffs were to meet their burden.   *Langton v. Johnson,* 928 F.2d 1206, 1220 (1st Cir. 1991); *see also Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990) ("Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good

faith effort at compliance."); *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d

Cir. 1989) ("A court may hold a party in civil contempt only if . . . 'the defendant has not been

reasonably diligent and energetic in attempting to accomplish what was ordered.'"); *Balla v.*

*Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989) ("Substantial compliance

with a court order is a defense to an action for civil contempt.")

## ARGUMENT

**I.**     **Plaintiffs Have Failed To Demonstrate Non-Compliance By "Clear And Convincing Evidence" As To Whether ICE Has Been Conducting Individualized Determinations As Required By The September 5, 2019 Order**

Plaintiffs appear to recognize that, since the beginning of 2020, the parole grant rate for

facilities within the New Orleans Field Office has regularly approached 30 percent, a percentage

that demonstrates compliance with the Court's September 5, 2019 order.   Indeed, that rate

conclusively establishes that individualized parole determinations are occurring, that the Parole

Directive is not being ignored, and that denials are not being issued on a "categorical basis." *See,*

*e.g., R.I.L.R. v. Johnson,* 80 F. Supp. 3d 164, 174 (D.D.C. 2015) (JEB) ("Although these

materials certainly do not reflect a large body of favorable release determinations, the Court is

reluctant to find an across-the-board No-Release Policy when it appears that — at least in some

small number of cases — ICE does grant bond on the basis of individualized considerations.")

While Plaintiffs may prefer a higher grant rate, that preference is not a basis for contending that

Defendants are failing to conduct individualized determinations in violation of this Court's

September 5, 2019 order.

Apparently recognizing this fatal flaw in their position, Plaintiffs make a series of

arguments that attempt to suggest that the statistics being reported are not complete.   Defendants

12

address those specific arguments below.   But, ultimately, these are arguments at the margins of

these statistics.   Plaintiffs are not disputing the actual number of parole grants reflected in the

monthly reports.   They instead contend, based on a handful of examples, that the denominator

used to calculate the grant rate percentage should be larger to some unspecified extent.   But

nibbling at the edges of the statistics in this way does not change the material fact that the grant

rate percentage has significantly increased since the Court's September 5, 2019 order.

### A.  Plaintiffs Have No Basis To Argue For Contempt Based On Any Alleged Inaccuracy In Reporting.

Plaintiffs contend that Defendants have "defied this Court's order to provide complete

and accurate parole adjudication data via monthly reports filed with the Court." (Pl. Mem. at 1)

However, there is no such order that could provide the basis for a contempt motion.   The

applicable order is a minute order dated October 7, 2019, in which the Court directed, in relevant

part, that "the Reports shall issue in the manner proposed by Defendants in the [October 2, 2019]

Status Report."   Defendants have provided those reports "in the manner proposed by

Defendants" in the October 2, 2019 status report, and Plaintiffs have not established otherwise.

Accordingly, because Defendants are in compliance with that order, that order cannot provide a

basis for a finding of contempt.

While Defendants have endeavored to provide complete and accurate reports, Defendants

also made clear in the October 2, 2019 status report that compiling the data on parole denials can

be challenging, particularly when done manually.   And, although Defendants reported that they

had developed the ability to prepare computer-generated reports to "provide more accurate

information" than in the manual reports, they also explained that, due to "limitations" with that

system, the computer-generated reports would be limited to initial parole determinations and that

Defendants would continue to report on parole redeterminations through manually created reports.   (ECF No. 35 at 1)   The computer-generated reports also rely on the manual entry of data into the system and thus also are subject to human error.   (Hartnett Decl. ¶ 34)   Thus, in ordering Defendants to provide reports "in the manner proposed" in that status report, the Court did not mandate 100 percent accuracy or impose any "clear and unambiguous" threshold by which it would evaluate the reports' accuracy or completeness.

### B.  The Alleged Inaccuracies Are Exaggerated Or Lack Support In The Record.

As to the alleged inaccuracies themselves, those have been exaggerated by Plaintiffs or otherwise lack support in the record.   Plaintiffs appear to make two main arguments regarding the completeness and accuracy of the monthly reports:   (1) that "Data Provided by Defendants' Shows Inconsistencies and Deficiencies in Record-Keeping and Reporting" and (2) that "Parole Redeterminations at Some Detention Centers Are Particularly Low and Have Only Shown Modest, Inconsistent Improvement in Parole Grants."   (Pl. Mem. at 18-20)   Each is addressed below.

### 1.  Alleged Inconsistencies and Deficiencies

Plaintiffs make the disingenuous argument that the monthly reports are deficient because they do not reflect certain categories of information while failing to acknowledge that the Court never directed Defendants to include those categories.   In that regard, Plaintiffs contend that:

> Reports for first-time parole decisions do not indicate reasons for denial, even though ICE must provide a reason for denial in every parole consideration. Directive at § 8.2. Reports for first-time parole decisions do not identify the facilities where asylum-seekers are detained. Relatedly, class members are often transferred, and their assigned DOs are frequently shifted. *See generally* Exs. 2-12. Defendants also fail to provide submission dates for parole redetermination requests, making it impossible to discern if they are in full compliance with the Directive, and thus, the Court's Order.

(Pl. Mot. at 31)

But the content of Defendants' monthly reports already have been addressed by the Court and the items that Plaintiffs identify are not items that were to be included. The parties had set forth their respective positions on the contents of those reports in the Joint Status Report filed on October 2, 2019 (ECF No. 35), Defendants explained that there would be differences in the categories appearing in the manual spreadsheet (for redeterminations) and computer-generated spreadsheet (for initial determinations), and, by order dated October 7, 2020, the Court adopted Defendants' proposal. Any arguments, therefore, regarding the categories of information provided in the reports should be summarily rejected as a basis for a finding of contempt.

Plaintiffs also contend that the monthly reports contain inaccuracies because (1) "no parole-request date is recorded for 10 first-time parole decisions" (citing Pl. Ex. 1O); (2) "some parole decisions are reported in parole redeterminations before the date each asylum-seeker entered ICE custody" (citing Pl. Ex. 1O); (3) "[a]t least 14 class members received parole-denial letters issued on dates that directly contradict the dates of denial reflected in Defendants' monthly reports" (citing Pl. Ex. 23); and (4) "at least 17 parole denial decisions and at least 10 class members do not appear anywhere in Defendants' monthly reports despite requesting parole sometime between October 9, 2019 and February 17, 2020" (citing Pl. Ex. 24 and Huber Decl. ¶ 2e). (Pl. Mem. at 18-19)[6]

---

[6]     Plaintiffs also reference errors in two parole decision letters and the length of time some detainees have been detained. (Pl. Mem. at 19) But these issues do not demonstrate any inaccuracy or deficiency in the monthly reports, nor are they evidence of non-compliance with the Court's September 5, 2019 order. The length of detention, moreover, is correlated to the progress of an individual's immigration proceedings, not any provision of the Parole Directive.

