UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGEL ALEJANDRO HEREDIA MONS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHAD WOLF, Acting Secretary of the Department of Homeland Security, *et al.*, <br><br> Defendants. | Civil Action No. 19-1593 (JEB) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are members of a provisionally certified class of asylum-seekers detained by Immigration and Customs Enforcement at its New Orleans Field Office. In bringing suit, they alleged that the Office has subjected them to systematic detention in violation of ICE's 2009 "Parole Directive," which governs detention policy and sets forth procedural requirements for determining whether an asylum-seeker is eligible for pre-hearing release on parole. Finding that Plaintiffs were reasonably likely to succeed on that claim, this Court last September granted a preliminary injunction requiring that Defendants comply with the Directive. See Heredia Mons v. McAleenan, No. 19-1593, 2019 WL 4225322, at *11–12 (D.D.C. Sept. 5, 2019). Believing that the New Orleans Field Office is not following that injunction, Plaintiffs now return to court seeking discovery regarding the Office's compliance, a potential finding of contempt, and an appointment of a Special Master. As they have raised a sufficient question of noncompliance, the Court will grant their Motion in part and permit limited discovery.

**I.      Background**

The background of this case is set forth in this Court's prior injunction Opinion. See

1

Heredia Mons, 2019 WL 4225322.  Stated briefly, the Immigration and Nationality Act and accompanying regulations permit the Secretary of Homeland Security, under whom ICE operates, to temporarily parole non-citizens applying for asylum who are "neither a security risk nor a risk of absconding," in the service of such "urgent humanitarian reasons or significant public benefit."  Id. at *1 (quoting 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b)).  The Directive sets out procedural requirements for assessing whether individual applicants should be released.  It provides that, if an asylum-seeker has established her identity and that she is neither a flight risk nor a risk to the public, detention is not in the public interest and parole should be granted between the non-citizen's credible-fear determination — the first step in gaining asylum status — and the full hearing.  Id. at *2; see ICE Directive No. 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).  The Directive also requires that ICE make an individualized parole determination, provide a written notice of the parole process in a language the asylum-seeker understands, grant a parole interview within seven days, and offer a "brief explanation" of its decision.  Heredia Mons, 2019 WL 4225322, at *2.

In arguing that Defendants are no longer following the Directive, Plaintiffs contrasted the New Orleans Field Office's 75.5% parole-grant rate in 2016 with the Office's 82%, 98.5%, and 100% denial rates in 2017, 2018, and the first seven months of 2019, respectively.  Id. at *10. Plaintiffs also submitted a host of declarations from asylum-seekers and their advocates alleging "myriad violations" of the Directive's various requirements.  Id.  Based on that evidence, the Court granted their request for a preliminary injunction.  Id. at *11–12.  It accordingly issued an Order requiring, *inter alia*, that "Defendants . . . [not] deny[] parole to any provisional class members absent an individualized determination"; that such determinations of flight risk and

danger "shall be based on the specific facts of each provisional class member's case"; and that Defendants "conform to all of the substantive and procedural requirements" of the Directive. See ECF No. 33 (Order), ¶¶ 3–5.  In order to monitor ICE's compliance, the Court subsequently ordered it to produce monthly reports containing parole determination data from the New Orleans Field Office.  See Minute Order (10/7/2019).

The Court's intervention notwithstanding, Plaintiffs now contend that Defendants are flouting the injunction.  Citing ICE's own statistics and a renewed set of declarations from asylum-seekers and practitioners, Plaintiffs filed a lengthy Motion seeking an order from this Court holding Defendants in contempt, permitting them limited discovery, and appointing a Special Master to ensure compliance.  See ECF No. 76 (Pl. Mot.) at 1.  On July 17, 2020, the Court held a hearing at which Plaintiffs ultimately indicated their desire to obtain limited discovery in advance of a potential future evidentiary hearing on their Motion for Contempt.  See Minute Entry (7/17/2020); see also Pl. Mot. at 39–40 (explaining that discovery will "enable the Court and the Parties to identify the exact processes and procedures that Defendants are implementing to comply with the Court's Order, and the areas where compliance is lacking").

