# Exhibit 1

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture**

| | |
|---|---|
| **DISTRIBUTION:** | ICE |
| **DIRECTIVE NO.:** | 11002.1 |
| **ISSUE DATE:** | December 8, 2009 |
| **EFFECTIVE DATE:** | January 4, 2010 |
| **SUPERSEDES:** | See section 3. |
| **FEA NUMBER:** | 601-05 |

1.   **PURPOSE.** The purpose of this ICE policy directive is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States. This directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge of the Executive Office for Immigration Review. This directive establishes a quality assurance process that includes record-keeping requirements to ensure accountability and compliance with the procedures set forth herein.

1.1.   This directive does not apply to aliens in DRO custody under INA § 236. This directive applies only to arriving aliens who have been found by USCIS or an immigration judge to have a credible fear of persecution or torture.

2.   **AUTHORITIES/REFERENCES.**

2.1.   INA §§ 208, 212(d)(5), 235(b), and 241(b)(3); 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ 1.1(q), 208.30(e)-(f), 212.5 and 235.3.

2.2.   Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Custom Enforcement" (Nov. 13, 2004).

2.3.   ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3.   **SUPERSEDED POLICIES AND GUIDANCE.** The following ICE directive is hereby superseded:

3.1.   ICE Policy Directive No. 7-1.0, "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture" (Nov. 6, 2007).

4.    **BACKGROUND.**

4.1.   Arriving aliens processed under the expedited removal provisions of INA §235(b) may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an immigration judge a credible fear of persecution or torture.

4.2.   Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(1)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have a credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

4.3.   The applicable regulations describe five categories of aliens who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk:  (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest.  *See* 8 C.F.R. § 212.5(b).  *But compare* 8 C.F.R. § 235.3(b)(4)(ii) (stating that arriving aliens who have not been determined to have a credible fear will not be paroled unless parole is necessary in light of a "medical emergency or is necessary for a legitimate law enforcement objective").

4.4.   While the first four of these categories are largely self-explanatory, the term "public interest" is open to considerable interpretation.  This directive explains how the term is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear.  The directive also mandates uniform record-keeping and review requirements for such decisions.  Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion.

5.    **DEFINITIONS:**

5.1.   **Arriving Alien.**  For purposes of this directive, "arriving alien" has the same definition as provided for in 8 C.F.R. § 1.1(q) and 1001.1(q).

5.2.   **Credible Fear.**  For purposes of this directive, with respect to an alien processed under the INA § 235(b) "expedited removal" provisions, "credible fear" means a finding by USCIS or an immigration judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts

2

as are known to the interviewing USCIS officer or immigration judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(b)(3), or protection from removal under the Convention Against Torture.

5.3.    **Parole.** For purposes of this directive, "parole" is an administrative measure used by ICE to temporarily authorize the release from immigration detention of an inadmissible arriving alien found to have a credible fear of persecution or torture, without lawfully admitting the alien. Parole does not constitute a lawful admission or a determination of admissibility, *see* INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, *see* 8 C.F.R. § 212.5(d). By statute, parole may be used, in the discretion of ICE and under such conditions as ICE may prescribe, only for urgent humanitarian reasons or for significant public benefit. As interpreted by regulation, "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth in 8 C.F.R. § 212.5(b) and listed in paragraph 4.3 of this directive, including the general category of "aliens whose continued detention is not in the public interest."

6.    **POLICY.**

6.1.    As soon as practicable following a credible fear determination by USCIS for an arriving alien detained by DRO, DRO shall provide the alien with the attached *Parole Advisal and Scheduling Notification*. This form informs the alien that he or she will be interviewed for potential parole from DRO custody and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole. The contents of the notification shall be explained to such aliens in a language they understand. In determining whether detained arriving aliens found to have a credible fear should be paroled from custody, DRO shall proceed in accordance with the terms of this directive.

6.2.    Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case. However, when an arriving alien found to have a credible fear establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described in paragraph 8.3 of this directive), parole the alien on the basis that his or her continued detention is not in the public interest. DRO Field Offices shall uniformly document their parole decision-making processes using the attached *Record of Determination/Parole Determination Worksheet*.

6.3.    Consistent with the terms of this directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in sections 7 and 8 of this directive.

3

6.4.    In conducting parole determinations for arriving aliens in custody after they are found to have a credible fear of persecution or torture, DRO shall follow the procedures set forth in section 8 of this directive.

6.5.    DRO shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole.  When DRO denies parole under this directive, it should also advise the alien that he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.  DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language.

6.6.    Written notifications of parole decisions shall be provided to aliens subject to this directive and, if represented, their representative within seven days of the date an alien is initially interviewed for parole or the date the alien requests a parole redetermination, absent reasonable justification for delay in providing such notification.

6.7.    A decision to grant or deny parole shall be prepared by a DRO officer assigned such duties within his or her respective DRO Field Office.  The decision shall pass through at least one level of supervisory review, and concurrence must be finally approved by the Field Office Director (FOD), Deputy FOD (DFOD), or Assistant FOD (AFOD), where authorized by the FOD.

7.    **RESPONSIBILITIES.**

7.1.    The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a credible fear of persecution or torture.

7.2.    The **DRO Assistant Director for Operations** is responsible for:

1) Ensuring considered, consistent DRO parole decision-making and recordkeeping nationwide in cases of arriving aliens found to have a credible fear;

2) Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

3) Overseeing an effective national quality assurance program that monitors the Field Offices to ensure compliance with this directive.

7.3.    **DRO Field Office Directors** are responsible for:

1) Implementing this policy and quality assurance processes;

4

2) Maintaining a log of parole adjudications for credible fear cases within their respective geographic areas of responsibility, including copies of the *Record of Determination/Parole Determination Worksheet*;

3) Providing monthly statistical reports on parole decisions for arriving aliens found to have a credible fear;

4) Making the final decision to grant or deny parole for arriving aliens found to have a credible fear within their respective areas of responsibility or, alternatively, delegating such responsibility to their DFODs or AFODs (in which case, FODs nevertheless retain overall responsibility for their office's compliance with this directive regardless of delegating signatory responsibility to DFODs or AFODs); and

5) Ensuring that DRO field personnel within their respective areas of responsibility who will be assigned to make parole determinations are familiar with this directive and corresponding legal authorities.

7.4.    **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.5.    **Assistant Field Office Directors** are responsible for reviewing, and forwarding for their respective DFODs' or FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture.  Alternatively, AFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.6.    As applicable, **DRO field personnel** so assigned by their local chains-of-command are responsible for providing detained arriving aliens found to have a credible fear with the attached *Parole Advisal and Scheduling Notification* and for fully and accurately completing the attached *Record of Determination/Parole Determination Worksheet* in accordance with this directive and corresponding legal authorities.

## 8.    PROCEDURES.

8.1.    As soon as practicable following a finding that an arriving alien has a credible fear, the DRO Field Office with custody of the alien shall provide the attached *Parole Advisal and Scheduling Notification* to the alien and explain the contents of the notification to the alien in a language he or she understands, through an interpreter if

5

necessary. The Field Office will complete the relevant portions of the notification, indicating the time when the alien will receive an initial interview on his or her eligibility for parole and the date by which any documentary evidence the alien wishes considered should be provided, as well as instructions for how any such information should be provided.

8.2     Unless an additional reasonable period of time is necessary (e.g., due to operational exigencies or an alien's illness or request for additional time to obtain documentation), no later than seven days following a finding that an arriving alien has a credible fear, a DRO officer familiar with the requirements of this directive and corresponding legal authorities must conduct an interview with the alien to assess his or her eligibility for parole. Within that same period, the officer must complete the *Record of Determination/Parole Determination Worksheet* and submit it for supervisory review. If the officer concludes that parole should be denied, the officer should draft a letter to this effect for the FOD's, DFOD's, or AFOD's signature to be provided to the alien or the alien's representative and forward this letter for supervisory review along with the completed *Record of Determination/Parole Determination Worksheet*. The letter must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request redetermination of parole based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.

8.3.    An alien should be paroled under this directive if DRO determines, in accordance with paragraphs (1) through (4) below, that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien.

    1) Identity.

        a) Although many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation, asylum-related fraud is of genuine concern to ICE, and DRO must be satisfied that an alien is who he or she claims to be before releasing the alien from custody.

        b) When considering parole requests by an arriving alien found to have a credible fear, Field Office personnel must review all relevant documentation offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity.

        c) If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should ask whether the alien can obtain government-issued documentation of identity.

6

d) If the alien cannot reasonably provide valid government-issued evidence of identity (including because the alien reasonably does not wish to alert that government to his or her whereabouts), the alien can provide for consideration sworn affidavits from third parties. However, third-party affiants must include copies of valid, government issued photo-identification documents and fully establish their own identities and addresses.

e) If government-issued documentation of identity or third-party affidavits from reliable affiants are either not available or insufficient to establish the alien's identity on their own, Field Office personnel should explore whether the alien is otherwise able to establish his or her identity through credible statements such that there are no substantial reasons to doubt the alien's identity.

2) Flight Risk.

a) In order to be considered for release, an alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required.

b) Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien.

c) Field Office personnel shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so.

d) Officers should exercise their discretion to determine what reasonable assurances, individually or in combination, are warranted on a case-by-case basis to mitigate flight risk. In any event, the alien must be able to provide an address where he or she will be residing and must timely advise DRO of any change of address.

3) <u>Danger to the Community</u>.

    a) In order for an alien to be considered for parole, Field Office personnel must make a determination whether an alien found to have a credible fear poses a danger to the community or to U.S. national security.

    b) Information germane to the determination includes, but is not limited to, evidence of past criminal activity in the United States or abroad, of activity contrary to U.S. national security interests, of other activity giving rise to concerns of public safety or danger to the community (including due to serious mental illness), disciplinary infractions or incident reports, and any criminal or detention history that shows that the alien has harmed or would likely harm himself or herself or others.

    c) Any evidence of rehabilitation also should be weighed.

4) <u>Additional Factors</u>.

    a) Because parole remains an inherently discretionary decision, in some cases there may be exceptional, overriding factors that should be considered in addition to the three factors discussed above. Such factors may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests.

    b) Field Office personnel may consider such additional factors during the parole decision-making process.

8.4.    Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5.    After preparing and signing the *Record of Determination/Parole Determination Worksheet*, and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence.

8.6.    Upon his or her concurrence, the first-line supervisor shall sign the *Record of Determination/Parole Determination Worksheet* where indicated and forward it, along with any related documentation, to the FOD (or, where applicable, the DFOD or AFOD) for final approval.

8.7.    The FOD (or, where applicable, the DFOD or AFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and

8

either grant or deny parole by signing the *Record of Determination/Parole Determination Worksheet* where indicated and, in the case of a denial, signing the written response to the alien.

8.8.   Following a final decision by the FOD to deny parole (or, where applicable, the DFOD or AFOD), the Field Office shall provide the written response to the alien or, if represented, to the alien's legal representative, indicating that parole was denied. If parole is granted, the Field Office shall provide the alien with a date-stamped I-94 Form bearing the following notation: **"Paroled under 8 C.F.R. § 212.5(b). Employment authorization not to be provided on this basis."**

8.9.   If an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office may, in its discretion, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.

8.10.   The supporting documents and a copy of the parole decision sent to the alien (if applicable), the completed *Record of Determination/Parole Determination Worksheet*, and any other documents related to the parole adjudication should be placed in the alien's A-file in a record of proceeding format. In addition, a copy of the *Record of Determination/Parole Determination Worksheet* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

8.11.   On a monthly basis, FODs shall submit reports to the Assistant Director for Operations, or his or her designee, detailing the number of parole adjudications conducted under this directive within their respective areas of responsibility, the results of those adjudications, and the underlying basis of each Field Office decision whether to grant or deny parole. The Assistant Director for Operations, or his or her designee, in conjunction with appropriate DRO Headquarters components, will analyze this reporting and collect individual case information to review in more detail, as warranted. In particular, this analysis will rely on random sampling of all reported cases for in-depth review and will include particular emphasis on cases where parole was not granted because of the presence of additional factors, per paragraph 8.3(4) of this directive. Any significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action.

8.12.   At least once every six months, the Assistant Director for Operations, or his or her designee, shall prepare a thorough and objective quality assurance report, examining the rate at which paroled aliens abscond and the Field Offices' parole decision-making, including any noteworthy trends or corrective measures undertaken based upon the monthly quality assurance analysis required by paragraph 8.11 of this directive.

9.   **ATTACHMENTS.**

   - *Parole Advisal and Scheduling Notification.*
   - *Record of Determination/Parole Determination Worksheet.*

10.   **NO PRIVATE RIGHTS CREATED.** This directive is an internal policy statement of ICE. It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:**

John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

10

# Exhibit 2



## Motion to Unseal in Case No: 1:19-cv-01593

**Luz Lopez** <luz.lopez@splcenter.org>                    Mon, Aug 17, 2020 at 5:12 PM
To: Victoria Baranetsky <vbaranetsky@revealnews.org>
Cc: Rachel Brooke <rbrooke@revealnews.org>, Mich Gonzalez <mich.gonzalez@splcenter.org>, Victoria Mesa
<victoria.mesa@splcenter.org>, Bruce Hamilton <bhamilton@laaclu.org>

Good evening,

Our clients do not oppose your motion, provided that you redact any personally identifying information before publicizing the reports, should the court grant your motion.

Thank you for reaching out, and please keep us posted.

Best,

Luz

On Aug 17, 2020, at 6:57 PM, Victoria Baranetsky <vbaranetsky@revealnews.org> wrote:

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Counsel,

One last question: I will be filing a pro hac vice motion to counsel in this case. Can you please tell me whether your clients would oppose that motion?

Thank you for your attention to this matter.

Kind regards,

On Mon, Aug 17, 2020 at 12:44 PM Victoria Baranetsky <vbaranetsky@revealnews.org> wrote:
Dear Counsel,

My name is Victoria Baranetsky, general counsel for the nonprofit investigative newsroom Reveal from The Center for Investigative Reporting. I'm contacting you about your case *Heredia Mons*, No: 1:19-cv-01593. As you may know, our reporter, Laura Morel, is working on a story involving the monthly reports filed under seal by the government.

We are preparing to file a motion to unseal by the end of this week. We clarify in the motion that the records should be unsealed according to the First Amendment right of access, with the exception of the A-numbers and personally identifying information.

If you could please let me know by EOD if you oppose. I appreciate your attention to this matter.

With care,
Victoria
--
Victoria D. Baranetsky
General Counsel
**(w)** 510-982-2890

# Exhibit 3



## Fwd: Unsealing Motion in HEREDIA MONS v. MCALEENAN (1:19-cv-01593)

---------- Forwarded message ----------
From: **Simon, Jeremy (USADC)** <Jeremy.Simon@usdoj.gov>
Date: Fri, Jul 17, 2020 at 6:01 AM
Subject: RE: Unsealing Motion in HEREDIA MONS v. MCALEENAN (1:19-cv-01593)
To: Victoria Baranetsky <vbaranetsky@revealnews.org>

Ms. Baranetsky,

Thank you for the email.   In the event you file a motion to unseal, please note in the motion that Defendants oppose the request to unseal and will take a further position after having an opportunity to review the motion as filed.

Thank you.