These limited assertions reflect a nitpicking of portions of thousands of lines of data that ultimately are irrelevant to the parole grant rate reflected in the monthly reports. For the first two assertions, Plaintiffs cite to Exhibit 1O to their motion, which is a graph that purports to show "data reporting deficiencies." According to that chart, out of 659 initial parole decisions for the referenced time period, there are only ten entries – or 1.5 percent – that do not reflect the parole request date. (Ex. 1O, ECF No. 74-15) Far from showing a deficiency in the data, that is evidence of its completeness given the volume of information provided. Likewise, as regards Plaintiffs' contention that "some parole decisions are reported in parole redeterminations before the date each asylum-seeker entered ICE custody," Plaintiffs' chart shows this typographical error occurring in 10 instances out of approximately 1,400 redetermination decisions, or 0.7 percent, a *fraction of a percentage*. (ECF No. 74-15) Aside from the hypercritical nature of these arguments, these alleged errors have no bearing on the parole grant rate reflected in the monthly reports, which this Court has previously considered to be the measure of compliance.

Plaintiffs cite to Exhibit 23 to their motion to contend that "[a]t least 14 class members received parole-denial letters issued on dates that directly contradict the dates of denial reflected in Defendants' monthly reports." Exhibit 23 is a group of approximately 14 denial letters issued to detainees that has the name of the detainees as well as the detainees' "A" numbers redacted. (ECF No. 74-41 to 74-54) Because unredacted copies of these exhibits were never filed with the Court or served on Defendants, neither the Court nor Defendants can assess the accuracy of this assertion. (ECF No. 75, identifying only a limited group of documents filed under seal without redactions) To the extent there are minor discrepancies in denial dates, as between the monthly reports and denial letters, that is likely the result of human error or the administrative

16

delay between the issuance of a denial letter and the entering of data into the system.   In any event, whatever the reason (which Defendants cannot address as a result of redactions), this contention likewise has no bearing on the grant rate reflected in the monthly reports.

Citing Exhibit 24 and the Huber declaration, Plaintiffs assert that "at least 17 parole denial decisions and at least 10 class members do not appear anywhere in Defendants' monthly reports despite requesting parole sometime between October 9, 2019 and February 17, 2020." (Pl. Mem. at 19)   Exhibit 24 is a group of documents similar to those contained in Exhibit 23, with similar redactions, that also were not filed or served on Defendant in an unredacted form. (ECF No. 74-55 to 74-71)   Although Defendants cannot assess the accuracy of this assertion in light of the redactions on these documents, it suffices to observe that, given the volume of parole decisions reflected in the monthly reports, the omission of 17 denials from the aggregate data would have no material impact on the parole grant rate.   Moreover, the period referenced ends February 17, 2020, and thus would have no bearing on data in more recent months, which is more relevant to Plaintiffs' assertion of current non-compliance.

Finally, Plaintiffs' reference to the Huber declaration is misleading.   In that declaration, the declarant attests that her organization *submitted* redetermination requests for 13 unidentified individuals at some unspecified dates during the period from October 14, 2019 to February 17, 2020, and that the names of only three appear in the monthly reports for that time period.   (ECF No. 74-37, Hubert Decl. ¶ 2(e)).   However, the manual spreadsheets referenced in the Huber declaration report on redetermination requests for which *decisions* have issued, not requests that have been submitted but that remain pending.   *See generally* Ex. A to the monthly Metoyer Declarations.   Plaintiffs fail to account for this distinction in making this contention.

## 2.   Grant Rates At Particular Detention Facilities

Although their Complaint focused on aggregate grant rates for the New Orleans Field Office, Plaintiffs attempt to support their contempt motion by focusing on grant rates at particular facilities within the New Orleans Field Office.   Notably, their purported "benchmark" statistics from 2016 do not include a facility-by-facility breakdown, rendering any purported comparison apples to oranges.   (*Compare* ECF No. 74-1 and ECF No. 74-9 with ECF No. 74-16)   Aside from that threshold defect, Plaintiffs' analysis is incomplete and misleading.

Plaintiffs limit this argument to redetermination decisions.   Plaintiffs assert that "[s]ome detention facilities report few to no parole redeterminations in any given month relative their population size compared with other detention facilities."   (Pl. Mem. at 20)   As support, they contend that "LaSalle ICE Processing Center and LaSalle Correctional Center report detaining over 1,300 people as of April 2020, but report only 19 redeterminations from September 2019 to April 2020, in the post-injunction data provided by Defendants. Catahoula Correctional Center reports detaining over 700 individuals as of April 2020, but reports only 9 redeterminations from September 2019 to April 2020."   (Pl. Mem. at 20) (citing Ex. 1C and ECF No. 64-2) (citations omitted).

The errors in this analysis are numerous.   First, Plaintiffs' combine LaSalle ICE Processing Center with LaSalle Correctional Center, when they are separate facilities.[7]   (ECF

---

[7]      In April 2020, LaSalle Processing Center had a current detainee population of 1080, whereas LaSalle Correctional Center had a current detainee population of 225.   (ECF No. 64-2)   For LaSalle Processing Center, Defendants reported in total only four redetermination decisions for the entire period of its reporting to date (October 2019 to April 2020), all of which occurred in April 2020.   Of those, one was granted and three were denied.   (Ex. A to Metoyer Decl., May 26, 2020 Status Report)

No. 64-2; Hartnett Decl. ¶ 43, explaining that "arriving aliens who have established a credible

fear are not normally transferred to the LaSalle ICE Processing Center").   Second, LaSalle

Correctional Center and Catahoula are used as final orders facilities, meaning aliens are typically

transferred to those facilities only after having received an order of removal as a prestaging for

removal.   (Hartnett Decl. ¶ 42)   Accordingly, a low number of both redetermination requests

and parole grants based on those requests would not be unexpected at these facilities.[8]

Third, Plaintiffs are obviously cherry-picking data.   Plaintiffs reference the number of

detainees "as of April 2020," citing ECF No. 64-2 (filed April 7, 2020), but not the number of

detainees at each facility during each month of the referenced eight month time period.   (ECF

No. 74-3)   And, most significantly, Plaintiffs fail to identify how many detainees in each facility

made redetermination requests during each month of the eight-month period reflected in their

table.   (*Id.*; ECF No. 74-16)   Redeterminations do not occur automatically, but require a

detainee to make an affirmative request for redetermination.[9]   Without the number of

redetermination requests in a given facility in a given month, the Court cannot draw any adverse

conclusions from the absolute number of redetermination decisions that have issued in any given

facility.

---

[8]      The distinct function of LaSalle Correction Center adds context to the allegation by M.B. that an officer at LaSalle stated there was "no parole here" and that there was a "99 percent denial rate."   (ECF No. 74-27 at ¶ 12)

[9]      The proactive reviews that ICE has conducted in light of COVID-19, and as reflected at ECF No. 66-1 (guidance dated April 4, 2020), are not redetermination requests that would result in a redetermination denial letter if the review determined that continued detention remained appropriate.