**II.    Analysis**

This Court has had previous occasion to determine the availability of discovery in a situation bearing a close resemblance to this one.  In Damus v. Nielsen, 313 F. Supp. 3d 317 (D.D.C. 2018), it issued a preliminary injunction requiring that ICE officials at five Field Offices (other than New Orleans) comply with the Directive.  Id. at 323.  The plaintiffs there returned to court in the months after that Order, citing evidence of the defendants' noncompliance and seeking discovery to monitor and asses future compliance.  Damus v. Nielsen, 328 F.R.D. 1, 2 (D.D.C. 2018).

3

The Court explained that it had the authority to order limited discovery "as part of its inherent power to enforce its judgments," and that "it is clear that 'appropriate discovery should be granted' where 'significant questions regarding noncompliance [with a court order] have been raised.'"  Id. at 3 (quoting Cal. Dep't of Social Servs. v. Leavitt, 523 F.3d 1025, 1033–34 (9th Cir. 2008)).  Other courts have similarly held.  See, e.g., Fraihat v. U.S. Immigr. & Customs Enf't, No. 19-1546, 2020 WL 2758553, at *4–5 (C.D. Cal. May 15, 2020) (ordering limited discovery when plaintiffs' evidence raised "significant questions" regarding defendants' compliance with preliminary injunction); Abdi v. McAleenan, No. 17-721, 2019 WL 1915306, at *3 (W.D.N.Y. Apr. 30, 2019) (granting discovery pursuant to court's "inherent authority to monitor and enforce its prior orders" where plaintiffs presented evidence of Government's noncompliance with preliminary injunction); Palmer v. Rice, 231 F.R.D. 21, 25 (D.D.C. 2005) (allowing discovery where, "without [it], plaintiffs will not be able to determine whether the government has complied with the court's injunctions").

Applying these principles to this case, the Court reaches the same conclusion as in Damus: Plaintiffs have sufficiently raised significant questions of Defendants' noncompliance so as to warrant limited discovery.  In the roughly seven months following this Court's Order on September 5, 2019, the New Orleans Field Office granted approximately 13.5% of total parole applications.  See ECF No. 74 (Pl. Mot.), Exh. 1D.  That figure stands in stark contrast to the aforementioned 75.5% grant rate in 2016.  Id., Exh. 1A.  Defendants acknowledge this disparity but repeatedly insist that the "relevant" time period for assessing their compliance starts in late January 2020, when they report an overall grant rate generally hovering between 20% and 30% for four consecutive months.  See ECF No. 82 (Def. Opp.) at 5, 9, 17, 23, 34; id. at 9–10 (citing data).  Defendants offer no compelling reason why the Court should discount the full range of

4

data from the months following its Order, given that the Court did nothing more than instruct them to adhere to a policy they "purport[ed] to already be following." Heredia Mons, 2019 WL 4225322, at *1. At any rate, although Defendants' preferred figures represent an improvement over the grant rate immediately prior and subsequent to this Court's Order, see Pl. Mot., Exhs. 1B, 1I, they remain a far cry from 2016 levels. And while Defendants invoke a "sustained increase in the parole grant rate" as evidence of a "favorable statistical trend," Def. Opp. at 9, 11, the most recent figures seem to buck it: Defendants' latest data filing, which postdated their Opposition brief by a single week, relates a total grant rate of just 15% in the most recent month-long reporting period. See ECF No. 83 (June 23, 2020, Status Report) at 1–2.