Jeremy Simon

**From:** Victoria Baranetsky <vbaranetsky@revealnews.org>
**Sent:** Monday, July 13, 2020 5:51 PM
**To:** Simon, Jeremy (USADC) <JSimon@usa.doj.gov>
**Subject:** Re: Unsealing Motion in HEREDIA MONS v. MCALEENAN (1:19-cv-01593)

Dear Mr. Simon,

I'm looping back around once more on this. Would the government consider unsealing in this case, with obvious redactions in place to protect persons' privacy?

Please let me know.

Victoria

On Thu, Jun 25, 2020 at 3:06 PM Victoria Baranetsky <vbaranetsky@revealnews.org> wrote:

> Dear Mr. Simon,
>
> My name is Victoria Baranetsky, general counsel for the nonprofit investigative newsroom Reveal from The Center for Investigative Reporting. I'm contacting you about your case No: 1:19-cv-01593  Our reporter is working on a story involving this case and interested in several of the records on the docket filed under seal. We are prepared to file a motion to unseal but would like to meet and confer and see if there is another resolution. Perhaps we could discuss whether there is a way to release the records under seal with redactions - without filing a motion.
>
> In other cases we have found conversations to be especially productive and useful rather than engaging in protracted litigation.
>
> I appreciate your attention to this matter in advance.
>
> With care,
> Victoria--
>
> Victoria D. Baranetsky
>
> General Counsel
>
> **(w)** 510-982-2890
>
> **(c)** 201-306-4831
>
> **PGP** EA48 1FB7 98E3 156E 3AFF  6748 F7B1 8B23 0838 D7F5

--

Victoria D. Baranetsky

General Counsel

**(w)** 510-982-2890

**(c)** 201-306-4831

**PGP** EA48 1FB7 98E3 156E 3AFF  6748 F7B1 8B23 0838 D7F5

[Quoted text hidden]

# Exhibit 4

AY! (HTTPS://CHECKOUT.FUNDJOURNALISM.ORG/MEMBERFORM?ORG_ID=CIR&AMOUNT=9&INSTALLMENTPERIOD=MONTHLY&CAMPAIGN=7011



(https://revealnews.org/)

# About Us

**OUR MISSION**

**We engage and empower the public through investigative journalism and groundbreaking storytelling that sparks action, improves lives and protects our democracy.**

(https://www.revealnews.org/wp-content/uploads/2015/01/426.gif)





Founded in 1977 as the nation's first nonprofit investigative journalism organization, The Center for Investigative Reporting has developed a reputation for being among the most innovative, credible and relevant media organizations in the country.

Reveal – our website, public radio program, podcast and social media platform – is where we publish our multiplatform work.

Our award-winning journalists hold the powerful accountable and reveal government fraud and waste of taxpayer funds, human rights violations, environmental degradation and threats to public safety. We consistently shine a bright light on injustice and protect the most vulnerable in our society.

From the San Francisco Bay Area epicenter of technological and creative innovation, our reporting ignites real-world change as evidenced by civil and criminal investigations, new laws and policies, the instigation of public discourse and solutions-oriented community action.

CIR is nationally respected for setting the highest journalistic standards, and for our signature approach to investigative reporting and collaboration. We partner with numerous other media organizations, prioritize impact over exclusivity, engage with the public and track results. To reach a broad and diverse audience worldwide, we publish our stories online, as well as for print, television, radio/audio, video and live events.

With PRX, CIR co-produces the nationally distributed "Reveal" radio show and podcast. "Reveal" features CIR's reporting, as well as stories from public radio stations and a wide range of media partners, both nonprofit and commercial.

Our work has been recognized for its excellence, groundbreaking creativity and impact. Recent awards include: News Emmy awards, a George Foster Peabody Award, a Webby award, a Military Reporters and Editors Award, a Barlett & Steele Gold Award for investigative business journalism, a Robert F. Kennedy Award, Alfred I. duPont-Columbia University awards, a George Polk Award, a Sigma Delta Chi award, IRE Awards for multiplatform journalism and an Edward R. Murrow Award for investigative reporting. We were a finalist for the Pulitzer Prize in 2012, 2013 and 2018, an Academy Award nominee in 2018, and a recipient of the 2012 MacArthur Award for Creative and Effective Institutions.

## EDITORIAL INDEPENDENCE POLICY

We subscribe to standards of editorial independence adopted by the Institute for Nonprofit News.

Our organization retains full authority over editorial content, maintaining a firewall between news coverage decisions and the pursuit of revenue. Accepting financial support does not constitute implied or actual endorsement of donors or their products, services or opinions.

We accept gifts, grants and sponsorships from individuals and organizations for the general support of our activities, but all editorial decisions are made independently, not on the basis of donor support. At times, we accept support for coverage of particular topics, but those topics are determined by our editorial staff, and we maintain full editorial control of the resulting coverage. Donors receive no preferential coverage, have no right to review editorial content before it is published and do not influence the direction or findings of our reporting in any way.

We do not accept donations from government entities, political parties, elected officials or candidates actively seeking public office, nor do we accept donations from sources who our board of directors deem could present a conflict of interest with our work or compromise our editorial independence. **(Update – April 22, 2020: After careful consideration, CIR applied for and received a forgivable loan through the Small Business Administration's Payroll Protection Program. We will update this policy to reflect that decision by the end of April.)**

The Center for Investigative Reporting is a registered 501(c)3 tax-exempt organization, Fed ID #94-2434026. Your gift is tax-deductible to the extent allowed by law. No goods or services are provided in exchange for your contribution.

ABOUT US

Our Mission (https://revealnews.org/about-us/)

Our Staff (https://revealnews.org/staff/)

Board and Advisors (https://revealnews.org/board/)

Awards (https://revealnews.org/awards/)

Impact (https://revealnews.org/about-us/impact-resources/)

Job Opportunities (https://revealnews.org/job-opportunities/)

Investigative Fellowships (https://revealnews.org/local/reveal-investigative-fellowships/)

Media Center (https://www.revealnews.org/press/)

# Exhibit 5

PROFILES MARCH 2, 2020 ISSUE

# HOW STEPHEN MILLER MANIPULATES DONALD TRUMP TO FURTHER HIS IMMIGRATION OBSESSION

*Donald Trump's senior adviser has been the true driving force behind this Administration's racist agenda. How far will he go?*

**By Jonathan Blitzer**

February 21, 2020



*Miller's obsession with restricting immigration and punishing immigrants has come to define Trump's Administration.* Illustration by Barry Blitt

0:00 / 54:15

**Audio:** Listen to this article. To hear more, download Audm for iPhone or Android.

One afternoon in November, a half-dozen government officials sat at a conference table in the White House, waiting for the arrival of Stephen Miller, a senior adviser to <u>Donald Trump</u>. Miller had summoned officials from the Departments of Homeland Security, State, and Justice to discuss a new Administration policy initiative: a series of agreements with the governments of Central America that would <u>force</u> asylum seekers to apply for protection in that region instead of in the United States. Miller, who had helped make the deals, wanted to know when their provisions could go into effect. Typically, everyone rises when top White House officials enter a room. But when Miller walked in, wearing a dark suit and an expression of wry resolve, everyone remained seated, their eyes cast down. "You go into meetings with Miller and try to get out with as little damage as possible," a former Administration official told me. Miller has a habit of berating officials, especially lower-ranking ones, for an agency's perceived failures. Chad Wolf, now the acting head of D.H.S., used to advise colleagues to placate Miller by picking one item from his long list of demands, and vowing to execute it. "It's a war of attrition," Wolf told them. "Maybe he forgets the rest for a while, and you buy yourself some time."

One participant in the November meeting pointed out that El Salvador didn't have a functioning asylum system. "They don't need a system," Miller interrupted. He began speaking over people, asking questions, then cutting off the answers.

As the meeting ended, Miller held up his hand to make a final comment. "I didn't mean to come across as harsh," he said. His voice dropped. "It's just that this is all I care about. I don't have a family. I don't have anything else. This is my life."

Miller, who is thirty-four, with thinning hair and a sharp, narrow face, is an anomaly in Washington: an adviser with total authority over a single issue that has come to define an entire Administration. "We have never had a President who ran, and won, on immigration," Muzaffar Chishti, of the Migration Policy Institute, told me. "And he's kept his promise on immigration." Miller, who was a speechwriter during the campaign, is now Trump's longest-serving senior aide. He is also an Internet meme, a public scourge, and a catch-all symbol of the racism and malice of the current government. In a cast of exceptionally polarizing officials, he has embraced the role of archvillain. Miller can be found shouting over interviewers on the weekend news shows or berating reporters in the White House briefing room; he has also vowed to quell a "<u>deep state</u>" conspiracy against Trump. When he's not accusing journalists of harboring a "cosmopolitan bias" or denying that the Statue of Liberty symbolizes America's identity as a nation of immigrants, he is shaping policy and provoking the President's most combative impulses.

<u>Jeh Johnson</u>, who headed the Department of Homeland Security under Barack Obama, told me, "D.H.S. was born of bipartisan parents in Congress, in the aftermath of 9/11, when there was support for a large Cabinet-level department to consolidate control of all the different ways someone can enter this country." D.H.S. is the third-largest federal department, with a fifty-billion-dollar budget and a staff of some two hundred thousand employees, spanning the Federal Emergency Management Agency, the Cybersecurity and Infrastructure Security Agency, and Immigration and Customs Enforcement. From its founding, in 2002, to the end of Obama's Presidency, the department had five secretaries; under Trump, it has had five more. "Immigration is overheated and over-politicized, and it has overwhelmed D.H.S.," Johnson said.

"The massive changes Miller engineered in border and immigration policy required that the policymaking process at D.H.S. be ignored," Alan Bersin, a former senior department official, told me. "Who do you think has filled the vacuum?" Miller has cultivated lower-level officials in the department who answer directly to him, providing information, policy updates, and data, often behind the backs of their bosses. "At the beginning of 2017, none of us could have foreseen that he would wield this kind of power," a former Trump Administration official told me. Of thirty current and former officials I interviewed, not one could recall a White House adviser as relentless as Miller, or as successful in imposing his will across agencies. These officials resented him as an

upstart and mocked his affectations—his "arrogant monotonal voice" and tin-eared bombast—but few were comfortable going on the record, even after leaving the government. Miller is famously vindictive, and, as Trump runs for a second term, he is sure to grow only more powerful. "Miller doesn't have to get Trump to believe everything he does," one of the officials told me. "He just has to get Trump to say it all."

When Miller and I spoke by phone, it was off the record. Without an audience, he gave the same message at half the volume—a litany of talking points about all the ways in which the President had delivered on his campaign promises. Afterward, the White House sent me a quote for attribution: "It is the single greatest honor of my life to work for President Trump and to support his incredible agenda."

Miller's obsession with restricting immigration and punishing immigrants has become the defining characteristic of the Trump White House, to the extent that campaigning and governing on the issue are no longer distinguishable. In the past three and a half years, the Trump Administration has dismantled immigration policies and precedents that took shape in the course of decades, using current laws to intensify enforcement against illegal immigration and pursuing new ones to reduce legal immigration. Trump has slashed the refugee program; virtually ended asylum at the southern border; and written a rule <u>denying</u> green cards to families who might receive public benefits. Miller has choreographed these initiatives, convincing Trump that his political future depends on them—and on going even further. If Trump is not reëlected, Miller will never again have such power. A D.H.S. official told me, "Going into 2020, Miller is at a crossroads."

The radicalism of Miller's views tends to obscure how much he has evolved as a tactician since he arrived in Washington. He grew up in Santa Monica, California, the son of Jewish Democrats, but, by the time he entered high school, he had become a strident conservative. "He was going to a very liberal, diverse school," Megan Healey, one of his classmates, told me. "In a school where the nerds were considered cool, he was still the guy that nobody liked." The terrorist attacks of 9/11 took place when he was a junior, cementing his persona. "Anti-Americanism had spread all over the school like a rash," he later <u>wrote</u>. "Osama Bin Laden would feel very welcome at Santa Monica High School." At Duke, where he studied political science and wrote a column for the student newspaper, he became a familiar presence on conservative television and radio programs. His hostility toward immigrants formed part of his politics, but did not stand out. He opposed left-wing bias in the classroom, invited controversial speakers to campus, and organized "Islamo-Fascism Awareness Week." "America without her culture is like a body without a soul," he wrote in one column. "Yet many of today's youth see America as nothing but a meeting point for the cultures of other nations." His most notable cause was to defend a group of white lacrosse players who had been falsely accused of raping a black woman who was stripping at a party. The editor of his column later <u>told</u> *The Atlantic*, "He picked the most contrarian of stances to articulate, wrote the most hyperbolic prose he could . . . then sat back and waited for people's reactions."

After graduation, in 2008, he was offered a job as press secretary for <u>Michele Bachmann</u>, a Republican representative from Minnesota, who gained national attention after an undocumented immigrant near her district crashed her car into a school bus, killing four children. Miller pushed Bachmann to go on television. On Fox News, she described the tragedy as an example of "anarchy versus the rule of law," and, in a later campaign stop, blamed immigrants for "bringing in diseases, bringing in drugs, bringing in violence." The following fall, after Bachmann was reëlected, Miller left his post, and took a communications job in the office of <u>Jeff Sessions</u>, of Alabama, then the Senate's staunchest opponent of immigration.

Sessions and Miller approached immigration from different perspectives. During the nineties and early two-thousands, immigration had quadrupled in Alabama, and Sessions, a resolute populist, grew alarmed at the state's increasingly foreign workforce. Miller's concerns tended to be more cultural and inflammatory—he raised questions about the ability of Latin Americans to learn English and of Islam's compatibility with American norms.

Sessions introduced Miller to such think tanks as <u>NumbersUSA</u> and the Center for Immigration Studies, which produced data-laden reports on the societal costs of immigration. Soon Miller was attending weekly meetings at the Heritage Foundation, the conservative-policy institute, with a small group of congressional staff. "He'd arrive with these policy notions he'd just conjure up," a participant told me. "He came across as super smart, but super right wing." To most Republican staffers, he was known for his mass e-mails about immigration, full of links to articles from fringe Web sites. "I just started deleting them when I'd see his name," a senior Republican staffer told me. "Everyone did."

M itt Romney ran for President, in 2012, on a platform that included a commitment to reducing illegal immigration. He argued that, if the federal government made life harder for undocumented immigrants by limiting their employment opportunities, large numbers would "self-deport." After Romney lost, the Republican National Committee commissioned an emergency report on the future of the Party, in which pollsters and elected officials concluded that Republican candidates had moved too far right. The report <u>warned</u> that if the Party did not "embrace and champion comprehensive immigration reform" its appeal would "continue to shrink to its core constituencies." On the night of Obama's second Inauguration, in January, 2013, his former chief of staff, Rahm Emanuel, whose reluctance to tackle the issue of immigration—the "third rail of American politics," he called it—was well known inside the Administration, told White House officials that now "even a blind person" could steer a comprehensive reform bill through Congress.

In the spring of 2013, a bipartisan group of senators known as the <u>Gang of Eight</u>—which included the Republicans <u>Marco Rubio</u>, <u>John McCain</u>, and <u>Lindsey Graham</u>—proposed a bill that would have made changes to the immigration system while creating a pathway to citizenship for millions of undocumented people. The legislation was widely embraced in the Senate, but it was premised on a compromise that repulsed Sessions: legalization in exchange for increased border-security measures. Or, as he saw it, amnesty for nothing.