In contrast to the analysis in the instant motion, Plaintiffs' analysis in the status report filed on April 2, 2020, is more illustrative but still not comprehensive.   (ECF No. 63 at 2)   That analysis, which is copied below verbatim from the status report, focused on one 30-day period, January 15, 2020 to February 15, 2020, and identified the parole grant rate by facility by comparing the number of redetermination decisions against the number of parole grants that were issued:

| Detention Facility and detainee population | # of Parole redeterminations received between Jan. 15, 2020 and Feb. 15, 2020 | # of parole redeterminations granted | Parole redeterminations grant approval rate (%) |
|---|---|---|---|
| ACDC | 55 | 7 | 12.73% |
| Jackson Parish | 47 | 14 | 29.79% |
| Winnfield | 145 | 47 | 32.41% |
| Richwood | 40 | 14 | 35.00% |
| S. Louisiana | 75 | 14 | 18.67% |
| River | 38 | 13 | 34.21% |
| Pine Prairie | 12 | 5 | 41.67% |
| LaSalle Correctional Ctr | 4 | 0 | 0.00% |
| Catahoula | 3 | 0 | 0.00% |
| Allen Parish | 1 | 0 | 0.00% |

Although LaSalle Correctional Center, Catahoula, and Allen Parish reflect a 0% grant rate for this 30-day period according to Plaintiffs' analysis, the number of redetermination decisions made in those facilities for the referenced time period is too small of a sample size to draw any conclusions.   Indeed, according to Defendants' monthly reports, Allen Parish reported in total only two redetermination decisions for the entire period since the Court's September 5, 2019 order.   (Def. May 26, 2020 Report, Ex. A to Metoyer Decl.)   One was the denial on February 26, 2020 reflected in the chart above, and the other was a parole grant on April 30, 2020.   (*Id.*)

In addition, LaSalle Correction Center also has had a low number of redetermination decisions over the eight-month period since the September 5, 2019 order – only an estimated 11 decisions, all of which were parole denials (Def. May 26, 2020 Report, Ex. A to Metoyer Decl.), a result that is not unexpected given the function of that facility.   (Hartnett Decl. ¶ 42)   During that same eight month time period, Catahoula has had approximately 25 redetermination decisions, of which eight were grants, for a rate of over 30 percent.   (Def. May 26, 2020 Report, Ex. A to Metoyer Decl.; *see also* Hartnett Decl. ¶ 42, noting that "Catahoula's recent uptick in parole adjudications have primarily been the result of reviews for release based on COVID-19")

Accordingly, Plaintiffs' argument is based on a cherry-picking of data and a failure to account for the distinct role of some facilities, which has the effect of reducing the overall redetermination grant rate.   (*Compare* ECF No. 74-16)   When the data is fully considered, it demonstrates that individualized determinations are occurring within the New Orleans Field Office consistent with this Court's September 5, 2019 order.

### C.  Arguments Regarding Increased Reference To Flight Risk In Parole Denials

As a further basis for their contempt motion, Plaintiffs contend that "Use of Flight Risk as a Reason for Denial Has Inexplicably Become Extensive."   (Pl. Mem. at 16)   What is "inexplicable" is how this contention has any bearing on whether Defendants are in compliance with the Court's September 5, 2019 order.   That order did not set any limits on the use of "flight risk" as a basis for denying parole, nor could the Court have done so without infringing on the discretionary nature of the parole decision.   ICE, moreover, has explained why "flight risk" would account for a large percentage of parole denials.   (Hartnett Decl. ¶ 19)

21

Plaintiffs' argument boils down to the following conclusory assertion: "the reason for this percentage of flight-risk denials is unclear, but it evidently is not based on the individualized facts of parole redetermination requests. *Supra* section II.B1.iv., II.B.2., (individualized reasons for "flight risk" determinations were not provided to class members)."   (Pl. Mem. at 17)   As support, Plaintiffs cite "anecdotal evidence" consisting of two examples of class members (K.S.R. and M.P.I.) who "report that their spouses who were detained by other ICE Field Offices were released months ago based on the same evidence submitted in their own parole requests." (*Id.*)   Plaintiffs claim these declarations establish that "other field offices are not systematically determining parole applicants to be flight risks."   (*Id.*)

However, Plaintiffs mischaracterize the content of these declarations.   Plaintiffs cite paragraphs 9 and 10 of the K.S.R. declaration (*id.*), but K.S.R. did not attest that she provided "the same evidence" submitted by her husband, but only that she had the same "sponsor" as her husband.   (ECF No. 74-18, K.S.R. Decl. ¶ 9)   And, although she identifies the documents that she submitted, she does not state that they are the "same" as submitted by her husband.   (*Id.* ¶ 10)   M.P.I.'s declaration states that she was denied parole on two occasions and then submitted a third request and was interviewed utilizing a questionnaire form on April 20, 2020, and, as of the date of the declaration (April 27, 2020) was "awaiting a decision."   (ECF No. 74-20, M.P.I. Decl. ¶ 10)   According to her declaration, it is this third request, completed approximately seven days before the date of the declaration, that she contends "used the same evidence" that was used to obtain parole for her husband the previous month.   (*Id.*)   This so-called anecdotal evidence, which simply shows that M.P.I. was awaiting a decision on her most recent request at the time this declaration was executed, does not "corroborate[]" that the New Orleans Field Office is

22

"systematically determining parole applicants to be flight risks."   (Pl. Mem. at 17)   Indeed,

M.P.I. was granted parole on May 15, 2020, following this third redetermination request.

(Hartnett Decl. ¶ 30)

**II.      Plaintiffs Have Failed To Establish Non-Compliance As to Other Aspects Of The Court's Order By Clear And Convincing Evidence Or, Alternatively, Defendants Are In Substantial Compliance.**

   **A.   Plaintiffs Overlook Important Distinctions And Qualifying Language In The Parole Directive In Making Their Procedural Arguments.**

Plaintiffs' argument that ICE has failed to provide detainees with the procedures set forth

in the Parole Directive is largely smoke and mirrors, conflating individual determinations from

the distinct redetermination process, relying on alleged fixed deadlines and other procedures that

are not reflected in the Parole Directive, and mischaracterizing the evidence cited.   Once

Plaintiffs' assertions are disentangled, they are left with at most a handful of situations – out of

approximately 2,400 parole determinations – in which the letter of the Parole Directive may not

have been fully met.   Of these limited examples, most allegedly occurred months ago and thus

do not reflect ICE's current compliance, which is the relevant focus of Plaintiffs' motion.

Moreover, in response to the September 5, 2019 order, ICE has implemented training,

complied with monthly reporting requirements, and has seen a substantial increase in the parole

grant rate percentage.   Given the volume of parole determinations, resource limitations, staff

turnover, and the strain on resources caused by the COVID-19 situation (Hartnett Decl. ¶¶ 7, 15,

35), the limited issues cited by Plaintiffs fail to establish non-compliance by "clear and

convincing" evidence.   Even if such a limited showing were sufficient to meet Plaintiffs'

burden, ICE has demonstrated substantial compliance with the Parole Directive and thus a

finding of contempt would be improper for that additional reason.