In addition to this troubling dataset, Plaintiffs offer affidavits from detainees and practitioners to "substantiate their claim that asylum-seekers continue to be summarily detained as flight risks without the required individualized analysis." Damus, 328 F.R.D. at 4. As part of that showing, they cite evidence of prospective parolees receiving form denial letters seemingly devoid of any individualized process. See Pl. Mot., Exh. 2 (Declaration of K.S.R.), ¶¶ 7–8, 10, 17–18; Exh. 3 (Declaration of Y.P.T.), ¶¶ 10, 13–14; Exh. 6 (Declaration of D.A.A.), ¶ 7; Exh. 7 (Declaration of L.P.C.), ¶¶ 9, 14; Exh. 8 (Declaration of Y.M.T.), ¶¶ 6, 9–10; Exh. 9 (Declaration of Y.C.F.), ¶ 6; Exh. 10 (Declaration of R.C.L.), ¶¶ 16–17; Exh. 12 (Declaration of C.L.H.), ¶¶ 5–8; Exh. 14 (Declaration of Kari Ann Fonte), ¶ 2(d); Exh. 15 (Declaration of Peter M. Isbister), ¶¶ 12–13; Exh. 16 (Declaration of Joseph Giardina), ¶¶ 2(5), 5. Plaintiffs also submit evidence that Defendants are failing to comply with a host of the Directive's procedural requirements. To name a few: they contend that ICE officials neglect to explain the contents of parole documents in a language that asylum-seekers understand, see Y.P.T. Decl., ¶ 9; Pl. Mot., Exh. 11 (Declaration of M.B.), ¶¶ 6, 8; C.L.H. Decl., ¶ 6, and they maintain that some applicants either

do not receive written notification of parole decisions or are not offered necessary translation services. See Y.P.T. Decl., ¶ 14; R.C.L. Decl., ¶ 14; M.B. Decl., ¶¶ 16–18; C.L.H. Decl., ¶¶ 6, 16–17.

Resisting this trove of evidence, Defendants primarily argue that rising grant rates, along with several specific parole grants, establish that "individualized parole determinations are occurring" in ICE facilities. See Def. Opp. at 12; see also id. at 3 (citing four parole grants). This misses the point. Plaintiffs do not dispute that "recent data show some individualized parole determinations are occurring," and they acknowledge that "the Directive is not being completely ignored." ECF No. 84 (Pl. Reply) at 10. What Plaintiffs instead understandably object to is the abundant evidence suggesting Defendants are not providing many parole applicants — let alone every applicant, as required by the Directive — an individualized determination of parole eligibility. See Parole Directive, ¶ 6.2. Defendants also take issue with Plaintiffs' anecdotal evidence, variously contesting the accuracy and reliability of individual declarations. See Def. Opp. at 28–41. To obtain discovery, however, Plaintiffs need only raise "significant questions" regarding Defendants' compliance, as opposed to actually establishing noncompliance itself. Damus, 328 F.R.D. at 4; see Leavitt, 523 F.3d at 1034 ("[T]he kind and amount of evidence of noncompliance required to justify discovery is, necessarily, considerably less than that needed to show actual noncompliance."). The Court finds that Plaintiffs have made that lesser showing. It leaves questions surrounding the greater for another day.

Finally, Defendants assert, without elaboration, that any discovery would be "unduly burdensome." Def. Opp. at 44. But that concern goes to the scope of discovery, rather than its propriety in the first place. As in Damus, the Court will not grant Plaintiffs unfettered access to Agency records and decisionmakers. See 328 F.R.D. at 5. Indeed, it has previously emphasized

6

that any discovery will be appropriately "limited."  See ECF No. 55 (Jan. 29, 2020, Order) at 2.

### III.     Conclusion

For the foregoing reasons, the Court ORDERS that:

1. Plaintiffs' Motion for an Order to Show Cause, Expedited Discovery, and Appointment of a Special Master is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.  The Motion is granted with respect to Plaintiffs' request for limited discovery, and it is denied without prejudice in all other respects, to be renewed following discovery and a potential hearing on Defendants' violations;

2. Defendants' Motion to Strike or, Alternatively, for Leave to File a Sur-Reply is DENIED;

3. The parties shall confer regarding the proposed scope of discovery, and they shall submit a joint status report by July 22, 2020, regarding such proposed discovery and any related disputes; and

4. The parties shall appear for a further telephonic hearing on July 23, 2020, at 3:00 p.m.

**SO ORDERED.**

                                            */s/ James E. Boasberg*
                                            JAMES E. BOASBERG
                                            United States District Judge

Date:  July 22, 2020