At meetings throughout the spring and summer of 2013, Republican staffers debated the terms of a possible bill. When Miller was allowed to sit in, he took notes and asked questions about esoteric provisions. Sessions was one of a half-dozen senators who weren't expected to vote for a bill in any form; Miller was there to "take the information, punch it up, and make it into an attack," according to a senior Republican Senate aide. "It was sending a signal to Senate Republicans to stay away from the bill, or to give them heartburn over it. And it was a kind of Bat-Signal to the House Republicans."

<u>Steve Bannon</u>, then the head of Breitbart News, compared the work that Sessions and Miller were doing to stop the bill to "the civil-rights movement in the nineteen-sixties," and he began communicating regularly with Miller, who sent the Web site ideas and details for immigration stories. The far-right press characterized a provision introduced by Rubio to distribute cell phones in border areas, so that residents could report border crossings, as a measure to give "amnesty phones" to migrants; a pathway to citizenship would end in "benefits to line-jumping illegal aliens." Miller took reporters' calls late into the night, making himself indispensable to anyone covering the policy fight in Washington. "As a staffer, serving his boss, he was excellent," Julia Preston, a

former correspondent for the *Times*, told me. She spoke to Miller regularly. "This stuff is emotional for him." In a conversation about H1-B visas, "he was talking so passionately that he actually wept."

Opponents of the bill began to feel more confident. "Miller played a pretty substantial role" in "bruising" the legislation, the senior Senate aide said. A crisis was developing at the southern border, where tens of thousands of unaccompanied children, as well as families from Central America, were arriving in search of asylum. The Obama Administration tried to downplay the situation, but the crisis coincided with the Republican primary campaigns, in which populist Tea Party members were challenging members of the G.O.P. establishment. On June 10th, the day before Republican staffers in the House were scheduled to present a version of the bill to the Party leadership, the second-highest-ranking Republican in the House, Eric Cantor, of Virginia, lost his primary to Dave Brat, an academic and a political neophyte, who had run to the right of Cantor on immigration. "That's really when the bottom started falling out," Cecilia Muñoz, who worked at the White House at the time, told me. The immigration bill had already passed the Senate, but the Speaker of the House, a Republican, never brought it to the floor for a vote.

Miller "got a master's degree in immigration policy during that process," one of the Republican aides who worked with him at the time told me. "Before that, he didn't have any policy experience at all. It was all communications. In 2013, he learned where all the bodies were buried." Miller studied decades' worth of immigration regulations, rules, and discretionary judgments, which were designed to guide and temper enforcement. He objected to the reluctance of establishment politicians to strictly interpret the existing laws. "He'd say, 'It's easy to simply execute the law as it's written,' " a former colleague of his told me. "That's actually when he would make his most impressive arguments. Fact-based, legal arguments. He used to say, 'There's a lot of bureaucratic procedure imposed on the law. Why do we need to concern ourselves with all the extra stuff?' "

Miller pointed out the many loopholes in immigration laws, especially the widespread practice of "catch and release," in which large numbers of migrants were allowed to remain in the U.S. while they waited for their cases to be heard by immigration judges. Sessions had proposed amendments to end the policy, but they failed to gain support among Republicans. "Miller's response was 'The laws need to change,' " the aide said. "He was unimpressed by the promises of more border-patrol agents, or a trillion dollars for a virtual wall. People were taking advantage of the laws, not just of a porous border."

In January, 2015, when Republicans took control of the Senate, Miller and Sessions published a rebuttal to the Party's 2012 postmortem, called "Immigration Handbook for the New Republican Majority." They wrote, "On no issue is there a greater separation between the everyday citizen and the political elite than on the issue of immigration."

Five months later, Trump declared his candidacy, and, in January, 2016, Miller took a leave from Sessions's office to join the campaign. Sessions, who considered Trump an ally on immigration, had doubts about his electability, but in February Bannon convinced him that Trump could win. Sessions became the first senator to endorse him. Bannon, who was advising Trump, had also persuaded Corey Lewandowski, Trump's main handler, to promote Miller to the position of speechwriter. "You just can't wing it. Immigration is too important," he recalled saying. "You need policy people on this."

Trump's candidacy felt more like a low-grade insurgency than like a professional operation. The campaign rallies, with their ecstatic crowds, emboldened Miller, who often served as a warmup act for Trump. Pacing the stage with a relaxed smile, he resembled an insult comic, leading chants of "Build the wall." He'd flash a peace sign, and make way for Trump, who would recite a list of crimes committed by undocumented immigrants. Then, growing sombre, he'd invite the parents of a victim onstage to offer his condolences.

In August, 2016, at a rally in Phoenix, Trump delivered a policy speech on immigration, written by Miller. It was typically raucous and aggressive, full of racist fearmongering, but it also contained a detailed blueprint. "Our immigration system is worse than anyone realizes," Trump began. "Countless Americans who have died in recent years would be alive today if not for the open-border policies of this Administration." A ten-point list of desired policies followed: among them were an "end to catch and release," "zero tolerance for criminal aliens," penalties for sanctuary cities, a vow to reverse Obama's executive orders, and a "big-picture" vision for reforming the immigration system "to serve the best interests of America and its workers." Miller told the Washington *Post* that it was "as though everything that I felt at the deepest levels of my heart were now being expressed by a candidate for our nation's highest office."

Government and congressional staffers who supported immigration restrictions were impressed by Trump's speech. One official, who joined a group of immigration advisers to the campaign, told me, "I didn't like the candidate very much, but he's saying the right things about enforcing the law." Members of the group went on to join the transition team and later staff the government. "Filling those immigration jobs in the Administration was the top obsession. It was a shock-and-awe thing," the official said. "The fantasy was that there'd be a table full of executive orders that Trump would sign and then walk away. There would be thirty things happening on Day One, within an hour, and there wouldn't be enough lawyers to handle all the litigation. They wouldn't even know who to sue."

After Trump won the election, "Miller didn't even flirt with an agency or nomination position," a White House official told me. "He wanted to know what White House adviser position had the most say on immigration." He asked to head the Domestic Policy Council, an influential but amorphous group inside the White House. The position gave him proximity to the President and insulation from congressional scrutiny; he would issue, rather than implement, orders. "The rest of us have to testify before Congress. That's a check. If you're going to have your ass hauled before Congress, you're not going to feel comfortable breaking the law," a former top Administration official told me. "Miller will never have to testify for anything."

Immigration restrictionists have had a foothold in Congress for decades, but they haven't had access to the White House in a century. Even among the ideologues, Miller's approach was distinct. In his view, the more controversial the Administration's immigration policies were, the more easily it could divide and conquer the electorate. He had scared Republican House leaders in 2013 by caricaturing Democrats and moderate Republicans as advocates for "open borders"; now he aimed to send the same message from the White House. One of the measures contemplated by the President's immigration-advisory group was an order to block travellers from several Muslim-majority countries from entering the U.S. The group had been preparing the ban so that it would survive legal challenges, but Miller intervened. "Miller has two impulses that he's warring with," another senior Republican aide told me. "One is to be the bomb-thrower he always was. The other is to try to secure victories for the President." In the days leading up to Trump's Inauguration, Miller and a close associate named Gene Hamilton, another former Sessions staffer in his mid-thirties, drafted an executive order called "<u>Protecting the Nation from Foreign Terrorist Entry Into the United States</u>"—the travel ban.

When Trump signed it, none of the top officials at the Department of Homeland Security, which was in charge of enforcing the ban, had been notified in advance. Travellers with valid visas were suddenly trapped at American airports, unable to enter the country; refugees who, after years of waiting, had been vetted and approved for entry were turned back. Thousands of protesters and civil-rights attorneys began congregating at airports across the country, and Senators Graham and McCain issued a statement saying that "we should not turn our backs on those refugees who . . . pose no demonstrable threat to our nation, and who have

suffered unspeakable horrors." Jared Kushner, the President's son-in-law and senior adviser, was enraged. The next day, when the President's senior staff assembled in the Situation Room, Miller told John Kelly, the head of D.H.S.; Tom Bossert, the President's homeland-security adviser; and officials from the State Department, "This is the new world order. You need to get on board," according to an account in "Border Wars," by Julie Hirschfeld Davis and Michael D. Shear.

The ban was immediately challenged in federal court; it took eighteen months, and three versions of the order, before it passed legal muster. Instead of censuring Miller, Trump blamed the courts and lawyers at the Justice Department, including Sessions, who was now his Attorney General, for "watering down" the order.

Miller wasn't so much channelling Trump as overtaking him. Inside the White House, he was known as a "walking encyclopedia" on immigration, and the President's political advisers, who acknowledged that campaigning on the issue had been the key to Trump's victory in 2016, deferred to him as an expert. Those with reservations—like Rex Tillerson, the Secretary of State, and H. R. McMaster, the national-security adviser—had other responsibilities. Miller could outmaneuver them if he used the right interagency channels. He sent e-mail sparingly and avoided calling officials directly to issue orders, relaying his messages through intermediaries.

Since Trump could rarely comprehend the full substance of his own Administration's agenda on immigration, it fell to Miller to define what victory looked like. One of the President's favorite routines, according to someone close to both of them, is to play the good cop to Miller's bad cop: "He'll smile and say, 'Well, that sounds O.K. to me but, Stephen, I know you'd never go for it.' "

Miller invoked the President constantly, especially when he encountered resistance from other officials. One of them told me, "Someone would say to him, 'Stephen, what you're trying to do is not possible.' And his response would be 'It is possible. I spoke to the President an hour ago, and he said it had to be done.' " (Hogan Gidley, a White House spokesperson, told me, "The policies Stephen works on are not his own but, instead, a faithful and vigilant implementation of the agenda Donald Trump brilliantly laid out.")

For the first seven months of his Presidency, Trump vacillated about cancelling Deferred Action for Childhood Arrivals, a highly popular program that Obama had instituted through executive action. DACA protected from deportation some seven hundred thousand people who had come to the U.S. as children. Trump had campaigned against it, then reversed himself. Miller was viscerally hostile to DACA. In an e-mail to a Breitbart editor, he said that expanding the "foreign-born share" of the U.S. workforce was an instance of "immigration" being used "to replace existing demographics." In September, 2017, under pressure from Miller and other White House advisers, Trump agreed to cancel DACA, setting a six-month deadline for Congress to find a legislative solution. The fight that ensued led to a brief government shutdown. Republicans refused to grant any form of "amnesty" unless they could get something significant in return, but, given Trump's inconsistency on DACA, the Party leadership couldn't gauge what he wanted from the negotiations.

Mostly, Trump cared about building a wall along the southern border. For Miller, the main goal of negotiations was to reduce the number of legal immigrants, which was not something that Congress had previously been willing to contemplate. But, with DACA recipients as a bargaining chip, the circumstances were different. "Miller knew the window was closing, that his only chance to force his agenda was if DACA kids were on the line," a Republican aide who worked closely with Miller told me.

On January 11, 2018, Trump summoned Dick Durbin, a Democratic senator from Illinois, and Lindsey Graham, from South Carolina, to the White House so that they could explain the terms of a bipartisan deal they'd reached. It would offer a path to citizenship for DACA recipients in exchange for increased border security and enforcement measures. The President told the senators that he was ready to back their plan. But, two hours later, when they entered the Oval Office, they found that they were not alone. Miller had invited a group of far-right Republicans—including Tom Cotton and David Perdue, the sponsors of a bill to cut legal immigration in half—to join them. The "fix is in," Durbin told an aide. When Graham brought up Haitian immigrants, while explaining an aspect of the agreement, Trump asked, "Why would we want all these people from shithole countries?" He now refused to endorse the deal he had supported that morning.

In the weeks that followed, whenever Trump responded positively to an overture by Democrats, Miller interceded. "Whoever has access to the President last—that's what sticks," a White House official told me. "Miller always made sure he was that person." Graham said, "As long as Stephen Miller is in charge of negotiating immigration, we're going nowhere."

The images first began appearing on Fox News in early April, 2018: a thousand migrants from Honduras, most of them travelling with their families, massing at the border between Guatemala and Mexico before heading north toward the United States. Trump regularly updated his Twitter feed as the group advanced into southern Mexico, more than a thousand miles from the U.S. He renewed calls for a border wall, attacked Mexico for failing to do more, and excoriated Democrats for "ridiculous liberal laws like catch and release." In the first year of his Presidency, border crossings were down, owing in part to what analysts called "the Trump Effect," as migrants and smugglers paused to consider whether Trump's actions toward migrants would match his rhetoric. But by May, 2018, there were roughly fifty thousand apprehensions a month at the border, double the number when he took office. Though the increase was largely due to instability in Central America, the White House blamed Kirstjen Nielsen, who had taken over D.H.S. the previous December, after John Kelly became Trump's chief of staff. At a Cabinet meeting, on May 9th, Kelly focussed the discussion on immigration policy. By then, the President was calling Nielsen five times a day to complain. At the meeting, he berated her for half an hour. "How is this still happening?" Trump demanded. "Why don't you have solutions?"

Miller had ideas of his own. In 2013, during the unaccompanied-minors crisis, an official at ICE had suggested separating parents and children once they reached the border, in the hope of deterring other families from travelling north. The White House had dismissed the proposal as inhumane, but Miller took it up again. "He was obsessed with the idea of consequences," a top D.H.S. official who worked with Miller at the time told me. "He'd always say to us, 'They are breaking the law, and the only way we'll change that is if there's a consequence.' " The consequences were specific. The official said, "Miller made clear to us that, if you start to treat children badly enough, you'll be able to convince other parents to stop trying to come with theirs." Miller had already led a meeting at the White House to pressure D.O.J. officials to prosecute border crossers as criminals. (Doing so was the basis for separating families: while parents faced criminal charges, their children were treated as unaccompanied minors.) In April, he and Hamilton wrote a Presidential memorandum directing agencies to end catch and release; they also composed a letter, signed by Attorney General Sessions, articulating a policy, called zero tolerance, for prosecuting all adults who were arrested by D.H.S. for illegal entry.

Sessions announced the new policy at a gathering of law-enforcement officials in Arizona, saying that if parents were caught "smuggling" their children into the country they'd be separated from them and treated as criminals. The head of Customs and Border Protection, Kevin McAleenan, and the head of ICE, Tom Homan, signed off on zero tolerance, as did Nielsen. Miller, however, forced the policy into action before D.H.S. was ready to implement it. When border agents began separating families,

the Administration hadn't yet made plans to reunite them, a direct result of "the pressure he brought to bear," a top D.H.S. official said. By late June, more than twenty-five hundred children, including a hundred and two under the age of five, had been separated from their parents, many of whom didn't know where the government had taken them. In an ICE detention center in El Paso, groups of separated mothers secretly exchanged information in the cafeteria to compile lists of their missing children and smuggle out requests to local lawyers for help.

Hundreds of parents were deported without their children. From Central America, they called intermittently functioning U.S. hotlines, set up by the Department of Health and Human Services, in an effort to locate them.