23

As a general matter, the Parole Directive sets forth certain procedures to follow in the parole process as regards the initial parole determination.   Redetermination requests are treated differently than initial parole determinations.   The Parole Directive provides that "if an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office *may in its discretion*, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.   (Parole Dir. ¶ 8.9) (emphasis added)   Thus, interviews are not required for redetermination requests.[10]   Moreover, although redetermination requests are permitted under the Parole Directive, the Directive contemplates that such requests will be "based upon changed circumstances or additional evidence relevant to the alien's identify, security risk, or risk of abandoning."   (Parole Dir. ¶¶ 6.5, 8.2)   In other words, the repeated submission of the same, deficient request is not contemplated.

As discussed below, much of Plaintiffs' procedural arguments fail to account for these distinctions, a prime example being the "sticky note" example that Plaintiffs highlight repeatedly (Pl. Mem. at 7, 10).   That was a situation where a redetermination request was returned because

---

[10]   Although ICE has discretion not to re-interview individuals who have been denied parole and request redeterminations (Parole Directive § 8.9), ICE previously stated that it plans to treat individuals previously denied parole *prior to* September 5, 2019 and who request a new determination *after* that date under the procedures applicable to an initial adjudication.   (ECF No. 35 at n.1)   That was intended to address any alleged deficiencies in process for individuals who had requested parole *prior to* the Court's September 5, 2019 order and who sought a redetermination *after* that order, which is a finite number of class members.   However, that accommodation does not extend to any additional requests following the first redetermination request post-dating the September 5, 2019 order.   In addition, it also does not extend to detainees who initially were denied parole *after* the September 5, 2019 order and who then make redetermination requests.   All redetermination requests by such individuals (i.e., those initially denied parole *after* September 5, 2019) are subject to the procedures applicable to redetermination requests under the Parole Directive.

it contained the same deficiency that had been flagged in several prior requests.   (ECF No. 74-
40, reiterating prior guidance that "has to be an immediate relative" and returning the request on
that basis; Hartnett Decl. ¶ 35, explaining that redetermination requests should be based on a
change of circumstances or additional evidence and how multiple such requests strain resources).

      Moreover, although certain time periods are referenced for different steps in the process,
the Parole Directive recognizes that those time periods may not always be achievable and thus
allows flexibility in meeting them.   For instance, the Parole Directive states that, following a
positive credible fear determination, field office personal are to provide the detainee "as soon as
practicable" with a Parole Advisal and Scheduling Notification.   (Parole Dir. ¶ 8.1)   For initial
determinations, the Parole Directive provides for an interview to occur within "seven days"
following a credible fear determination "[u]nless a reasonable additional time period is necessary
(e.g., due to operational exigencies or an alien's illness or request for additional time to obtain
documentation)".   (Parole Dir. ¶ 8.2)   That "same period" applies to the time for an officer to
make a recommended parole decision to his or her supervisor (*id.*; *see also id.* ¶ 8.5), meaning
that operational "exigencies" and other issues allow for these deadlines to be exceeded without
violating the Parole Directive.

      Similarly, written notifications of parole decisions should be provided within seven days
of the detainee's initial parole interview or the date a detainee requests a redetermination "absent
reasonable justification for delay in providing such notification."   (Parole Dir. ¶ 6.6)   In other
words, the goal is to complete the initial parole determination process within 14 days of a
credible fear determination (i.e., conduct an interview and make a recommendation within 7 days
and issue a decision within 7 days of the interview/recommendation).   However, that is not a

fixed deadline and, instead, flexibility is built into the referenced time periods in recognition of the many potential reasons why those time periods might not be met in any given case. Consequently, given that built-in flexibility, the alleged failure to meet those time periods cannot constitute non-compliance with this Court's September 5, 2019 order. Presently, ICE estimates that it takes the New Orleans Field Office, on average, 18 days from the credible fear determination to issue an initial parole determination, a time period that is very close to the 14-day goal set forth in the Directive. (Hartnett Decl. ¶ 15; *see also* Pl. Mem. at 11, stating that "[o]n average, it takes NOLA ICE over two weeks to issue a parole decision for first-time applicants after they make a parole request").

Relatedly, because of the referenced time periods, the Parole Advisal and Scheduling Notification document affords detainees only a few days to provide documentation because the time periods could not be met otherwise.   Plaintiffs argue inconsistently that Defendants have violated the Parole Directive by failing to issue parole determinations within 14 days of a credible fear determination, while at the same time arguing that Defendants also are in violation because they afford detainees only a few days to provide supporting documentation, which is necessary to meet the seven day time period to make a parole recommendation.   (Pl. Mem. at 7 (referencing "unreasonably short timelines to submit supporting documents") and *id.* at 11 (asserting that class members "rarely" receive notifications of their parole determinations "within the seven-day timeframe required by the Directive")).   Thus, from Plaintiffs' standpoint, Defendants should be held in contempt for failing to meet the short time period for a parole determination and also for seeking documentation from detainees within the limited window necessary to meet that short time period.   Plaintiffs cannot have it both ways.

26

Finally, the Parole Directive does not require the degree of translation or interpreter services that Plaintiffs suggest.   It uses the terms "language", "translation" or "interpreter" (or a variations of these terms) only in three paragraphs and only in reference to the Parole Advisal and Scheduling Notification and the written notification of a parole decision.   (Parole Dir. ¶¶ 6.1, 6.5, 8.1)   As to the former, the Parole Directive does not require that the Parole Advisal and Scheduling Notification be provided in a language that the detainee understands, but only that an ICE officer explain the "contents" of the advisal in a language the detainee understands, "through an interpreter if necessary."   (Parole Dir. ¶ 6.1, 8.1)   As to the notice of parole decision, the Parole Directive states that an ICE officer "shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language." (Parole Dir. ¶ 6.5)   Thus, neither document must be in a language other than English.   And, while the contents of the Parole Advisal must be explained in a language the detainee understands, and reasonable access to translation or interpreter services provided when a detainee advises that the detainee cannot understand the parole denial letter, the Directive does not require that these documents be explained in the detainee's best or native language, so long as the alien understands the language used.   (Hartnett Decl. ¶ 13)   Officers also can obtain assistance from other officers; they do not need to resort to interpreters unless necessary.   (Id.)

Importantly, the Parole Directive does not contain any similar provisions regarding interviews. (Parole Dir. ¶ 8.2)   Indeed, the Directive is silent as to how interviews should be conducted, whether they can be conducted through written questions instead of orally, and what, if any, interpreter or translation services should be made available.   How the Parole Directive

27

should be understood on these points of procedure is not the question presented here.   Plaintiffs

are asserting that ICE should be held in contempt for non-compliance with the Parole Directive

as written, not how it is interpreted by the Plaintiffs.   Thus, ICE cannot be held in contempt of

this Court's September 5, 2019 order for failing to utilize a procedure that is not set forth in the

Parole Directive or that is ambiguous.   Stated another way, the Court's order references the

"procedures" of the Parole Directive and, if the Directive is silent or ambiguous on a particular

matter of procedure, than this Court's order necessarily is not "clear and unambiguous" as

regards that procedure.   Plaintiffs' preferred interpretation is thus not a basis for contempt.