Miller forcefully defended family separation, telling the *Times* that voters would support the White House "90-10." In fact, the public was outraged, especially after a recording of small children crying for their parents at a Texas detention center was leaked to ProPublica. A Border Patrol agent could be heard saying derisively, "Here we have an orchestra." The policy dominated television news, and Ivanka and Melania Trump lobbied the President to end it. Some inside the Administration thought that the policy was justified, but that its execution had been poor. Several officials blamed Miller. "How many things have fallen because of bad messaging?" a D.H.S. agency head said to me. "Isn't Miller supposed to be the master of messaging?" On June 18th, officials at the White House decided to explain the Administration's position to the public in a press conference. Sarah Huckabee Sanders, the President's chief spokesperson, pressured Nielsen to deliver the briefing, as a means of shielding the White House from blame. Nielsen's advisers were uniformly opposed. "She would become the face of the policy," one of them told me. But, according to an official who was present for the conversation, Sanders told Nielsen, "The President is getting killed on this, and it's your department. How are you not going to go out there?"

At the press conference, Nielsen alternated between denying that the government had created a policy to separate children from their parents and defending zero tolerance as a necessary measure for enforcing immigration laws. Forty-eight hours later, Trump ended the separation policy, blaming Nielsen for his political defeat. "I have no idea how Miller managed to escape this one," the official told me. "He knows just how and when to disappear."

As Trump has consolidated his control over the Republican Party, it is easy to see Miller as an embodiment of the rightward turn of conservative politics. But, in the past year, he has made enemies among people at D.H.S. who shared his goals of tightening enforcement and revamping the legal-immigration system yet were alarmed by his contempt for policy channels and his disregard for the law. As one of them told me, Miller was conducting "a kind of permanent political campaign." Miller tried to enlist officials to bolster the President's claims about immigrant crime. David Lapan, a retired colonel who worked for John Kelly at D.H.S., told me, "He'd say, 'You need to work harder to show how bad immigrants are. Highlight stories on criminal immigrants getting charged after being released.' "

On Fridays, Miller convened a meeting at the Eisenhower Office Building, next to the White House, to discuss the ways in which federal bureaucrats were falling short of implementing Trump's agenda. Eventually, career officials stopped attending, and Miller's audience became the political appointees who were already aligned with him. He harangued them, too. At one meeting, displeased with an ICE official who had once worked at the Center for Immigration Studies, he told him, "I'll send you right back to writing blog posts for C.I.S."

After Trump ended the family-separation policy, he was forced to make another concession. More families were fleeing Central America and travelling to the U.S., owing in part to the cycle of restrictive measures being adopted, then refashioned and

sometimes abandoned after court challenges and political setbacks. When border policy changes in frequent and conspicuous ways, news tends to spread through Central America. "Trump made for the perfect sales pitch for smugglers: Come now, before it's too late!" James Nealon, a former senior D.H.S. official, told me. The department ran out of detention space, and had to resume the catch-and-release policy.

According to a D.H.S. official who worked closely with Miller, as "the problems got more complex, and as the frustrations mounted," his behavior became erratic. At meetings, he would ask for data that were irrelevant to the discussion, then launch into a monologue. Another D.H.S. official said, "You didn't know which Stephen you were going to get. He could be very articulate, then he'd be quoting Breitbart in a diatribe. It was all over the place." His policy ideas were often impracticable or unrelated to the issue under discussion. He wanted the department to house all migrants at Guantánamo Bay, and the F.B.I. to conduct immigration arrests. One official told me, "It got tedious. None of it would solve the problem we had. And, at the end of the operations he was pushing, the question would just be: Are you going to have something meaningful and sustainable that isn't just a sharp elbow?"

Department officials felt that they knew how to manage the border crisis. They needed more resources, to house families and children, and other agencies needed to absorb the overflow. But, the official said, Miller "had unreasonable expectations about how fast the bureaucracy could write rules to fix the biggest problems we had. His default position was that there was a bunch of bureaucrats in the bowels of ICE or Citizenship and Immigration Services who didn't want this to happen."

Because Miller had inserted himself into D.H.S.'s policymaking process, officials felt obliged to shield their work from him. At one point, to keep Miller from discovering the details of a policy discussion, the head of D.H.S. held meetings in a classified security bunker, known as a SCIF, where cell phones are prohibited and strict rules of confidentiality are in effect. Convinced that a cabal of deep-state actors was trying to thwart Trump's agenda, Miller had effectively forced officials to go underground in their own agencies. Steve Bannon told me, "Stephen's experience has deepened his belief in the deep state, that they're all going to leak in an attempt to stop his policy efforts."

Increasingly, Miller lashed out at high-level D.H.S. officials, even those who favored many of the same policies. A frequent target was Francis Cissna, the director of Citizenship and Immigration Services since 2017, who had worked to reshape the immigration system in ways that were often too technical to capture mainstream attention. Cissna had been an immigration lawyer in the government for more than a decade; when he got married, his wedding cake was decorated with an edible version of the Immigration and Nationality Act. "He's an immigration nerd," Barbara Strack, a former colleague, told me. Cissna was a hero to members of the restrictionist movement: deeply knowledgeable, he framed his actions as a commitment to the rule of law.

For months, Cissna had been working on the Administration's most significant attempt to overhaul the legal-immigration system: the "public-charge rule," which would allow the government to block millions of people—disproportionately, immigrants from Latin America, Africa, and Asia—from getting green cards based on their income. It typically takes two years to fully implement a rule, but Miller wanted it done more quickly. He already resented Cissna for what he called the "asylum fraud crisis" at the border, since Cissna's agency was in charge of handling asylum applications. After he hectored Cissna on one interagency phone call, with dozens of officials listening in, Cissna told him to stand down.

"I won't stand down," Miller shouted. "I won't stand down. I won't stand down."

On another occasion, during a meeting in the White House Situation Room, Miller lambasted Ronald Vitiello, the head of ICE, who had worked in immigration enforcement for more than three decades, for not single-handedly rewriting federal rules on the detention of children. "You ought to be working on this regulation all day, every day," Miller told him. "It should be the first thought you have when you wake up. And it should be the last thought you have before you go to bed."

Cissna, Vitiello, and others were exasperated by Miller's lack of interest in setting sound policies. "We'd say, 'Well, the law says this and that, you'd need to make changes,' " an official told me. "Then we'd get the phone call again, and the proposal would be slightly different. We'd say, 'You still can't do that.' They'd come back to us again. Finally, sure, it was lawful, but it was also stupid." Officials came to think that Miller was territorial; he wanted to be the only immigration expert in the room at all times, and he was willing to undermine like-minded people who might impede his access to the President. One of them told me, "He's not a true believer. If he were, he'd want to get the agenda done right."

In April, Miller initiated a purge of D.H.S. It began with the firing of Nielsen, then continued with the ouster of Vitiello, Cissna, the head of Customs and Border Protection, and the department's top lawyer. Restrictionist groups like the Center for Immigration Studies protested Cissna's departure. Chuck Grassley, who had worked with Cissna on the Senate Judiciary Committee, said that the President was "pulling the rug out from the very people that are trying to help him accomplish his goal." But with Nielsen and the other officials gone, Miller was able to move loyalists into the top positions. One of them was Matthew Albence, the new head of ICE, who, in congressional testimony from 2018, compared family-detention facilities to "summer camp." A senior D.H.S. official said, "Now there are no breaks in the chain of command."

Disgruntled department veterans saw many of Miller's actions as policy miscues and legal errors, but they were more likely signs of Miller's success. So was the political deadlock on immigration, which the White House was deliberately exacerbating. Michael Chertoff, who led D.H.S. under George W. Bush, told me, "The only two arguments you hear now are 'Don't enforce the law at all,' or 'Be draconian.' " Miller has exploited calls by left-wing Democrats to abolish ICE and to decriminalize border crossings. On the whole, public outrage has dissipated, and the federal courts, which are increasingly populated by Trump appointees, are starting to uphold the Administration's policies. The U.S. is resettling the fewest number of refugees in its history; there are more than fifty-five thousand asylum seekers stuck in Mexico under a policy called the Migrant Protection Protocols; and the Central American asylum deals—known as safe third-country agreements—are expanding. A former senior official told me, "Without Miller, Nielsen would still be secretary. There would be no safe third-country agreements, no M.P.P. He pushed and pushed. He simply works harder than everyone else."

Last October, the President's fourth head of Homeland Security, Kevin McAleenan, who filled the position left by Nielsen, announced his resignation, six months into the job. "What I don't have control over is the tone, the message, the public face and approach of the department in an increasingly polarized time," he told the Washington *Post*. White House officials initially distrusted McAleenan, who was a career official and had served during the Obama Administration. Yet the President soon came to depend on McAleenan's experience: after he took charge of the department, the number of immigrants apprehended at the southern border dropped by close to sixty per cent. He was also the lead negotiator of the Central American asylum deals. When McAleenan tendered his resignation, Miller initially refused to accept it.

In late fall, as Trump's impeachment hearings began, Miller tried to limit his own public exposure. "He was getting a little too much steady attention, so he knew he had to hang back," a top Administration official told me. Miller has survived the upheavals

in Trump's inner circle by representing himself as a member of the supporting cast. This strategy was reinforced by the demise of Steve Bannon, who, a few months before being fired, in August, 2017, appeared on the cover of *Time*, next to the headline "*The Great Manipulator*." Sessions was forced out in November, 2018, after having recused himself from the Russia probe. Trump continued to mock him, often in front of Miller. According to someone who witnessed the exchanges, Miller never spoke up to defend his mentor. He was "part of the family now," a White House official told me.

By the end of November, Miller was back in the news, though not by choice. The Southern Poverty Law Center acquired and published hundreds of e-mails that Miller had exchanged, between 2015 and 2016, with editors at Breitbart. They included links to articles on the white-supremacist Web site VDARE, as well as an enthusiastic reference to "The Camp of Saints," a racist French novel about the ravages of immigration. In one e-mail, Miller approvingly forwarded an article arguing that the U.S. should deport immigrants on trains "to scare out the people who want to undo our country." In Congress, there were calls for his resignation, but only from Democrats.

The e-mail scandal barely registered at the White House, where Miller faced a greater challenge. At Trump's behest, Jared Kushner—who was already responsible for negotiating peace in the Middle East, overhauling international trade agreements, and leading the President's reëlection campaign—has added immigration to his portfolio. "Stephen understands that Kushner is the real power," a former White House official said. "He would never cross Kushner."

"When Kushner came in to work on this, he told people that they were too close to the issue, that he had the distance from it that was needed," a senior Republican aide told me. A number of people Kushner consulted on the Hill recommended that he start by trying smaller deals, such as one on DACA. "I'm doing this big or I'm not doing it at all," he responded. In May, from a dais in the White House Rose Garden, Trump announced the broad contours of Kushner's "merit-based" immigration plan, in which applicants would be evaluated based not on family ties, as in the current system, but on a combination of factors, including language skills, education, and employment prospects. (Sitting in the front row was Lindsey Graham, who was now one of Trump's strongest allies.) In 2013, when Miller was first engaged in immigration policy, he and Sessions talked about moving to a merit-based system, and "it was laughed about," one of the former Republican aides told me. "It wasn't just a fringe position. It was a politically impossible position." Now the proposal represents the White House's "moderate" pitch, though it is still unlikely to get through Congress.

A six-hundred-page bill that details Kushner's plan has been circulating in Washington. It would not directly lower the number of legal immigrants allowed into the country each year, but, so far, Miller has coöperated with Kushner, writing the parts of it that address asylum and family detention. "Jared is the most powerful White House adviser, but he's very busy," a person who has worked closely with both Miller and Kushner told me. "Miller is focussed on one thing. He and Kushner make situational alliances. They both think the President needs the other, and they each believe in the other's absolute loyalty to Trump. In all my time around them, I have never heard either one of them say a negative word about the other, and that's not true of anyone else."

Recently, the number of migrants intercepted at the border has dropped significantly—from a hundred and forty-four thousand, in May, 2019, to thirty-six thousand, last month. Asylum seekers stuck in Mexico have given up on reaching the U.S. America's legal and moral standing may not survive the Administration's immigration policies, but Trump has succeeded in realizing one of his most infamous tweets: "Our country is full."

With the border virtually sealed, Miller is turning his attention inward. D.H.S. has begun sending armed agents from Border Patrol SWAT teams to New York, Chicago, and other so-called sanctuary cities, where local law enforcement has limited its coöperation with ICE. "There's no one left at D.H.S. to say 'No' to Miller anymore," a senior department official told me. Another official was present at a meeting in which Miller advocated allowing ICE officers to pull children out of school.

This summer, months before the election, the Supreme Court is expected to rule on whether the Administration can cancel DACA. "Everything—everything!—hinges on that decision," a former senior D.H.S. official told me. If the Supreme Court ends DACA, then "Miller will be in ecstasy. He'll finally have the leverage over the Democratic Congress that he's been dying to have this entire time. He'll say, 'Well, you're all worried we're going to deport them. What will you agree to?' " The official continued, "It'll be the summer of a huge campaign, and Miller will be in his glory." ◆

An earlier version of this story misstated the name of the Immigration and Nationality Act.

*Published in the print edition of the <u>March 2, 2020</u>, issue, with the headline "Get Out."*



<u>Jonathan Blitzer</u> *is a staff writer at The New Yorker.*

More:    Stephen Miller Immigration Donald Trump Family Separation Immigrants Department of Homeland Security Jeff Sessions

# Exhibit 6



×

**Support our journalism:**

Nearly 20,000 people support Vox's explanatory journalism with a contribution. Will you join them?

Contribute

# The 2020 Democratic immigration debate, explained

Trump's extremism is helping 2020 Democrats avoid the really hard questions on immigration.

By Tara Golshan  |  Jul 29, 2019, 9:30am EDT



From left: Democratic presidential candidates South Bend, Indiana Mayor Pete Buttigieg, former Vice President Joe Biden, Sen. Bernie Sanders (I-VT), and Sen. Kamala Harris (D-CA) take part in the second night of the first Democratic presidential debate  |  Drew Angerer/Getty Images

Part of
**Vox's guide to where 2020 Democrats stand on policy**

Not a single **Democrat running for president** in 2020 says the current immigration system is working.

There are more than 2,000 children being held in custody without their parents at the **southern border** daily; migrant adults and children are facing overcrowded facilities; since the start of Donald Trump's presidency, **two dozen migrants have died in custody** with US Border Patrol, including six children.

There is a backlog of **850,000 asylum cases** waiting for a day in court and fewer than 450 judges to handle them. **Roughly 11 million undocumented immigrants** are living under fear of deportation; 3.6 million were brought to the United States as children. As of last November, more than 3 **million people** were waiting for family-based visas, and more are in line for employment-based visas. Trump's administration has cut the number of refugees the United States admits by 60 percent, **even as a global refugee crisis rages on**.

Six 2020 Democratic candidates — **Sen. Elizabeth Warren**, former Housing and Urban Development **Secretary Julián Castro**, former **Rep. Beto O'Rourke**, Washington Gov. **Jay Inslee**, **Sen. Kamala Harris**, and **Sen. Cory Booker** — have proposed changes to some or all of this. Those who haven't put out a full plan are nonetheless positioning themselves in interviews and at Democratic debates.

Democrats are unified on the broad-strokes message they want to send on immigration, and on the fact that some kind of "comprehensive immigration reform" is necessary. In Congress, House Democrats have rallied around the **Dream and Promise Act,** a pathway to citizenship for unauthorized immigrants who came to the US as children and those with temporary humanitarian protections.