### B.  Plaintiffs' Examples Of Procedural Non-Compliance Are Overstated Or Largely Irrelevant

Plaintiffs make sweeping assertions of procedural non-compliance, but when their

evidence is examined, these assertions lack support, are overstated or are based on procedures

that are not stated in the Parole Directive.   Defendants briefly address these assertions and

Plaintiffs' purported evidence below using the numbering from Plaintiffs' filing.

### i.    Parole Advisal and Scheduling Notification

Since the Court's September 5, 2019 order, ICE has issued at least 700 initial parole

determinations.   (Hartnett Decl. ¶ 33)   Plaintiffs assert that Defendants are in contempt of this

Court's order based on the experience of five detainees, or less than one percent of all initial

determinations, regarding their receipt of the Parole Advisal and Scheduling Notification

(hereinafter, "Parole Advisal").   (Pl. Mem. at 7)   Plaintiffs also mischaracterize the requirement

of the Parole Directive when they contend that an "interpreter or translator" is rarely provided to

class members that are not English proficient.   (*Id.*)   As discussed above, "an interpreter or

translator" is not required merely because a class member is "not English proficient."   That

28

becomes a requirement only if other efforts to communicate the contents of the Parole Advisal are not effective.

A review of the individual declarations cited by Plaintiffs also reveals that these assertions are overstated.   Y.P.T. admits receiving a copy of the Parole Advisal following Y.P.T.'s credible fear determination and received another copy immediately following this Court's September 5, 2019 order.   (ECF No. 74-19 at ¶¶ 6, 9; *see also* Hartnett Decl. ¶¶ 25) Although Y.P.T. states that the Parole Advisal was "in English" (ECF No. 74-19 at ¶ 9), nothing in the Parole Directive requires that it be provided in a different language.   (Parole Dir. ¶ 8.1) Although Y.P.T. also states that, following a transfer to a new facility in February 2020, Y.P.T. was shown but not provided a copy of the Parole Advisal (ECF No. 74-19 at ¶ 13), there is no requirement in the Parole Directive that an additional copy of the Parole Advisal be provided at that stage of detention.   (Parole Dir. ¶ 8.1, stating that parole advisal must be provided "as soon as practicable" after a credible fear determination).

C.L.H. acknowledges receiving a Parole Advisal.   (ECF No. 74-28 at ¶ 5)   Although C.L.H. alleges that it was in English, he does *not* assert that officers failed to explain the contents of the Parole Advisal to him. (*Id.*)   To the contrary, C.L.H. discusses the contents of the Parole Advisal in the declaration – i.e., that it afforded two days to submit documents – thus indicating an understanding of the contents.   (*Id.*)

M.B. also acknowledges receiving a Parole Advisal.   (ECF No. 74-27 at ¶ 6)   Although M.B. claims to have been unable to understand the document, M.B. states that an ICE officer explained the contents, stating that "an ICE officer told me I had two days to submit documents from the person waiting to receive me in the United States."   (*Id.* ¶ 7)   Although M.B. states

29

that "[n]o interpreter was provided so that we could better communicate" (*id.*), the Parole Directive only requires that contents be explained so that the detainee understands.   Because M.B.'s own description reflects an understanding of what was communicated, the Parole Directive did not require that the officer seek assistance from an interpreter.

Y.C.F. also acknowledges receiving a Parole Advisal and having the advisal explained by an ICE officer.   (ECF No. 74-25 at ¶ 4)   Y.C.F. states that "the DO spoke in English and another asylum seeker in detention was helping me as an interpreter . . . . [and] understood enough to communicate these statements to me."   (*Id.*)   Similarly, K.S.R. acknowledges receiving a Parole Advisal and that she understood the contents.   (ECF No. 74-18 at ¶ 7)   In K.S.R.'s words, "an ICE officer gave me a parole advisal in English and told me that I had until December 7, 2019 to turn in all my evidence in support of a parole application. I immediately requested two additional days to present all evidence as I knew I would not receive all my supporting documents on time."   (*Id.*)   These accounts reflect conduct consistent with the requirements in paragraph 8.1 of the Parole Directive and thus fail to establish non-compliance.

### ii.    Time and Directions On Submitting Documents For Initial Parole Determination.

Citing the experiences of three detainees, and inadmissible hearsay from four attorneys regarding "reports" they received from detainees, Plaintiffs contend that "[m]any class members report difficulty determining who their assigned Deportation Officer (hereinafter "DO") is at any given time, let alone having the opportunity to communicate with or receive instructions from DOs on how to submit documents in support of their parole requests."   (Pl. Mem. at 7) Plaintiffs contend that these assertions violate paragraph 8.1 of the Parole Directive, and thus reflect non-compliance with the Court's September 5, 2019 order.   As discussed above,

paragraph 8.1 sets forth certain procedures to follow with respect to initial parole determinations following a credible fear determination, including an initial interview and submission of documents.   (Parole Dir. ¶ 8.1) However, it does not address the extent to which access to DOs should be provided or how detainees are to be notified about the identity of their DOs.

In relevant part, paragraph 8.1 states that the Field Office should provide instructions in the Parole Advisal on how information should be provided by detainees.   (Parole Directive ¶ 8.1)   Plaintiffs' declarants, however, do not contend that such information was omitted from the advisals they received.   For instance, Y.P.T. does not allege that the Parole Advisal was deficient in this regard, but contends with respect to a subsequent facility that "[t]here is no list in my dorm of the DO assignments, and just like the other centers, the ICE officers that have come to our dorm do not answer our questions."   (ECF No. 74-19 at ¶ 19)   Likewise, L.P.C. asserts that "[a]fter receiving my first parole denial, my assigned DO changed" and that "[i]t is very difficult to know who my assigned DO is at any given moment because they change about every 45 days."   (ECF No. 74-23 ¶ 10)   L.P.C. does not contend that L.P.C. failed to receive instruction on how to submit documentation.   M.B. also does not make such allegations. Rather, M.B. alleges that, after she transferred to a different facility and wanted to make a redetermination request, she had difficulty identifying her DO.   (ECF No. 74-27 ¶ 11)   As set forth in the accompanying Hartnett Declaration, resource limitations have required ICE to utilize detailees to staff facilities, resulting in frequent turnover.   (Hartnett Decl. ¶¶ 5, 7)   Such staffing issues, however, do not reflect non-compliance with a "clear and unambiguous" provision of the Court's September 5, 2019 order.

Plaintiffs also contend that they are not afforded sufficient time to submit documents for initial parole determinations.   (Pl. Mem. at 7)   But, as already addressed above, the Parole Directive sets a time period of seven days following a credible fear determination for a parole interview to occur and for a recommended decision on parole to be made.   (Parole Dir. ¶ 8.2) Given that timeframe, requiring detainees to submit documents within two or three days of receiving the Parole Advisal is not inconsistent with the Parole Directive and thus cannot form a basis for a contempt finding.