Still, immigration remains one of the most contentious policy issues in the United States. And Democrats' plans so far aren't addressing the most divisive issues, including whom to deport and whom to let in.

For now, they have an out: Trump's immigration agenda is so extreme, they simply want to undo it.

"My first executive orders will be to reverse every single thing President Trump has done to demonize and harm immigrants," Sanders said.

**The 2020 Democrats' immigration positions, explained**



Florida Rep. Debbie Mucarsel-Powell (R) and Democratic presidential hopefuls Pete Buttigieg, Kamala Harris, Julián Castro, and John Hickenlooper address the media about detained migrant children in front of a detention center in Homestead, Florida.   |   Rhona Wise/AFP/Getty Images

For two decades, the Democratic position on immigration mostly consisted of the DREAM Act, a piece of legislation first introduced in 2001 that was designed to give undocumented immigrants brought to the US as children a path to citizenship.

The DREAM Act, which has **long had broad bipartisan support**, has never made it to a president's desk — and Democrats have been less willing to trust Republicans to negotiate in good faith. The result is the liberal consensus on immigration has also moved further left, from legalizing sympathetic undocumented immigrants, often with additional border security as the trade-off, to broadly rethinking how the United States enforces immigration laws.

The 2020 Democratic presidential primary has brought that shift to the forefront.

Every candidate supports a path to citizenship for the people currently living in the United States without papers — not just those who came in as children. **Sanders, Harris, and Castro have publicly said** they would pursue legislation to provide a path to citizenship for the 11 million unauthorized immigrants currently living the United States in their first 100 days in office.

And candidates' first priority is to stop Trump's immigration agenda. Inslee **said his immediate actions** include stopping the construction of Trump's border wall, reinstating the Obama-era Deferred Action for Childhood Arrivals program — which the Trump administration decided to sunset, and which remains tied up in courts — and increasing the number of refugees the United States admits.

But some candidates are taking the debate further. Castro, the only Latino candidate in the Democratic primary, was first to propose a radical reshaping of immigration enforcement by calling to repeal the provision that makes "illegal entry" into the US a federal crime. The **law has been on the books for decades** but was rarely enforced until the George W. Bush administration, when criminal prosecution of unauthorized immigrants for illegal entry became increasingly common.

Many candidates have followed suit: Sanders, Warren, Harris, Booker, Sen. Kirsten Gillibrand, Inslee, Rep. Seth Moulton, Marianne Williamson, Andrew Yang, and Miramar, Florida, Mayor Wayne Messam have all support repealing the provision that makes being apprehended at the border a criminal offense.

**Warren's plan**, she admits, "has a lot of Castro" in it. It not only decriminalizes crossing the border without papers but also includes reductions in immigration detention, the elimination of private detention facilities, and protecting schools, medical facilities, and courthouses from immigration enforcement.

Warren also called for ending programs that allow local law enforcement to be deputized as federal immigration officers, pledged to admit six to eight times as many refugees as Trump has in her first years as president, and to implement proposals that would make it easier for asylum seekers to get a day in court. **Almost all** the candidates support **alternatives to detention facilities**, including electronic monitoring and social work monitoring.

The candidates acknowledge this is all going to be an uphill battle in Congress, which has repeatedly failed to pass comprehensive immigration reform — especially when one chamber remains in Republican hands.

Some candidates have proposals to get around that, too. Harris has called for using executive action to expand deferred action immigration programs, and to change the immigration status of DREAMers to "lawful immigrants" and retroactively allow them to be

permitted to work, which she **said** would put 2 million DREAMers on the path to citizenship.

O'Rourke's plans also focus on executive action. As Dara Lind explained for Vox, O'Rourke's proposed executive orders include ending **"metering"** — which is how US officials restrict the number of asylum seekers allowed to enter legally at ports of entry each day, ending family separation, and **expanding DACA to also include the parents**.

That said, while calls to "**Abolish ICE**" has become a rallying cry for activists, only New York City Mayor Bill DeBlasio and Messam support abolishing Immigration and Customs Enforcement and reallocating its duties to other departments.

**There are dividing lines between Democrats**



Immigrants and allies protest outside a Department of Homeland Security facility to call for the Trump administration to end family separation. | Erik McGregor/Pacific Press/LightRocket via Getty Images

Legalizing all unauthorized immigrants, not just DREAMers, was once considered the "third rail" in Democratic immigration politics; Republicans decried it as amnesty, and even **moderate Democrats** worried it would send the wrong message to people living unlawfully in the United States. Now it's uncontroversial: **Public opinion shows** that conservatives have increasingly lost the fight on a path to citizenship.

Now there are new dividing lines emerging in the party, particularly on border security and deportation. Contrary to what Trump says about Democrats, none of them actually support an "open borders" policy. But so far, the candidates mostly haven't gotten into details about who should be deported and who should be allowed into the US.

In 2014, Obama's administration prioritized convicted criminals and national security threats — but Democrats still have to decide how to define those terms.

Another dilemma is the question posed by Castro's proposal on whether crossing the border without papers should be considered a criminal offense, or just a civil one. This is a major leftward shift in how Democrats would approach migrants at the border. Migrants who enter the US without papers would still be committing a crime, and they could still be deported. But as **Lind explained for Vox** earlier this year, making crossing the border without papers a civil offense would have big ramifications, including ending the practice of family separation.

A **survey conducted by the Washington Post** found the idea has been adopted by half the Democratic candidates. Notably, however, the more moderate candidates haven't lined up behind it. O'Rourke — who has tried to emphasize his history as a lawmaker from a border district — also would not commit to it during the first Democratic debates. Former Vice President Joe Biden is against it, **telling CNN**, "I think people should have to get in line, but if people are coming because they're actually seeking asylum they should have a chance to make their case."

Biden gets at one of the most controversial parts of any comprehensive immigration proposal, and one Democrats have hardly touched: What happens to the many of millions of people currently waiting in line to legally enter the United States? Immigration advocates say the future of legal immigration is often the most difficult, especially for Democrats, because there are so many different constituencies that have different needs.

"When comprehensive immigration reform measures have been worked out on Capitol Hill, [legal immigration] has been the toughest thing to get right," Douglas Rivlin, with the liberal immigration reform group America's Voice, said. "The bottom line is that we need wider legal immigration channels ... but do you move the people who have been waiting in line first and then establish wider channels?"

Questions about increases and preferences in legal immigration must balance organized labor interests, a call for family unification, and a demand for high-skilled labor. It's a careful

calculus.

**Democrats are making their immigration argument about Trump**

In many ways, Trump has allowed Democrats to avoid the most difficult questions on immigration policy.

Details are tricky. Comprehensive immigration reform requires somehow prioritizing both the millions of people who have been waiting in legal immigration channels to come to the United States, and the legal status of millions of undocumented immigrants already living in the country. Democrats will eventually have to define what physical border security looks like after a Trump presidency that's politicized a "wall," and reconcile typically bipartisan proposals like E-Verify with the demands of the labor movement.

"The comprehensive immigration narrative really swallows up a lot of issues that were ignored for a long time," said Salvador Sarmiento, an organizer with NDLON, an organization that mobilizes day laborers. "For 20 years, all the energy and resources has been focused on passing one omnibus bill. Outwardly, that was the strategy. Inwardly in the party, there was a division of whether they were trying to even pass a policy."

But Trump, in many ways, has masked some of these divisions. Democrats are morally unified on immigration.

Being opposed to detaining children in cages is easy. Denouncing Trump's xenophobic rhetoric is uncontroversial. So is calling Trump's travel ban against Muslim-majority countries discriminatory.

And it's no surprise that Democratic candidates are, so far, finding those options preferable to working out the details of a comprehensive immigration plan.

**Vox's guide to where 2020 Democrats stand on policy**

*Health care*                                                    16  ⌄

*Criminal justice*                                              12  ⌄

*Taxes and economics*                                    12  ⌄

# Exhibit 7

# Congress of the United States
## Washington, D.C. 20510

April 20, 2020

Acting Director Matthew Albence
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th St. SW
Washington, D.C. 20536

Dear Acting Director Albence,

We write with serious concerns about the public health risks of detainees and staff at detention facilities operated by U.S. Immigration and Customs Enforcement (ICE) and contract facilities nationwide during the coronavirus (COVID-19) outbreak. We believe that the COVID-19 outbreak across the country requires the agency to be more transparent regarding the impact of COVID-19 on detainees, their employees, and the public.

As of today, the ICE.gov website reports 30 confirmed cases of COVID-19 among ICE employees working in ICE detention facilities. However, we recently confirmed that this number does not include confirmed cases among private employees at ICE contract detention facilities. As an example, ICE.gov is currently reporting two positive cases of COVID-19 among employees at the Aurora Contract Detention Facility and zero at the Otero County Processing Center. These numbers do not include three employees of the GEO Group, the contractor at Aurora, and one employee of MTC, the contractor at Otero, who recently tested positive according to ICE and the regional health department.

We believe that this oversight amounts to underreporting. All employees, regardless of whether employees in question receive their paycheck from ICE or a private contractor, should be reported. Family members of those in custody and the general populations in neighboring communities should be aware of all potential COVID-19 exposure in detention facilities.

The situation is compounded by our concern about the U.S. Department of Homeland Security's ability to protect the health and safety of detainees and their staff. Last year, detention facilities in Colorado, Arizona, and Texas instituted quarantines in response to viral disease outbreaks among their detainee populations. Despite these public health issues, ICE expanded capacity and transferred detainees into facilities impacted by these outbreaks. At the end of the viral disease outbreak, the CDC reported a total of 898 confirmed and 19 states reported probable mumps cases in adult migrants detained in 57 facilities (34 contract detention facilities, 19 county jails that housed detainees, and four ICE-operated) between September 1, 2018 and August 22, 2019. There were 33 confirmed cases among the facility staff.

We ask ICE to immediately provide data related to the following:
- Number of confirmed cases of COVID-19 among those currently in ICE custody; and

- Number of confirmed cases of COVID-19 among non-ICE employees working in ICE contract detention facilities.

These incidents have raised serious questions about the existing public health standards and procedures in both detention facilities operated by ICE and contract facilities nationwide. Omitting positive cases among contracted employees is not in line with the American precepts of transparency, accountability, and good governance. In light of this revelation, we request ICE to provide the data requested and make it available on their website. This information would ensure the health and safety of the detainees in our government's care, while also protecting the well-being of the neighboring communities during this public health crisis.

Sincerely,

JASON CROW
Member of Congress

JERROLD NADLER
Member of Congress

ZOE LOFGREN
Member of Congress

BARBARA LEE
Member of Congress

ED PERLMUTTER
Member of Congress

JAMES P. MCGOVERN
Member of Congress

NYDIA M. VELAZQUEZ
Member of Congress

FREDERICA S. WILSON
Member of Congress

ELEANOR HOLMES NORTON
Member of Congress

XOCHITL TORRES SMALL
Member of Congress

JUDY CHU
Member of Congress

ROSA L. DELAURO
Member of Congress

# Exhibit 8

AY! (HTTPS://CHECKOUT.FUNDJOURNALISM.ORG/MEMBERFORM?ORG_ID=CIR&AMOUNT=9&INSTALLMENTPERIOD=MONTHLY&CAMPAIGN=7011



(https://www.revealnews.org/)

IMMIGRATION (HTTPS://WWW.REVEALNEWS.ORG/TOPIC/IMMIGRATION/)

# Inside ICE lockdown: Face masks made of socks, no hand sanitizer and growing tensions

By Laura C. Morel (https://www.revealnews.org/author/laura-morel) / April 7, 2020



OM/SHARER/SHARER.PHP?
(MAILTO:?

From the moment officers woke him at 4 a.m. each day, Pedro Iglesias would contemplate the same question: Would the ICE Processing Center today?

He would watch officers clock in and out, walking through the barbed-wire and chain-link fences surrounding the facility, about a three-hour drive from one of the nation's most significant outbreaks, New Orleans, and wonder whether one of them had already carried the virus inside.

During his shifts in the kitchen, he and other detainees would speak about the supervisor who kept coughing. Between meals, it's Iglesias' job to wipe down the tables where detainees eat. He wished he had

disinfectant to clean with, but all the officers gave him was a cloth that he dampens with water.

He said he left Cuba for the United States last year in the wake of government harassment for refusing to participate in Communist Party activities. Ever since, he's lived here, with 13 other men in a small, fluorescent-lit pod equipped with two toilets, two sinks and two shower stalls.

Inside Pine Prairie, Iglesias said, detainees go without hand sanitizer or gloves. Some men have figured out a way to fashion masks out of their own socks. Iglesias and other detainees said officers haven't provided any guidance or notification about the virus.



So Iglesias heeds the advice of medical experts on Telemundo and CNN: He uses the small bar of soap he's allotted each week to wash his hands between meals and outings into the yard. And he waits for the people who control his life to do something.

"There's this global pandemic that's taking people's lives," the 31-year-old said, "and they have us here trapped like animals."

Pedro Iglesias Tamayo holds the small bar of soap he's allotted each week to wash his hands between meals and outings into the yard. (CREDIT: Laura Morel)

On Friday, he got the answer to the question that had gripped him every day: U.S. Immigration and Customs Enforcement announced that a 52-year-old detainee inside Pine Prairie had tested positive (https://www.theadvertiser.com/story/news/american-south/2020/04/03/coronavirus-ice-detainee-tests-positive-pine-prairie-louisiana/2946110001/) for the virus. ICE said he'd been released from the nearby Oakdale federal prison, where five inmates have died from the coronavirus. In a statement, ICE said no one at Pine Prairie was exposed to the detainee, who has been held in medical isolation since his arrival.

**We've been telling stories that change laws and lives for more than 40 years. And we're just getting started.**

Sign up for our newsletter.

| Email Address | SUBMIT |

Detention numbers have soared under the Trump administration. It has sent far more asylum seekers into detention than ever before, and once they're in custody, the administration has almost eliminated parole, meaning greater numbers are detained for extended periods. Now, with the pandemic raging, nearly 36,000 immigrants, their families and government officials are staring down the consequences of those policies.

Human rights organizations, immigrant rights advocates and a former acting ICE director worry that a massive outbreak in detention facilities will further overwhelm an already-strained health care system and put lives at risk.



The exercise yard at the Pine Prairie ICE Processing Center in December 2019. CREDIT: American South/USA Today Network

Dr. Ranit Mishori, a senior medical adviser (https://phr.org/people/ranit-mishori-md-mhs/) for the nonprofit Physicians for Human Rights, has studied migrant health for the past two decades.

"Imagine when you don't have those options to protect yourself, when you live with other people in close proximity, in dorm-like facilities, sharing bathrooms with poor access to soap and hand sanitizer," Mishori, who is also a family medicine professor at Georgetown University's School of Medicine, said in a call with reporters. "This is exactly the setup that's ideal for an infectious disease to spread."

The only way to avoid a massive outbreak, Mishori said, is to release detainees. "Acting now will save lives," she added. "Acting late will lead to death."