Plaintiffs cite three examples of ICE officers allegedly refusing to accept documentation from class members, but the declaration of only one detainee actually makes that allegation (i.e., L.P.C., ECF No. 74-23 at ¶ 8, asserting that her DO would not accept her initial parole submission)   While L.P.C. also contends that one of her redetermination requests was returned with a sticky note reiterating the defects from an earlier request (*id.* ¶ 17 and ECF No. 74-40), that does not demonstrate a violation of paragraph 8.1 of the Parole Directive for reasons previously discussed, namely, the Parole Directive contemplates that redetermination requests will be based on new information, not simply restate the same insufficient information.

The other declarants cited do not support the assertion that documentation for initial parole determinations is not accepted or reviewed.   K.S.R. does not contend that officers refused to accept her parole application or supporting documents.   (ECF No. 74-18 at ¶¶ 7-9) Similarly, Y.C.F. also makes no such allegations; instead, Y.C.F. complains that only three days were afforded to submit documentation and the belief that the application was not meaningfully considered.   (ECF No. 74-25 at ¶¶ 4-6)   The documents attached as exhibit 25 (ECF No. 74-72 to 74-80) also do not support this assertion.   These documents reflect responses from ICE

32

officers to detainees, but lack any context to allow the Court to draw the conclusions advanced by Plaintiffs.   For instance, exhibit 25H is a one line request from a detainee dated December 21, 2019, and a response from December 23, 2019, stating that "your parole was denied 17/12/2019" (i.e., December 17, 2019).   (ECF No. 74-79)   Given the close date proximity, it would appear that the officer understood this as an inquiry into the status of a pending parole request, rather than a new request, and advised that the request recently had been denied. Plaintiffs seek to take this document out of context to suggest that the officer denied a new request after just two days, when that is not a reasonable conclusion to draw.

To the extent Plaintiffs rely on alleged statements regarding the unavailability of parole (Pl. Mem. at 8), those statements are irrelevant in light of the statistics reflecting parole grants at the facilities referenced.   Plaintiffs, for instance, reference statements allegedly made on a "weekly basis" at Winn Correctional Center since the Court's September 5, 2019 order (*id.*) but acknowledge in their own filing grant rates at Winn of 69 percent (January), 48 percent (February) and 25 percent (March).   (ECF No. 74-16)

Finally, Plaintiffs allege the appearance of a "continued pattern and practice of *de facto* denial for all initial parole requests" at Tallahatchie. (Pl. Mem. at 8)   Not only is that assertion entirely speculative based on the limited evidence cited, but Tallahatchie has not been used to house ICE detainees since January 2020, and parole determinations have not occurred there since that time.   (Hartnett Decl. ¶¶ 12, 39).

### iii.   Interviews For Initial Parole Determinations

Plaintiffs contend that ICE has failed to comply with the requirement to interview detainees in connection with their initial parole determinations in violation of paragraph 8.2 of the Parole Directive.   (Pl. Mem. at 8)   That paragraph provides that, unless additional time is necessary for operational or other reasons, initial parole interviews should occur within seven days of a credible fear determination.   (Parole Dir. ¶ 8.2)   However, the Parole Directive does not require interviews for redeterminations but makes them discretionary. (Parole Dir. ¶ 8.9)

With limited exception, Plaintiffs purported evidence fails to distinguish between these two provisions.   For instance, Plaintiffs cite to the declaration of "one advocate" who asserts that, of the 25 parole requests on which the individual worked, 23 reported that they had not been interviewed.   (Pl. Mem. at 8, citing Huber declaration (ECF No. 74-37), ¶ 2a)   However, that declaration does not address whether those were initial parole determination requests or redetermination requests in which interviews are discretionary.   (ECF No. 74-37 at ¶ 2a)   ICE also has records that contradict the assertions of several of the declarants cited by Plaintiffs as having never received an initial interview.   For instance, ICE's records reflect that K.S.R., Y.M.T., Y.P.T. and D.A.A. all received initial interviews.   (Hartnett Decl. ¶¶ 23, 24, 25, 29) Moreover, Plaintiffs cite to the declaration of M.B. (paragraphs 6 to 8), but M.B. does not state in those paragraphs that no interview occurred.   Rather, the declaration is silent on that issue. (ECF No. 74-27 at ¶¶ 6-8)   Other alleged examples, such as A.P.E., refer to the time period immediately after the Court's September 5, 2019 order, which is not the relevant time period for assessing current compliance.   (ECF No. 74-21 at ¶¶ 8-9 (A.P.E.); *see also e.g.,* ECF No. 74-22 at ¶ 7 (D.A.A.))   Indeed, as Plaintiffs acknowledge, A.P.E. was granted parole on April 30, 2020

and released on May 1, 2020.   (Pl. Mem. at 9 n.5; Def. May 26, 2020 Report, Ex. A to Metoyer Decl.)

Plaintiffs also cite to four detainees who contend that they were not provided with translation or interpreter services during their interviews.   (Pl. Mem. at 9)   As discussed above, however, the Parole Directive is silent as to the manner or requirements of interviews. Moreover, ICE's records reflect that one of the detainees, M.B., was provided a French interpreter during M.B.'s interview in December 2019.   (Hartnett Decl. ¶ 26)   Ultimately, these limited allegations fail to demonstrate non-compliance with any procedural requirement of the Parole Directive.

### iv.   Written Notification Of Parole Decision

Plaintiffs contend that "class members and their legal representatives report not receiving notifications of parole decisions" and that "[m]any also report not receiving translation or interpretation when needed."   (Pl. Mem. at 9)   These assertions also are overstated as reflected by a review of the evidence cited.

### a.   Receipt of Written Parole Denial Notification

In support of the first assertion, Plaintiffs cite to the declarations of R.C.L. (ECF No. 74-26 at ¶ 14), C.L.H. (ECF No. 74-28 at ¶ 6, 16-17, 20), K.S.R. (ECF No. 74-18 at ¶¶ 12, 21), and D.A.A. (ECF No. 74-22 at ¶15), as well as declarations by two advocates, Fonte (ECF No. 74-30 at ¶ 5) and Crawford (ECF No. 74-29 at ¶ 3e).   Each of these is addressed in turn, and none support a basis for contempt.

35

In the cited paragraph, R.C.L. states the following:

> The last time I submitted a parole interview form and packet was on March 10, 2020 to my then-assigned DO, Officer Paredes. However, on March 12, 2020, DO Paredes and the other DOs from that time period left, and new ones arrived. Eventually, I was able to ask my newly assigned DO about the status of my previously submitted parole request. He informed me that it was denied, once again because ICE considers me to be a flight risk. He told me he would provide me the denial letter for this denial. Now he has also left, and he never provided me the denial letter.

(ECF No. 74-26 at ¶ 14)   R.C.L. states that the newly assigned DO "never provided me the denial letter" but not that it was not ultimately received.   Moreover, to the extent it was never received, R.C.L.'s declaration suggests it was an omission that resulted from staff turnover, rather than some systemic failure that could support a finding of contempt.