On March 13, ICE canceled all social visits (https://www.pbs.org/newshour/health/visits-halted-in-fed-prisons-immigration-centers-over-virus) at detention centers and later announced it would scale back (https://www.washingtonpost.com/national/ice-halting-most-immigration-enforcement/2020/03/18/d0516228-696c-11ea-abef-020f086a3fab_story.html) arrests. Two days later, it announced (https://www.ice.gov/coronavirus) that detainees with respiratory symptoms or who are at high risk of becoming seriously ill from the virus, based on Centers for Disease Control and Prevention criteria, were being housed separately from the general population. Newly arrived detainees are also being screened and isolated if they have a fever or respiratory distress. Today, ICE announced that it had released 160 detainees who it had determined were "vulnerable."

But inside facilities, detainees and their families and attorneys said, ICE has done little to protect those in its charge. Detainees live and sleep in cramped quarters where social distancing is impossible. They are still being shuffled between detention centers. Many officers go to work without gloves or masks. At some facilities, such as the Morrow County Correctional Facility in Ohio, Bergen County Jail in New Jersey and South Louisiana ICE Processing Center, detainees report that they lack soap or are provided only with what sources described as watered-down liquid hand soap.

An ICE spokesperson said detainees are provided with soap for the shower and hand soap to wash their hands. Officials from Bergen and Morrow counties said these allegations are false.

Lawyers across the country have been furiously trying to get their clients released. John Sandweg, the former acting ICE director under President Barack Obama and now a lawyer in private practice, has called for ICE to release all nonviolent detainees on bond or with ankle monitors.

Because risk assessments are conducted when immigrants first enter ICE custody, the agency already knows which detainees would pose a low flight risk if released.

"It makes little to no sense to me," he told reporters last week, "why the administration does not just take the next step."

In the meantime, fear has bubbled over into direct conflict (https://www.buzzfeednews.com/article/hamedaleaziz/immigrants-coronavirus-outbreak-ice-protests) inside ICE facilities as the first detainees and ICE employees tested positive for COVID-19. The first case, announced March 24, was a detainee at the Bergen County Jail. Two days later, a second detainee tested positive in Essex County, New Jersey. The following week, three other detainee cases emerged in New Jersey, as well as another at the La Palma Correctional Center in Eloy, Arizona.

By Friday, two more cases had been reported, one at a Pennsylvania facility and the other at Pine Prairie. As of April 4, ICE had reported 13 detainees had tested positive (https://www.ice.gov/coronavirus).

Osmany Espinosa called Reveal from The Center for Investigative Reporting moments after seeing one of these major clashes March 24. Through the glass partition of his bunker at Pine Prairie, he watched as guards in full riot gear suddenly stormed a nearby pod – known as Bravo Delta – and doused a group of men with pepper spray. Espinosa and detainees in his room yelled at the officers: "Abusers! Stop hurting them! This is abuse!" To silence them, guards shut the air vent that connects his bunker to the corridor outside, Espinosa said.

An ICE spokesperson later said seven detainees had become "disruptive and confrontational" with staff as they were escorted to the yard.

Days later, Espinosa said, brown stains left by the pepper spray remained on the walls.

It was one of at least four clashes between guards and detainees that ended with the use of pepper spray at ICE detention facilities



At Pine Prairie, Osmany Espinosa witnessed guards in tactical gear pepper-spraying detainees in a nearby bunker. (CREDIT: Laura Morel)

(https://www.buzzfeednews.com/article/hamedaleaziz/immigrants-coronavirus-outbreak-ice-protests) run by The GEO Group, one of the nation's largest private prison contractors. The company has come under intense scrutiny, through lawsuits (https://www.motherjones.com/crime-justice/2019/12/immigration-detainee-geo-forced-labor-lawsuit/) and federal investigations (https://www.sun-sentinel.com/business/fl-bz-geo-house-letter-20190712-vvmmd62bvvbxzlwysujwebtkde-story.html), over alleged mistreatment of detainees. The company did not respond to requests to comment for this story.

"It's not just coronavirus affecting us," Espinosa said. "We're also being intimidated and mistreated."

**Consequences of mass detention**

Since President Donald Trump took office, the number of detained immigrants has soared. Before then, border agents frequently allowed asylum seekers to go free while they awaited their appearance in court,

a wait that often takes months or years. Trump derided this policy as "catch and release" and sought to end it.

As a result, the number of immigrants in ICE facilities has boomed during his tenure, from 37,931 in 2017 to 50,922 in 2019, according to agency statistics (https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf).

Pine Prairie has a maximum capacity of 1,094, nearly as large as the town population of Pine Prairie. The facility consists of five housing units



Inside Manuel Rodriguez Ruiz's bunker at Pine Prairie. (CREDIT: Photo courtesy of Rodriguez family)

(https://www.ice.gov/doclib/facilityInspections/pinePrairieLA_CL_04_25_2019.pdf), which contain a mix of small and large dorms, some of which can hold up to 70 people, in a state where gatherings larger than 10 people (https://www.theadvocate.com/baton_rouge/news/coronavirus/article_922869e8-6c6d-11ea-aeee-6b6fd5e8f4bd.html) are now banned. Detainees live under the stark glare of fluorescent lights that officers flip on around 9 a.m. They sleep in bunk beds narrower than twin-sized mattresses.

They pass the time playing board games and talking to loved ones on tablets officers let them keep in the bunkers. Reveal spoke with four detainees at Pine Prairie and family members who had been in regular communication with another three. Together, they painted a picture of the uncertainty and desperation gripping detainees and their loved ones nearly four weeks into the U.S. pandemic. They fear it's only a matter of time before a COVID-19 outbreak sweeps through Pine Prairie.

Manuel Rodriguez Ruiz is the kind of immigrant who likely wouldn't have been detained before the Trump era. He sought asylum at a port of entry, claiming he'd faced persecution at the hands of Cuba's communist government. He has spent the last nine months in Pine Prairie as his immigration case slogs through court.

About two weeks ago, he said, officers distributed some face masks to his pod, but they broke after a few days. The gesture did little to assuage anxiety, Rodriguez said. Detainees in his pod barely sleep. Some nights, Rodriguez stares up at the bunk bed mattress above him, hoping that a little sleep will come before his 2 a.m. shift preparing breakfast.

On a recent Saturday, Rodriguez said, an officer entered the kitchen and was coughing so much that he could barely breathe. Eventually, the officer left.

Rodriguez, who has asthma, used to rely on the mayonnaise, saltine crackers and Maruchan instant soups sold at the commissary as a respite from the bland oatmeal, cereals, rice and potatoes served in the kitchen. But in recent weeks, he's stopped buying them.



Manuel Rodriguez Ruiz, 34, speaks from his pod at the Pine Prairie ICE facility. (CREDIT: Laura Morel)

"Those products come from the outside, and we don't know whether they're clean or not," he said. "We're scared that's a way of the virus getting inside. There are lots of people who don't buy from the commissary anymore for that reason."

To distract himself from the chaos around him, Rodriguez tries to find solace in daily chats with his girlfriend in Florida through a video chat app sardonically called GettingOut.

"This isn't about liberty anymore. This is about our health and our lives," he said. "If people on the outside are getting sick, can you imagine what it will be like in here?"

**Dwindling likelihood of parole**

Like many others at Pine Prairie, Rodriguez has requested parole, a mechanism through which asylum seekers can be released while they await a decision on their case. ICE has denied his requests multiple times for a variety of reasons, Rodriguez said. On at least two occasions, documents show, ICE said his request was denied because he had already previously requested parole.

Such denials have helped fuel ICE's swelling detention population in recent years.

In 2018, the American Civil Liberties Union sued (https://www.aclu.org/blog/immigrants-rights/ice-and-border-patrol-abuses/under-court-order-ice-must-reconsider-asylum) the Department of Homeland Security for what it called the "arbitrary detention" of asylum seekers through parole denials. The lawsuit identified ICE offices covering seven states where parole grant rates had dropped from 95% in 2013 to nearly zero under the Trump administration. A federal judge in the U.S. District Court in Washington, D.C., sided with the ACLU and in July 2018 ordered ICE to comply with the agency's own directive (https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf), which allows officers to grant parole for a number of reasons, such as when an asylum seeker doesn't pose a flight risk or has been diagnosed with a serious medical condition.

In May, the Southern Poverty Law Center and ACLU in Louisiana sued the Department of Homeland Security after it discovered that the New Orleans ICE office, which handles parole requests for Louisiana and four other states, had granted parole (https://www.reuters.com/article/us-usa-immigration-asylum/more-asylum-seekers-sue-trump-administration-over-prolonged-u-s-detention-idUSKCN1T02PR) in just two of the 130 requests it received in 2018. The low numbers continued into 2019: In December, the office declined 98% of parole requests.

In this case, too, a federal judge in Washington, D.C., ordered the New Orleans ICE office to comply with the agency's parole guidelines, and the grant rate has improved since then, reaching 11% for new requests in March.

Last week, the Southern Poverty Law Center filed an emergency motion (https://www.courtlistener.com/recap/gov.uscourts.dcd.207794/gov.uscourts.dcd.207794.61.1.pdf) that calls for the immediate release of asylum seekers held in ICE custody to mitigate the risk of coronavirus exposure.



The Pine Prairie ICE Processing Center is run by The GEO Group, one of the nation's largest private prison contractors. (CREDIT: Patrick Michels/Reveal)

paroled. While a judge in New Jersey ordered
(https://www.northjersey.com/story/news/new-jersey/2020/03/27/nj-
coronavirus-ice-detainees-bergen-essex-hudson-county-jails-nj-ordered-
released/2923848001/) 10 at-risk detainees released from county jails
following an outbreak there, several lawyers said they haven't had such
luck.

"The message that we have gotten back is ICE is not budging on this,"
said Jessica Shulruff Schneider, detention program director at
Americans for Immigrant Justice, based in Miami. "They're not going to
be releasing individuals just as a result of COVID-19."

Attorney Allegra Love, director of the legal nonprofit Santa Fe Dreamers
Project, said lawyers in her network have filed more than 100 parole
requests. Many have already been denied. "This is going to end in
wrongful death suits," she said.

**Families in crisis**

On Facebook groups and WhatsApp chats, detainees' family members
exchange news and rumors about the virus, the pace of their messages
accelerating as the national death toll continues to climb.

One WhatsApp group, called Louisiana 🇨🇺, has 138 members from Cuba
and across the U.S. They've shared contact information for attorneys,
the website for the Louisiana governor's office and articles about ICE
officers diagnosed with COVID-19. They post supportive messages as
family members await news on their loved ones' parole requests and
asylum cases.

"God protect all of them," one woman from Ciego de Avila, Cuba, posted
to the Spanish-language Facebook group
(https://www.facebook.com/groups/2800066520067467/) "Liberty for
the Cuban detainees in Louisiana." She included video of a recorded
message from four detainees at Pine Prairie. "Everyone here is
terrorized," one says.

Iglesias' mother, Maria Antonia, who
asked that Reveal not use her last
name, is among the nearly 4,000
members of this Facebook group.
She lives in Havana and cares for her
13-year-old grandchild, Iglesias' son.
She last saw Iglesias last February,
before he boarded a raft to Mexico to
begin his trek to an international
bridge near McAllen, Texas, to seek
asylum. She doesn't understand how
someone who came to seek refuge in

the U.S. ended up imprisoned for a
year. "I don't have anyone who can
explain to me what is going on."

Now she sees him on her phone
through video chats a few times a
week, his face pixelated and backlit
by the fluorescent lights behind him.

Last month, he said he was feeling
ill. Maria Antonia reassured him that
it was just anxiety.

But she finds it harder and harder to
comfort him. In a recent call, Iglesias
asked her, "What are we going to
do?"

She didn't have an answer.

**UPDATE, April 7, 2020:** *This story
has been updated with a figure from
ICE on how many detainees it has
released.*

*Reporters Patrick Michels and Aura Bogado contributed to this story. It
was edited by Andrew Donohue and Esther Kaplan and copy edited by
Nikki Frick.*

*Laura C. Morel can be reached at* lmorel@revealnews.org
(mailto:lmorel@revealnews.org)*. Follow her on Twitter:* @lauracmorel
(https://twitter.com/lauracmorel)*.*



Pedro Iglesias Tamayo speaks with his mother
over the GettingOut video visitation app. His
mother is in Cuba. (CREDIT: GettingOut
screenshot courtesy of Iglesias family)

**Everyone should have access to the facts.**

Yes, I want to help!
(https://checkout.fundjournalism.org/memberform?
org_id=cir&amount=12&installmentPeriod=monthly&campaign=7011Y000001bFca&then

---

REPUBLISH THIS CONTENT

---

## Related



**How federal agencies put immigrants and
immigration workers at risk amid
coronavirus**

# Exhibit 9

# MotherJones

**CORONAVIRUS    MARCH 13, 2020**

## ICE Is Ignoring a Simple Way to Slow the Spread of Coronavirus: Let People Out of Detention

*"This is a disaster waiting to happen and there's no reason it should be."*

**NOAH LANARD**



An administrator walks through a group cell inside the Winn Correctional Center, a for-profit prison in Louisiana used by Immigration and Customs Enforcement, during a September tour. **Gerald Herbert/AP**

*The coronavirus is a rapidly developing news story, so some of the content in this article might be out of date. Check out our most recent coverage of the coronavirus crisis, and subscribe to* Mother Jones' *newsletters.*

Last week, a Cuban asylum seeker called me from a for-profit jail in Louisiana to express the same fear shared by people across the world. The man, whom I'll call Alberto to protect him from potential retaliation, had more reason to worry about the coronavirus than most: He was detained in a crowded room alongside nearly 100 others at a jail run by LaSalle Corrections, a company with a long record of providing shoddy medical care. "If coronavirus gets in here," he said, "it's going to be a massacre."

"It's going to be a massacre because everyone will get it at the same time," Alberto explained in Spanish. "Not just one person. Everyone will get it at the same time because we're all breathing the same air." His concern is shared by immigrant advocates and detention experts who have spent years documenting Immigration and Custom Enforcement's in some cases fatally substandard medical care.

There is a simple step the agency could take to reduce the risk of the coronavirus spreading and potentially causing more deaths in its custody: ICE could release people, particularly those who are most vulnerable to the virus, who don't pose a threat to public safety. That

would lead to thousands of people being released from detention. So far, ICE appears set on keeping detention numbers high. In the first week of March, ICE took more than 5,400 people into detention, a similar rate to before the outbreak began.

**"If coronavirus gets in here,"
Alberto said, "it's going to be a
massacre."**

Marc Stern, who served as the health services director for Washington state's department of corrections, explained that reducing detainee populations would slow the spread of the virus by creating more distance between people. In a recent memo making recommendations to Washington jails, Stern, now an assistant professor at the University of Washington's School of Public Health, wrote that local officials should ask whether there are inmates who can be released on their own recognizance or whether they could employ alternatives to detention. Anne Spaulding, a medical doctor and correctional health expert in Emory University's epidemiology department, has also recommended that jails consider detention alternatives such as electronic monitoring.

Fortunately, ICE has broad authority to release people in its custody. Eunice Cho, a senior staff attorney and detention expert at the American Civil Liberties Union, said, "The question is whether the government will actually exercise this and mitigate what continues to be a very foreseeable disaster." Luz Lopez-Ortiz, a senior attorney at the Southern Poverty Law Center, said, "This is a disaster waiting to happen and there's no reason it should be."