C.L.H.'s declaration (ECF No. 74-28) states in the cited paragraph that, in December 2019, C.L.H. received a written notification that parole was denied and that the notice was in English, all of which is consistent with the requirements of the Parole Directive.   (Parole Dir. ¶ 6.5)   As already addressed above, the Parole Directive does not require that the denial notice be written in a language other than English, only that "DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language."   (*Id.*) Although C.L.H. contends that he did not understand the notice because it was in English, he does not contend that he requested, or was denied, "reasonable access to translation or interpreter services."   (ECF No. 74-28 at ¶ 6)   In the other cited paragraphs, C.L.H. references a subsequent parole request that was made on April 7, 2020, three weeks before the date of his declaration (April 28, 2020), and which was resubmitted by Federal Express overnight mail on April 23, 2020.   Although he contends that, as of the date of his declaration, a response to the

redetermination request had not been received, that is not evidence that written parole denials are not issued given the close proximity between the date of the request and his declaration.

Plaintiffs also cite to the declaration of K.S.R. (ECF No. 74-18), who in the cited paragraph describes her experience with a parole request that is consistent – not contrary to – the requirements of the Parole Directive.   K.S.R. states that she submitted a parole redetermination request on December 24, 2019 that was supplemented with additional information by her sponsor on December 30, 2019.   (ECF No. 74-18 at ¶ 12)   K.S.R. then describes communications with an ICE officer regarding the request who, on January 14, 2020, gave her a form with written questions to complete and also gave her additional time to "submit evidence that my husband is in fact my husband and that he had been granted parole."   (*Id.* ¶ 14)   K.S.R. states that she submitted the information on January 17, 2020, and that she received a parole denial letter on January 26, 2020.   (*Id.* ¶¶ 15, 17)   Although K.S.R. states that the denial letter was in "English only" (*id.* ¶ 17), that is not inconsistent with the requirements of the Parole Directive and K.S.R. does not contend that she was unable to understand the letter (to the contrary, her allegations make clear that she did understand it).   (*Id.*)   The other paragraph that Plaintiffs cite from the K.S.R. declaration – paragraph 21 – references K.S.R. having "witnessed" an unspecified number of detainees "get denied parole with their parole packets returned to them sealed and unopened" but K.S.R. is not competent to attest to the circumstances of those alleged denials.

Paragraph 21 of K.S.R.'s declaration also reflects the resource limitations that ICE is currently experiencing under the COVID-19 situation, and references the following statement that an ICE officer allegedly made "[r]ecently": "'there are only four of us, 300 of you and everyone has applied for parole, and our supervisors are working from home.'"   (*Id.* ¶ 21)

Rather than demonstrate non-compliance with the Court's order, that statement confirms the challenges that ICE officers are facing as they work to comply with the Parole Directive under challenging circumstances.

The Crawford Declaration (ECF No. 74-29), in the paragraph cited, discusses the experiences of two clients.   Crawford acknowledges that the two clients received copies of written parole denials but asserts that copies also had not been sent to her directly.   (*Id.* ¶ 3e) Consequently, she states that "[w]e had to wait to get these denials from our clients, which slowed down our ability to quickly submit reconsideration requests."   (*Id.*)   Rather than demonstrate non-compliance, this type of evidence goes beyond the narrow issues raised in the Complaint and shows the extent to which Plaintiffs are searching for reasons to bring a contempt motion.

The Fonte declaration (ECF No. 74-30), contains a chart in the cited paragraph that purports to chronicle the initial parole request and multiple redetermination requests of one detainee dating back to March 14, 2019, well before the Court's preliminary injunction order. (ECF No. 74-30 at ¶ 5)   For the post-injunction period, that chart reflects that this detainee's redetermination request was denied on October 2, 2019 through a denial letter sent to the detainee, and that, although there was an alleged delay in responding to a subsequent request, a notice ultimately was sent by email that the prior decision "stands."   (*Id.*)

Finally, Plaintiffs discuss two examples where detainees submitted parole requests that failed to address deficiencies that had been identified by ICE previously and were returned for that reason.   (Pl. Mem. at 10)   As already discussed, the Parole Directive contemplates that redetermination requests will be based on new information, not simply reiterate information

38

already deemed to be insufficient.   And, although Plaintiffs cite to D.A.A.'s declaration dated

April 30, 2020, where he contends that he had not yet received a response to his redetermination

request made "sometime in February 2020" (ECF No. 74-22 at ¶15), the May 26, 2020 monthly

report reflects that that redetermination request was denied on April 30, 2020.   (Def. May 26,

2020 Status Report, Ex. A to Metoyer Decl.)   Given that that declaration was signed the same

day as the denial decision, D.A.A's declaration is not evidence that a denial letter was not issued.

### b.  Translation and Interpretation

Plaintiffs also cite a handful of declarations in support of their assertion that translation

and interpretation services have not always been received "when needed."   (Pl. Mem. at 9)   The

cited declarations also do not support that assertion.

For instance, M.P.I.'s declaration at the cited paragraph states only that "all of the parole

denial letters that I have received from ICE were provided to me in English", but that is

consistent with the Parole Directive as already explained.   (ECF No. 74-20 at ¶ 12)   M.P.I. does

not contend in that paragraph that reasonable access to translation or interpretation services was

requested and denied by ICE.   Y.P.T. also references a parole denial that was received in

English, and, although Y.P.T. claims to have had difficulty understanding the denial letter,

Y.P.T. likewise does not contend that access to translation or interpretation services were

requested or denied.   (ECF No. 74-19 at ¶ 14)   The cited paragraph of C.L.H.'s declaration does

not pertain at all to the issue of translation or interpretation services (ECF No. 74-28 at ¶ 8), nor

do the cited paragraphs in the K.S.R. declaration (ECF No. 74-18 at ¶¶ 8, 17).   Similarly, the

cited paragraph in the Fonte declaration (ECF No. 74-30 at ¶ 6) also is unrelated to this issue.

In the cited paragraph of the Gardina declaration, the declarant makes the conclusory allegation that "I have had clients wrongly denied an interpreter" without providing any specifics as to the circumstances that would allow the Court to assess whether that alleged failure conflicted with the requirements of the Parole Directive.   (ECF No. 74-32 at ¶ 3) (Indeed, the Gardina declaration is entirely conclusory, devoid of specifics and resting entirely on this attorney's personal opinion as to the matters stated in the declaration.)   The Crawford declaration (ECF No. 74-29) states that two clients received parole denials in English and, although stating that no Spanish translation of the documents was provided, does not state that one was requested.   (*Id.* ¶ 3c)   The Crawford declaration also references the absence of an interpreter at an interview (*id.* ¶ 3d), but the Parole Directive is silent as to whether and when that is necessary.