As of Tuesday, four people in ICE custody had been tested for the coronavirus; all tested negative. But if—and presumably when—the coronavirus enters ICE detention centers and the county jails the agency contracts with, it could be particularly difficult to stop the virus from spreading. "Immigration detention is like a cruise ship but obviously worse for many reasons," Cho explained. ICE detainees often live together in large rooms filled with dozens of bunk beds, not in cells. Then there are ICE's longstanding issues with medical care. Cho's experience with ICE's handling of infectious diseases does not give her much confidence in its ability to respond to something as serious as the coronavirus. (ICE did not respond to questions about how many people it has tested for the coronavirus or whether it plans to release people from vulnerable populations.)

At a congressional hearing on Wednesday, Rep. Grace Meng (D-N.Y.) asked acting ICE director Matthew Albence whether he would consider releasing detainees who are most at risk of the coronavirus, including older people and those with preexisting medical conditions. "It would be a prudent course of action," she said. Albence replied, "The people that we have in detention are there because they're public safety threats or flight risks." The implication was that his hands were tied: He couldn't let them out. That is not true, nor is it true that everyone in ICE custody is a flight risk let alone a threat to others. "When it comes down to it," Cho said, "ICE has the power to decide who they release or not."

Federal judge James Boasberg has repeatedly found that ICE is unnecessarily subjecting asylum seekers to mandatory detention. Between 2011 and 2013, five of ICE's 24 field offices approved 92 percent of asylum seekers' requests to be released on parole. In the first months of the Trump administration, that rate dropped to 4 percent. In response to a class action lawsuit, Boasberg ruled that the government needed to return to following its own parole policy, which requires it to release asylum seekers who don't pose flight risks or threats to public safety. Still, ICE kept denying most parole applications, a decision that forced Ansly Damus, a Haitian asylum seeker, to spend two years inside a windowless jail with no access to fresh air.

Last year, the SPLC and the ACLU of Louisiana sued the Trump administration after it started ignoring ICE's parole policy at a sixth field office in New Orleans. The office, which covers five southern states, had approved 75 percent of parole applications in 2016. By 2019, it was approving none. "Defendants offer absolutely no explanation for the precipitous nosedive in the parole-grant rates issued by an Office that has allegedly preserved the same underlying policy for making those decisions all along," Boasberg ruled in a September decision that forces the New Orleans office to follow the parole policy.

At first, lawyers with clients in Louisiana saw no sign that ICE was complying with Boasberg's order. In February, ICE's parole rate in the region rose to 21 percent, up from 2 percent in January. Lopez-Ortiz, who is working on the case for the SPLC, said deportation officers are telling asylum seekers that they'll only be granted parole if they have close relatives with legal status who make at least about $60,000 per year. Neither of those are requirements under the 2009 ICE parole directive that theoretically remains in effect. Lopez-Ortiz spoke with a US citizen from Cuba whose fiance has been denied parole multiple times. She makes roughly $40,000 per year and ICE officials told her

that's not enough, Lopez-Ortiz said. (Lopez-Ortiz has heard that ICE has a coronavirus contingency plan, but she has not seen it yet. She and others working on the parole lawsuit plan to request it and may seek further action from Boasberg if they decide it is inadequate.)

Across the country, more than 6,500 of the nearly 38,000 people in ICE custody as of Sunday had established a fear of being persecuted in their home countries in interviews with US asylum officers. Only 38 percent of all ICE detainees have a criminal conviction, many of which are for minor offenses like crossing the border without authorization. Among the 50 percent of ICE detainees who were stopped at the border, as opposed to being arrested by ICE within the country, only about one in nine have a criminal conviction.

When we spoke last Friday, Alberto said fellow detainees were always getting the flu. The conditions were horrible and unhygienic, he said. They breathed the same air and touched the same things. Alberto believed the logical response would be for ICE to let them join relatives in the United States while their cases were pending. Instead, he was living in fear at an isolated jail built to hold convicted criminals. "We feel kidnapped," he said, "and nobody hears us."

Copyright © 2020 Mother Jones and the Foundation for National Progress. All Rights Reserved.

# Exhibit 10

# MotherJones

POLITICS   JULY 21, 2020

# 7 Detainees Sued ICE. Then They Were Transferred to a Notorious Alabama Jail.

*The cross-country transfers are putting vulnerable people at increased risk of COVID-19.*

NOAH LANARD



People detained at the Etowah County Detention Center in Gadsen, Alabama, come to the windows to watch as protesters march in front of the jail in 2011. **Sarah Dudik/AP**

*For indispensable reporting on the coronavirus crisis and more, subscribe to* Mother Jones' *newsletters.*

On June 29, Stephen Brown was woken up around 4 a.m. and told that he was about to be moved from the jail in Clinton County, Pennsylvania. He didn't know where he was heading. Brown, who came to the United States from Jamaica as a teenager 40 years ago, learned that six other immigrant detainees were being transferred from the jail. He realized that the seven of them had something in common: They were all suing Immigration and Customs Enforcement.

Over the next 24 hours, they were loaded into a van to cross through Pennsylvania, a plane to Texas and then Louisiana, and a bus to Alabama, according to a sworn declaration Brown submitted in federal court this month—all of which put them in close quarters with each other and with guards just as the number of COVID-19 cases nationwide was spiking. The seven men ended up an hour northeast of

Birmingham at the Etowah County jail, which now has 20 active COVID-19 cases, according to ICE's website. The Pennsylvania jail they

Birmingham at the Etowah County jail, which now has 20 active COVID-19 cases, according to ICE's website. The Pennsylvania jail they left has none.

Eunice Cho, a senior staff attorney at the American Civil Liberties Union, which is representing Brown in his suit, says ICE has long used transfers to the Deep South as a form of retaliation and to get people under the jurisdiction of conservative judges. What's new is that those transfers now mean potentially exposing people like Brown, who has high blood pressure, to the virus that led them to sue for their release in the first place. They also risk spreading COVID-19 between detention centers.

"We're seeing ICE transfer people in a retaliatory manner," Cho says. "This, of course, is not a new thing. ICE has done this for years before COVID broke out. But in light of the COVID pandemic, the risks to people because of transfer are even more heightened."

An ICE spokesperson declined to comment. But in response to another recent ACLU lawsuit, ICE denied allegations that it transferred people from Massachusetts to Etowah as retaliation for suing the agency.

Brown ended up in ICE custody after pleading guilty to an attempted heroin distribution charge in 2016 and serving time in federal prison, according to federal court records. An immigration judge ordered him to be deported this year, though Brown, a US Army veteran, is now appealing that decision.

_____

## "We're seeing ICE transfer people in a retaliatory manner," says ACLU attorney Eunice Cho.

Neither the ACLU nor Brown's immigration attorney had a chance to stop his transfer because they weren't notified. The ACLU is demanding that ICE release Brown or safely return him to Clinton County, where he would be able to meet with his immigration attorney.

In addition to Brown, the ACLU is representing 10 other detainees who are vulnerable to COVID-19 and seeking release from three Pennsylvania immigration detention centers. Cho says Brown is the only plaintiff in the case who has been transferred out of the state.

The other six detainees who were transferred, who were among dozens of people at Clinton County suing ICE without an attorney as part of a different lawsuit, had all taken part in a brief hunger strike at Clinton a few days before the transfer, according to Brown's declaration. The ACLU argues in its lawsuit that the transfer was "blatant retaliation." A jail roster shows that all six remain at Etowah.

The transfer could make it harder for the six men to secure improved detention conditions. Their lawsuit focuses on conditions at the Clinton County jail. Transfers cause claims to become moot, or no longer legally relevant, when a lawsuit challenges conditions at a specific jail, Cho explains. If the six men filed a new lawsuit to demand better treatment at Etowah, ICE could transfer them again or choose to fight the case in the conservative Northern District of Alabama.

In April, Bakhodir Madjitov, an Uzbeki asylum seeker who has high blood pressure and a heart condition, was one of 19 medically vulnerable people who sued to be released from Etowah to protect him from COVID-19. The complaint filed in the Northern District of Alabama stated that Etowah had responded to the pandemic by moving more than 100 ICE detainees into one unit of the jail, where they were often in close proximity to each other in common areas. Instead of clamping down on the spread of the virus by enabling social distancing and avoiding new transfers, the lawsuits states, the jail purchased a "fogger" machine to spray cleaning chemicals, even though the Centers for Disease Control and Prevention doesn't recommend the practice.

Judge R. David Proctor, a George W. Bush appointee, ruled against releasing Madjitov and his fellow plaintiffs in May. With only one COVID-19 case among Etowah ICE detainees at the time, Proctor argued that it was hard to determine whether they would be safer inside or outside the jail.

Madjitov, who is married to a US citizen and has three young boys, told me last week that he was moved to isolation cell at Etowah on July 6 after coughing and experiencing body aches, and a few days later he tested positive for COVID-19. Most of the people in his unit had been sick, but many avoided getting tested because they didn't want to be moved to solitary confinement, Madjitov said. He believed the outbreak had been caused by ICE transferring people to Etowah from a Massachusetts county jail in June. One of those people became Madjitov's cellmate after a one-week quarantine, he said.

Etowah, which did not respond to a request for comment, has long been criticized by immigrant advocates for lacking basic amenities like

Etowah, which did not respond to a request for comment, has long been criticized by immigrant advocates for lacking basic amenities like an outdoor recreation area, but it's been a boon to the local economy. After ICE decided against ending its contract with Etowah in 2011, the local paper wrote, "It had to be like Christmas, New Year's, the Fourth of July and a whole bunch of birthdays rolled into one when Etowah County officials got 'the call' telling them U.S. Immigration and Customs Enforcement had decided to keep more than 300 detainees in the Etowah County Detention Center." A 2018 AL.com investigation found that the local sheriff had bought a $740,000 beach house after pocketing more than $750,000 in jail food funds. The following year, a new sheriff invited the television station A&E to send innocent people into the jail to be undercover inmates on a reality show.

Brown wrote in his declaration that Etowah seemed worse than Clinton County and that the intake process had been particularly bad:

> There were about 25 guys in the intake cell. It was impossible to social distance there—I was sitting right next to people. Some of them were laying on the ground—including me, because I was tired and wanted to sleep. On the ground, we were laying right next to each other. It smelled like pee on the ground too where we were laying. It was really filthy. I had to wait about 12 to 13 hours until was processed. I saw the intake people take on and off their masks—they were not consistently wearing them. Around 4:00 or 5:00am we were finally taken [to] the quarantine block.

Brown's daughter, Britney, a rising senior at the Fashion Institute of Technology in New York City, still hopes that her dad will be able to attend her graduation next year. "America was built off the backs of immigrants," she said. "Why do these people have to be treated this way? I don't understand. It's just disgusting in my opinion."

Copyright © 2020 Mother Jones and the Foundation for National Progress. All Rights Reserved.

# Exhibit 11



# Emails Show Officials Blocked Coronavirus Testing During Outbreak at Mesa Verde ICE Jail

**HEADLINE** AUG 07, 2020

*Image Credit: Twitter: @CIYJA*

A federal judge in California has ordered Immigration and Customs Enforcement, ICE, to establish rapid, on-site COVID-19 testing and to set up a dormitory for coronavirus-positive prisoners at the Mesa Verde Detention Facility in Bakersfield. Thursday's order follows a coronavirus outbreak that hospitalized two prisoners and infected at least seven others. The ruling cites disturbing emails between ICE officials and the GEO Group, the private prison company that runs Mesa Verde. In one email, a clinical operations specialist at a healthcare company that provides services to ICE says, "Testing all detainees will potentially cause the same housing issue we had last week but on a larger scale. Completing the testing is not the issue it is just what we will need to do with the results once they are received." Over 4,100 prisoners have tested positive for COVID-19 at ICE prisons across the United States.

In more immigration news, two men in the custody of ICE died Wednesday, making this fiscal year the deadliest for immigrants in ICE custody since 2006. Meanwhile, the Trump administration is dramatically increasing fees for dozens of immigration and work visa applications. This includes a more than 80% increase on naturalization applications, which will now cost over $1,000. There will also be an unprecedented $50 fee for asylum applications. The new fees go into effect in October.

**TOPICS:**   Coronavirus   Immigrant Rights   Refugees   Immigration   Prison   California

# More Headlines from August 07, 2020

## Study Predicts U.S. Coronavirus Deaths Could Reach 300,000 by December

AUG 07, 2020

# Exhibit 12

 Miami Herald | IMPACT2020

# Miami Herald

IMMIGRATION

# Miami federal judge orders a new fact-finder to investigate ICE detention centers

BY MONIQUE O. MADAN

JULY 20, 2020 11:35 AM , UPDATED JULY 20, 2020 04:09 PM



Detainees at Krome Processing Center in Miami-Dade and Broward Transitional Center in Pompano Beach have been begging to be released since the coronavirus pandemic started. They say they have no access to personal protective equipment.

BY COURTESY OF MIRAMAR CIRCLE OF PROTECTION | **MARTA OLIVER CRAVIOTTO**



**Listen to this article now**
03:22   Powered by **Trinity Audio**

After a conflict of interest surfaced two weeks ago involving a Miami law firm charged with investigating South Florida immigration jails, a Miami federal judge has appointed a new observer to complete the task.

Over the weekend, U.S. District Court Judge Marcia G. Cooke assigned Matthew C. Dates – a Miami attorney who represented Secret Service agents during their testimony before the grand jury investigating President Clinton in the 1990s – to determine whether U.S. Immigration and Customs Enforcement officials have violated her court orders aimed at preventing coronavirus cases behind bars.

Cooke's decision to hire Dates, a Stearns Weaver Miller attorney, comes exactly two weeks after she abruptly <u>reversed her order to have Michael B. Chavies</u> – a longtime Miami trial lawyer, former Miami-Dade circuit judge and partner at Akerman LLP in Miami – do the job: inspect and investigate the Krome Processing Center in Miami-Dade, the Broward Transitional Center in Pompano Beach and the Glades Detention Center in Moore Haven.

**TOP ARTICLES**



He calls himself a 'witch.' Feds are calling him a kidnapper in the missing mother case

Cooke offered no explanation on why she reversed her order just hours after she filed it, but according to Akerman<u>'s own website</u>, the firm represented long-time client The GEO Group – a private prisons company that is contracted to run several prisons and detention centers nationwide, including the Broward detention facility – in a $307 million acquisition.

The law firm had also done white-collar work, defense work and regulatory litigation involving federal agencies such as the Department of Homeland Security

— which oversees ICE.

## Today's top headlines

Sign up for the Afternoon Update and get the day's biggest stories in your inbox.

Enter Email Address

protected by reCAPTCHA
Privacy - Terms

SIGN UP

Cooke's new order filed late Friday was nearly identical to the first. Both say that "a continued failure to provide detainees with bare minimum necessities and supplies to survive the pandemic is evidence of deliberate indifference to medical needs, tantamount to the infliction of cruel and unusual punishment because it increases the risk of exposure to a lethal and highly-contagious disease."

Cooke added: "The Eighth Amendment does not mandate comfortable prisons, but neither does it permit inhumane ones... Accordingly, the Court finds it appropriate to appoint a special master... to assess whether ICE is committing an ongoing violation of the detainees' constitutional rights."

Cooke's order, part of an ongoing lawsuit seeking the release of about 1,200 U.S. Immigration and Customs Enforcement detainees, says Dates will have the authority to request any records, physically inspect the three facilities and take photos and videos of conditions inside. Cooke said Dates' findings will be filed under seal until they are redacted and made public.

Dates, who had no comment Monday, has experience defending allegations made by the U.S. government regarding securities fraud, Clean Water Act violations, and Ponzi schemes. According to the law firm's website, Dates spent about seven years at the United States Attorney's Office as an assistant U.S attorney in the executive, narcotics, major crimes and appellate divisions. At one point, he also supervised the Office of the Special Counsel for Public Affairs.

He will be paid $650 an hour until the order expires on Sept. 1. The cost is to be split equally between ICE and the detainees' lawyers, Cooke said.

## Local news has never been more important

Subscribe for unlimited digital access to the news that matters to your community.

#READLOCAL



Cooke's designation of an investigator came in response to a recent motion filed by immigration lawyers accusing ICE of violating the courts' April 2020 order by: co-mingling covid-positive detainees with individuals who have not been confirmed with the disease, failing to provide cleaning supplies and masks to detainees and not educating detainees about the COVID-19 pandemic. The detainees and their attorneys also accuse the agency of not promoting or enforcing social distancing within the detention centers.



The fear that the influx of newcomers would bring coronavirus with them — while ICE refuses to test detainees for the illness —sparked two violent fights on April 7 at the Krome detention center. *ANONYMOUS*



**MONIQUE O. MADAN**

    305-376-2108

Monique O. Madan covers immigration and enterprise; she previously covered breaking news and local government. Her work has appeared in The New York Times, The Boston Globe, The Boston Herald and The Dallas Morning News. She is currently a Reveal Fellow at the Center for Investigative Reporting. She graduated from Miami Dade College and Emerson College in Boston. A note to tipsters: If you want to send Monique confidential information, her email and mailbox are open. The address is 3511 NW 91st Ave, Doral, FL 33172. You can also direct message her on social media and she'll provide encrypted Signal details.

**FROM OUR ADVERTISING PARTNERS**



**1 Simple Trick to Cut Your Electric Bill by 90%**
OKOWATT



**25 States Where Americans Don't Want To Live Anymore**



**Put Rubber Bands over Your Door Knobs, Here's Why**

# Exhibit 13



# Watchdog suing ICE, DHS, CBP
# release records of deaths in cu

BY **REBECCA KLAR** - 07/23/20 12:43 PM EDT

**3,161** SHARES                                           SHARE          TW

## Just In...

**18 years after Jam Master Jay's fatal shooting, two men charged in his death**
IN THE KNOW — 7S AGO

**Employee ownership, the wealth gap, and the current crisis**
OPINION — 8M 20S AGO

**Federal judge rejects Louisiana bar owners' challenge to closure order**
COURT BATTLES — 24M 19S AGO

**Are women finally reclaiming their time?**
OPINION — 38M 21S AGO

**Virginia state senator faces felony charges after Confederate monument protest**
STATE WATCH — 42M 54S AGO

**Federal judge temporarily blocks Trump transgender health rule from taking effect**
HEALTHCARE — 53M 27S AGO

**Texas Democrat: US natural gas vital in transition to renewables**
BLOG BRIEFING ROOM — 54M 20S AGO

**DHS rejects government watchdog finding that top officials**


© Greg Nash

Watchdog group American Oversight filed a lawsuit Thursday compelling federal agencies to release information about the deaths of migrants detained by federal authorities.

American Oversight is seeking the release of records the group has yet to receive from the Department of Homeland Security (DHS), U.S. Customers and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) despite filing a series of Freedom of Information Act (FOIA) requests.

"Reports have shown us time and time again that deaths in DHS custody are avoidable. We can't trust this administration to follow best practices for keeping detainees safe," Austin Evers, executive director of American Oversight, said in a statement. "Trump's anti-immigrant policies have made it clear that the safety of migrants is not a priority. Each of these people have families who deserve to know the conditions that led to their loved one's death."

Spokespeople for ICE and CBP declined to comment on the specifics of the pending litigation.

"However, lack of comment should not be construed as agreement or stipulation with any of the allegations," the CBP spokesperson added in a statement.

**were improperly appointed**

ADMINISTRATION — 59M 53S AGO

VIEW ALL

The lawsuit, filed in federal district court in D.C., is over seven FOIA requests filed by American Oversight, two from March and five from June, for records from the federal agencies related to the deaths of detained migrants.

**DHS rejects government watchdog finding that top officials were...**

**GOP group launches new ad featuring ex-Trump DHS official endorsing...**

American Oversight is asking the court to order the federal agencies to conduct a search to uncover all records related to the FOIA requests, as well as enjoin the agencies from continuing to withhold any and all non-exempt records responsive to the FOIA requests.

The lawsuit is the latest in the watchdog's investigations into the Trump administration's immigration policies.

Twenty-seven detainees have died in ICE custody since 2018, according to ICE data.

TAGS   DHS   IMMIGRATION AND CUSTOMS ENFORCEMENT   CBP   AMERICAN OVERSIGHT

SHARE          TWEET

Related News          by          |



GOP senator draws fire from all sides on Biden,



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2020 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

Do Not Sell My Data

# Exhibit 14



95°

TRENDING   Drew Pearson HOF   Coin Shortage Hits Tooth Fairy   Lesson Plan   Clear the She...

**EL PASO**

# Cuban Asylum Seeker Remains Detained by ICE Without Parole

By Lauren Villagran • Published on February 9, 2020 at 4:40 pm

  

*David Maung/Bloomberg via Getty Images*



Cuban Ariel Guzman waited four months in a Mexican border town for his turn to seek asylum in the U.S., legally.

Immigration agents placed Guzman -- whose anti-communist views made ████ ██ ████get of the Cuban government -- in handcuffs and chains and bused him to federal detention.

"We came to a country where freedom of expression is permitted, where liberty is allowed," the former IT professional told the El Paso Times, speaking for himself and other detained Cubans. "We understood that the United States is a place that respects laws, the only country that has signed all the international accords on human rights."

## Texas News
News from around the state of Texas.



**26 MINS AGO**
Texas Dems Unwilling to Have a 'Serious Conversation' About Confederate Monuments:
Lt. Gov. Dan Patrick

**4 HOURS AGO**

"So we don't understand why they have detained me and the other asylum seekers without parole," he said. "They have in many cases given incoherent explanations."

Detention without parole remains a centerpiece of the Trump administration's crackdown on asylum seekers. ICE field offices including El Paso, Los Angeles and New Orleans are increasingly denying parole, a conditional release which allows asylum seekers to live in the U.S. while pursuing their claims, according to the ACLU.

At four immigrant detention centers run by U.S. Immigration and Customs Enforcement in West Texas and New Mexico, an asylum seeker's chance of earning parole is shrinking drastically, according to data compiled by the CLU as part of an ongoing court case. The parole grant rate dropped from about 75% in July 2018 to 58% in October 2019. It fell again to 36% in November and December.

The El Paso Times interviewed Guzman on numerous occasions, as well as a dozen Cuban, Venezuelan, Indian and Guatemalan asylum seekers held at the Otero County Processing Center, all denied parole in the past six months. At least seven said they were denied parole after being found to have a "credible fear" of persecution in their home country.

In asylum cases, ICE can release asylum seekers "on parole" to a sponsor. They are then responsible for attending court hearings or ICE check-ins; ICE can also apply alternatives to detention, such as a GPS ankle monitor or mandatory cellphone check-ins.

During President Donald Trump's first year in office, in 2017, ICE field offices across the country began categorically denying parole to detained asylum seekers, including in El Paso where the grant rate neared zero, according to the ACLU.

The ACLU sued El Paso and four other ICE offices with parole rates at or near zero -- Los Angeles, Detroit, Newark and Philadelphia -- and won an injunction that pushed the parole grant rates back up.

"A few years ago, field offices were granting parole in 90% of cases under an Obama-era policy," said Michael Tan, deputy director of the ACLU's Immigrants' Rights Project. "In a nine-month period in

2017, the five field offices were denying parole in 100% or nearly 100% of cases. You saw a clear crackdown and a blanket detention policy rolled out, including in El Paso."

But the administration never officially, or publicly, changed its parole policy, Tan said.

ICE declined to comment on the parole grant rate for asylum seekers in El Paso, citing the pending litigation.

"However, lack of comment should not be construed as agreement with or stipulation to any of the allegations," ICE said in a statement. "Our trained law enforcement professionals adhere to the (Department of Homeland Security's) mission and values, and uphold our laws while continuing to provide the nation with safety and security."

Of roughly 40,000 detainees in ICE custody as of Jan. 18, 22% have established claims of persecution or torture that open the door to an asylum claim, according to ICE data. Two-thirds of ICE detainees, including Guzman, have no criminal records.

Those who are found by U.S. Citizenship and Immigration Services asylum officers to have a "credible fear" of returning to their home country are eligible for parole.

Guzman passed his credible fear interview, according to a transcript obtained by the El Paso Times. But he received his parole determination Nov. 18 and was denied.

The trouble that forced Guzman to flee Cuba started with Facebook.

Guzman was teaching computer skills at a youth program on the island when he signed up for the social media site in 2010. He didn't realize the Cuban government ? controlled by a Communist regime for 50 years at the time ? viewed the site with deep suspicion.

"State security agents found out immediately, from spying on the servers," said Rolando Fernandez, a childhood friend who fled Cuba for Dallas in 2016. "They fired Ariel and dubbed him a 'counter-revolutionary.' He couldn't find another job, because 90% of jobs in Cuba are tied to the government."

Guzman said he spent the next nearly nine years washing cars to put food on the table for his son and mother, who has lupus, a serious autoimmune condition. He didn't consider leaving Cuba,

to care for them

"I couldn't abandon them," ██ ████

But in late 2018 and early 2019, as the Cuban government prepared to approve a new constitution, Guzman spoke out against it -- in particular, a tenet that enshrines socialism as the country's governing model. He shared his opinions in public debates held by the government.

He paid a price for speaking freely. Political police questioned him multiple times, held him and beat him on several occasions, according to the transcript of Guzman's account to an asylum officer, taken under oath.

Fernandez corroborated the story. "They started to visit his house," he said. "They threatened ██ █e away his mother's medicine. Then, a friend who also spoke out disappeared. I visited Cuba around that time and I told him, `Your only option is to request asylum in the U.S. or hide in an embassy.' His life was in danger."

Detained immigrants, including asylum seekers, have few of the rights of those in the criminal justice ██ ████

Although they may hire counsel, they aren't entitled to a public defender. Law and legal precedent sets limits on the detention of immigrants for immigration violations, but ICE can hold them for the duration of their immigration proceedings. That can take months or years if court dockets are ███ ██ if a case is appealed.

Unlike the criminal justice system, the immigration court system ? currently overwhelmed by more than 1 million pending cases ? is governed less by law than by policy, which can be variable and influenced by politics.

"It's counter-intuitive because our whole criminal justice system is ██████ound the idea that you are innocent until proven guilty," said Sarah Pierce, policy analyst with the nonpartisan, nonprofit Migration Policy Institute in Washington, D.C.

"But when you step into immigration law, the idea is you are guilty until proven innocent," she said. "Like much of immigration law, it's completely up to the officers holding the case file."

Guzman tried to follow the letter of the law. He reached Ojinaga, a small Mexican border town south of Presidio, in June and put his name on the list of asylum seekers hoping to cross the border legally. He waited four months for his number to be called by U.S. Customs and Border Protection and he entered an official port on Sept. 19.

"I wanted to do everything the legal way," he said. "I waited my turn, which is what the law says to do."

But while he was waiting, in July, the Trump administration issued an asylum ban that required asylum seekers to first seek refuge in a country other than the U.S.

The ban is being challenged in court. In November, a U.S. District Court judge issued an injunction exempting all non-Mexican asylum seekers "who were unable to make a direct asylum claim at the U.S. (port of entry) before July 16, 2019, because of the U.S. Gov_____s metering policy." Then, the 9th Circuit stayed the injunction; the ban is in force while on appeal.

ICE first transported Guzman to New Mexico's Torrance County ICE detention center, where an asylum officer interviewed Guzman in October for an hour and found his claims of persecution in Cuba believable. Then, ICE moved him again, to Otero.

There, a deportation officer denied his parole request, deeming him a "flight risk," according to a copy of his parole determination. But Guzman said the officer verbally told him he wasn't eligible for asylum, thanks to the asylum ban.

"When I arrived at the U.S. border, I didn't know about this rule," he said. "I couldn't follow a law that didn't exist at the moment I arrived."

He appealed ICE's parole decision and provided additional letters of support from Fernandez in Dallas and family members in Michigan, only to be denied again.

Guzman has been held nearly five months now at Otero, without charge or parole.

"The due process problem there is huge," said Ian Philabaum, program director at the Innovation Law Lab, which participates in an El Paso attorneys' collective to provide representation to detained immigrants.

"Detention facilities are black holes," he said. "They exist inside with DHS acting with impunity despite its own policy directives. This is a big issue here."

The Executive Office of Immigration Review, which oversees the nation's immigration courts, reports the median case completion time for detained immigrants was 46 days nationwide in fiscal 2019, up from eight days in fiscal 2009.

For asylum seekers in Otero denied parole, an immigration court decision can take months or even years, according to detainees and El Paso-area immigration attorneys, and they can be held for the duration of their immigration proceedings.

MTC, the private corporation that manages Otero, runs the facility like a jail, Guzman said. The more than 900 detainees inside live on a schedule in which every aspect of the day is regulated; they on bunks in dormit          Spanish-speaking detainees call tanques, or tanks.

"No one knows what desperation is until you've been detained by ICE," Guzman said. "They say this isn't a prison. But if it's not a prison, what is it? Because I don't have the freedom to leave."

Guzman, held since September, saw an immigration judge for the first time Jan. 23 -- Judge Jacinto Palomino.

Palomino's courtroom is inside the Otero detention center, accessible through two locked doors that require a security guard to open them. Guzman sat in a crowded row, shoulder to shoulder with men from Mexico and Cuba; in the row behind him were two men from Ghana and China. All wore the          vernment-issue navy or orange scrubs and jean jackets.

Only three of the men had an attorney.

Shuffling through blue file folders stack          ay on the bench, Palomino called Guzman's name, and Guzman rose alone. The judge explained Guzman's right to delay proceedings until he finds an attorney and fired off four questions about his citizenship and plans to apply for admission t          U.S.

Guzman listened to an interpreter through headphones.

Palomino asked a guard to hand Guzman an I-589 -- an asylum application.

"Fill it out in English," he said to Guzman, who doesn't speak English and can't afford an attorney. "Say who you fear, what you fear in Cuba. You need to corroborate your claim with evidence."

Although Guzman had already explained his fear of persecution to the asylum officer and presented evidence to ICE of his claim and his family ties in the U.S., he would have to do it all again on the asylum application.

Palomino set Guzman's next hearing for March 19 -- guaranteeing him at least another two months in detention.

ICE agents "tell us it's almost impossible to win here, at Otero," Guzman said.

"I have to leave it in God's hands," he said. "I don't have any other option. I don't have the resources for an attorney. I have to do this alone. Another month and a half, two months waiting for my next court date in here? What can I say?"

Copyright AP - Associated Press

---

This article tagged under:

**EL PASO**



---

CCPA Notice

SPONSORED • WILD ALASKAN COMPANY

**No More Bad Fish! Wild Caught Seafood To Your Door**