Ultimately, of the declarations cited, there is one example – that of M.B. – where the declarant contends that interpreter services were requested and not provided.   (ECF No. 74-27 at ¶ 14)   But that concerned a parole interview (*id.*), where the Parole Directive is silent on the issue, not a parole denial letter.   ICE's records, moreover, reflect that a French interpreter was used during M.B.'s interview on December 7, 2019.   (Hartnett Decl. ¶ 26)   Although M.B. also contends that a denial letter was provided in English and that "no ICE officer ever explained the document to me" (*id.* ¶ 18), M.B. does not contend that translation or interpreter services were requested and denied.   (*Id.*)   Rather, M.B. explains that she chose to seek assistance from a bunkmate to understand the document (*id.* ¶ 16), which apparently sufficed as M.B. describes in detail the content of the denial letter.   (*Id.* ¶¶ 16-17)

     **v.**       **Record Keeping**

Plaintiffs cite two "anecdotes" that they say demonstrate a failure to comply with paragraph 8.10 of the Parole Directive, which identifies certain material that should be placed in the alien's A-file.   (Pl. Mem. at 12) These anecdotes described two alleged instances where parole request information was allegedly submitted and lost by ICE.   (*Id.*)   These allegations exceed the scope of this lawsuit and, in any event, fail to demonstrate non-compliance given the volume of parole requests that have been processed since the Court's September 5, 2019 order.

    **C.  Plaintiffs Arguments Regarding Substantive Non-Compliance Are Misplaced.**

Plaintiffs also make a series of arguments that ICE is not complying with the "substantive" provisions of the Parole Directive.   These arguments are thinly veiled attempts to litigate the outcome of individual parole determinations, something this Court has repeatedly recognized is outside the scope of its jurisdiction.   All such arguments should be summarily rejected.

First, Plaintiffs contend that "[c]lass members and legal representatives report that NOLA ICE is not properly weighing "serious medical conditions" and "public interest" when reviewing parole requests, particularly in light of the COVID-19 pandemic and the serious health risks it presents to those detained in the NOLA region."   (Pl. Mem. at 12-13)   The weighing of such factors is a matter entirely within ICE's discretion.   *See Damus v. Nielsen,* 313 F. Supp. 3d 317, 327 (D.D.C. 2018) ("[t]o the extent Plaintiffs are challenging the [parole] determinations themselves – i.e., the actual balancing of the merits of each application for parole – this Court agrees that it lacks jurisdiction").   Accordingly, Plaintiffs cannot base a contempt motion on

their belief that ICE has failed to properly weigh applicable factors in any individual parole determination.

Relatedly, Plaintiffs contend that "[l]egal advocates for class members report submitting thorough parole requests with extensive supplementary documentation and receiving boilerplate denial letters in response that suggest the evidence submitted was not taken into consideration by NOLA ICE."   (Pl. Mem. at 13)   By this allegation, Plaintiffs appear to be challenging both ICE's discretionary decisionmaking (addressed above) as well as ICE's use of a form letter, Notification Declining to Grant Parole, on which the relevant basis for denial are checked (i.e., flight risk, failure to establish identity, danger to the community, or other factors) with a brief explanation for that basis.   (Hartnett Decl. ¶ 18)   Plaintiffs contend that instead ICE is required by the Parole Directive to provide more detailed, "individualized reasons" for the denial decision and the failure to do so indicates a lack of consideration of the request.   (Pl. Mem. at 13)

The Court's preliminary injunction order, however, does not "clearly and unambiguously" prohibit the use of such form letters and, accordingly, this argument cannot be a basis for a contempt motion.   The Parole Directive requires that ICE provide arriving aliens who are denied parole a "brief explanation of the reasons for the decision to deny parole."   (Parole Directive, at § 6.5)   The denial letter used by the New Orleans Field Office does so, indicating the specific reason or reasons – flight risk, danger, etc. – that parole was denied in a particular arriving alien's case.   (*e.g.,* ECF No. 74-41 to 74-71)   Plaintiffs believe that the denial letters should include more information than they do. However, Plaintiffs' belief about what the denial letters should include is not based on any actual requirements under the Parole Directive or this Court's September 5, 2019 order, which requires ICE to provide provisional class members with

parole determinations that "conform to all of the substantive and procedural requirements" of the Parole Directive.   However, the Parole Directive does not clearly and unambiguously require an explanation beyond the one offered in the form letters that are utilized.

Plaintiffs' related contention – that ICE fails "to provide clarity on what supporting documents or underlying factors would sufficiently satisfy NOLA ICE that they are not flight risks" – fails for the same reason.   (Pl. Mem. at 14)   There is no such requirement in the Parole Directive.   Accordingly, because ICE is not violating any provision of the Parole Directive by utilizing a form letter to explain the basis for denials, and Plaintiffs' other arguments regarding the "substantive" provisions of the Parole Directive implicate matters outside this Court's jurisdiction, Plaintiffs' contention of non-compliance on these grounds should be rejected.

### III.     The Court Should Deny The Request For Expedited Discovery And For Appointment Of A Special Master

Plaintiffs make sweeping allegations of non-compliance but, absent supporting evidence, those allegations have no legal significance.   As discussed above, such evidence is lacking. The assertions in Plaintiffs' brief are not supported by the cited evidence, mischaracterize the provisions of the Parole Directive, and seek to expand the scope of this lawsuit well beyond the narrow issues that have been pled by implicitly challenging the outcome of parole decisions and delving into discrete matters of parole procedure not previously raised.

Because this is a motion for contempt, Plaintiffs can be entitled to relief only if Defendants have been shown to have violated a clear and unambiguous provision of a court order.   No such showing has been made.   For the last several months, ICE's monthly reports reflect a grant rate approaching 30 percent, and, beyond that, Plaintiffs' own evidence demonstrates that individualized parole determinations are occurring.   Out of the approximately

43

2400 parole determinations that have been made since this Court's September 5, 2019 order, Plaintiffs base their motion on a handful of examples, most of which are easily rebutted or relate to events occurring months ago.   Plaintiffs profess that they do not move for contempt "lightly," but their attempt to rest a contempt motion on the thinnest of grounds demonstrates otherwise.

Moreover, for the same reason, Plaintiffs have failed to establish a need for expedited discovery under either of the standards that they cite, whether it is the standard in *Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y. 1982) or the "reasonableness" test in *In re Fannie Mae Derivative Lit.*, 227 F.R.D. 142 (D.D.C. 2005).   The limited issues that Plaintiffs identify, even if they could be credited by the Court (which Defendants dispute as discussed above), fail to rise to the level of irreparable harm needed to support expedited discovery nor are they reasonably correlated to the expansive discovery that Plaintiffs outline in their motion, which would be unduly burdensome on the agency if permitted.

For all of these reasons, the Court thus should not order expedited discovery or appoint a special master.   The Court instead should deny the motion and set a schedule for Defendants to move for summary judgment.   Alternatively, to the extent the Court considers some discovery to be appropriate, it should be narrowly tailored to the specific issue of alleged non-compliance that the Court finds to warrant such discovery.   The wide-ranging discovery that Plaintiffs request should be rejected in all events.   This remains an APA case where discovery is disfavored. Allowing Plaintiffs to engage in a fishing expedition would be unduly burdensome on an agency whose resources already are strained and divert personnel from the agency's mission.

44

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. BAR # 924092
Civil Chief

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendants